**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE PLUG POWER, INC. SECURITIES LITIGATION | No. 1:21-cv-2004-ER<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**(LEAVE TO FILE MOTION TO DISMISS AND ADDITIONAL PAGES GRANTED 8/3/2021 AND 11/29/2021)** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION**
<u>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**</u>

Deborah S. Birnbach
Jennifer B. Luz
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel.: 617.570.1000
Fax: 617.523.1231
DBirnbach@goodwinlaw.com
JLuz@goodwinlaw.com

*Counsel for Defendants Plug Power Inc.,*
*Andrew Marsh, and Paul B. Middleton*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ................................................................................................................... 5

    A.    Plug Power Is A Rapidly Growing Market Leader In The Hydrogen Industry. ....................................................................................................... 5

    B.    Plug Power Has Raised Significant Capital To Finance Its Dramatic Growth. ....................................................................................................... 6

    C.    Plug Power Issued A Restatement Of Complex, Technical Accounting Issues In 2021. ....................................................................................... 7

    D.    Plug Power Identified A Material Weakness In Staffing Of Internal Controls Functions As Part Of Restatement. ..................................................... 11

ARGUMENT ..................................................................................................................... 11

I.    THE AC DOES NOT SUPPORT ANY INFERENCE OF SCIENTER, MUCH LESS THE REQUIRED STRONG INFERENCE. ....................................................... 13

    A.    The AC Does Not Plead Any Facts To Suggest Defendants Had Motive Or Opportunity To Engage In Fraud. ..................................................................... 14

        1.    Raising Capital Is A General Corporate Motive Not Indicative Of Scienter. .................................................................................... 15

        2.    Trading by Marsh and Middleton Was Pursuant To Rule 10b5-1 Plans And Not Suggestive Of Fraudulent Intent. .................................... 18

    B.    Plaintiff Does Not Allege Particularized Facts Showing That Defendants Knew Or Were Extremely Reckless In Not Knowing That Any Statement Was False When Made. ..................................................................................... 21

        1.    The AC Pleads No Specific Facts Demonstrating That Plug Power Knew Or Was Reckless In Not Knowing There Were Errors In Its Accounting Judgments. ................................................................. 23

        2.    The Magnitude Of The Restatement Does Not Suggest Scienter Because There Was No Impact On Plug Power's Cash Position, Business Operations, Or Economics Of Commercial Arrangements. .................................................................................... 28

        3.    Complex And Technical Accounting Judgments Are Not Plug Power's Core Operations And Are Not A Basis For Inferring Scienter ........................................................................................ 30

        4.    SOX Certifications Are Not Indicative of Scienter. .............................. 32

    C.    The Non-fraudulent Inferences Far Outweigh Any Inference Of Scienter.......... 33

II.    THE AC FAILS TO PLEAD LOSS CAUSATION. ...................................................... 34

III.    PLAINTIFF'S SECTION 20(a) CLAIM MUST BE DISMISSED. .............................. 35

CONCLUSION .................................................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995) .................................................................................. *passim*

*In re Agnico-Eagle Mines Ltd. Sec. Litig.*,
No. 11 Civ. 7968, 2013 WL 144041 (S.D.N.Y. Jan. 14, 2013).........................................16, 17

*Alaska Elec. Pension Fund v. Asar*,
768 F. App'x 175 (5th Cir. 2019) ......................................................................................12

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
980 F. Supp. 2d 564 (S.D.N.Y. 2013).....................................................................................16

*In re Bristol-Myers Squibb Sec. Litig.*,
312 F. Supp. 2d 549 (S.D.N.Y. 2004)..................................................................13, 15, 23, 29

*Chapman v. Mueller Water Prods., Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020)....................................................................................29

*City of Brockton Ret. Sys. v. Shaw Grp.*,
540 F. Supp. 2d 464 (S.D.N.Y. 2008)..................................................................13, 29, 33, 34

*In re CRM Holdings, Ltd. Sec. Litig.*,
No. 10 Civ. 975, 2012 WL 1646888 (S.D.N.Y. May 10, 2012)............................................20

*In re Cross Media Mtkg. Corp. Sec. Litig.*,
314 F. Supp. 2d 256 (S.D.N.Y. 2004)....................................................................................17

*Dobina v. Weatherford Int'l Ltd.*,
909 F. Supp. 2d 228 (S.D.N.Y. 2012)................................................................................. *passim*

*In re DRDGOLD Ltd. Sec. Litig.*,
472 F. Supp. 2d 562 (S.D.N.Y. 2007)...........................................................................16, 17

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005).............................................................................................................34

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)............................................................................................. *passim*

*El Dabe v. Calavo Growers, Inc.*,
719 F. App'x 607 (9th Cir. 2018) .......................................................................................12

*In re Express Scripts Holding Co. Sec. Litig.*,
  No. 16 Civ. 3338 (ER), 2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017) ..........................1, 13, 30

*Francisco v. Abengoa, S.A.*,
  481 F. Supp. 3d 179 (S.D.N.Y. 2020).............................................................................. *passim*

*Frankfurt-Trust Inv. Luxemburg AG v. United Techs. Corp.*,
  336 F. Supp. 3d 196 (S.D.N.Y. 2018)......................................................................................32

*Fries v. Northern Oil & Gas, Inc.*,
  285 F. Supp. 3d 706 (S.D.N.Y. 2018).............................................................................13, 33

*In re Gentiva Sec. Litig.*,
  932 F. Supp. 2d 352 (E.D.N.Y. 2013) ....................................................................................35

*In re Gildan Activewear, Inc. Sec. Litig.*,
  636 F. Supp. 2d 261 (S.D.N.Y. 2009)......................................................................................19

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011).........................................................................18, 19, 25

*In re Glenayre Techs., Inc. Sec. Litig.*,
  No. 96 CIV. 8252, 1998 WL 915907 (S.D.N.Y. Dec. 30, 1998) .............................................19

*In re Hain Celestial Grp. Inc. Sec. Litig.*,
  No. 2:16-cv-04581, 2020 WL 1676762 (E.D.N.Y. Apr. 6, 2020)............................................20

*Hensley v. IEC Elec. Corp.*,
  No. 13-CV-4507, 2014 WL 4473373 (S.D.N.Y. Sept. 11, 2014).........................24, 31, 32, 35

*In re Hertz Glob. Holdings Inc.*,
  905 F.3d 106 (3d Cir. 2018)....................................................................................................12

*In re Iconix Brand Grp., Inc.*,
  No. 15 Civ. 4860, 2017 WL 4898228 (S.D.N.Y. Oct. 25, 2017) ................................... *passim*

*Jackson v. Abernathy*,
  960 F.3d 94 (2d Cir. 2020)......................................................................................................12

*In re JP Morgan Chase Sec. Litig.*,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005).....................................................................................29

*Kalnit v. Eichner*,
  264 F.3d 131 (2d Cir. 2001)..............................................................................................17, 22

*In re Kandi Techs. Grp., Inc. Sec. Litig.*,
  No. 17 Civ. 1944 (ER), 2019 WL 4918649 (S.D.N.Y. Oct. 4, 2019).............................. *passim*

*Kasilingam v. Tilary, Inc.*,
No. 20-cv-03459, 2021 WL 4429788 (S.D.N.Y. Sept. 27, 2021) ...........................................17

*In re Keyspan Corp. Sec. Litig.*,
383 F. Supp. 2d 358 (E.D.N.Y. 2003) ...............................................................................21

*Knurr v. Orbital ATK Inc.*,
272 F. Supp. 3d 784 (E.D. Va. 2017) ................................................................................21

*Koplyay v. Cirrus Logic, Inc.*,
No. 13 Civ. 790, 2013 WL 6233908 (S.D.N.Y. Dec. 2, 2013)........................................19, 20

*Lentell v. Merrill Lynch & Co., Inc.*,
396 F.3d 161 (2d Cir. 2005)..............................................................................................34

*Lipow v. Net1 UEPS Techs., Inc.*,
131 F. Supp. 3d 144 (S.D.N.Y. 2015)................................................................1, 22, 30, 35

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014)............................................................................12, 19, 20

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
26 F. Supp. 3d 278 (S.D.N.Y. 2014)...................................................................25, 26, 27, 34

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
616 F. App'x 442 (2d Cir. 2015) .....................................................................................12, 25

*Medis Inv. Grp. v. Medis Techs., Ltd.*,
586 F. Supp. 2d 136 (S.D.N.Y. 2008), *aff'd* 328 F. App'x 754 (2d Cir. 2009).......................22

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)..............................................................................................16

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010)..............................................................................................35

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*,
153 F. Supp. 3d 628 (S.D.N.Y. 2015)................................................................................22

*Plymouth Cnty. Ret. Assoc. v. ViewRay, Inc.*,
No. 1:19-cv-2115, 2021 WL 3773330 (N.D. Ohio Aug. 25, 2021)........................................21

*In re PXRE Grp., Ltd., Sec. Litig.*,
600 F. Supp. 2d 510 (S.D.N.Y. 2009)................................................................................16

*Reilly v. U.S. Physical Therapy, Inc.*,
No. 17 Civ. 2347, 2018 WL 3559089 (S.D.N.Y. July 23, 2018) ................................... *passim*

*In re Rockwell Med., Inc. Sec. Litig.*,
No. 16 Civ. 1691, 2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) ....................................25, 31

*Rombach v. Chang*,
355 F. 3d 164 (2d Cir. 2004)...........................................................................................15

*Russo v. Bruce*,
777 F. Supp. 2d 505 (S.D.N.Y. 2011)................................................................................16

*Shemian v. Research in Motion Ltd.*,
No. 11 Civ. 4068, 2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ..........................................30

*In re Sina Corp. Sec. Litig.*,
No. 05 Civ. 2154, 2006 WL 2742048 (S.D.N.Y. Sept. 26, 2006)...........................................21

*Slayton v. Am. Express Co.*,
604 F.3d 758 (2d Cir. 2010)............................................................................................13

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
531 F.3d 190 (2d Cir. 2008).............................................................................................12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)................................................................................................4, 13, 33

*Thomas v. Shiloh Indus., Inc.*,
No. 15-cv-7449, 2017 WL 1102664 (S.D.N.Y. Mar. 23, 2017).............................................29

*Tyler v. Liz Claiborne, Inc.*,
814 F. Supp. 2d 323 (S.D.N.Y. 2011)................................................................................32

*Venkataraman v. Kandi Techs. Grp., Inc.*,
No. 20 Civ. 8082, 2021 WL 4952260 (S.D.N.Y. Oct. 25, 2021) ...........................4, 14, 29, 32

*Villare v. Abiomed, Inc.*,
No. 19 Civ. 7319 (ER), 2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021) ......................... *passim*

*Wyche v. Advanced Drainage Sys., Inc.*,
No. 15 Civ. 5955, 2017 WL 971805 (S.D.N.Y. Mar. 10, 2017) ...........................4, 25, 27, 29

**Statutes**

Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a)............................................ *passim*

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u..................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 9(b) ................................................................................................1, 12, 23

Fed. R. Civ. P. 12(b)(6)..............................................................................................................1

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ................................................................ *passim*

Defendants Plug Power Inc. ("Plug Power" or the "Company"), Andrew Marsh, and Paul B. Middleton (together with Marsh, "Individual Defendants") respectfully move pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u (the "PSLRA"), to dismiss the Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws (the "AC") with prejudice.

## PRELIMINARY STATEMENT

Plug Power is a leading provider of clean hydrogen energy, operating on the forefront of the "paradigm shift in the power, energy, and transportation industries to address climate change and energy security and to meet sustainability goals." Ex. B (2020 Form 10-K), at 8[1]; *see* AC ¶ 30. Using "green hydrogen," the Company is deploying its fuel cells and hydrogen solutions in "high growth markets," bringing clean power sources and refueling stations directly onsite to the world's largest retail-distribution and manufacturing facilities, including Amazon, BMW, Walmart, and The Home Depot. Ex. B at 9; *see* AC ¶ 31. After operating for more than 20 years (AC ¶ 29), Plug Power's fuel solutions gained significant traction and the Company experienced tremendous growth in 2020, growing from a $959 million market capitalization at the end of 2019 to a $15.5 billion market capitalization at the end of 2020. Ex. W (Bloomberg Data); *see* AC ¶ 52. Plug Power's success in the clean energy industry reflects its continued significant investment in innovation and its ability to scale its worldwide reach. *See* AC ¶ 34.

---

[1] The Court may consider the AC's allegations, as well as the exhibits attached to the accompanying Declaration of Deborah S. Birnbach, which are referenced in the AC and/or filed with the SEC, or are relevant press releases, conference call transcripts, and analyst reports whose authenticity is not in dispute. "The Court may 'take judicial notice of public disclosure documents that must be filed with the SEC and documents that both bear on the adequacy of SEC disclosures and are public disclosure documents required by law." *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 197 (S.D.N.Y. 2020). "[M]atters of which judicial notice can be taken include press coverage establishing what information existed in the public domain during periods relevant to the plaintiffs' claims." *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 158 (S.D.N.Y. 2015); *see In re Kandi Techs. Grp., Inc. Sec. Litig.*, 2019 WL 4918649, at *1 n.1 (S.D.N.Y. Oct. 4, 2019) (court may consider "press releases and earnings call transcripts" on motion to dismiss); *In re Express Scripts Holding Co. Sec. Litig.*, 2017 WL 3278930, at *1 n.1 (S.D.N.Y. Aug. 1, 2017) (same). Unless noted, all emphasis is added and all citations are omitted.

During this transformative growth in a newly developing industry, the Company's accounting resources were strained. *See* AC ¶ 34. On February 24, 2021, prior to releasing its 2020 fourth quarter results, the Company and the Audit Committee discussed the fourth quarter results and no material issues were raised. AC ¶ 95; Ex. O (3/16/21 Form 8-K), at 2. After those results were released, in the course of finalizing the audit, the Company's independent auditor KPMG LLP ("KPMG") identified for the first time that there may be issues with the Company's application of certain complex and technical accounting principles, despite KPMG's prior years of clean audit opinions on the Company's financial statements that included the same applications of the same accounting principles. *See* Ex. O. Plug Power promptly disclosed the potential issue, which did not result from any override of controls or misconduct. Ex. C (3/2/20 Form NT 10-K); *see* AC ¶ 159. After the issues were identified, Plug Power restated its 2018, 2019 and 2020 quarterly financial results to correct for these errors in several technical accounting areas. *See* AC ¶ 108. The restatement did not change the overall financial picture of the Company: revenue remained largely the same and the adjustments were not cash adjustments. *See* AC ¶ 162. Rather, certain balance sheet items were adjusted to reflect new judgments on certain complex accounting, including the reported book value of right of use lease assets and related financial obligations, loss accruals for certain service contracts, impairment of certain long-lived assets, and classification of certain costs, resulting in a decrease in research and development ("R&D") operating expenses and a corresponding increase in the cost of revenue. *See* AC ¶¶ 108-20. The Company also disclosed a material weakness over internal controls, namely that the Company did not have a sufficient team in place with respect to internal control over financial reporting during this period of dynamic growth in the business. *See* AC ¶ 118.

Following these disclosures and a drop in Plug Power's stock price, Plaintiff now claims

securities fraud, and that Andrew Marsh (the Company's President, CEO, and a director) and Paul

Middleton (the Company's CFO) purposefully orchestrated a "ploy" to misclassify costs related

to fuel delivery as R&D, so as to inflate gross profits—*despite the fact that the Company has*

*always reported net losses*—so that Plug Power could secure additional financing and they could

continue selling stock pursuant to trading plans. *See* AC ¶¶ 46, 103. Plaintiff's theory is not based

on contemporaneous documents or witness statements. *Cf.* AC ¶¶ 163-98. Instead, the AC argues

that fraudulent intent can be inferred under the "core operations doctrine," from the magnitude of

the restatement, and from Marsh's and Middleton's Sarbanes-Oxley certifications ("SOX

Certifications") of the earlier financial statements. *See* AC ¶¶ 168-83, 195-98. But a financial

restatement is not securities fraud, and all of these allegations taken together do not lead to a strong

inference of scienter necessary to survive dismissal because:

- **The AC Does Not Plead Motive Based On The Company's Capital Raises**. General motives such as raising capital and obtaining the most favorable prices for a transaction funded by stock are motives attributable to all corporate officers and are not evidence of scienter. *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 195 (2d Cir. 2009) ("Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable . . . do not constitute 'motive' for purposes of this [scienter] inquiry."); *cf.* AC ¶¶ 173-83.

- **Routine Trading by Marsh and Middleton Is Not Evidence of Fraudulent Motive**. Trading by insiders is not evidence of motive unless it is unusual or suspicious. The trading alleged here is neither: all trades were pursuant to Rule 10b5-1 trading plans, Marsh's and Middleton's trading during the class period was less than their trading before the class period, and the trades did not occur soon after any alleged misstatements or soon before any alleged corrective disclosures. *Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *21 (S.D.N.Y. Sept. 21, 2021) (no scienter because "the mere fact that insider stock sales occurred is not sufficient to establish scienter; instead, a plaintiff must establish that the sales were unusual or suspicious"); *cf.* AC ¶¶ 184-94.

- **The AC Does Not Plead Any Facts Suggesting Scienter, Much Less With Particularity**. The AC lacks a single specific fact to suggest that Marsh, Middleton or anyone else at Plug Power knew at the time that the Company was misapplying the complex and technical accounting principles related to the one restatement item alleged to be fraud, R&D: there is no document cited, no witnessed conversation, and no facts alleged showing how Defendants knew what they were doing was incorrect, or even recklessly ignored information that rendered their prior statements untrue. That the

-3-

financial statements were independently audited by KPMG, and KPMG repeatedly issued clean audit opinions on the prior audited financial statements that included these technical accounting judgments, suggests that the reasonable inference is not fraudulent intent, but that the accounting guidance was so complex that Defendants were not reckless in classifying certain costs as R&D. *See Wyche v. Advanced Drainage Sys., Inc.*, 2017 WL 971805, at *17 (S.D.N.Y. Mar. 10, 2017) (no scienter where "the Company's independent auditor, Deloitte, found no issues when performing its audits," suggesting that the accounting at issue "was no easy task, even for a party with significant knowledge and expertise"); *cf.* AC ¶¶ 163-98.

- **The Magnitude Of The Restatement Does Not Imply Scienter**. Plaintiff argues that the magnitude of the restatement implies scienter. But here, the restatement did not suddenly reveal a cost that was previously hidden; it reclassified to a different line item expense information previously disclosed, and the Company's cash and overall net loss remained relatively stable. *See In re Iconix Brand Grp., Inc.*, 2017 WL 4898228, at *17 (S.D.N.Y. Oct. 25, 2017) (declining to infer scienter based on magnitude of restatement because "[t]he fact of an error, even a large error, does not suggest knowledge or intent to misstate when the financial results were originally published"); *cf.* AC ¶ 167.

- **The Core Operations Doctrine Does Not Apply**. Even if the core operations doctrine was still viable in the Second Circuit (which is far from certain), accounting principles or internal controls are not core to Plug Power's operations. Even if the business underlying the accounting issues was considered, neither accounting for R&D nor for fuel delivery are the "core function" of the Company. *Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *19 (S.D.N.Y. July 23, 2018) (no inference of scienter based on core operations doctrine in a restatement case because the company's "core operation is . . . not accounting"); *cf.* AC ¶¶ 168-72.

- **SOX Certifications Are Not Evidence of Scienter**. SOX certifications "typically add nothing to the scienter calculus" because that would "eviscerate the pleading requirements set forth in the PSLRA," *Reilly*, 2018 WL 3559089, at *19. This is especially true where, as here, the accounting guidance is complex and there are no "glaring accounting irregularities or other red flags, about which the certifying defendant had a reason to know." *Venkataraman v. Kandi Techs. Grp., Inc.*, 2021 WL 4952260, at *4 (S.D.N.Y. Oct. 25, 2021) (no inference of scienter in restatement case because "nothing about [SOX certification] ordinarily sheds light on the state of mind of the person executing it"); *cf.* AC ¶¶ 195-98.

Plaintiff alleges that he can think of "no explanation [for the restatement] but for fraud and severe recklessness." AC ¶ 171. But the Court must weigh both the inferences urged by Plaintiff and the competing inferences, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007), and the non-culpable explanation is the far more compelling inference here: during a period of enormous growth and product innovation, Plug Power erred in applying complicated technical

accounting principles after years of its independent auditors' signing clean audit opinions using that very accounting, and no one realized the errors until KPMG identified issues during the conclusion of its annual audit after the fourth quarter earnings release on February 25, 2021.

The AC should also be dismissed for the independent reason that it does not plead loss causation. Absent a primary violation of § 10(b)(5), the § 20(a) claim should also be dismissed, and the AC should be dismissed in its entirety with prejudice.

## BACKGROUND

### A.     Plug Power Is A Rapidly Growing Market Leader In The Hydrogen Industry.

Plug Power is a market leader in the "paradigm shifting" clean energy industry and the leading provider of comprehensive hydrogen fuel cell turnkey solutions. AC ¶¶ 5, 29; Ex. B at 8. Plug Power's technology enables customers to operate in a more efficient and environmentally sustainable manner. AC ¶¶ 30-31; Ex. B at 8. Its innovative technology involves combining hydrogen and oxygen to produce electricity used to power forklifts and other vehicles of customers such as Amazon, The Home Depot, The Southern Company, BMW, Carrefour, and Walmart. AC ¶¶ 5, 31; Ex. B at 8-9. Plug Power sells these customers fuel cells and can install hydrogen fueling infrastructure onsite, say at an Amazon warehouse. AC ¶ 31; Ex. B at 40. The Company has deployed more fuel cell systems than anyone else in the world, and is the largest purchaser of liquid hydrogen, having built and operated a hydrogen highway across North America. AC ¶¶ 5, 29-30; *see* Ex. B at 8-9. Plug Power is building North America's largest green hydrogen production facility in New York. Ex. M (2/25/21 Press Release ("PR")), at 1.

Plug Power's growth has been fast and exponential. *E.g.*, AC ¶ 52. Between 2019 and 2020, it increased its number of fuel cell systems sold by more than 50%—from 6,058 to 9,418. Ex. B at 40. During the same time period, it also increased its hydrogen fueling infrastructure sites nearly sevenfold—from four to 27. *Id*. This growth is reflected in Plug Power's financials: its net revenue

has increased by orders of magnitude from $40.0 million in 2016 to $149.9 million in 2019—a 375% increase in net revenue over a three-year period. *Id*. at 35.[2] The Company's market capitalization alone increased sixteen fold from 2019 to 2020. Ex. W.

A key part of Plug Power's growth is its partnerships with other industry leaders. *E.g.*, AC ¶ 70. During the class period alone, Plug Power entered into a number of significant partnerships with companies around the world. *Id.* In January 2021, Plug Power announced a joint venture with SK Group (the "SK Group JV"), the largest energy provider in South Korea, to "provide hydrogen fuel cell systems, hydrogen fueling stations, and electrolyzers to the Korean and broader Asian markets." Ex. H (1/7/21 Form 8-K), at Ex. 99.1; AC ¶ 177. It also announced a collaboration with French company Gaussin to deploy a commercial suite of hydrogen-powered vehicles to logistical centers in Europe; a joint venture with French company Groupe Renault to deploy fuel cell light commercial vehicles in Europe; and a joint venture with the largest renewable power retailer in Spain, ACCIONA. Ex. G (11/30/20 PR), Ex. I (1/12/21 PR), Ex. L (2/16/21 PR); *see* Ex. B at 78.

**B.      Plug Power Has Raised Significant Capital To Finance Its Dramatic Growth.**

In light of the Company's exciting developments, it is no surprise that Plug Power's investment in itself "accelerated" by FY2020. AC ¶ 33. Hand-in-hand with its growth, Plug Power invested heavily in R&D, which is essential to Plug Power's "ability to compete successfully." Ex. B at 12; *see* AC ¶ 34. To finance this continued growth and innovation, Plug Power—*which has never reported a net profit*—raised funds in several ways. *See* AC ¶ 46. In November 2020, Plug Power raised approximately $1 billion through an offering that "uniquely position[ed] Plug Power to execute and accelerate on its green hydrogen strategy as well as other strategic growth initiatives." AC ¶ 64; Ex. F (11/24/20 PR), at 1. Shortly after, in January 2021, as part of the SK

---

[2] Although the Company did not experience an increase in net revenue in 2020, that is due to a charge related to the accelerated vesting of certain Amazon warrants resulting in a decrease in revenue of $339.7 million. Ex. B at 38, 40.

Group JV described above, SK Group acquired approximately 51.4 million shares of Plug Power's stock for $1.5 billion. AC ¶¶ 70-71. As Marsh put it, "[t]he current relationship with SK Group offers immediate strategic benefits to Plug Power to accelerate its expansion into Asian markets – and is intended to result in a formal joint venture (JV) by 2022. Due to the complementary strengths in this partnership, we expect rapid growth and significant revenue generation from the joint venture that are incremental to our 2024 plan." Ex. H at Ex. 99.l; *see* AC ¶¶ 70-72. A month after that, in February 2021, Plug Power raised additional capital of more than $2 billion through an offering that "position[ed] Plug power to execute and accelerate it's green hydrogen and overall growth strategy." Ex. K (2/9/21 PR), at 1; *see* AC ¶¶ 82, 92-93.

> ### C.    Plug Power Issued A Restatement Of Complex, Technical Accounting Issues In 2021.

Since 2001, Plug Power has retained independent auditor KPMG to audit its financial statements. Ex. B at F-4. Every year, Plug Power has received clean audit opinions from KPMG. *E.g.*, Ex. P (2018 Audit Letter); Ex. Q (2019 Audit Letter). As far as Plug Power knew at the time of its earnings call for the fourth quarter of FY2020 on February 25, 2021, it was on track to receive another clean audit opinion for its FY2020 financial statements. *See* Ex. B at 3.

After that earnings call, however, in the course of finalizing the audit, KPMG for the first time identified several errors with the Company's previously issued financial statements that eventually necessitated a restatement of the Company's prior financials.[3] Ex. B at 3; *see* AC ¶ 157. On March 2, the Company disclosed that it had uncovered potential issues and would not timely file its annual report. AC ¶ 95; Ex. C (3/2/20 Form NT 10-K). The identified accounting issues

---

[3] As outside analysts explain, "there was a change in the KPMG Partner assigned to PlugPower [for the audit of Plug Power's FY2020 financials], which is required every 5 years." Ex. R (3/16/21 Cowen Analyst Report), at 1; *see also* Ex. S (3/17/21 Craig-Hallum Analyst Report), at 1 (The decision to restate "was made during the finalization of the audit and, we believe, was due in part to a change in the audit partner overseeing PLUG (occurs every 5 years).").

were "complex and technical and involve[d] significant judgments in applying U.S. GAAP," made even more complicated by the "unprecedented, dynamic, and innovative nature of the Company's business and its position in a nascent and rapidly developing industry." Ex. O at 3; Ex. N (3/16/21 Form 8-K, with PR); *see* AC ¶ 159. These complicated accounting issues did not "impact cash and cash equivalents or the economics of the Company's existing or future commercial arrangements." Ex. O at 2; *see* AC ¶ 159. Nor did they impact the Company's gross billing targets or business partnerships. Ex. N at Ex. 99.1 (3/16/21 Form 8-K, with PR). The accounting issues were not due to "any override of controls or misconduct." Ex. O at 2; *see* AC ¶ 159. And they were all part of the Company's prior financial statements on which KPMG had previously issued clean audit opinions. *See* Ex. P (2018 Audit Letter); Ex. Q (2019 Audit Letter). KPMG's new view on these accounting judgments impacted Plug Power's prior financial statements, and on March 16, 2021, Plug Power and its Audit Committee concluded and disclosed that the Company needed to restate its financials for prior periods. Ex. O at 2; *see* AC ¶ 157.

On May 13, 2021, Plug Power filed a Form 10-K restating its financials for 2018, 2019, and the earlier quarters of 2020 to correct these accounting errors. Ex. B at 110; *see* AC ¶ 162. The restatement corrected the following highly technical non-cash errors:

(a) $112.7 million overstatement of the right of use assets related to operating lease liabilities at December 31, 2019, due to the Company incorrectly calculating the operating lease liability associated with certain sale/ leaseback transactions;

(b) ($1.6) million understatement of benefit for loss contracts related to service on the Statement of Operations for the year ended December 31, 2019, inclusive of the partial release of the 2018 accrual to the cost of services performed on fuel cells and related infrastructure, and a $5.3 million understatement of the provision for loss contracts for the year ended December 31, 2018, due to the Company not properly estimating the loss accrual related to extended maintenance contracts;

(c) $19.5 million and $21.2 million, overstatement of gross profit (loss) for the years ended December 31, 2019 and 2018, respectively, due to the Company not properly presenting certain costs related to research and development activities and cost of revenues;

(d) $1.8 million recording of a deemed dividend for certain conversions of the Company's

Series E Convertible Preferred Stock settled in common stock during the year ended December 31, 2019;

(e) The Company determined that the amount recorded to accumulated deficit as of January 1, 2018 for a cumulative adjustment of approximately $3.4 million was the correction of an error in prior lease accounting. As a result of the correction of this error, the $3.4 million charge to accumulated deficit is now reflected in the beginning accumulated deficit for the 12 months ended December 31, 2018; and

(f) $5.3 million understatement of bonus expense and related payroll taxes for the three months ended September 30, 2020, due to the Company not properly estimating bonus expense for the nine month period ended September 30, 2020. AC ¶ 108; Ex. B at 3-4.

Despite the range of complex accounting judgments restated, the AC alleges misstatements exclusively on Items (b) and (c), which relate to the classification of certain costs related to R&D.[4] AC ¶¶ 108, 133, 135, 141, 147, 154; Ex. A (Chart of AC's Alleged False Statements), at 1. Plug Power invests in R&D across its entire platform, continually developing new and enhancing existing products, services, and technologies. AC ¶ 34; Ex. B at 12. R&D costs include "materials to build development and prototype units, cash and non-cash compensation and benefits for engineering and related staff, expenses for contract engineers, fees paid to consultants for services provided, materials and supplies consumed, facility related costs such as computer and network services, and other general overhead costs associated with research and development activities," and are recorded as an "operating expense: research and development." Ex. B at 44; *see* AC ¶ 38.

After KPMG raised issues while finalizing its audit following the announcement of 2020 fourth quarter results, the Company determined for the first time that certain costs were not appropriately classified as R&D operating expenses on the Company's financial statements—Item (c) of the restatement. *See* AC ¶ 109. Less than half of the reclassified R&D expenses concern costs associated with hydrogen fuel deliveries, which were restated as "cost of revenue: fuel

---

[4] Other restatement items, not the subject of this lawsuit, such as the overstatement of the right of use assets relating to operating lease liabilities, were more significant changes than the reclassification of R&D expenses. *E.g.*, AC ¶ 108 (right of use asset adjustment was $112.7 million at December 31, 2019); Ex. B at 3.

delivered to customers." Ex. B at F-17-18, F-30-31; *see* AC ¶¶ 110-12. Importantly, the restatement did not reveal any expense that was previously hidden; rather, certain costs were moved from one part of the income statement to another. *Id*. Specifically, as Table 1 shows, while the change increased Plug Power's cost of revenue for FY2019, FY2018, and the first three quarters of FY2020, it simultaneously decreased Plug Power's operating expenses for those periods. *Id*.

| Table 1:  Plug Power's Restatement Adjustments | | | |
|---|---|---|---|
| **Reporting Period** | **Restatement Adjustment for Cost of Revenue** | **Restatement Adjustment for R&D Operating Expenses** | **Source (Ex. B)** |
| FY2018 | Increase of $8.3 million | Decrease of $21.2 million | F-18 |
| FY2019 | Increase of $8.9 million | Decrease of $19.5 million | F-17 |
| Nine months ending 9/30/2020 | Increase of $7 million | Decrease of $15.9 million | F-30-31 |

As a result, the restatement had a relatively modest impact on the Company's bottom line net loss. As Table 2 shows, the restatement had little to no impact on Plug Power's net loss in ten of the eleven quarters that the Company restated in 2018, 2019, and 2020.[5]

| Table 2:  Plug Power's Net Loss | | | | |
|---|---|---|---|---|
| **Reporting Period** | **As Previously Reported (Thousands)** | **As Restated (Thousands)** | **Difference (Thousands)** | **Source (Ex. B)** |
| FY2018 | ($78,115) | ($85,608) | ($7,493) | F-18 |
| FY2019 | ($85,465) | ($83,743) | $1,722 | F-17 |
| Three months ending 3/31/2020 | ($37,479) | ($37,432) | ($47) | F-32 |
| Three months ending 6/30/2020 | ($8,656) | ($9,401) | ($745) | F-31 |
| Three months ending 9/30/2020 | ($39,379) | ($65,217) | ($25,838) | F-30 |

---

[5] The comparatively larger adjustment for the three months ending September 30, 2020 is primarily due to a "$21.0 understatement of the provision for loss contracts . . . due to the Company not properly estimating the loss accrual related to extended maintenance contracts." Ex. B at F-22; *id*. at 43 ("based on historical experience, [] certain cost down initiatives were taking longer to achieve than originally estimated. As a result, the Company increased its estimated projected costs to service fuel cell systems and related infrastructure").

The reclassification of certain R&D costs had a waterfall effect on loss accruals, which are potential losses related to Plug Power's extended maintenance contracts—Item (b) of the restatement. AC ¶¶ 45, 116; Ex. B at 3. Each quarter, Plug Power estimates the cost to provide maintenance services to its customers, and how much unearned revenue it expects to receive from those contracts. Ex. B at 62; *see* AC ¶ 116. If the expected costs of providing services is more than the expected revenue, a loss is recorded on the Company's financial statements as a "cost of revenue: provision for loss contracts related to service." *Id*. When the Company decided for the first time in 2021 that certain costs previously classified as an R&D "operating expense" should instead be recorded as a "cost of revenue," the expected cost of providing services under certain contracts increased and became more than the unearned revenue on those contracts in FY2018 and FY2020, increasing the cost of revenue in those years. AC ¶¶ 108, 117; Ex. B at 3, 62.[6]

### D.    Plug Power Identified A Material Weakness In Staffing Of Internal Controls Functions As Part Of Restatement.

As part of the restatement, the Company assessed the effectiveness of its internal controls over financial reporting and identified a "material weakness in internal control over financial reporting." Ex. B at 3; *see* AC ¶ 118. More specifically, the Company reported that it "did not maintain a sufficient complement of trained, knowledgeable resources to execute their responsibilities with respect to internal control over financial reporting for certain financial statement accounts and disclosures." Ex. B at 25; *see* AC ¶ 118. In other words, as the Company underwent rapid growth, the noncore but still important functions in accounting and internal controls did not keep up with the dramatic growth and complexity of the business. *See* AC ¶ 118.

### ARGUMENT

To state a securities fraud claim under Section 10(b) of the Exchange Act and Rule 10b-5,

---

[6] The cost of revenue actually *decreased* by $394,000 in FY 2019. Ex. B at 62.

Plaintiff must plead, among other things, (i) a strong inference of scienter; (ii) a material misrepresentation; and (iii) loss causation. *ECA,* 553 F.3d at 195. The complaint must also meet the heightened pleading requirements of the PSLRA and Federal Rule of Civil Procedure 9(b) by "stating with particularity the circumstances constituting fraud," including "facts that give rise to a strong inference that the defendant acted with the required state of mind." *Id.* at 196. The allegations must "provide sufficient particularity . . . to support a plausible inference that is more likely than not that a securities law violation has been committed." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014). Complaints with far more particularized allegations than the AC are regularly dismissed with prejudice, and the Second Circuit routinely affirms. *See*, *e.g.*, *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020) (affirming dismissal for lack of scienter, despite "allegations that three employees knew of problems with" the company's products); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 616 F. App'x 442, 446 (2d Cir. 2015) (no scienter in a restatement case, despite allegations from nine confidential witnesses); *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (no scienter in a restatement case, despite allegations that senior executives had access to data suggesting the company's statements were inaccurate).[7] The AC falls well short of this exacting pleading standard and should be dismissed for at least two independent reasons: (i) Plaintiff fails to adequately plead scienter; and (ii) Plaintiff fails to adequately plead loss causation.

---

[7] Other circuits have similarly affirmed dismissals of securities fraud cases based on restatements with far more particularized allegations than the allegations in the AC. *E.g.*, *Alaska Elec. Pension Fund v. Asar*, 768 F. App'x 175, 181-83 (5th Cir. 2019) (affirming dismissal of restatement case for lack of scienter even though company overstated pre-tax income by $87 million, its executives traded company stock, and its Audit Committee found that executives "set an inappropriate tone at the top" and "engaged in inappropriate historical accounting practices"); *El Dabe v. Calavo Growers, Inc.*, 719 F. App'x 607, 608-09 (9th Cir. 2018) (same, even though the company overstated its earnings by $40 million, where the complaint failed to allege that defendants "were alerted to any possible defect" and its auditor, Ernst and Young LLP, issued clean audit reports for prior years); *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106 (3d Cir. 2018) (same, even though the company overstated its net income by $132 million (20.23%), its executives traded company stock, and the company admitted that "an inconsistent and sometimes inappropriate tone at the top . . . resulted in an environment which in some instances may have led to inappropriate accounting decisions").

## I.    THE AC DOES NOT SUPPORT ANY INFERENCE OF SCIENTER, MUCH LESS THE REQUIRED STRONG INFERENCE.

To plead scienter, Plaintiff must allege that a defendant acted with "a state of mind demonstrating 'an intent to deceive, manipulate or defraud.'" *Fries v. Northern Oil & Gas, Inc.*, 285 F. Supp. 3d 706, 720 (S.D.N.Y. 2018) (dismissing for lack of scienter); *Express Scripts*, 2017 WL 3278930, at *15 (dismissing for lack of scienter). Plaintiff must "allege facts with particularity that would give rise to a strong inference that the defendant acted with the required state of mind." *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (affirming dismissal for lack of scienter); *In re Kandi Techs. Grp., Inc. Sec. Litig.*, 2019 WL 4918649, at *4 (S.D.N.Y. Oct. 4, 2019) (dismissing claims arising from financial restatement for lack of scienter). A "strong inference" is one that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. This mandatory inquiry "requires courts to consider not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Fries*, 285. F. Supp. 3d at 720. "[I]t is well settled that mere fact of a restatement of earnings does not support a strong, or even a weak, inference of scienter." *City of Brockton Ret. Sys. v. Shaw Grp.*, 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008) (dismissing claims arising from financial restatement for lack of scienter); *see also In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 560 (S.D.N.Y. 2004) (dismissing for lack of scienter).

Scienter may be established by alleging facts that show either (1) that the defendants had the "motive and opportunity' to commit the alleged fraud, or (2) "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198; *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995). The AC attempts to plead both, but does not sufficiently allege either (1) or (2). The AC alleges that Defendants were motivated to raise capital and sell stock. But these

-13-

are general motivations attributable to every company and employee stockholder, and courts routinely reject such lackluster motivation allegations. *See ECA*, 553 F.3d at 198 ("Motives that are common to most corporate officers. . . do not constitute 'motive' for purposes of this inquiry"). The AC also attempts to plead that Defendants acted knowingly, or at least recklessly. However, the AC lacks specific factual allegations to suggest that anyone knew the accounting judgments were wrong at the time, instead alleging that Defendants *must have known* either because of the magnitude of the restatement, because the accounting judgments were supposedly core operations of the Company, or because of the Individual Defendants' SOX Certifications. These arguments, too, are routinely rejected. *See Iconix*, 2017 WL 4898228, at *17 (no scienter based on magnitude of restatement because "[t]he fact of an error, even a large error, does not suggest knowledge or intent to misstate when the financial results were originally published"); *Reilly*, 2018 WL 3559089, at *19 (no scienter based on "core operations" doctrine in a restatement case because company's "core operation is . . . not accounting"); *Venkataraman*, 2021 WL 4952260, at *4 (no scienter based on SOX certification in a restatement case because "nothing about it ordinarily sheds light on the state of mind of the person executing it"). The only cogent and compelling inference based on the factual allegations is that Plug Power's application of complex accounting guidance, previously the subject of clean audit opinions, was determined to be in error as part of KPMG's annual audit, and no one at Plug Power or its independent auditor believed the application of the guidance was in error at the time, not that Defendants knew or recklessly disregarded that it had erred on certain non-cash technical and complex accounting judgment calls.

### A. The AC Does Not Plead Any Facts To Suggest Defendants Had Motive Or Opportunity To Engage In Fraud.

The AC advances two theories of motive, neither of which suggest any inference of scienter, much less the strong and compelling inference required. *First*, Plaintiff alleges that the

Individual Defendants were financially motivated to commit fraud to raise capital for the Company. AC ¶¶ 173-84. *Second*, Plaintiff alleges that Marsh and Middleton were motivated by the potential to profit from trading Company shares. AC ¶¶ 184-94. Both allegations fail, however, because there are no specific facts pled to suggest that Defendants "benefited in some concrete and personal way from the purported fraud" that is different from ordinary corporate motivations. *ECA*, 553 F.3d at 198; *see Bristol-Myers Squibb*, 312 F. Supp. 2d at 561 (no scienter where plaintiff did not allege any "'concrete benefits' that would accrue to defendants as a result of the misstatements alleged"). "Exacting scrutiny" is applied to allegations of motive and opportunity. *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 243 (S.D.N.Y. 2012).

### 1. Raising Capital Is A General Corporate Motive Not Indicative Of Scienter.

Plaintiff alleges that the Individual Defendants were motivated to falsify financial statements "in order to attract the investment capital necessary to execute Plug Power's growth strategy." AC ¶¶ 174-83. Plaintiff points to the November 2020 offering (AC ¶¶ 55-64); the SK Group JV (AC ¶¶ 70-75); and the February 2021 offering (AC ¶¶ 81-94). According to Plaintiff, Plug Power could not have raised this capital if it did not appear profitable, and so Marsh and Middleton undertook a "ploy" to "inflate margins" and "inflate gross profits" by misclassifying costs of fuel delivery as an R&D operating expense. AC ¶ 103. Absent specific facts to support the AC's pejorative term "ploy," trying to make the Company look profitable in support of ordinary course securities offerings does not support an inference of fraud. *ECA*, 553 F.3d at 198 ("[T]he desire for the corporation to appear profitable . . . do[es] not constitute 'motive' for purposes of this [scienter] inquiry."); *Rombach v. Chang*, 355 F. 3d 164, 177 (2d Cir. 2004) ("[a]ction taken to maintain the appearance of corporate profitability, or the success of an investment . . . does not entail concrete benefits sufficient to demonstrate motive").

The desire to raise capital to fund growth is common to most companies, and cannot form the basis of a securities fraud claim. *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000). Otherwise, "it would require virtually every company in the United States that experiences a downturn in stock price to defend securities fraud actions." *Acito*, 47 F.3d at 54; *Dobina*, 909 F. Supp. 2d at 243. Courts routinely find such allegations inadequate. *See Dobina*, 909 F. Supp. 2d. at 242 (no scienter based on alleged motive "to fund its aggressive growth strategy"); *Francisco v. Abengoa*, 481 F. Supp. 3d 179, 212-15 (S.D.N.Y. 2020) (no scienter based on alleged motive to "avoid breaching debt covenants with its lenders, for the purpose of raising capital"); *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 585 n.8 (S.D.N.Y. 2013) ("alleged motive to raise capital is a generic one insufficient to support scienter"); *In re Agnico-Eagle Mines Ltd. Sec. Litig.*, 2013 WL 144041, at *16 (S.D.N.Y. Jan. 14, 2013) (no scienter based on alleged motive to "raise capital" to support "aggressive growth strategy"); *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 570 (S.D.N.Y. 2007) (no scienter in a restatement case based on motive "to inflate the price of DRD's stock, maintain the appearance of profitability or raise capital").[8]

Nor is the SK Group JV indicative of fraudulent intent by Marsh or Middleton. The SK Group JV was a "landmark" deal that signaled Plug Power's entry into the Asian market. AC ¶ 72. The transaction consisted of SK Group purchasing approximately 9.9% of the Company's issued and outstanding shares and the formation of a joint venture that would be a platform for Plug Power to "bring hydrogen solutions to Korea, China and Vietnam." *See* Ex. H (1/7/21 Form 8-K), at 2.[9]

---

[8] The AC does not allege that raising capital was essential for the Company's survival. Even where a complaint so alleges, courts routinely hold that the desire to raise capital does not support a finding of motive to commit fraud. *See, e.g. Russo v. Bruce*, 777 F. Supp. 2d 505, 519 (S.D.N.Y. 2011) (no scienter despite allegation of motive to "protect the very survival of the company" because this alleged motive was too general); *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 531-32 (S.D.N.Y. 2009) (no scienter based on "desire to maintain a high credit rating to raise money that is desperately needed or necessary to protect the very survival" of the company).

[9] If anything, the SK Group JV confirms that the non-fraudulent inference is far more compelling. It is implausible that Plug Power would jeopardize an important, long-term business relationship by defrauding its new partner, who was purchasing nearly 10% of Plug Power's stock during the class period and joining the Company's Board.

-16-

That Defendants wanted the transaction to be on favorable terms is not an indication of scienter. *Dobina*, 909 F. Supp. 2d at 243 ("an acquisition program funded by stock issuances…is not sufficient to allege scienter"); *see also ECA*, 553 F.3d at 201 (no scienter when plaintiffs failed to allege a connection between the alleged misstatements and the allegedly motivating acquisition); *Kalnit v. Eichner*, 264 F.3d 131, 141 (2d Cir. 2001) (no scienter where defendants allegedly inflated the stock price before acquisition because "the desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired" and "[s]uch generalized desires do not establish scienter"); *In re Cross Media Mtkg. Corp. Sec. Litig.*, 314 F. Supp. 2d 256, 264 (S.D.N.Y. 2004) (no scienter inferred from allegation that defendants wanted to "use inflated stock as currency" for an acquisition). If anything, this so-called motive evinces "a laudable desire . . . to protect shareholder investments," not an intent to defraud shareholders. *Agnico-Eagle Mines*, 2013 WL 144041, at *16; *see also DRDGOLD*, 472 F. Supp. 2d at 571 ("[t]he assertion that DRD sought to keep its share price elevated so that it could complete transactions on more favorable terms does not demonstrate defendants' intent to benefit themselves at the expense of the shareholders because the shareholders themselves would benefit from a superior transaction").

The AC contains no allegations that allegedly inflating the stock price to conduct offerings or to enter into the SK Group JV was done for personal gain, as opposed to things done "as part of the officers' and directors' financial responsibilities to the Company." *Kasilingam v. Tilary, Inc.*, 2021 WL 4429788, at *7 (S.D.N.Y. Sept. 27, 2021) (no inference of scienter because no allegation of how artificially inflating stock prices would provide a direct financial benefit to the individual defendants); *Cross Media Mtkg.*, 314 F. Supp. 2d at 265 (no motive based on capital raise because no concrete benefits to defendants).

Even if raising capital was suggestive of fraudulent intent (which it is not), it is not plausible that the accounting judgments at issue in the restatement were related to the Company's desire to raise funds. *See Dobina*, 909 F. Supp. 2d at 242 (absent a "unique connection" between fraud and acquisition, acquisition is not evidence of motive). Focusing on the reclassification of certain R&D expenses, Plaintiff alleges that Plug Power intentionally manipulated esoteric accounting principles in order to inflate gross profit by accounting for certain costs as R&D when such costs should have been accounted for in the costs of goods sold. AC ¶¶ 109. But the restatement had no meaningful impact on many of the Company's core financial metrics, including its revenues, net loss, cash positions, or the economics of its commercial relationships. *See* Ex. B at 4; Ex. O at 2. The AC does not allege that the offerings or joint venture were related to or dependent on gross profit, as opposed to these other fundamental economics of the Company.

> **2.    Trading By Marsh and Middleton Was Pursuant To Rule 10b5-1 Plans And Not Suggestive of Fraudulent Intent.**

Plaintiff's second theory of motive, that the Individual Defendants were motivated by the potential of profiting from sales of Plug Power shares they held, similarly fails. Insider "stock sales, standing alone, are insufficient to support a strong inference of fraudulent intent," unless Plaintiff "establish[es] that [the] stock sales were unusual." *Acito*, 47 F.3d at 54. Routine trading by Marsh and Middleton pursuant to Rule 10b5-1 trading plans during the class period was not unusual or suspicious, and is not indicative of scienter.[10]

All trades by Marsh and Middleton were executed pursuant to Rule 10b5-1 trading plans,

---

[10] The following factors are considered when determining if insider sales are "unusual or suspicious": "(1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider defendants selling; (5) whether sales occurred soon after statements defendants are alleged to have known were misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5-1 plans." *Villare*, 2021 WL 4311749, at *21.

*see* Ex. X (Marsh Trades); Ex. Y (Middleton Trades),[11] which "raise an inference that the sales were prescheduled and not suspicious." *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009) (dismissing case alleging insider sales of $96 million in gross profits for lack of scienter). There is no allegation that either trading plan was "entered into or strategically amended to take advantage of an inflated stock price or insider information." *Villare*, 2021 WL 4311749, at *21 ("ordinarily, trades pursuant to 10b5-1 plans do not raise a strong inference of scienter"); *Lululemon*, 14 F. Supp. 3d at 585 (no scienter where no allegation that the trading plan was entered into "strategically so as to capitalize on insider knowledge").

Nor was the amount of Marsh's and Middleton's stock sales suspicious. Marsh and Middleton traded fewer Plug Power shares during the four month class period than they did in the four months preceding the class period. From July 4, 2020 to November 8, 2020, Marsh sold 1.65 million shares—*approximately three times* the number of shares he sold during the class period. Ex. X at 1. During that same time period, Middleton sold 1.50 million shares—*almost seven times* the number of shares he sold during the class period. Ex. Y at 1. This alone makes their class period trades not suspicious. *See In re Glenayre Techs., Inc. Sec. Litig.*, 1998 WL 915907, at *4 (S.D.N.Y. Dec. 30, 1998) ("Insider stock sales are unusual where the trading was in amounts dramatically out of line with prior trading practices. . .").

The fact that Middleton obtained $7.6 million in gross proceeds from his class period sales (AC ¶ 185), does not render his class period sales suspicious. During the four months preceding the class period, Middleton obtained $18.8 million in net proceeds, dwarfing the $7.1 million[12] in

---

[11] When a complaint alleges only 'incomplete information' concerning insider sales, the court is 'free to consider' defendants' SEC filings to fill gaps on motion to dismiss." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011); *Koplyay v. Cirrus Logic, Inc.*, 2013 WL 6233908, at *6 n.1 (S.D.N.Y. Dec. 2, 2013) (same). The AC's allegations regarding trading could only have come from these same SEC filings, where the trades are disclosed.

[12] "Plaintiffs must allege not only the insider defendants' selling activity during the relevant period, but also those defendants' net profits as opposed to gross proceeds." *Glaser*, 772 F. Supp. 2d at 587. The AC alleges that Middleton

net proceeds he obtained from his class period sales. Ex. Y at 2-3. Similarly, Plaintiff's allegation that Marsh's class period sales "reduced [his] holdings by 43%" for $37.7 million in gross proceeds[13] (AC ¶ 188), even if true, does not render his sale suspicious.[14] Courts routinely find far more significant trading not indicative of scienter. *See Reilly*, 2018 WL 3559089, at *15 (sales of 44% of shares not suspicious); *In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at *23 (S.D.N.Y. May 10, 2012) ($37 million of sales of 100%, 36%, and 26% of shares not suspicious); *In re Hain Celestial Grp. Inc. Sec. Litig.*, 2020 WL 1676762, at *16 (E.D.N.Y. Apr. 6, 2020) ($80 million of sales of 74% and 66% of shares not suspicious); *Lululemon*, 14 F. Supp. 3d at 585 (sales of $81 and $50 million not suspicious).[15]

Where, as here, stock sales were made "neither at the beginning of the Class Period, soon after the allegedly misleading statements, nor clustered at its end, when insiders theoretically would have rushed to cash out before the fraud was revealed and stock prices plummeted," the timing of the sales is not suspicious. *Koplyay*, 2013 WL 6233908, at *5; *see Reilly*, 2018 WL 3559089, at *14 (no scienter where sales "were not calculated to maximize the personal benefit from undisclosed inside information"). The AC alleges false statements made on November 9, 2020, November 18, 2020, January 28, 2021, and February 25, 2021 (AC ¶¶ 127-54), but Middleton and Marsh sold shares on December 24, 2020 and January 19, 2021, respectively. Their

---

"netted" $7.6 million, but that is incorrect. *See* AC ¶ 185. After deducting the exercise price of the shares sold, Middleton recovered *net* proceeds of $7.1 million. Ex. Y at 2-3.

[13] The AC alleges that Marsh "netted" $37.7 million, but that is incorrect. *See* AC ¶ 188. After deducting the exercise price of the shares sold, Marsh recovered *net* proceeds of $36.1 million. Ex. X at 2.

[14] Plaintiff's allegation that Marsh sold 43% of his holdings (AC ¶ 188) refers to his exercise and sale of vested options pursuant to his trading plan on January 19, 2021. Aside from that day's activity, Marsh's total number of shares owned outright remained the same at the start and end of the class period. Ex. X (Marsh 1/21/21 Form 4). Moreover, taking into account Marsh's unvested holdings, Marsh in fact only exercised and sold approximately 20% of his overall holdings during the class period. Ex. Z (2021 Definitive Schedule 14A Proxy Statement); *see Acito*, 47 F.3d at 54.

[15] Plaintiff also alleges that the trading is indicative of scienter because the proceeds from the sales of these shares, which were obtained as equity compensation, were "material" in comparison to Marsh and Middleton's base salary. *See* AC ¶¶ 186, 191. But trading equity compensation at a profit is insufficient to show scienter. *See ECA*, 553 F.3d at 201 ("Incentive compensation can hardly be the basis on which an allegation of fraud is predicated."); *Acito*, 47 F.3d at 54 (same).

sales were not immediately after any of the alleged misstatements. *See Iconix*, 2017 WL 4898228, at \*15-16 (stock sales that occurred when "the alleged fraud was only just beginning to ramp up" not "unusual"); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 385 (E.D.N.Y. 2003) (four to six weeks between the allegedly fraudulent statements and insider sales "tends to negate any inference that defendants sought to reap the immediate benefit a falsely positive statement had on the market"). Nor were the sales timed to be immediately prior to the alleged corrective disclosures on March 2, 2021 and March 16, 2021 (AC ¶¶ 155-57). *See In re Sina Corp. Sec. Litig.*, 2006 WL 2742048, at \*12 (S.D.N.Y. Sept. 26, 2006) (stock sales more than a month before adverse disclosure not suspicious); *Keyspan*, 383 F. Supp. 2d at 385 (stock sales two months before adverse disclosure not suspicious).[16] Taken together, the AC fails to plead any facts to suggest that the stock sales at issue were unusual.

### B.   Plaintiff Does Not Allege Particularized Facts Showing That Defendants Knew Or Were Extremely Reckless In Not Knowing That Any Statement Was False When Made.

Absent motive to commit fraud, the AC must plead strong circumstantial evidence of conscious misbehavior or recklessness. *ECA*, 553 F.3d at 198; *Acito*, 47 F.3d at 52. To do so, Plaintiff must plead specific facts demonstrating conduct "that is at least highly unreasonable and which represents an *extreme departure from the standards of ordinary care* to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Villare*, 2021 WL 4311749, at \*22-23 (dismissing for lack of scienter despite confidential

---

[16] Nor is it "suspicious" that Marsh and Middleton exercised options that were not due to expire for a number of years. *See* AC ¶¶ 69, 80. Such an inference is unwarranted absent additional allegations indicating that the trades were suspicious. *E.g.*, *Plymouth Cnty. Ret. Assoc. v. ViewRay, Inc.*, 2021 WL 3773330, at \*19 (N.D. Ohio Aug. 25, 2021) (defendant's 2019 trades of options set to expire in 2020 and 2022 not suspicious); *Knurr v. Orbital ATK Inc.*, 272 F. Supp. 3d 784, 808-09 (E.D. Va. 2017) (no scienter even though "sales allegedly involved options that were not set to expire for several years"). Marsh's and Middleton's trading in the four months preceding the class period confirms their exercise of options years before expiration was not unusual—during that period Marsh exercised options expiring in 2024, 2028, and 2029; and Middleton exercised options expiring in 2024, 2025, 2026, and 2027. Ex. X (Marsh 7/8/20, 8/21/20, 9/1/20 Forms 4); Ex. Y (Middleton 7/8/20, 8/12/20, 10/14/20 Forms 4).

witness allegations); *Abengoa*, 481 F. Supp. 3d at 213 (dismissing for lack of scienter despite allegations of abrupt resignation of CEO and criminal charges). Recklessness is not "merely enhanced negligence;" instead, Plaintiff must plead "a state of mind approximating actual intent." *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 653, 655 (S.D.N.Y. 2015) (dismissing for lack of scienter due to lack of "particularized allegations supporting [such] an inference"); *Medis Inv. Grp. v. Medis Techs., Ltd.*, 586 F. Supp. 2d 136, 142 (S.D.N.Y. 2008), *aff'd* 328 F. App'x 754 (2d Cir. 2009) (dismissing for lack of scienter where plaintiff "fail[ed] to adduce" "strong and particularized circumstantial evidence" of recklessness). "Where the plaintiff pleads scienter by conscious misbehavior or recklessness rather than motive, the strength of the circumstantial allegations must be correspondingly greater." *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 162 (S.D.N.Y. 2015) (dismissing for lack of scienter despite allegations of DOJ and SEC investigations into the company); *see also Kalnit*, 264 F.3d at 131 (affirming dismissal for lack of scienter where allegations were "inadequate to demonstrate strong circumstantial evidence of defendants' conscious misbehavior or recklessness"). Despite this higher standard, the AC does not allege any facts, much less with particularity, to suggest anything different from what Plug Power disclosed: the "*errors were identified after the Company reported its 2020 fourth quarter and year end results on February 25, 2021 during the course of the audit with respect to the Company's financial statements for the year ended December 31, 2020.*" Ex. B at 3.

The AC contends that Marsh and Middleton knew—or were reckless in not knowing—that there were errors in the Company's application of highly technical accounting guidance, despite KPMG's annual clean audit opinions—under three different theories, none of which support an inference of scienter. *First*, the AC alleges that the magnitude of the restatement suggests that

Defendants must have known about the errors, AC ¶ 167; but the magnitude of the restatement is not indicative of scienter absent facts suggesting knowledge of the incorrect accounting judgments at the time. *Dobina*, 909 F. Supp. 2d at 250. *Second*, Plaintiff alleges that knowledge of the incorrect accounting judgments can be imputed to Marsh and Middleton under the "core operations doctrine," AC ¶¶ 168-72; but even if the core operations doctrine survived the enactment of the PSLRA (which is questionable), it does not stretch far enough to suggest that complex and technical accounting judgments concerning classification of a small portion of a power company's expenses are so core as to impute scienter. *Reilly*, 2018 WL 3559089, at *19. *Third*, the AC alleges that the SOX Certifications indicate scienter, AC ¶¶ 195-98; but absent any allegations that Marsh and Middleton knew or had reason to know of the problematic accounting judgments at the time, the certifications are not probative of scienter. *Reilly*, 2018 WL 3559089, at *19.

      **1.**      **The AC Pleads No Specific Facts Demonstrating That Plug Power Knew Or Was Reckless In Not Knowing There Were Errors In Its Accounting Judgments.**

The AC alleges that Defendants knew, or should have known, that certain financial metrics were misstated at the time those financial statements were disclosed, despite KPMG's review. For support, Plaintiff makes the conclusory assertion that Defendants knew or must have known "by virtue of their receipt of information reflecting the true facts." AC ¶ 164. But merely saying so is not enough. *Acito*, 47 F.3d at 53 ("[C]onclusory allegations of fraud do not satisfy the pleading requirements of Rule 9(b)."); *Bristol-Myers Squibb*, 312 F. Supp. 2d at 563 (conclusory allegations insufficient to establish scienter). Rather, "the complaint must specifically identify the reports or statements containing this information." *Villare*, 2021 WL 4311749, at *22; *Abengoa*, 481 F. Supp. 3d at 213 (same). This is especially so where, as here, the alleged misstatements relate to accounting that is "complex and technical and involves significant judgments in applying U.S. GAAP." *See* Ex. B at 3, F-14-15, F-21-22 (describing items restated and why). Highly technical

-23-

accounting errors with little impact on the company's bottom line—the errors at issue here—do not raise a strong inference of scienter.[17] *Hensley v. IEC Elec. Corp.*, 2014 WL 4473373, at \*6 (S.D.N.Y. Sept. 11, 2014) (no scienter when restatement turned net gain into net loss because the alleged "accounting error, however substantial . . . was highly technical in nature; did not affect the company as a whole"); *Iconix*, 2017 WL 4898228, at \*17 ("allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim").

Plaintiff must plead "far more than a misapplication of accounting principles." *Iconix*, 2017 WL 4898228 at \*17. The AC, however, does not identify a single admission, internal record, witnessed discussion, or communication to suggest that Marsh or Middleton, or anyone at Plug Power knew (or was warned) that the accounting judgments underlying those financial metrics were incorrect at the time or at any time before February 25, 2021, as the Company disclosed. Ex. B at 3 ("the errors were identified after the Company reported its 2020 fourth quarter and year end results on February 25, 2021."). There are no allegations that contradict Plug Power's disclosure that the misstatements were not attributable to "an override of controls or misconduct." Ex. O at 2. There are no allegations that the applicable accounting principles were anything other than "complex and technical" and required "significant judgments," (*id.* at 3), or that the accounting principles were so straightforward that Plug Power should have known that the application of those principles was incorrect. Nor is there any allegation that the costs that were reclassified from R&D to cost of fuel delivered were so obviously unrelated to R&D that it was reckless to categorize those costs as R&D. Without any such specific factual allegations, the AC fails to establish scienter. *See Iconix*, 2017 WL 4898228, at \*18 (no scienter despite restatement where complaint

---

[17] *See, e.g.*, Ex. U (5/14/21 Piper Sandler Analyst Report), at 1 ("the impacts to prior period revenue and eps were *de minimus* . . . there was no impact on cash position, gross billings or forward guidance from the restatement."); Ex. V (5/14/21 Craig-Hallum Analyst Report), at 1 ("Importantly, PLUG's restatement was *non-cash* in nature, had a *minimal impact* to revenues an EPS and *did not impact its overall business in a meaningful way*.").

"cites no internal reports, documents, or communications that shed light on Defendants' knowledge of or conduct concerning the Company's accounting practices"); *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *13 (S.D.N.Y. Mar. 30, 2018) (no scienter where complaint "fails to reference a single internal [] document or confidential source" and does not "include any dates or time frame in which Defendants were put on notice of contradictory information").[18]

The affirmance of dismissal of the securities fraud class action in *Magnum Hunter* is instructive. Like Plug Power, Magnum Hunter "[o]ver a relatively short period . . . significantly expanded its operations and added to its accounting complexity," which, in Magnum Hunter's case, resulted in multiple sequential restatements and disclosures of control deficiencies. *Magnum Hunter*, 26 F. Supp. 3d at 283-84 (company "grew substantially during 2011 and 2012, increasing its total assets by 470% during fiscal year 2011"). In that case, the allegations to support scienter were much more robust and included: (1) *nine* confidential witnesses who discussed "the depth and breadth of the internal control deficiencies at the company"; (2) defendants' sale of 325,000 and 172,500 shares of the company's stock during the class period; (3) an offering during the class period; (4) the company's firing its independent auditor during the class period after it "identified numerous issues"; (5) an "inexperienced corporate controller; and (6) a former chief accounting officer who "lacked the desire or training to train staff." *Id.* at 285, 296-97, 299-300. The court nonetheless dismissed for failing to plead a strong inference of scienter, *id.* at 303, and the Second Circuit affirmed, *Magnum Hunter*, 616 F. App'x at 448. As the trial court held, "[w]hile Magnum Hunter made numerous accounting errors and revealed internal control weaknesses in dribs and

---

[18] Cases with former employee or confidential witness allegations—which this case lacks—are routinely dismissed. *See Villare*, 2021 WL 4311749, at *7, 22 (no scienter despite seven confidential witnesses); *Wyche*, 2017 WL 971805, at *14 (no scienter despite five former employees); *Magnum Hunter*, 26 F. Supp. 3d at 285 (S.D.N.Y. 2014) (no scienter despite nine confidential witnesses); *Glaser*, 772 F. Supp. 2d at 594, 597 (no scienter despite four confidential witnesses).

drabs . . . it is equally plausible that defendants were in a constant game of 'Catch up'—acknowledging the company's material weaknesses and disclosing their continued efforts to resolve them, only to learn of yet more. While this pattern supports an inference of potentially poor accounting management, it does not support fraud." *Magnum Hunter*, 26 F. Supp. 3d at 298.

Lacking any specific facts about what the Individual Defendants knew about the application of the accounting principles at the time, the AC instead turns to two after-the-fact reports by a single analyst. AC ¶¶ 102-04, 124-26. Relying on this single outside analyst's opinion, the AC simply asserts that there was "no explanation but for fraud and severe recklessness" for the reclassification of certain R&D costs to fuel delivery costs. AC ¶¶ 171-72. In fact, the same analyst report the AC cites offers an innocent explanation that the AC conspicuously omits: it was "quite possible that some of the staff, the materials used for the fuel cells and components shipped, and even facility costs could be shared between R&D and commercial production." Ex. T (3/18/21 Barclays Analyst Report), at 2; *cf.* AC ¶¶ 102-04. Regardless, a post-hoc musing from a single outside analyst does not create a plausible inference that anyone at Plug Power knew any earlier than February 25, 2021 that the application of U.S. GAAP was incorrect, or that the accounting principles were so clear that Marsh or Middleton should have known their application was incorrect despite receiving clean audit opinions. And to the extent that the AC is suggesting that Marsh or Middleton knew or should have known at the time that costs were improperly allocated to R&D instead of cost of fuel delivery because cost of fuel delivery was a separate line item on the financial statement (*see* AC ¶ 124), the AC pleads no facts to support such a contention. For example, there is no allegation to suggest that Plug Power was *not* conducting R&D to improve the costs of fuel delivery, or that the costs were so obviously unrelated to R&D that it was reckless to classify them as such.

Any inference that Defendants knew or should have known about the accounting judgment errors is not plausible given that KPMG reviewed and issued clean audit opinions for Plug Power's prior financial statements including the complex accounting judgments that were later restated. That KPMG did not identify the errors when auditing the 2018 and 2019 financial statements suggests that the errors were, in fact, complex, technical, and not easily identifiable or known to the Defendants. *Wyche*, 2017 WL 971805, at *17 (no scienter in restatement case where "the Company's independent auditor, Deloitte, found no issues when performing its audits," suggesting that the accounting at issue "was no easy task, even for a party with significant knowledge and expertise"). KPMG's independent review of these accounting issues for multiple years without concern, and the fact that these technical accounting principles were being applied by a Company experiencing exponential growth across its entire platform of innovative clean energy products and services, cuts strongly against any inference of scienter. *See Iconix*, 2017 WL 4898228, at *18 (no scienter where "financial statements and accounting judgments were subject to audit by BDO— an independent public accounting firm—which assessed the accounting principles used by Iconix and reviewed its financial statements"); *Reilly*, 2018 WL 3559089, at *17 (repeated auditor sign off "suggests that the Company's accounting . . was not obviously wrong . . . And plaintiffs here in no way suggest that the Company's auditors were complicit in the alleged fraud.").[19]

Finally, to the extent Plaintiff is asking this Court to infer scienter based on Defendants' not providing adjusted EBITDA guidance for 2021 during earnings calls in early 2021,[20] the Court

---

[19] In addition, the Company's timely disclosure of the identification of potential issues with accounting judgments on March 2, 2021, only days after the errors were first identified, negates an inference of scienter. *See Acito*, 47 F.3d at 53 (no scienter despite one-month delay in disclosure of corrective information); *Magnum Hunter*, 26 F. Supp. 3d at 297-98 (no scienter where prompt disclosure after errors identified).

[20] Plaintiff claims that "the Company advised investors that EBITDA is an important metric to value the Company and that Plug Power relied on 'Adjusted EBITDA' as 'a basis for evaluating the Company's performance as well as for forecasting future periods.'" *See* AC ¶ 48. Conspicuously omitted from the AC are the caveats provided, which include: "Disclosure of this non-GAAP measure is to provide investors with the same information that management uses for these purposes," "Adjusted EBITDA is *not* a measure of our performance under GAAP and should not be

-27-

should decline the invitation. *See* AC ¶ 182. Plaintiff does not (because they cannot) claim that

Defendants had any legal obligation to provide that information. Nor, contrary to Plaintiff's claim,

did Defendants ever "promis[e] to do so." *See* AC ¶ 181. All Defendants indicated was that "*we*

*might be in a better position to give* you more specificity [in early 2021]," Ex. E (11/9/20 Earnings

Call Transcript), at 14; AC ¶¶ 53-54, and "*we'll be happy to share* those numbers [in February]."

Ex. J (1/26/21 Earnings Call Transcript), at 13; AC ¶ 178. That Plug Power declined to answer

questions about EBITDA guidance during earnings calls is not a "refusal" indicative of knowledge

sufficient to infer fraud; the more plausible inference is that the Company was not yet prepared to

provide such guidance. *See* AC ¶¶ 173-83.

**2.   The Magnitude Of The Restatement Does Not Suggest Scienter Because There Was No Impact On Plug Power's Cash Position, Business Operations, Or Economics Of Commercial Arrangements.**

Plaintiff also argues that the magnitude of the restatement is evidence of scienter. AC ¶

167. More specifically, the AC alleges that because gross profit was flipped to a loss in 2018 and

one quarter of 2020, and because other periods had either more gross losses or less gross profits,

this means that Plug Power knew or should have known there were errors in the accounting

judgments. *See id*. However, whether "the magnitude of an error is relevant to scienter depends on

the circumstances." *Dobina*, 909 F. Supp. 2d at 250 n.106. "[T]he size of the fraud alone does not

create an inference of scienter," absent "any allegation that . . . defendants had any

contemporaneous basis to believe that the information they related was incorrect." *Id*. at 251. The

AC is devoid of any such allegations. *See supra* Section I.B.1. The simple fact of a restatement is

not sufficient alone to indicate scienter. *See Iconix*, 2017 WL 4898228, at *17 ("The fact of an

---

considered in isolation or as an alternative to reported operating income, or any other measures prepared in accordance with GAAP," "*there are limitations associated with the use of this measure*," and "Adjusted EBITDA should be read only in conjunction with the Company's consolidated financial statements prepared in accordance with GAAP." *See* Ex. D (9/24/20 Form 8-K), at Ex. 99.2.

error, even a large error, does not suggest knowledge or intent to misstate when the financial results were originally published."); *Venkataraman*, 2021 WL 4952260, at *4 ("the fact that there were errors in the financial reports does not mean that the errors were made intentionally or recklessly"). This argument is nothing more than impermissible fraud by hindsight—*i.e.*, that Defendants must have known earlier there were errors because there was later a restatement. *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005) ("fraud cannot be pled by hindsight"); *Bristol-Myers Squibb*, 312 F. Supp. 2d at 566-68 (rejecting "fraud-by-hindsight" argument that defendants must have known the company's financial statements were incorrect when made because they were later restated); *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 404 (S.D.N.Y. 2020) (no scienter based on "fraud by hindsight" allegations).

"Courts within the Second Circuit that have addressed this issue . . . have consistently measured the restatements by the magnitude of their impact on *corporate income*." *Kandi*, 2019 WL 4918649, at *6. Where impact on corporate income is "modest," the fact of restatement is not indicative of scienter. *Id.*; *see also Wyche*, 2017 WL 971805, at *1 (no scienter where restatement reduced net income by 23.19%); *City of Brockton*, 540 F. Supp. 2d at 468 (no scienter where restatement reduced net income by 14%); *Thomas v. Shiloh Indus., Inc.*, 2017 WL 1102664, at *4 (S.D.N.Y. Mar. 23, 2017) (no scienter where restatement reduced net income by 50% and 13% in two fiscal quarters). Here, the impact of Plug Power's restatement on the Company's net losses was modest. *See* Table 2. Plaintiff's focus on gross profit, rather than the Company's annual net loss, is a red herring and ignores that the overall economic picture of the Company remained the same, and that the restatement did not reveal any hidden costs but instead addressed technical accounting treatment issues for a company in a cutting edge and rapidly developing industry. The

-29-

Court should decline to infer scienter based on the magnitude of the restatement.[21]

### 3. Complex And Technical Accounting Judgments Are Not Plug Power's Core Operations And Are Not A Basis For Inferring Scienter.

According to Plaintiff, the alleged misstatements—*e.g.*, the financial metrics and the Company's earlier statement about effectiveness of controls (AC ¶¶ 127-54)—"concern critical aspects of Plug Power's core operations," which indicates that Defendants must have known or were reckless in disregarding that the accounting judgments were incorrect. AC ¶ 168. As an initial matter, it is unclear if the "core operations" doctrine has survived the passage of the PSLRA. *Lipow*, 131 F. Supp. 3d at 163 n.11 ("The Second Circuit has not determined the continued viability of the 'core operations' theory since the passage of the PSLRA . . . ."); *Shemian v. Research in Motion Ltd.*, 2013 WL 1285779, at *18 (S.D.N.Y. Mar. 29, 2013) ("[T]his Court has carefully considered the continued viability of the 'core operations' inference in light of the PSLRA's heightened pleading requirement and found it lacking"). To the extent it is still viable, the core operations theory does not independently establish scienter and can be, at most, some evidence of scienter. *Lipow*, 131 F. Supp. 3d at 163.

Accounting judgments or internal controls over financial reporting were not Plug Power's "core operations." Core operations are matters "critical to the long term viability of the company and events affecting a significant source of income." *Express Scripts*, 2017 WL 3278930, at *18. The operation must "either make up nearly all of a company's business or be essential to its survival." *Kandi*, 2019 WL 4918649, at *7. The Company describes its "core business" as providing and developing "commercially-viable hydrogen and fuel cell product solutions to replace lead-acid batteries in electric material handling vehicles and industrial trucks for some of

---

[21] With the exception of one quarter, the restatement impacted Plug Power's previously reported net losses—in both directions—by less than 10%, and there was no increase in net losses by "multiples," as Plaintiff suggests. *See* Ex. B at F-17-18, F-30-32.

the world's largest retail-distribution and manufacturing businesses." Ex. B at 9. The AC concedes

as much. *E.g.*, AC ¶ 168 (Plug Power's "core operation" is "providing hydrogen fuel cells and fuel

to its customers"). The restatement does not concern provision of hydrogen solutions or fuel cells,

but instead relates to the Company's *accounting* for right of use assets related to operating lease

liabilities, loss accruals, classification of certain R&D-related expenses, a deemed dividend for

certain conversions of stock, lease accounting, and certain other financial metrics that impacted

gross profit. AC ¶¶ 127-54. Such complex and technical accounting judgments are not "core

operations" such that it is reasonable to infer that Marsh or Middleton knew or were reckless in

not knowing that the judgment calls were incorrect at the time despite independent auditor sign

off. *See Reilly*, 2008 WL 3559089, at *19 (core operations doctrine inapplicable where case

"involves a disputed technical accounting issue" that did not "undermine[] the ongoing viability

of the Company's core business"); *Hensley*, 2014 WL 4473373, at *5 (core operations doctrine

inapplicable because "accounting for 'work-in-process' inventory—the source of the error that led

to the restatement and the alleged false statements by Defendants—could not be described as (and,

more to the point, is not alleged in the Complaint to be) a core operation.").[22]

Even if the alleged misstatements related to R&D, delivery of hydrogen fuel, and loss

accrual contracts—as opposed to the *accounting* for those items—Plaintiff fails to plead that any

of those items constitutes "nearly all of [Plug Power's] business" or is "essential to its survival."

*See Kandi*, 2019 WL 4918649, at *7; *see also Rockwell Med.*, 2018 WL 1725553, at *13 (core

operations doctrine inapplicable where plaintiffs "fail to allege that sales of one product ever

---

[22] Plaintiff does not allege that the alleged internal control misstatement relates to a "core operation" of Plug Power. Nor could he, as the Company identified as a material weakness that it "did not maintain a sufficient complement of trained, knowledgeable resources to execute their responsibilities with respect to internal control over financial reporting for certain financial statement accounts and disclosures." Ex. B at 25. This statement is even further removed from Plug Power's core business of selling hydrogen fuel cells, and likewise is not an indication that Marsh or Middleton knew or should have known of this weakness during the class period.

comprised nearly all of Rockwell's business"). Nor could Plaintiff so plead, as "[s]ales of fuel cell systems and related infrastructure" account for the lion's share—62% in 2018 and 65% in 2019—of Plug Power's net revenue. Ex. B at F-17-18. By contrast, hydrogen fuel delivery accounts for less than 13% of the Company's net revenue in those years. *Id*. This underscores the inapplicability of the core operations doctrine. *E.g., Frankfurt-Trust Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 225 (S.D.N.Y. 2018) (core operations doctrine inapplicable where business was 25% of profits); *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343-44 (S.D.N.Y. 2011) (core operations doctrine inapplicable where sales comprised 16% of business); *Hensley*, 2014 WL 4473373, at *5 (core operations doctrine inapplicable where business was 15% of revenue).

### 4.      SOX Certifications Are Not Indicative of Scienter.

The AC also alleges that Marsh's and Middleton's SOX Certifications evidence their earlier knowledge of the incorrect accounting judgments. AC ¶¶ 195-98. The entirety of Plaintiff's argument is that "[t]he fact that the Defendants reviewed Plug Power's financial reports is highly indicative that they reviewed the relevant accounting standards at issue but purposefully ignored them." AC ¶ 197. There is no factual allegation that Marsh and Middleton reviewed the accounting standards applicable to the items that were restated, or that if they so reviewed, they would or should have understood that the significant judgments made on those highly technical accounting issues were incorrect. This allegation is not sufficient. SOX certifications "may be probative of scienter" only where the plaintiff alleges "glaring accounting irregularities or other red flags, of which the certifying defendant had reason to know." *Reilly*, 2018 WL 3559089, at *19. "[T]hese certifications typically add nothing to the scienter calculus because allowing Sarbanes-Oxley certifications to create an inference of scienter in every case where there was an accounting error by a public traded company would eviscerate the pleading requirements set forth in the PSLRA." *Id*.; *see also Venkataraman*, 2021 WL 4952260, at *4 ("the signing of a SOX certification, without

more, is insufficient to plead scienter").

The probative value of SOX certifications is even less where, as here, "the accounting guidance [is] complex." *Reilly*, 2018 WL 3559089, at *19. In addition, the accounting treatment at issue had no significant impact on the Company's bottom line net losses or cash position, and it was blessed by KPMG, Plug Power's independent auditor since 2001. Ex. B at 4, F-4. It is simply not plausible that Marsh or Middleton understood during their review and certification of the financial statements that both their internal accounting team and their independent auditor made errors in judgment in applying a complex accounting standard, despite KPMG's clean audit opinion. Absent other facts, their SOX Certifications are no indication that either knew or should have known that the Company erred in its accounting treatment of certain expenses.

C.    **The Non-fraudulent Inferences Far Outweigh Any Inference Of Scienter.**

The AC lacks any facts that support a cogent and compelling inference of scienter when balanced, as the court must, against non-fraudulent inferences. *Tellabs*, 551 U.S. at 314; *Kandi*, 2019 WL 4918649, at *4; *Fries*, 285 F. Supp. 3d at 720. The court must consider the facts taken as a whole, but here, Plaintiff's argument that "zero plus zero plus zero plus zero plus zero adds up to something" is incorrect. *City of Brockton*, 540 F. Supp. 2d at 475. Absent any facts showing that Plug Power knew or should have known the application of the accounting principles were incorrect at the time, the AC asks the Court to accept an illogical theory, unsupported by citation to any contemporaneous documents or witness statements, under which Defendants purposefully misclassified certain costs using complex, technical accounting provisions (and with no real change to the Company's cash position or net losses), just to pursue  typical corporate activity of raising capital, and to continue routine trading under Rule 10b5-1 plans.

By contrast, the non-culpable explanation is cogent and compelling: Plug Power's application of accounting guidance was incorrect because it was complex and technical and not

due to any misconduct or override of internal controls, and neither Plug Power nor its auditors identified the errors until *after* fourth quarter earnings were announced when KPMG was finalizing its audit. This non-fraudulent inference is especially strong where, as here, there are no allegations of a single internal document or witness statement that anyone knew or should have known the application of the accounting judgments was incorrect; the Company's independent auditor issued annual clean audit opinions; the accounting principles at issue were complex and technical and required significant judgments; the Company timely disclosed the accounting errors upon discovery; and there is no allegation that the accounting errors were the result of any override of controls or misconduct. *See supra* Section I.B. A mistake in financial statements is sometimes just a mistake and "is not sinister at all." *City of Brockton*, 540 F. Supp. 2d at 473.

## II.    THE AC FAILS TO PLEAD LOSS CAUSATION.

The AC must be dismissed in its entirety for the additional reason that it fails to plead loss causation. Plaintiff must allege that "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co., Inc*., 396 F.3d 161, 175 (2d Cir. 2005). It is not enough to claim that Plug Power's stock price was inflated; rather, Plaintiff must allege that the price "fell significantly after the truth [of the fraud] became known." *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).[23]

Plaintiff bases his loss causation claim on two alleged corrective disclosures dated March 2, 2021 and March 16, 2021. *See* AC ¶¶ 203-08. But these disclosures merely revealed

---

[23] The AC could also be dismissed in its entirety because it fails to plead an actionable misstatement or omission. A restatement alone is not an admission of falsity. *Magnum Hunter*, 26 F. Supp. 3d at 295 (rejecting plaintiffs' argument in a restatement case that a restatement "constitutes an admission of falsity"); *Kandi*, 2019 WL 4918649, at *8 (same). It is not sufficient for Plaintiff to merely allege that Plug Power restated prior period financials; instead, Plaintiff must allege that Plug Power knew at the time it disclosed its earlier financial statements that the accounting judgments therein were incorrect. *Kandi*, 2019 WL 4918649, at *9 (where allegations had "not specifically shown that [d]efendants were aware of any facts contradicting the statements regarding internal controls when made . . . [plaintiffs] failed to plausibly allege that [d]efendants' statements regarding internal controls were false when made.").

disappointing news—not any misconduct or fraudulent conduct. *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (no loss causation where article did not include "any new information . . . regarding Omnicom's alleged fraud"); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 389 (E.D.N.Y. 2013) (no loss causation where earnings releases did not "contain any disclosure of the alleged fraud"). The March 2, 2021 disclosure informed investors that the Company would be unable to file its annual report on time.  Ex. C at 1. While disappointing, the disclosure did not suggest any misconduct or fraud. Rather, it stated that the Company was reviewing its accounting judgments, and confirmed that any adjustments would be "non-cash in nature and any such adjustments or charges would not impact the Company's guidance on forward projections." *See id*. The March 16, 2021 disclosure announced that the Company would restate its 2018, 2019 and 2020 financial statements. *See* Ex. O at 2. While news of a restatement may have been disappointing, the disclosure dispelled any notion that Plug Power acted inappropriately, stating that the restatement was not the result of "any issues related to an override of controls or misconduct." *Id*. at 2-3.  The AC fails to plead loss causation.

### III.    PLAINTIFF'S SECTION 20(a) CLAIM MUST BE DISMISSED.

Because Plaintiff fails to plead a primary securities law violation, Plaintiff's claim under Section 20(a) must also be dismissed. 15 U.S.C. § 78t(a); *Lipow*, 131 F. Supp. 3d at 173 ("Given that a control person liability claim under § 20(a) is predicated on a primary violation of the securities laws, the control person liability claims must be dismissed because Plaintiff has failed to allege a primary violation under § 10(b)."); *Abengoa*, 481 F. Supp. 3d at 215.

### CONCLUSION

For the foregoing reasons, the AC should be dismissed with prejudice. *See Hensley*, 2014 WL 4473373, at *6-7 (denying motion for leave to amend complaint where "Plaintiffs have given 'no indication' that they could allege any additional facts to establish the requisite intent").

Dated:  December 6, 2021

Respectfully submitted,

PLUG POWER, INC., ANDREW MARSH, AND
PAUL B. MIDDLETON

By their attorneys,

*/s/ Deborah S. Birnbach*

Deborah S. Birnbach
Jennifer B. Luz
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel.: 617.570.1000
Fax: 617.523.1231
DBirnbach@goodwinlaw.com
JLuz@goodwinlaw.com

-36-

-37-

## CERTIFICATE OF SERVICE

I, Deborah S. Birnbach, hereby certify that a copy of the foregoing Memorandum of Law in Support of Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint For Violations of the Federal Securities Laws, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on December 6, 2021.

Dated: December 6, 2021                                      */s/ Deborah S. Birnbach*____