**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PLUG POWER, INC. SECURITIES LITIGATION | No. 1:21-cv-2004-ER<br><br>JURY TRIAL DEMANDED |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

Page(s)

I.      INTRODUCTION ..................................................................................................1

II.     STATEMENT OF FACTS ....................................................................................4

        A.      Company Overview ..................................................................................4

        B.      Throughout the Class Period Defendants Provided the Market with
                False and Misleading Financial Information ............................................5

        C.      The Defendants Take Advantage of the Company's False and
                Misleading Financial Statements for Their Own Financial Benefit .......5

        D.      Defendants' Declined to Provide EBITDA Guidance to the Market
                During the Class Period ............................................................................6

        E.      The Truth is Revealed, and Plug Power Is Forced to Restate Its
                Financial Statements ................................................................................7

        F.      Post-Class Period Facts Confirm that Plug Power Misled the
                Market ......................................................................................................8

III.    THE COMPLAINT STATES AN EXCHANGE ACT § 10(B) CLAIM.........................10

        A.      Legal Standard ........................................................................................10

        B.      The Complaint Alleges a Strong Inference of Scienter .........................11

                1.      Defendants Had Motive and Opportunity to Fraudulently
                        Inflate the Price of Plug Power Stock ........................................11

                        a.      Enticing the Monumental Deal with SK Group
                                Provided Defendants with Motive and Opportunity
                                to Engage in Fraud........................................................12

                        b.      The Individual Defendants' Insider Sales Create a
                                Strong Inference of Scienter .........................................15

                2.      Lead Plaintiff Adequately Alleged that Individual
                        Defendants Knew or Recklessly Disregarded Material
                        Accounting Errors........................................................................21

        a.     Defendants' Decision to Omit EBITDA Figures in January 2021 Shows Defendants Knew Margins Were Overstated ............................................................ 22

        b.     The Magnitude and Impact of the Restatement Compels an Inference of Scienter ................................................. 25

        c.     Defendants Knew Margins Were Overstated because Research and Development Are Core Operations of Plug Power ............................................... 27

        d.     Defendants' SOX Certifications Are Indicative of Scienter ......................................................................... 30

    3.    A Holistic Reading of the Complaint further Demonstrates Scienter ............................................................................... 31

  C.    The Complaint Adequately Pleads Loss Causation ............................................... 33

IV.    THE COMPLAINT STATES AN EXCHANGE ACT § 20(A) CLAIM .......................... 35

V.    CONCLUSION ................................................................................................ 35

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)................................................................................................ 10

*Azar v. Yelp, Inc.*,
 No. 18-cv-00400-EMC, 2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ................................. 19

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007)................................................................................................. 10

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
 750 F.3d 227 (2d Cir. 2014) ...................................................................................... 33

*Century Pacific, Inc. v. Hilton Hotels Corp.*,
 528 F. Supp. 2d 206 (S.D.N.Y. 2007), *aff'd*, 354 App'x 496 (2d Cir. 2009)........................... 11

*Chill v. Gen. Elec. Co.*,
 101 F.3d 263 (2d Cir. 1996) ...................................................................................... 12

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
 450 F. Supp. 3d 379 (S.D.N.Y. 2020) ......................................................................... 28

*City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*,
 967 F. Supp. 2d 771 (S.D.N.Y. 2013) ......................................................................... 17

*Dobina v. Weatherford Int'l Ltd.*,
 909 F. Supp. 2d 228 (S.D.N.Y. 2012) ................................................................... 13, 26

*Dura Pharms. Inc. v. Broudo*,
 544 U.S. 336 (2005)................................................................................................. 33

*ECA, Loc. 134 IBEW Joint Pension Trust of Chi. v. JPMorgan Chase Co.*,
 553 F.3d 187 (2d Cir. 2009) ............................................................................ 11, 13, 31

*Employees' Ret. Sys. of Gov't of the V.I. v. Blanford*,
 794 F.3d 297 (2d Cir. 2015) .................................................................................. 21, 22

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
 783 F.3d 395 (2d Cir. 2015) ...................................................................................... 33

*Francisco v. Abengoa*, S.A.,
 No. 15 CIV. 6279 (ER), 2021 WL 4136899 (S.D.N.Y. Sept. 10, 2021)................................. 28

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) ................................................................................. 19, 21

*Ganino v. Citizens Utilities Co.*,
  228 F.3d 154 (2d Cir. 2000) ........................................................................................................ 21

*George v. China Auto Sys., Inc.*,
  No. 11 Civ. 7533(KBF), 2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012).................................... 20

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000) .................................................................................................... 29

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004) ........................................................................................ 29

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011) ........................................................................................ 34

*In re Citigroup Inc. Sec. Litig.*,
  753 F. Supp. 2d 206 (S.D.N.Y.2010) ......................................................................................... 15

*In re Complete Mgmt. Inc. Secs. Litig.*,
  153 F. Supp. 2d 314 (S.D.N.Y. 2001) ................................................................................. 12, 13

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
  20 F.4th 131 (2d Cir. 2021) ........................................................................................................ 31

*In re Initial Pub. Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003) ........................................................................................ 16

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
  26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).......................... 24

*In re Oxford Health Plans Inc.*,
  187 F.R.D. 133 (S.D.N.Y. 1999) ........................................................................................... 17, 18

*In re Pareteum Sec. Litig.*,
  No. 19 Civ. 9767 (AKH), 2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021).......................... 27, 28

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001) ............................................................................................... 16, 17, 25

*In re Time Warner Inc. Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993) ............................................................................................................ 13

*In re Top Tankers, Inc. Secs. Litig.*,
  528 F. Supp. 2d 408 (S.D.N.Y. 2007) ........................................................................................ 31

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
No. 13 Civ. 8846(LGS), 2014 WL 7176187 (S.D.N.Y. Dec. 16, 2014) .................................. 27

*In re Wachovia Equity Sec. Litig.*,
753 F. Supp. 2d 326 (S.D.N.Y. 2011) .................................................................................... 24

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
504 F. Supp. 3d 224 (S.D.N.Y. 2020) .................................................................................... 16

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001) .................................................................................................. 21

*Lapin v. Goldman Sachs Grp.*, Inc.,
506 F. Supp. 2d 221 (S.D.N.Y. 2006) .................................................................................... 35

*Lipow v. Net1 UEPS Techs., Inc.*,
131 F. Supp. 3d 144 (S.D.N.Y. 2015) .................................................................................... 28

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015) .................................................................................................. 32

*Malin v. XL Capital Ltd.*,
499 F. Supp. 2d 117 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) ........................ 19

*Nguyen v. New Link Genetics Corp.*,
297 F. Supp. 3d 472 (S.D.N.Y. 2018), *aff'd in part, vacated in part on other grounds sub nom.
Abramson v. Newlink Genetics*,
965 F.3d 165 (2d Cir. 2020) .................................................................................................. 21

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) .......................................................................................... 13, 22

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l*,
367 F. Supp. 3d 16 (S.D.N.Y. 2019) ...................................................................................... 24

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
No. 1:16-CV-3591-GHW, 2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) ................................ 10

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
89 F. Supp. 3d 602 (S.D.N.Y. 2015) ...................................................................................... 30

*Reilly v. U.S. Physical Therapy Inc.*,
No. 17 Civ. 2347 (NRB), 2018 WL 3559089 (S.D.N.Y. July 23, 2018) ................................ 30

*Rothman v. Gregor*,
220 F.3d 81 (2d Cir. 2000) ...................................................................................... 12, 13, 25

v

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009) .................................................................................... 12

*S.E.C. v. Rorech*,
    720 F. Supp. 2d 367 (S.D.N.Y. 2010) .................................................................. 18

*Stevelman v. Alias Rsch. Inc.*,
    174 F.3d 79 (2d Cir. 1999) .................................................................................... 18

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..................................................................................... passim

*Wilson v. Merrill Lynch & Co.*,
    671 F.3d 120 (2d Cir. 2011) .................................................................................. 10

**Statutes**

15 U.S.C. § 78u–4(b)(2) .............................................................................................. 11

**Rules**

Fed. R. Civ. P. 12(d) .................................................................................................. 19

Fed. R. Evid. 201(b)(2) .............................................................................................. 27

**Regulations**

17 C.F.R. § 240.10b5-1(c) .......................................................................................... 19

17 C.F.R. § 240.10b5-1(c)(1)(i).................................................................................. 19

17 C.F.R. § 240.10b5-1(c)(1)(ii)................................................................................. 20

17 C.F.R. § 240.10b5-1(c)(1)(i)(B) ............................................................................ 19

Lead Plaintiff Manfred Schumacher ("Lead Plaintiff") submits this memorandum of law in opposition to Defendants' motion to dismiss the Consolidated Amended Class Action Complaint.[1]

## I.    INTRODUCTION

Throughout the Class Period, Defendants reported that Plug Power's hydrogen fuel cell business margins were growing, and that the Company was on track to becoming profitable after years of losing money. Turning the corner towards profits by showing the ability to scale with increased margins was important to investors, and it was critical to acquire the SK Group as a partner. SK Group was the largest energy provider in South Korea, who Defendants had been courting to expand the use of green energy in Korean and broader Asian markets. After reviewing Plug Power's margins, SK Group invested $1.5 billion in Plug Power and partnered with Plug Power to form a joint venture in South Korea. When SK Group announced the joint venture, SK Group emphasized that it partnered with Plug Power because Plug Power had "proven its ability to scale . . . in North America." The deal was widely described as transformative for Plug Power. Plug Power's growth and the SK Group deal increased the Company's stock price by 90% in less than 2 weeks.

Unbeknownst to investors, however, Defendants had been falsifying Plug Power's financial statements to make it seem like the business was scaling efficiently. Among other things, Defendants were hiding the costs of providing hydrogen fuel that it sold to its customers as Research and Development costs. This maneuver made Plug Power's margins seem exponentially better than they in fact were. The inflated margins finally allowed the Company to

---

[1] Unless otherwise defined, all capitalized terms have the same definitions as in the Consolidated Amended Class Action Complaint, filed on October 6, 2021 (the "Complaint") (ECF No. 78). "Compl. ¶__" refers to paragraphs in the Complaint. "Mot. or "Motion" refers to Defendants' Motion to Dismiss. "Rule" refers to the Federal Rules of Civil Procedure.

generate a gross profit for consecutive years for the first time in a decade and boosted the Company's common stock price that investors paid for Plug Power common stock.

The Individual Defendants benefitted from Plug Power's false statements by selling millions of dollars of Plug Power common stock at the heavily inflated prices. The Individual Defendants even exercised stock options several years early to take advantage of their false statements. Plug Power also sold millions of shares at inflated prices to investors in a historic secondary offering for billions of dollars to support its losing business. These sales were unusual in amount and timed to take advantage of the stock's artificial inflation, including Defendant Marsh's over $37 million in proceeds from selling stock shortly after the SK Group announcement.

Immediately after Defendants realized massive personal profits from their false statements, Plug Power's new auditor required Defendants to correct their false margins through a financial restatement. On March 2, 2021, the Company first advised the market that there were issues with its financial statements concerning Research and Development costs, which caused the stock price to drop 7%. Then on March 16, 2021, the Company fully disclosed it was restating its prior financial results. This announcement caused investors to suffer more losses as the price of Plug Power common stock reacted by falling another 7.8%. The restatement ultimately showed that the costs of hydrogen fuel cut margins by over 100% and caused EBITDA to decrease by over $20 million in the third quarter of FY2020.

Defendants move to dismiss this action by claiming that the Complaint fails to allege scienter for Defendants' false statements. The Complaint, however, details Defendants' motive and opportunity to issue the false financial statements as shown through massive insider sales and a direct link between projecting growth and securing SK Group as a partner. While

2

Defendants acknowledge that Individual Defendants profited from sales of Plug Power stock while issuing false financial information, they argue that these sales were allowed pursuant to an Exchange Act Rule 10b5-1 trading plan.  This argument fails for at least three reasons: 1) it is premised on an affirmative defense that is not permitted for this motion; 2) the affirmative defense must fail as there is no evidence of a valid Rule 10b5-1 trading plan for any Defendant; and 3) though Defendants claimed certain trades are Rule 10b5-1 transactions, it appears any Rule 10b5-1 plan would have been created in bad faith—while Defendants issued false statements to the market.  Accordingly, Rule 10b5-1 defense does not apply.  The concrete personal benefits from Defendants' insider sales strongly support a finding of scienter.

Additionally, the Complaint sufficiently alleges that Defendants issued the false statements knowingly or at least with severe recklessness.  Research and Development is a core business operation of Plug Power and Defendants monitored the financial metrics associated with hydrogen fuel cells.  The Individual Defendants discussed and forecasted the Company's EBITDA quarterly prior to the Class Period, and during the Class Period, told investors that EBITDA would be "more than last year."  The fact that Defendants acted with scienter by intentionally misclassifying hydrogen fuel costs was not lost on analysts.  After the Company announced the restatement, Barclays confirmed that the reason costs of goods sold were being intentionally misclassified, "simply put" was to "show higher margins on hardware the fuel cells."

In addition to scienter, Defendants' only other challenge is whether the Complaint adequately alleges loss causation for this action.  That challenge fails because it is undisputed that when Defendants revealed they issued materially false financial statements to investors requiring a restatement, the price of Plug Power dropped materially.  Prior to expert discovery,

3

allegations showing the stock price dropped in reaction to the revelation of the fraud are sufficient for pleading loss causation. Accordingly, Defendants' motion to dismiss should be denied in full.

## II.    STATEMENT OF FACTS

### A.    Company Overview

Plug Power provides comprehensive hydrogen fuel cell turnkey solutions in the electric mobility and stationary power markets. Compl. ¶ 29. A substantial part of Plug Power's revenue comes from delivering hydrogen fuel to customers of its hydrogen fuel cells. *Id*. ¶¶ 6, 40. Since hydrogen fuel is a nascent industry, Plug Power is a capital-intensive business and must continually innovate to be successful.[2] *Id*. ¶¶ 32-34. Plug Power's efforts to expand and diversify resulted in the Company's cash usage reaching all-time highs by FY2020. *Id*. ¶ 33. The Company's research and development expenses also grew over 50% between FY2016 and the third quarter of FY2020. *Id*. ¶ 111. Over that same time period, Plug Power's annual revenue increased from $39.99 million to $215,862 million[3]. *See* Ex. B to Mot. (ECF No. 86-2) at 9, 28. However, Plug Power required substantial cash infusions to fund growth and innovation, particularly following the Company's considerable spending in FY2020. *Id*. ¶¶ 32-33.

---

[2] According to Plug Power's 2020 Form 10-K, the Company must "continue to develop new products and technologies and to enhance existing products in the areas of cost, size, weight, and in supporting service solutions in order to drive further commercialization." Compl. ¶ 34.

[3] $215,862 million represents the Company's net revenue for the nine months ended September 30, 2020. Lead Plaintiff relies on the Company's restated net revenue figures as net revenue was marginally affected by the purported fraud.

**B.      Throughout the Class Period Defendants Provided the Market with False and Misleading Financial Information**

The Class Period begins on November 9, 2020, when Plug Power reported its third quarter 2020 financial results. *Id*. ¶¶ 127, 129.  The Company's results were materially false and misleading because Defendants knew or recklessly disregarded that the Company (a) misclassified fuel delivery costs as research and development expenses, thereby inflating reported gross profits and (b) understated the loss accrual related to its extended maintenance contracts thereby, inflating reported gross profits and EBITDA. *Id*. ¶ 133.  These false and misleading results were repeated to the market throughout the Class Period. *Id*. ¶¶ 127-154.

**C.      The Defendants Take Advantage of the Company's False and Misleading Financial Statements for Their Own Financial Benefit**

On November 16, 2020, Plug Power announced a $750,000,000 secondary public offering. *Id*. ¶ 56.  The November Prospectus in connection with this offering contained the same materially false and misleading financial metrics. *Id*. ¶¶ 57-63.  On November 24, 2020, Plug Power announced that the Company's offering generated approximately $1 billion in capital—the largest in the Company's history. *Id*. ¶ 64.  The Company further noted that "[t]he capital raise uniquely positions Plug Power to execute and accelerate on its green hydrogen strategy as well as other strategic growth initiatives." *Id*.

On December 24, 2020, Defendant Middleton sold 216,667 shares of Plug Power stock, generating proceeds of approximately $7.6 million. *Id*. ¶ 66.  To effectuate this sale, Defendant Middleton exercised options that were not due to expire for eight to nine years. *Id*. ¶ 68.

On January 6, 2021, Plug Power and SK Group, the largest energy provider in South Korea, announced their intention to enter a joint venture. *Id*. ¶ 70.  As part of this new partnership, SK Group agreed to make a $1.5 billion strategic investment in Plug Power. *Id*. ¶ 71.  SK Group stressed that Plug Power's proven ability to scale its business was integral to the

deal as the South Korean government had been seeking a partner to meet the country's ambitious green energy goals for 2040. *See* Ex. H to Mot. (ECF No. 86-8) at 6. On January 7, 2021, the next trading day, Plug Power's stock price jumped 35%, and within two weeks, had increased almost 90%. *Id*. ¶¶ 73, 76.

Immediately following the completion of the deal with SK Group, both Defendant Marsh and Plug Power took advantage of the Company's inflated stock price. *Id*. ¶¶ 76-94. On January 19, 2021, Defendant Marsh sold 573,268 shares, or 43%, of his Plug Power stock, for approximately $37.7 million. *Id*. ¶¶ 77-78. To reap this massive windfall, Defendant Marsh exercised options that would not expire until 2027. *Id*. ¶ 79. Then, on January 26, 2021, while Plug Power's stock was trading at a 52-week high, the Company announced a $1.5 billion secondary public offering. *Id*. ¶ 82. The January Prospectus in connection with this offer contained the same materially false and misleading financial metrics. *Id*. ¶¶ 85-91. On February 9, 2021, Plug Power announced that the offering generated over $2 billion in net proceeds. *Id*. ¶ 92. After Plug Power received SK Group's $1.5 billion investment following the closing of the deal on February 25, 2021, the Company had tripled its cash balance to over $5 billion. *Id*. ¶ 93.

### D.    Defendants' Declined to Provide EBITDA Guidance to the Market During the Class Period

In FY2018 and FY2019, Plug Power was able to generate gross profits in consecutive years for the first time in a decade. *Id*. ¶ 47. Throughout FY2020, including on the first day of the Class Period, Defendants extoled Plug Power's newfound profitability and regularly provided adjusted EBITDA figures as "a basis for evaluating the Company's performance as well as for forecasting future periods." *Id*. ¶¶ 48-53. During the Company's earnings call on November 9, 2020, and in response to a question from a Barclays analyst about the Company's EBITDA guidance for FY2021, Defendant Marsh, without providing a specific guidance range for

6

FY2021, stated that "it will definitely be higher [than 2020]".  *Id.* ¶ 54.  He further added that the Company is "very confident that we'll continue to be accretive and go up" and he would be in a better position to provide guidance during the Company's January business update call.  *Id.*

On January 26, 2021, however, during the Company's business update conference call, Plug Power declined to provide adjusted EBITDA guidance for FY2021.  *Id.*  On February 25, 2021, during Plug Power's earnings call for the fourth quarter of FY2020, the Company again did not provide any information on its adjusted EBITDA for FY2020 or guidance for FY2021 despite previously promising to do so.  *Id.* ¶ 181.

> **E.      The Truth is Revealed, and Plug Power Is Forced to Restate Its Financial Statements**

Following a change in auditors, the Company was forced to admit that its financial results for FY2018, FY2019, and certain of its results during FY2020 were incorrect and may need to be restated.  *Id.* ¶ 12.  On March 2, 2021, before the market opened, Plug Power stated that it could not timely file its 2020 Form 10-K because the Company was completing a "review and assessment of the treatment of certain costs with regards to classification between Research and Development versus Costs of Goods Sold…and certain internal controls over these and other areas."  *Id.* ¶ 155.  The Company further stated that "[i]t is possible" there may be adjustments to certain of its prior financial statements expected "significant changes" from its previous financial reporting for the fourth quarter of FY2020 and full year FY2019.  *Id.*  On this news, the Company's stock price fell $3.68, or 7%.  *Id.* ¶ 156.

On March 16, 2021 (the last day of the Class Period), Plug Power confirmed that the Company needed to restate its prior financial results for FY2018 and FY2019 and quarterly filings for 2019 and 2020 (the "Previously Issued Financial Statements").  *Id.* ¶¶ 157-159.  Specifically, Plug Power revealed that the Company needed to reclassify certain research and

development expenses as costs of revenue—directly reducing the Company's gross profits, and disclosed a material weakness in the Company's internal controls over financial reporting. *Id.* On March 17, 2021, the next trading day, Plug Power common stock fell $3.35 per share, or approximately 7.8%. *Id.* ¶ 160.

In response, analysts immediately expressed concerns about the Company's restatements. *Id.* ¶ 101. In a March 18, 2021 report, Barclays analysts were "most crucially" concerned with "the degree to which past margin for fuel cell products are lower (if a lot of R&D moves to Cost of Rev.)." *Id.* ¶ 102 Barclays analysts further posited that Plug Power's overstated research and development expenses was a ploy by Defendants to inflate margins, stating "[s]imply put, that management wanted to show higher margins on the core hardware, the fuel cells." *Id.* ¶ 103.

### F.    Post-Class Period Facts Confirm that Plug Power Misled the Market

On May 14, 2021, before the market opened, Plug Power announced that the Company had completed the restatement and filed its 2020 Form 10-K.[4]   *Id.* ¶ 105.   Plug Power's restatement effectively eliminated nearly all the Company's gross profits since 2016 and caused nearly every reporting period to turn from positive to negative. *Id.* ¶¶ 113, 115. The 2020 Form 10-K also revealed that most of the $35.5 million loss accrual for FY2020 was generated by the Company understating the provision for loss contracts related to service during the third quarter of that year by $20.8 million. *Id.* ¶ 117. This loss accrual was understated because the Company misclassified fuel delivered to customers as a research and development expense instead of as a cost of revenue. *Id.* ¶ 117. This directly caused the Company's operating income to decrease by $20.8 million, negatively impacting operating and income and EBITDA. *Id.* ¶¶ 45, 117. Finally,

---

[4] While the Company did not fully restate its financial results for the fiscal years 2016 and 2017, the 2020 Form 10-K included substantial corrections to these years as well. Compl. ¶ 110.

the 2020 Form 10-K also revealed that Plug Power's reported growth in recent years was fictional. As Plug Power grew its operations, the Company appeared to maintain steady margins for its services performed on fuel cell systems and related infrastructure and fuel delivered to customers. However, in reality, Plug Power's margins in these areas were actually two to four times worse than originally reported, indicating that the Company was not scaling efficiently but rather poorly:

| Plug Power's Gross Margins for Services Performed on Fuel Cell Systems and Related Infrastructure ("Services") and Fuel Delivered to Customers ("Fuel Delivery")  ("Orig." = Originally Reported Amount[5], "Rest." = Restated Amount[6] | | | | | |
|---|---|---|---|---|---|
| | **FY2020 (Q1-Q3)** | **FY2019** | **FY2018** | **FY2017** | **FY2016** |
| **Services (Orig.)** | -11.3% | -14.2% | -7.7% | -22.2% | -9.9% |
| **Services (Rest.)** | -40.04% | -37% | -46.8% | -46.8% | -22.6% |
| | | | | | |
| **Fuel Delivery (Orig.)** | -31.5% | -24.9% | -23.3% | -62.9% | -27% |
| **Fuel Delivery (Rest.)** | -60.3% | -55.5% | -60.4% | -274.8% | -74.9% |

On May 16, 2021, Barclays analysts expressed further concerns following Plug Power's restatement. *Id.* ¶ 123. Barclays' analysts were specifically perplexed by the reclassification of

---

[5] Plug Power's originally reported amounts for the fiscal years 2016-2019 are sourced from pages 26 and 28 of the Company's 2019 Form 10-K filed on EDGAR on March 9, 2020. A true and correct copy of the report can be found at: https://www.sec.gov/Archives/edgar/data/0001093691/000155837020002267/plug-20191231x10k.htm.

[6] All of Plug Power's restated amounts, as well as the originally reported amounts for FY2020 (Q1-Q3), are sourced from ECF No. 86-2 at 9, 28 (excerpts of Plug Power's 2020 Form 10-K).

fuel costs, stating the change "surprised us, as it's unclear how fuel could've ended up erroneously in R&D." *Id*. ¶ 124. Barclays also was "[q]uestioning what margins look like now, near and long term" and highlights that "[i]n the past we had pointed to strong gross margin across select business segments as indicators of PLUG's R&D efforts paying off, specifically fuel cells. This proved untrue and there is now increased execution risk and lesser clarify on the potential for a dramatic margin improvement narrative playing out." *Id*. ¶¶ 126, 172.

## III. THE COMPLAINT STATES AN EXCHANGE ACT § 10(b) CLAIM

### A. Legal Standard

A complaint can defeat a Rule 12(b)(6) motion by alleging sufficient factual matter that states a facially plausible claim to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim is facially plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable[.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[P]lausibility…is not akin to…probability…[but] asks for more than a sheer possibility that…defendant…acted unlawfully." *Iqbal*, 556 U.S. at 678. Courts must "accept[ ]…all factual allegations [on a 12(b)(6) motion] and draw [] all inferences in…plaintiff's favor." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011).

To plead a §10(b) claim, a plaintiff must show that the defendant made a material misrepresentation or omission, scienter, *i.e.*, a wrongful state of mind, in connection with the purchase or sale of a security, reliance, economic loss, and loss causation. *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, No. 1:16-CV-3591-GHW, 2020 WL 1877821, at *7 (S.D.N.Y. Apr. 14, 2020). Here, Defendants only contest scienter and loss causation. Their arguments fail.

10

B.      The Complaint Alleges a Strong Inference of Scienter

Under the PSLRA, to plead scienter, a plaintiff must allege facts with particularity that would give rise "to a strong inference that the defendant acted with the required state of mind." *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (quoting 15 U.S.C. § 78u–4(b)(2)).  This requisite scienter "can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  *Id*.  When determining whether Lead Plaintiff alleges a strong inference of scienter, a court must consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).  A complaint will survive "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id*. at 324.  The inference of scienter "need not be…the 'most plausible of competing inference[s],'"—only "*at least as likely* as any plausible opposing inference."  *Id*. at 308, 324, 328.  (Emphasis added).  A plaintiff is not required to produce direct evidence of scienter because "fraudulent intent is rarely susceptible to direct proof and must ordinarily be established by circumstantial evidence and…inference[s] arising therefrom."  *Century Pacific, Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 222 (S.D.N.Y. 2007), *aff'd*, 354 App'x 496 (2d Cir. 2009) (internal quotation marks and citations omitted).

1.      Defendants Had Motive and Opportunity to Fraudulently Inflate the Price of Plug Power Stock

Defendants' motive to commit securities fraud is alleged "by pointing to the concrete benefits that could be realized from one or more of the allegedly misleading statements or

nondisclosures; opportunity [can] be shown by alleging the means used and the likely prospect of achieving concrete benefits by the means alleged." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 108–09 (2d Cir. 2009) (internal quotation marks and citations removed).[7] Here, Defendants were motivated to inflate Plug Power's margins to make the Company's business appear scalable, which was a necessary precondition to gain SK Group's $1.5 billion investment and a partnership with SK Group. After issuing the false financial statements and announcing the SK Group deal, the Company's stock price increased by 90%. Defendants sold millions of dollars of Plug Power common stock to profit and to cover the Company's losses.

Accordingly, as discussed below, Lead Plaintiff has sufficiently alleged facts showing motive and opportunity to support a strong inference of scienter that is "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

> **a.     Enticing the Monumental Deal with SK Group Provided Defendants with Motive and Opportunity to Engage in Fraud**

Lead Plaintiff sufficiently alleges that Defendants were motivated to falsely inflate Plug Power's gross margins to create the appearance that the Company's growth trajectory was positive. This illusion of progressive growth increased Plug Power's stock price and attracted a needed $1.5 billion investment from SK Group to form a joint venture with Plug Power. Plug Power's misleading margins increased the stock price, attracted this crucial investment, and allowed Defendants to profit in the weeks following the SK Group deal through considerable insider sales and a historic secondary offering at inflated prices.

---

[7] Defendants' opportunity to commit the alleged fraud prong is not contested. The Individual Defendants held the highest positions of authority at Plug Power and admittedly made material, false statements in SEC filings to Plug Power investors. *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996) (noting that it is "indisputable that key directors and officers have [the] ability to manipulate their company's stock price").

To plead a strong inference of scienter through "motive and opportunity" to defraud, Lead Plaintiff must allege that Plug Power or its officers "benefitted in some concrete and personal way from the purported fraud." *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000). The desire to complete a corporate transaction can be sufficient to warrant an inference of scienter. *Rothman v. Gregor*, 220 F.3d 81, 92–94 (2d Cir. 2000). But the inquiry is an "extremely contextual one," *In re Complete Mgmt. Inc. Secs. Litig.*, 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001), that demands an allegation of a "unique connection between the fraud and the acquisition." *ECA, Loc. 134*, 553 F.3d at 201 n.6. This Court has found that "unique connection" can exist when the "misstatements directly relate to the acquisition." *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 243 (S.D.N.Y. 2012) (internal quotation marks and citations omitted); *see also Rothman*, 220 F.3d at 93 (relying on *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 262, 270 (2d Cir. 1993), in which the Second Circuit addressed misstatements that directly concerned company's search for strategic partners and its nondisclosure of its consideration of alternative stock offering).[8]

Here, misstating cost of goods sold as research and development dramatically inflated Plug Power's margins for services performed on fuel cell systems and related infrastructure and fuel delivered to customers. These false statements were necessary to make Plug Power's business seem scalable and to attract the investment and partnership with SK Group. The direct connection between the false statements and the SK Group deal is evidenced by SK Group's and Plug Power's joint announcement to investors on January 6, 2021. At the time of the deal, SK Group stressed that Plug Power's ability to scale its business was integral to forming the joint

---

[8] *See also In re Complete Mgmt*, 153 F. Supp. 2d at 327-28 (finding allegation of recognition of "phony receivables" in context of acquisition sufficiently concrete to find motive).

venture because the South Korean government had been seeking a partner to meet the country's ambitious green energy goals for 2040:

> In January 2019, the South Korea government announced the Hydrogen Economy Roadmap through 2040, with ambitious goals, including: over 5MM tons of hydrogen per year, over 6MM fuel cell EVs, 1,200 refilling station and 15 GW of fuel cell power generation, and expects the cumulative economic value of its hydrogen economy to reach [approximately] 40Bn by 2040. **Plug Power has proven its ability to scale a hydrogen business in North America** as a global leader in the hydrogen economy. The opportunity to partner with SK presents an attractive and timely opportunity to establish a foothold in this market with one of South Korea's leading industrial conglomerates.

(Emphasis added) Ex. H to Mot. (ECF No. 86-8) at 6.

The "proven" scalability of Plug Power's operations, however, was based on Defendants' materially overstated margins published in the Company's financial statements. Between FY2016 and the third quarter of FY2020, the Company represented that it maintained relatively steady margins for its services performed on fuel cell systems and related infrastructure and fuel delivered to customers. In reality, Plug Power's margin losses for fuel delivery and fuel cell maintenance were actually two to four times worse than originally reported and at times over 100% negative. *See supra* notes 5 and 6. In other words, Plug Power was not scaling efficiently and the critical reason for SK Group's decision to partner with and invest in Plug Power was based on the materially false statements.

After Defendants' false statements induced the SK Group deal, Plug Power's stock price jumped 35%. Compl. ¶ 73. Within two weeks, Plug Power's stock increased by almost 90%. *Id.* ¶ 76. On cue, Defendant Marsh then sold the Company's inflated stock by executing unusual trades on January 19, 2021 and selling 43% of his holdings for approximately $37.7 million. *Id.* ¶¶ 77-78. A week later, Plug Power announced that it was commencing a secondary public offering of its common stock. *Id.* ¶¶ 82-83. Ultimately, this secondary offering netted the

14

Company proceeds in excess of $2 billion, representing the largest bought deal in the cleantech sector the most lucrative capital raise in the Company's 24-year history. *Id.* ¶ 92. Accordingly, both Defendant Marsh and the Company immensely benefited at the expense of shareholders.

Defendants' argument that Lead Plaintiff merely alleges a general corporate motive of appearing profitable to raise capital is wrong. Mot. at 15. In fact, Defendants specifically sought to keep its gross margins inflated so that its business could appear scalable and complete the deal with SK Group.[9] Further, Defendants' claim that the SK Group deal was not done for personal gain completely ignores that the deal secured a $1.5 billion investment into Plug Power and Defendant Marsh's and the Company's subsequent actions to take advantage of the Company's inflated stock price. Mot. at 17. In the weeks following the announcement of the SK Group deal, both Defendant Marsh and Plug Power heavily profited at shareholders' expense with substantial insider sales and a historic secondary offering. The apparent and unique connection between Plug Power's alleged misconduct and the SK Group deal combined with the tremendous personal benefit that the deal provided the Company and Defendant Marsh establishes a strong motive to perpetuate the fraud. Defendants' arguments otherwise should be rejected.

> **b.     The Individual Defendants' Insider Sales Create a Strong Inference of Scienter**

Individual Defendants were motivated to participate in the fraud to profit from substantial insider trades. There is no question that "motive can be shown…when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 233 (S.D.N.Y.2010) (internal citation and quotation marks omitted). "Unusual insider sales at the time of the alleged withholding of negative corporate

---

[9] Defendants' legal support for its argument is inapplicable as the case law involves instances of general corporate motive and not the unique circumstances of making a business appear scalable to attract a specific partner. *See* Mot. at 15-18.

news may permit an inference of bad faith and scienter." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001). Among the things considered when determining whether trading was unusual or suspicious are the amount of net profits realized from the sales; the percentages of holdings sold; the change in volume of insider defendant's sales; and whether sales occurred shortly before corrective disclosures or materialization of the alleged risk. *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 256 (S.D.N.Y. 2020). There is no *per se* rule, however, and the Second Circuit has held "each case [should be] decided on its own facts". *In re Scholastic*, 252 F.3d at 75.

Defendants Marsh and Middleton made substantial sales during the Class Period. Defendants Marsh and Middleton sold 43% and 48% of their holdings respectively. Compl. ¶¶ 185, 188. Defendant Marsh sold 573,268 shares for over $37 million in proceeds and Defendant Middleton sold 216,667 for over $7 million in proceeds. *Id*. Far less dramatic insider selling has been held to show motive and opportunity. *See e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 365-66 (S.D.N.Y. 2003) ("Where corporate insiders…sold hundreds of thousands of dollars' worth of inflated stock, the motive prong is plainly satisfied."); *see also In re Weight Watchers*, 504 F. Supp. 3d at 256 (finding a reduction in ownership by an insider from 44% to 22% to be sufficient to establish motive and opportunity).

The timing of Individual Defendants' sales also supports an inference of fraud. Defendant Marsh became President and CEO of Plug Power in April 2008. Over a 12-year period between April 2008 and January 2020, Defendant Marsh never sold any of his Plug Power stock. In the following 12 months, between February 2020 and January 2021, Defendant Marsh sold over 5.7 million shares of Plug Power stock, generating total proceeds of over $76 million, including 573,268 shares for over $37 million during the Class Period. Defendant Marsh's sales

16

during this period—a period when the Company was forced to restate its financial performance—are wholly inconsistent with his historical practices. *See* Exhibit A to the Declaration of Michael S. Bigin, filed herewith ("Bigin Decl."); *see also In re Scholastic*, 252 F.3d at 74 ("unusual insider sales at the time of the alleged withholding of negative corporate news may permit an inference of bad faith and scienter.").[10]   Similarly, despite joining Plug Power in 2014, Defendant Middleton had never sold any of his Plug Power stock until July 2020. Between July 6, 2020 and December 24, 2020, Defendant Middleton sold over 1.7 million shares of Plug Power stock, generating total proceeds of over $29 million, including 216,667 shares for over $7.6 million during the Class Period. *See* Ex. Y to Mot. (ECF No 86-25).   Defendant Middleton's sales during the period Plug Power issued false financial statements were also inconsistent with his historical practices.

Furthermore, Defendant Marsh's Class Period sales were undoubtedly timed to take advantage of the artificial stock inflation caused by the announcement of the SK Group deal. Defendant Marsh's insider sales occurred less than two weeks after that announcement and when the Company's stock had increased by 90%.  Compl. ¶ 76.  Moreover, sales near the end of the Class Period further support the inference of fraud. *See City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 800 (S.D.N.Y. 2013) ("the end of the putative class period, [is] when insiders would have rushed to cash out."); *see also*, *In re Oxford Health Plans Inc.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999) ("Trades made a short time before the negative public announcements are suspiciously timed.").  Here, Defendant Marsh's trades were made less than

---

[10] Defendants' argument that the amount of Defendant Marsh's Class Period sales was not suspicious because they were smaller than sales that occurred earlier in 2020 falls flat because all of the sales referenced occurred while Plug Power was providing misleading financial information to the market.  Mot. at 18.  As noted above, Defendant Marsh's sales during the restatement period dwarf his sales prior to the restatement period.

2 weeks following the announcement of the SK Group deal and only 6 weeks before the first corrective disclosure. *See* Compl. ¶¶ 70, 77, 95. Given the timing of Defendants Marsh's insider sales, the most plausible inference is that these sales were "calculated to maximize the personal benefit from undisclosed inside information." *S.E.C. v. Rorech*, 720 F. Supp. 2d 367, 414 (S.D.N.Y. 2010).

Lastly, Individual Defendants' decisions to exercise their stock options six to nine years before their expiration show they knew Plug Power's stock price did not reflect the Company's true financial condition. In order to effectuate over 80% of his shares sold on January 19, 2021, Defendant Marsh exercised options that would not expire until 2027. Compl. ¶ 79. That Defendant Marsh utilized options set to expire so far in the future is even more compelling considering that less than a week after his sales, Plug Power raised its gross billings guidance for FY2021 to $475 million. *Id.* ¶ 178. Likewise, Defendant Middleton exercised options that were not due to expire until 2028 and 2029. *Id.* ¶ 68. Abandoning substantial future value during periods of optimism, as Individual Defendants did, has been found to be indicative of fraudulent conduct. *See Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) (finding president and CEO sold 40 % of his stock holdings to be unusual in light of him making optimistic statements about company's financial position during the class period). Accordingly, the volume, proceeds and timing from the Individual Defendants' sales are highly indicative of scienter.

Defendants' attempt to negate the cogent inference of scienter from their enormous and suspiciously timed stock sales by stating they were made pursuant to an Exchange Act Rule 10b5-1 plan. Mot. at 18-19. As an initial matter, relying on a Rule 10b5-1 plan is an affirmative defense and inappropriate to consider during motion to dismiss. *See* 17 C.F.R. § 240.10b5-1(c) (A valid plan is an affirmative defense only); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp.

18

2d 171, 201 (S.D.N.Y. 2010) (disallowed use of 10b-5 plan defense during motion to dismiss). Additionally, a 10b5-1 affirmative defense is premised on an insider demonstrating that the plan met all the applicable requirements of Exchange Act Rule 10b5-1(c). For example, the plan must have at least (1) specified the amount of securities to be sold and the price and date which they were to be sold sale date, (2) included a formula for determining the amount of securities to be sold and the price and date which they were to be sold, or (3) did not allow the adoptee to exercise any discretion over the sale. *See* 17 C.F.R. § 240.10b5-1(c). Here, the purported 10b5-1 plans are not public. Therefore, Defendants cannot show that the plans are valid without discovery and converting their Rule 12(b)(6) motion to a Rule 54 motion. Fed. R. Civ. P. 12(d). Indeed "issues of fact remain with regard to the trading plans" and, thus, they cannot operate as an affirmative defense. *Malin v. XL Capital Ltd.,* 499 F. Supp. 2d 117, 156 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009); *see also Azar v. Yelp, Inc.*, No. 18-cv-00400-EMC, 2018 WL 6182756, at *19 (N.D. Cal. Nov. 27, 2018) (stating that 17 C.F.R. § 240.10b5-1(c)(1)(i)(B) requires the trading plan adhere to certain standards and "without reviewing" the trading plan, "the Court cannot determine whether these requirements were met and cannot conclude that the plan negates any inference of scienter").

But even if discovery later shows Individual Defendants' Rule 10b5-1 plans met some of the more objective requirements of 17 C.F.R. § 240.10b5-1(c)(1)(i), the affirmative defense can only apply if the plan was "entered in good faith and not as part of a plan or scheme to evade the prohibitions of this section." 17 C.F.R. § 240.10b5-1(c)(1)(ii).[11] Here, Defendants have failed to

---

[11] The Securities and Exchange Commission has also recently expressed concern of the use of 10b5-1 plans as an affirmative defense, noting "gaps" in the current scheme designed to protect investors from insider trading, and has proposed amendments to Rule 10b5-1 designed to fill in those gaps such as a cooling-off period before trading under a plan and a certification from the

establish that Defendants' plans were entered in good faith.  Defendant Marsh's Form-4 filed

with the SEC on January 21, 2021 disclosing his Class Period sales states that the "[s]hares

[were] sold pursuant to a pre-established 10b5-1 trading plan" but does not disclose when that

plan was established.  *See* Ex. X to Mot. (ECF No. 86-24) at 11.  Accordingly, it is highly

plausible that Defendant Marsh adopted or amended his 10b5-1 plan during the Class Period

while in possession of non-public information to take advantage Plug Power's artificially inflated

share price, which had reached near all-time highs shortly following the announcement of the SK

Group deal.[12]  Similarly, Defendant Middleton's sale may have been made pursuant to a 10b5-1

trading plan that was established during the period Defendants were providing false financial

metrics to the market.  *Id.* ¶ 67.  This plan can hardly be considered to have been made in good

faith and certainly requires discovery.  Therefore, the Individual Defendants' 10b5-1 plans are

not a defense to scienter.  *See George v. China Auto Sys., Inc.*, No. 11 Civ. 7533(KBF), 2012

WL 3205062, at *9 (S.D.N.Y. Aug. 8, 2012) (Where "10b5-1 trading plans are entered into

during the class period, they are not a cognizable defense to scienter allegations on a motion to

dismiss"); *see also Employees' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 309 (2d

Cir. 2015); *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 494 (S.D.N.Y. 2018), *aff'd*

---

trader. *See* Press Release, Securities and Exchange Commission, SEC Proposes Amendments Regarding Rule 10b5-1 Insider Trading Plans and Related Disclosures (Dec. 15, 2021), https://www.sec.gov/news/press-release/2021-256; *see also* Rule 10b5-1 and Insider Trading, Release No. 33-11013; 34-93782, (proposed Dec. 15, 2021) (to be codified 17 CFR pts. 229, 232, 240 and 249), https://www.sec.gov/rules/proposed/2022/33-11013.pdf; Fact Sheet, Rule 10b5-1 and Insider Trading: Proposed Rules, SEC (Dec. 15, 2021), https://www.sec.gov/rules/proposed/2021/33-11013-fact-sheet.pdf.https://www.sec.gov/rules/proposed/2021/33-11013-fact-sheet.pdf.

[12] Contrary to Defendants' assertion that these sales were prescheduled (Mot. at 19), Plaintiffs have alleged that Defendant Marsh's insider sales were seemingly part of 10b5-1 plan issued while the Company made false and misleading statements to the public and to profit from the concealment of that non-public information.  *See* Compl. ¶¶ 188-191.

20

*in part, vacated in part on other grounds sub nom. Abramson v. Newlink Genetics Corp.*, 965 F.3d 165 (2d Cir. 2020); *Freudenberg,* 712 F. Supp. 2d at 201.  Therefore, because the contents of the plans are unknown, and given that the Court must draw all inferences in favor of the non-moving party, the Court cannot infer any good faith from the available information and should find that these plans provide no defense.  *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161 (2d Cir. 2000).  Defendants' insider trading strongly supports an inference of scienter.

### 2.    Lead Plaintiff Adequately Alleged that Individual Defendants Knew or Recklessly Disregarded Material Accounting Errors

The Individual Defendants' suspicious behavior surrounding Plug Power's reporting on its profitability, the magnitude and impact of Plug Power's restatement on its financials, the fraud's impact on the Company's core operations, and Individual Defendants' SOX certifications in the face of Plug Power's obvious accounting errors, support an inference that Defendants knew or recklessly disregarded the Company's issued material accounting misstatements prior to the initial corrective disclosure.

A plaintiff pleading the "conscious misbehavior or recklessness" theory of scienter must allege conduct that is "highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (internal quotation marks and citation omitted).  There are at least four methods where circumstantial evidence can support an inference of scienter, including allegations that defendants "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor."  *Blanford*, 794 F.3d at 306 (internal quotation marks and citations omitted).  "The

21

inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324.  Here, Lead Plaintiff adequately alleges strong circumstantial evidence to support an inference that Defendants knew or should have known that Plug Power misled investors by issuing false financial statements.

a.      **Defendants' Decision to Omit EBITDA Figures in January 2021 Shows Defendants Knew Margins Were Overstated**

The Individual Defendants' conduct and statements made in January 2021 indicate that they had access to information confirming Plug Power's margins were inflated, which directly and negatively impacted EBITDA.[13]  *See Novak*, 216 F.3d at 308 (finding access to information contradicting public statements as a basis to find scienter when specifically identified).

Prior to the Class Period, Defendants regularly provided adjusted EBITDA figures to investors. Compl. ¶¶ 47-50.  However, at the start of the Class Period (and coinciding with publishing inflated margins while courting SK Group), Defendants omitted EBITDA guidance. During the Company's earnings call on November 9, 2020, analysts asked Defendant Marsh about Plug Power's EBITDA guidance for 2021.  Defendant Marsh said that while the Company has not provided the market with a specific adjusted EBITDA guidance range yet for 2021, "it will definitely be higher [than 2020]." *Id*. ¶ 54.  He further added that the Company is "very confident that we'll continue to be accretive and go up" and that he would be in a better position to provide that guidance during the Company's January business update call. *Id*.  Then on January 26, 2021, Defendant Marsh did not provide a financial target for adjusted EBITDA. *Id*. ¶ 178.  When analysts again asked Defendant Marsh about this omission, he promised to share

_____

[13] For example, increases in cost of fuel negatively impacted EBITDA because that increased the loss accruals required for Plug Power's extended maintenance contracts which directly reduced the Company's operating income.  Compl. ¶ 45.

22

EBITDA guidance during the Company's earnings call for the fourth quarter of FY2020. *Id.* Nevertheless, on February 25, 2021, during that earnings call, Defendant Marsh again did not provide any information on adjusted EBITDA for FY2020 or guidance for FY2021. *Id.* ¶¶ 181. Even when Defendant Marsh was again asked for this information, he elected to neither provide this data nor an explanation for its omission. *Id.* It wasn't until after the SK Group Deal closed that investors learned EBITDA was suffering from false claims of higher margins. Indeed, Defendant Marsh's repeated refusal to disclose the Company's 2021 adjusted EBITDA guidance, despite routinely doing so in the past and conveying in November 2020 that he was monitoring the Company's EBITDA Guidance (*id.* ¶ 54), creates a strong inference that Defendants knew their new auditor was likely to or already had identified material misstatements in the Company's financial statements that would require restatement effecting margins and negatively impacting the Company's EBITDA.

Defendants argue that Plug Power was simply not yet prepared to provide EBITDA guidance. Mot. at 28. This explanation, however, ignores the totality of facts and circumstances surrounding Defendants' conduct. Defendants ignore the suspect timing of Defendants' decisions to not provide EBITDA guidance. Disclosing disappointing EBITDA guidance caused by pending revisions to the Company's financial statements and accounting procedures could have derailed two of the most important deals in the history of the Company. On January 6, 2021, Defendants had already announced the Company's deal with SK Group; however, the deal was still weeks away from closing. *Id.* ¶¶ 70-74. Moreover, that very same day, as the Company's stock was peaking in the wake of the SK Group announcement, the Company announced the largest secondary offering in its history. *Id.* ¶¶ 82-85. These two deals together represented a $3.5 billion dollar infusion into the Company and tripled its total cash balance to

23

over $5 billion. *Id*. ¶ 93. It was only after Defendant Marsh's insider selling, the completion of the secondary public offering, and the closing of the SK Group deal that Defendants revealed Plug Power's false accounting. *Id*. ¶¶ 74, 92, Ex. N to Mot. (ECF No. 86-14) at 4.[14]

Finally, Defendants' hefty reliance on *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015) for the proposition that the facts and circumstance alleged in the Complaint more plausibly support an inference of poor accounting management by Defendants is misplaced. *See* Mot. at 25-27, 34. The facts of *Magnum Hunter* are wholly distinguishable. In *Magnum Hunter*, plaintiff's claim was based solely on circumstantial evidence that defendants' accounting firm ultimately concluded that "internal controls necessary for the [c]ompany to develop reliable financial statement did not exist" and, thus, "defendants had no reasonable basis to have affirmatively assured investors throughout 2012 of the integrity of their internal controls." *In re Magnum Hunter*, 26 F. Supp. 3d at 297. Here, Lead Plaintiff's claims are not reliant on a determination on whether it was possible for Plug Power to have effective internal controls. Rather, Lead Plead Plaintiff alleges scienter exists based upon Defendants' suspicious behavior surrounding Plug Power's reporting on its profitability, the magnitude and impact of Plug Power's restatement on its financials and the fraud's impact on the Company's core operations. Further, the plaintiffs in *Magnum Hunter*

---

[14] Contrary to Defendants' argument, documents and confidential witnesses are not required to plead a strong inference of scienter. Mot. at 24. *See Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l*, 367 F. Supp. 3d 16, 38 (S.D.N.Y. 2019) ("this Court is aware of no authority requiring [witness] allegations"); *see also In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 360 (S.D.N.Y. 2011) (relying on alternative theories "to bridge the scienter gap"…"[i]In the absence of specified internal reports").

failed to allege any motive. *Id.* at 296. Here, Lead Plaintiff alleges Defendants were motivated to capitalize on the deal with SK Group, a lucrative deal uniquely tied to the fraud at issue.[15]

Ultimately, given Defendants' involvement in consistently providing EBITDA guidance throughout FY2020, Defendant Marsh's repeated promises to provide such guidance for FY2021, Defendant Marsh's and Defendant Middleton's failure to ultimately provide any explanation for its omission, and the conspicuous overlap of this inexplicable omission with two groundbreaking developments for Plug Power and substantial insider selling, it is more plausible that Defendants knew there were serious problems with the Company's accounting and delayed disclosure until the SK Group deal and the secondary public offering closed in February 2021 and had finished enriching themselves at shareholders' expense.

  **b.  The Magnitude and Impact of the Restatement Compels an Inference of Scienter**

The magnitude of Defendants' alleged fraud demonstrates that Defendants knew their statements were materially misleading or at least issued the misstatements with severe recklessness. The size of the purported fraud may provide an inference of scienter in the Second Circuit. *See In re Scholastic*, 252 F.3d at 77 (holding that a total of $24 million in charges "undermines, at the pleading stage, the argument that the defendants were unaware" of any increase in returns); *Rothman*, 220 F.3d at 92 (deeming significant the "magnitude" of a defendant's write-off in determining scienter). Here, Plug Power misclassified its research and development expenses in clear violation of Generally Accepted Accounting Principles (GAAP) for the restatement period by $80.7 million or 53.2% of the originally reported figures. Compl.

---

[15] Moreover, the *Magnum* court found a lack of scienter when accounting issues were released to the market in "dribs and drabs" over several months. That is not analogous to the facts here, where Defendants' initial corrective disclosure revealed the primary reasons for the restatement that were quantified in the final disclosure weeks later. Compl. ¶¶ 95, 108.

¶¶ 111, 167. This false accounting required a restatement of almost five years of financial statements and had the following effects: (1) Plug Power's margins for fuel delivery and fuel cell maintenance were decimated by 200% to 400%; (*see supra* notes 4 and 5); (2) almost all of the Company's gross profits since 2016 were expunged, and caused nearly every reporting period to report large gross losses except for FY2019, where the gross profit reported was cut by over 60% (Compl. ¶ 115); and (3) the resulting increase for the loss accruals required for Plug Power's extended maintenance contracts reduced the Company's operating income by $20.8 million for the third quarter of FY2020, a decrease of approximately 52% (*id*. ¶ 117). For Defendants to be unaware of deviations of this size, their actions can only be considered severely reckless.

Analysts were particularly concerned about the restatements effect on the Company's gross margins, given that the size of the misclassification had the potential to threaten Plug Power's future prospects and outlook. *Id*. ¶¶ 102-104, 123-126; *see also Dobina*, 909 F. Supp. 2d at 250 (stressing analyst interest in accounting errors as indicative that errors were substantial). In fact, analysts did not believe fuel could have been mistakenly recorded as Research and Development. Compl. ¶ 124. As Barclays stated, the only explanation for this type of misclassification "simply put" was to "show higher margins on hardware, the fuel cells," which made it appear Plug Power was scaling. *Id*. ¶ 103.

Despite Defendants' claim otherwise, there is no requirement that a restatement must heavily affect a defendant-company's corporate income to be considered significant.[16] Mot. at

---

[16] Lead Plaintiff objects to the Court taking judicial notice of Exhibits U and V to the Declaration of Deborah S. Birnbach for the truth of the matter asserted. These analyst reports were not cited in the Complaint and are not the type of documents that contain facts that "can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201 (b)(2).

29.    Even if there was such a requirement, by Defendants' own admission, Plug Power's restatement resulted in a $25.8 million loss to the Company's bottom line in the third quarter of FY2020, a decrease of approximately 65%.  *See* Mot. at 10.  Instead, "the size of the alleged fraud can be relevant to the scienter inquiry, provided it is presented in tandem with other circumstantial evidence to suggest scienter."  *In re Pareteum Sec. Litig.*, No. 19 Civ. 9767 (AKH), 2021 WL 3540779, at *17 (S.D.N.Y. Aug. 11, 2021) (internal quotations marks and citation omitted); *see also In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 13 Civ. 8846(LGS), 2014 WL 7176187, at *7 (S.D.N.Y. Dec. 16, 2014) ("The magnitude of a restatement, in other words, must be presented in tandem with other circumstantial evidence to suggest scienter."). Here, Lead Plaintiff has tied Plug Power's substantial restatement with Defendants' knowledge of the accounting errors with Defendants' motive to capitalize on the deal with SK Group, a lucrative deal uniquely tied to the fraud at issue, which was then shortly followed by Defendant Marsh's insider sales for tens of millions of dollars, and the Company's largest secondary public offering in its history—all in the weeks immediately preceding the initial corrective disclosure. As such, the magnitude and impact of Defendants' purported fraud further supports a strong inference of scienter.

c.    **Defendants Knew Margins Were Overstated because Research and Development Are Core Operations of Plug Power**

Defendants' misclassification of research and development expenses as costs of revenue concerns critical aspects of Plug Power's core operations, which were monitored by the Defendants.  The core operations "doctrine allows courts to draw an inference of scienter where misrepresentations and omissions allegedly made by defendants were about their core

operations."[17]  *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F.

Supp. 3d 379, 423 (S.D.N.Y. 2020).  Core operations constitute matters that "make up nearly all

of a company's business or be essential to its survival."  *Francisco v. Abengoa*, S.A., No. 15

CIV. 6279 (ER), 2021 WL 4136899, at *24 (S.D.N.Y. Sept. 10, 2021).

Here, Defendants' alleged fraud primarily concerns inflating research and development

expenses—an aspect of Plug Power's business vital to its survival.  As described in Plug Power's

2020 Form 10-K:

> Because the fuel cell industry is still in the early state of adoption, our ability to compete successfully is heavily dependent upon our ability to ensure a continual and timely flow of competitive products, services, and technologies to the marketplace. We continue to develop new products and technologies and to enhance existing products in the areas of cost, size, weight, and in supporting service solutions in order to drive further commercialization.

Ex. B to Mot. (ECF No. 86-2) at 7; Compl. ¶¶ 32-34.  Further, analysts were immensely

concerned about the likelihood of Plug Power reaching its long-term profitability goals.  Compl.

¶ 172.  In response to Plug Power's corrective disclosure on March 16, 2021, which, among

other things, described its accounting errors and revealed that the Company needed to restate its

Previous Issued Financial Statements, analysts from Barclays underscored that they were "most

crucially" concerned with "the degree to which past margin for fuel cell products are lower (if a

lot of R&D moves to Cost of Rev.)" and believed that revisions to research and developments

could have been a ploy by Defendants to inflate margins and would substantially affect Plug

Power's forecasts.  *Id*. ¶¶ 96-104.  Upon Plug Power completing the restatement of its Previous

---

[17] While "some courts have cast doubt on whether this doctrine survived the PSLRA's heightened scienter requirements, the majority of courts [including this one] in this Circuit have found that the "doctrine may provide support for, but not an independent basis of, scienter." *In re Pareteum*, 2021 WL 3540779, at *17 n.4 (quoting *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 n.11 (S.D.N.Y. 2015) (collecting cases).

Issued Financial Statements, Barclays analysts noted that due to the revisions, they could not render positive EBITDA for 2020 or 2021, no matter the add-backs attempted by the Company. Additionally, Barclays noted that they had "pointed to strong gross margins … as indicators of PLUG's R&D efforts paying off, specifically fuel cells"; however, "[t]his proved untrue" and put Plug Power's long-term profitability goals at risk. *Id.* ¶ 172.

Defendants' argument that accounting judgments are not "core operations" and thus it is not "reasonable to infer that Marsh or Middleton knew or were reckless in not knowing that the judgment calls were incorrect at the time" is misguided. Mot. at 31. In *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474 (S.D.N.Y. 2004), an argument similar to Defendants' was explicitly rejected as "each individual defendant who served as a high-level officer had a duty to familiarize himself with the facts relevant to the core operations of the company and the financial reporting of those operations." *See In re Atlas*, 324 F. Supp. 2d at 490-91; *see also Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1062 (9th Cir. 2000) ("Key corporate officers should not be allowed to make important false financial statements knowingly or recklessly, yet still shield themselves from liability to investors simply by failing to be involved in the preparation of those statements"). The Individual Defendants cannot avoid liability simply because their fraud involved issuing false financial statements that implicate basic accounting.

Given the importance of research and development to the survival of Plug Power's business, the fact that Defendants fraudulently inflated this expense by over 50% over a five-year span bolsters the plausible inference that the Individual Defendants knew or should have known that the statements at issue were false when made.

### d.        Defendants' SOX Certifications Are Indicative of Scienter

Defendants' Sarbanes-Oxley Act ("SOX") certifications, which falsely represented that the financial statements were materially correct, are also indicative of scienter. Compl. ¶¶ 195-198. Signing SOX certifications is indicative of scienter when a plaintiff alleges facts "show[ing] a concomitant awareness of or recklessness to the materially misleading nature of the statements." *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015) (collecting cases). Here, Lead Plaintiff alleges that Individual Defendants had reason to know of Plug Power's substantial accounting errors prior to January 2021. *See* Compl. ¶¶ 46-54, 178, 181-182. Following this date, Individual Defendants certified the accuracy of the January Prospectus and Plug Power's 4Q2020 Letter to Shareholders on January 28, 2021 and February 25, 2021, respectively, despite knowing that these statements contained material misrepresentations, including improper accounting for the Company's research and development expenses.

Additionally, Individual Defendants' SOX certifications in the face of Plug Power's blatant accounting errors are also suggestive of scienter. SOX certifications "may be probative of scienter" where the plaintiff alleges "glaring accounting irregularities or other red flags, of which the certifying defendant had reason to know." *Reilly v. U.S. Physical Therapy Inc.*, No. 17 Civ. 2347 (NRB), 2018 WL 3559089, at *19 (S.D.N.Y. July 23, 2018). Here, much of Plug Power's research and development expenses were reclassified as a very specific type of cost of revenue—cost of fuel delivered to customers. Compl. ¶ 112. Such a misclassification has no explanation but for fraud or severe recklessness. *Id.* ¶ 171.

Indeed, on May 16, 2021, following Plug Power's restatement, a Barclays analyst described this misclassification as surprising and specifically noted that there was no justification

30

to classify fuel costs as research and development expenses. *Id.* ¶¶ 123-126, 171-172. Defendants' counter that a March 18, 2021 Barclays report offered an innocent explanation for the misstatements by positing that there was a sharing of overhead costs. Mot. at 26. But Barclays later dismissed that possibility. In describing its astonishment over the reclassification of research and development expenses as fuel costs, Barclays clarified that overhead costs were only connected to services costs, not fuel costs. "This reclassification of R&D to fuel COGS surprised us, as it's unclear how fuel could've ended up erroneously in R&D (**Service line makes sense given dual functions at Rochester facility, for example**)." *See* Exhibit B to Bigin Decl. at 3. As there is nothing complex about proper the allocation of fuel costs, it is more than plausible that Individual Defendants knew the Company was incorrectly accounting for fuel cost, but nevertheless certified Plug Power's financial statements. Accordingly, Individual Defendants' SOX certifications further support an inference of scienter.

### 3.       A Holistic Reading of the Complaint further Demonstrates Scienter

The guiding question for determining whether a plaintiff has alleged scienter is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. Scienter allegations must be considered as a whole, and the Court must assess "the total weight of the circumstantial allegations together with the allegations of motive and opportunity". *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137-38 (2d Cir. 2021) (citing to *ECA, Loc. 134*, 553 F.3d at 198-99) (explaining that the strength of circumstantial allegations required to plead scienter varies depending on whether there are also allegations of motive and opportunity on the part of corporate officers to commit fraud). If the inference of scienter is equally as compelling as any innocent inference, the motion to dismiss must be denied. *See In re Top Tankers, Inc. Secs. Litig.*, 528 F. Supp. 2d 408, 413-14 (S.D.N.Y. 2007) ("courts since

*Tellabs* have concluded that even if the plaintiff demonstrates only that an inference of scienter is at least as compelling as any nonculpable explanation for defendant's conduct, the tie goes to the plaintiff."). Here, Lead Plaintiff's allegations, when viewed holistically, adequately demonstrate Defendants' scienter:

- Defendants were motivated to inflate Plug Power's margins to make the Company's business appear scalable and attract a $1.5 billion investment and partnership with SK Group;

- Plug Power's deal with SK Group was immediately followed by over $37 million in insider sales by Defendant Marsh and a secondary public offering worth over $2 billion—the largest secondary offering in the Company's history;

- Both Defendant Marsh and Defendant Middleton had substantial insider sales during the Class Period, which were out of line with their historic trading practices;

- Plug Power's accounting errors were revealed very shortly after the completion of its $2 billion secondary offering and the closing of the SK Group deal;

- In January of 2021, while the Company was trying to complete the SK Group deal and its $2 billion secondary public offering, Defendants inexplicably ceased to provide EBITDA guidance as it had routinely done in the past;

- Defendants overstated research and development expenses, a core aspect of Plug Power's business, by misclassifying fuel costs—which analysts found the only explanation was that "management wanted to show higher margins on the core hardware, the fuel cells";

- The magnitude and impact of Plug Power's restatement of its Previously Issued Financial Statements was so substantial that if Defendants were in fact unaware of the accounting improprieties, then they recklessly disregarded them;

- Individual Defendants signed SOX certifications based on their knowledge of the Company's accounting for material expenses; and

- Defendants maintained weak internal controls that allowed them to issue materially false financial statements. Compl. ¶¶ 135, 159.

When the allegations of the Complaint are viewed *in toto*, the inference that Defendants acted with scienter meets or exceeds Defendants' competing claims of an innocent mistake.

32

C.        The Complaint Adequately Pleads Loss Causation

The burden of pleading loss causation "is not a heavy one." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015).  As the Second Circuit has noted, "[t]he vast majority of courts in this district have required that loss causation only meet the notice requirements of Rule 8." *Id.* at 183.  All that is required at the pleading stage is to "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms. Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  This is not the time to test the strength of the allegations of loss causation.  *See Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 404 (2d Cir. 2015) (plaintiff "need only allege sufficient facts to raise a reasonable inference" in support of its loss causation theory).  Alleging that the market reacted negatively in response to disclosure of the alleged fraud is sufficient.  *See Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014).

The Complaint sufficiently alleges that Lead Plaintiff's and the Class's economic loss was caused by Defendants' misrepresentations and omissions.  Compl. ¶¶ 199-217.  Lead Plaintiff alleges that Defendant made materially false and misleading statements related to the Company's effectiveness of its internal controls, its research and development expenses, its loss accrual related to certain service contracts, and that those accounting misclassifications negatively impacted Plug Power and its reported profitability.  *Id.* ¶ 202.  Lead Plaintiff further alleges that Plug Power's stock was artificially inflated during the Class Period as a result of Defendants' false and misleading statements.  *Id.* ¶ 199.  On March 2, 2021, Plug Power partially revealed the alleged fraud by informing the market that Plug Power would not be timely filing its 2020 Form 10-K because the Company was completing a "review and assessment of the treatment of certain costs with regards to classification between Research and Development versus Costs of Goods Sold…and certain internal controls over these and other areas" and that

33

this may result in "significant changes" to its prior period financial statements. *Id.* ¶ 155. That same day, in response to the Company's announcement of a potential restatement, Plug Power's stock fell $3.68, or 7%. *Id.* ¶¶ 156, 204. On March 16, 2021, Plug Power confirmed that the Company's Previously Issued Financial Statements would need to be restated because research and development expenses were misclassified and that loss accruals for certain service contracts were underreported. *Id.* ¶ 206. The Company further disclosed that it had identified a material weakness in its internal controls over financial reporting. *Id.* On March 17, 2021, the next trading session following Plug Power's revelation that it needed to restate its financial results, the Company's common stock fell $3.35, or approximately 7.8%. *Id.* ¶ 207. These declines were a direct result of Defendants' false and misleading statements being revealed to the market. *Id.* ¶ 208. Analysts from Barclays addressed the announced restatement, positing that these misclassifications occurred because management wanted to give the appearance of increased profitability. *Id.* ¶ 170.

Defendants argue that Lead Plaintiff has not pled loss causation because the alleged corrective disclosures only revealed "disappointing news," not fraudulent conduct. Mot. at 34-35. This argument is without merit as it ignores Lead Plaintiff's allegations that Plug Power provided false and misleading financial information to the market during the Class Period and the revelations that certain of its financial information provided to the market may be inaccurate, and later confirmation that was in fact inaccurate both caused the negative impact on the Company's financial performance. *Id.* ¶¶ 136-160. Contrary to Defendants' argument, Lead Plaintiff does not have to plead "an [explicit] 'disclosure of wrongdoing,'" to establish loss causation. *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 520 (S.D.N.Y. 2011). Where, as here, "information is revealed to the market that establishes the

falsity of a defendant's prior representations, a plaintiff has pleaded enough to show loss causation in this Circuit."  *Id*. at 520-21.

## IV.    THE COMPLAINT STATES AN EXCHANGE ACT § 20(a) CLAIM

As shown above, the Complaint states a §10(b) claim, accordingly the §20(a) claim should be sustained.  *Lapin v. Goldman Sachs Grp.*, Inc., 506 F. Supp. 2d 221, 244 (S.D.N.Y. 2006) ("Because those primary liability claims have been found by the Court sufficient to survive Defendants' Motion to Dismiss, the section 20(a) claims have the requisite primary violation foundation."); c*f*. Mot. at 35.

## V.    CONCLUSION

For all these reasons, Defendants' motion to dismiss should be denied in its entirety.

DATED: February 4, 2022                Respectfully submitted,

**BERNSTEIN LIEBHARD LLP**

By: */s/ Michael S. Bigin*
    Stanley D. Bernstein
    Michael S. Bigin
    Peter Harrington
    Adam M. Federer
    10 East 40th Street
    New York, NY  10016
    Telephone: (212) 779-1414
    Facsimile: (212) 779-3218
    bernstein@bernlieb.com
    bigin@bernlieb.com
    pharrington@bernlieb.com
    afederer@bernlieb.com

    *Counsel for Lead Plaintiff and Lead Counsel for the Proposed Class*

35

**CERTIFICATE OF SERVICE**

I hereby certify that on February 4, 2022 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List.

*/s/ Michael S. Bigin*
MICHAEL S. BIGIN