**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE PLUG POWER, INC. SECURITIES LITIGATION | No. 1:21-cv-2004-ER<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**(LEAVE TO FILE MOTION TO DISMISS AND ADDITIONAL PAGES GRANTED 8/3/2021 AND 11/29/2021)** |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION
<u>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

Deborah S. Birnbach
Jennifer B. Luz
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel.: 617.570.1000
Fax: 617.523.1231
DBirnbach@goodwinlaw.com
JLuz@goodwinlaw.com

*Counsel for Defendants Plug Power Inc.,
Andrew Marsh, and Paul B. Middleton*

**TABLE OF CONTENTS**

**Page**

ARGUMENT.................................................................................................................. 2

I.      THE AC FAILS TO PLEAD SCIENTER................................................................ 2

      A.   Plaintiff's New Theory Of Scalability To Entice SK Group To Enter Into A Joint Venture Agreement Fails To Allege A Strong Inference Of Scienter. .................................................................................................. 4

      B.   Trading Pursuant To 10b5-1 Plans Is Not Sufficient To Allege Scienter.............. 7

      C.   Plaintiff Fails To Plead That Defendants Knew Or Were Extremely Reckless In Not Knowing That Any Statement Was False When Made............. 11

            1.   Choosing Not To Give EBITDA Guidance For 2021 Does Not Suggest Conscious Misbehavior Or Recklessness.................................. 12

            2.   The Magnitude Of The Restatement Does Not Plead Scienter................ 14

            3.   The "Core Operations Doctrine" Cannot Save The Deficient Pleading............................................................................................. 16

            4.   The SOX Certifications Do Not Sufficiently Plead Scienter................... 17

      D.   Plaintiff's Asserted Inference Is Not More Cogent Or Compelling Than The Non-Fraudulent Inferences The Court Must Weigh. ................................... 18

II.     THE AC FAILS TO PLEAD LOSS CAUSATION. ......................................... 19

III.    THE AC MUST BE DISMISSED WITH PREJUDICE. .............................. 20

CONCLUSION ...................................................................... 20

# TABLE OF AUTHORITIES

**Cases**                                                                                                     **Page(s)**

*In re Agnico-Eagle Mines Ltd. Sec. Litig.*,
   No. 11 Civ. 7968, 2013 WL 144041 (S.D.N.Y. Jan. 14, 2013).............................................6, 7

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004)........................................................................17

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
   -- F.4th --, No. 20 Civ. 3716, 2022 WL 727149 (2d Cir. Mar. 11, 2022) .........................2, 7, 9

*Azar v. Yelp, Inc.*,
   No. 18 Civ. 400, 2018 WL 6182756 (N.D. Cal. Nov. 27, 2018)................................................8

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
   763 F. Supp. 2d 423 (S.D.N.Y. 2011)........................................................................19

*Born v. Quad/Graphics, Inc.*,
   521 F. Supp. 3d 469 (S.D.N.Y. 2021).....................................................................5, 15

*Building Trades Pension Fund of W. Penn. v. Insperity, Inc.*,
   No. 20 Civ. 5635, 2022 WL 784017 (S.D.N.Y. Mar. 15, 2022) .............................................11

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014)...............................................................................19, 20

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
   No. 20 Civ. 2706, 2022 WL 541891 (E.D.N.Y. Feb. 23, 2022)..............................................20

*City of Brockton Ret. Sys. v. Shaw Grp. Inc.*,
   540 F. Supp. 2d 464 (S.D.N.Y. 2008)........................................................................2

*City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*,
   967 F. Supp. 2d 771 (S.D.N.Y. 2013).........................................................................9

*Colbert v. Rio Tinto PLC*,
   824 Fed. App'x. 5 (2d Cir. 2020)...........................................................................15

*In re Cyberonics Inc. Sec. Litig.*,
   523 F. Supp. 2d 547 (S.D. Texas 2007).....................................................................10

*Dobina v. Weatherford Int'l Ltd.*,
   909 F. Supp. 2d 228 (S.D.N.Y. 2012)...................................................................6, 14, 15

*In re DRDGOLD Ltd. Sec. Litig.*,
   472 F. Supp. 2d 562 (S.D.N.Y. 2007).........................................................................7

i

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)..................................................................................................19

*ECA, Local 134 IBEW Joint Pension of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)..............................................................................6, 7, 11

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
    783 F.3d 395 (2d Cir. 2015)...............................................................................19, 20

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)......................................................................7

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)......................................................................................8

*In re Glenayre Techs., Inc. Sec. Litig.*,
    No. 96 Civ. 8252, 1998 WL 915907 (S.D.N.Y. Dec. 30, 1998)...................15, 17, 18

*Hensley v. IEC Elec. Corp.*,
    No. 13 Civ. 4507, 2014 WL 4473373 (S.D.N.Y. Sept. 11, 2014).........................20

*Howard v. Everex Sys., Inc.*,
    228 F.3d 1057 (9th Cir. 2000) ...............................................................................17

*In re Ideanomics, Inc. Sec. Litig.,*
    No. 20 Civ. 4944, 2022 WL 784812 (S.D.N.Y. Mar. 15, 2022) .............................11

*In re Initial Pub. Offering Sec. Litig.,*
    241 F. Supp. 2d 281 (S.D.N.Y. 2003).......................................................................9

*Kalnit v. Eichner*,
    264 F.3d 131 (2d Cir. 2001).....................................................................................12

*In re Kandi Techs. Grp., Inc. Sec. Litig.*,
    No. 17 Civ. 1944 (ER), 2019 WL 4918649 (S.D.N.Y. Oct. 4, 2019)....................14

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d. Cir. 2015)...................................................................................19

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
    26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd* 616 Fed. App'x 442 (2d Cir. 2015).....................13

*Malin v. XL Cap. Ltd.*,
    499 F. Supp. 2d 117 (D. Conn. 2007).................................................................8, 9

*In re Molycorp., Inc. Sec. Litig.*,
    No. 13 Civ. 5697, 2015 WL 1097355 (S.D.N.Y. Mar. 12, 2015) ...................17, 18

*Novak v. Kasaks,*
216 F.3d 300 (2d Cir. 2000)...............................................................................................13

*In re Pareteum Sec. Litig.,*
No. 19 Civ. 9767, 2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021) ..........................................14

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.,*
89 F. Supp. 3d 602 (S.D.N.Y. 2015)....................................................................................18

*In re Renewable Energy Grp. Sec. Litig.,*
No. 21 Civ. 1832, 2022 WL 179830 (S.D.N.Y. Jan. 20, 2022)..............................................11

*In re Rockwell Med., Inc. Sec. Litig.,*
No. 16 Civ. 1691, 2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) ..........................................12

*Rothman v. Gregor,*
220 F.3d 81 (2d Cir. 2000)...............................................................................................7, 14

*In re Scholastic Corp. Sec. Litig.,*
252 F.3d 63 (2d Cir. 2001)...............................................................................................14, 15

*Shemian v. Rsch. In Motion Ltd.,*
No. 11 Civ. 4068, 2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) .............................................4

*In re Skechers USA, Inc. Sec. Litig.,*
444 F. Supp. 3d 498 (S.D.N.Y. 2020)...................................................................................10

*In re Sina Corp. Sec. Litig.,*
No. 05 Civ. 2154, 2006 WL 2742048 (S.D.N.Y. Sept. 26, 2006)...........................................10

*Stevelman v. Alias Rsch. Inc.,*
174 F.3d 79 (2d Cir. 1999)...................................................................................................10

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
551 U.S. 308 (2007).......................................................................................................3, 18

*In re Turquoise Hill Res. Ltd. Sec. Litig.,*
No. 13 Civ. 8846, 2014 WL 7176187 (S.D.N.Y. Dec. 16, 2014)...........................................14

*Villare v. Abiomed, Inc.,*
No. 19 Civ. 7319 (ER), 2021 WL 4311749 (S.D.N.Y. Sep. 21, 2021) .....................................8

*In re Weight Watchers Int'l Inc. Sec. Litig.,*
504 F. Supp. 3d 224 (S.D.N.Y. 2020)................................................................................7, 9

*Woodley v. Wood,*
No. 20 Civ. 2357 (ER), 2022 WL 103563 (S.D.N.Y. Jan. 11, 2022).....................................19

iii

*Wright v. Ernst & Young LLP*,
     152 F.3d 169 (2d Cir. 1998)..................................................................................................................4

**Other Authorities**

SEC Rule 10b-5, 17 C.F.R. § 240.10b5-1 ............................................................................. *passim*

Absent from the AC[1] is a single specific fact that shows that Defendants knew or were reckless in not knowing that their application of complicated, technical accounting principles was wrong, despite that the accounting was repeatedly blessed by the Company's independent auditors;[2] did not impact the Company's cash position, business operations, or economics of commercial arrangements; was not due to any override of controls or misconduct; and the errors were not discovered until the auditors were completing their annual audit in late February 2021. Lacking any particularized allegations to support fraud, Plaintiff's opposition (the "Opposition" or "Opp.") resorts to speculation that Plug Power *must have* had motive and opportunity and/or acted with conscious misbehavior or recklessness, while ignoring most of Defendants' arguments and virtually all of the cases cited in Defendants' Opening Brief. Plaintiff points to Plug Power's joint venture with SK Group formed in October 2021 (the "JV"), and argues that Marsh and Middleton must have committed fraud to show that the Company was "scalable" in order to entice the JV. But in January 2021, the parties only agreed to "work together and negotiate in good faith" the potential JV, Ex. BB (1/7/2021 8-K, Ex. 10.1),[3] which was formed five months *after* the restatement, eight months *after* SK Group placed a director on Plug Power's board, and *after* SK Group conducted significant diligence, and Plaintiff pleads no facts to suggest that the JV was influenced by any alleged fraud. Plaintiff's argument that Marsh's and Middleton's trades are suspicious in timing and amount is likewise unavailing. Contrary to case law cited in the Opening Brief, which Plaintiff does not distinguish, their trades—made pursuant to Rule 10b5-1 plans,

---

[1] All (i) abbreviations are defined in the Memorandum of Law in Support of Defendants' Motion to Dismiss ("Opening Brief" or "Mot."), (ii) internal alterations, citations, and quotation marks are omitted unless otherwise noted, and (iii) emphasis is added.

[2] Plaintiff repeatedly claims that Defendants issued a restatement "[f]ollowing a change in auditors," Opp. at 2, 7, but there was no change in auditors. *See* Mot. Exs. R-S (KPMG was the Company's auditors for years, and there was a change in audit *partner* at KPMG overseeing the audit of Plug Power, as occurs mandatorily every five years).

[3] The Court may consider the exhibits attached to this Reply Brief and accompanying Declaration of Deborah S. Birnbach, which are referenced in the AC and/or filed with the SEC. *See* Mot. at 1 n.1.

consistent with their pre-class period trading, and not close in time to any alleged misstatement or the end of the class period—were not suspicious. Plaintiff's request that the Court ignore these trading plans is contrary to well-established case law recently affirmed by the Second Circuit. *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, -- F.4th --, 2022 WL 727149, at *8-9 (2d Cir. Mar. 11, 2022) (affirming dismissal for lack of scienter; trading not suspicious considering 10b5-1 plans).

Plaintiff also attempts to cobble together scienter based on the Company's choice not to give EBITDA guidance for 2021, the alleged magnitude of the restatement, the core operations doctrine, and Marsh's and Middleton's SOX certifications. But these arguments fall far short of satisfying the PSLRA's stringent pleading requirements. Plainitff's argument that "zero plus zero plus zero plus zero plus zero adds up to something" is incorrect. *City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008). The far more compelling and non-fraudulent inference, which the Court must balance against the AC's proposed fraudulent one, is that the mistake in the Company's financials was a mistake concerning complex and technical accounting issues that were the basis for clean audit opinions for years, and "not sinister at all." *Id.* at 473.

After two complaints and a 35-page Opposition, Plaintiff still has not identified with particularity a single fact showing that Defendants knew or were reckless in not knowing that the application of technical accounting principles was incorrect. The AC should be dismissed with prejudice for failure to plead facts supporting any inference of scienter, much less the requisite strong inference. The AC should also be dismissed for failure to plead loss causation.

## ARGUMENT

### I.   THE AC FAILS TO PLEAD SCIENTER.

Plaintiff does not dispute that the "mere fact of a restatement of earnings does not support a strong, or even a weak, inference of scienter," or that the AC does not include a single internal

document or witness statement that Defendants knew or were reckless in not knowing that the application of accounting judgments was incorrect. Mot. at 13, 33. Nor could Plaintiff credibly advance that argument, given that Plaintiff does not contest that KPMG identified for the first time potential issues with the Company's accounting "*after* the Company reported its 2020 fourth quarter and year end results on February 25, 2021," and that the alleged misstatements "did not result from any override of controls or misconduct." *Id.* at 24. Moreover, Plaintiff does not distinguish the cases with more particularized allegations cited in the Opening Brief that were nonetheless dismissed with prejudice and affirmed on appeal. *Id.* at 12; *see* Opp. at 11, 22-27.

Notwithstanding, Plaintiff asks the Court to infer scienter based on weak circumstantial speculations. Plaintiff alleges motive and opportunity based on allegations that Defendants wanted to attract an investment from and enter into the JV with SK Group and that Marsh and Middleton "profit[ed] from substantial insider trades." Opp. at 11-21. Additionally, Plaintiff alleges conscious misbehavior or recklessness based on Defendants' decision not to provide EBITDA guidance for 2021, the magnitude of the restatement, its impact on Plug Power's core operations, and Marsh's and Middleton's SOX certifications. *Id.* at 21-31. But Plaintiff ignores the Company's disclosure that its long-term auditors first identified the technical accounting errors when it was completing its audit procedures *after* fourth quarter earnings were announced in February 2021, that the errors did not result from misconduct or an override of controls, and that the JV was entered into five months *after* the restatement was complete. The facts taken as a whole do not suggest fraud, but rather a rapidly growing company that erred in applying complex accounting guidance. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007) (a "strong inference" is one that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent").

3

### A.    Plaintiff's New Theory Of Scalability To Entice SK Group To Enter Into The JV Fails To Allege A Strong Inference of Scienter.

Plaintiff argues that the JV is sufficient to plead Defendants' motivation to commit fraud because demonstrated "scalability,"[4] which Plaintiff asserts is a code word for margins, was a precondition to SK Group's entering the JV. Opp. at 13. This new theory makes no sense: the JV was not formed in January 2021, as Plaintiff suggests. *Id.* at 12-15. In January, the Company announced "a *plan* to form a joint venture," and the parties agreed to "negotiate in good faith and use commercially reasonable efforts" for 18 months to try to enter the JV. Mot. Ex. H; Ex. BB. SK Group did exactly this, pursuing and then entering the JV in October 2021, eight months *after* SK Group's initial investment gave SK Group a director on Plug Power's board, five months *after* the restatement fully disclosed the impact to the Company's margins, and *after* months of continued negotiation and diligence. *See* Ex. EE (10/6/2021 8-K, Ex. 99.1).

Plaintiff concedes that absent some "unique connection" between the JV and the accounting errors, the JV is an ordinary corporate transaction that is not suggestive of motive to commit fraud. Opp. at 13.[5] The Opposition articulates a new theory of a so-called "unique connection" between the alleged financial misstatements and the JV that was not pled in the AC.[6] According to the Opposition, Defendants were motivated to "dramatically inflate[] Plug Power's margins" in order to "make Plug Power's business seem scalable and to attract the investment and

---

[4] Scalability is the "capability to cope and perform well under an increased or expanding workload or scope." *Scalability*, INVESTOPEDIA, https://www.investopedia.com/terms/s/scalability.asp.

[5] Plaintiff does not distinguish cases cited for the proposition that "[t]he desire to raise capital to fund growth is common to most companies, and cannot form the basis of a securities fraud claim." Mot. at 16. Plaintiff also abandons his argument that the November 2020 offering motivated fraud, arguing only that the February 2021 offering is relevant, although no "unique connection" between the accounting errors and the February offering is articulated in the AC or the Opposition. *See* Opp. at 15.

[6] Plaintiff may not amend the AC through the Opposition. *See Shemian v. Rsch. In Motion Ltd.*, 2013 WL 1285779, at *14 (S.D.N.Y. Mar. 29, 2013) ("a party is not entitled to amend its complaint through statements made in motion papers"); *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (securities fraud claim dismissed because "alleged duty" was first identified in opposition to motion to dismiss).

partnership with SK Group." *Id*. The words "scalable," "scalability," or "scale" do not appear even once in the AC, nor is there any allegation that margins are determinative of or relevant to scalability, which is not an accounting concept.[7] This theory is absent from the AC for good reason—the Company was, and still is, scaling. The Company's growth is exponential in every way: in 2020 it more than doubled the number of fuel cell systems sold and its hydrogen fueling infrastructure sites increased sevenfold; its net revenue increased 375% over three years; and it entered into partnerships with industry leaders in new geographies. *See* Mot. at 5-6. The risks inherent in this continued rapid scaling and in achieving forecasted margins were disclosed as two of the Company's most significant risk factors. *See e.g.*, Ex. AA (11/9/2020 10-Q) (risk factors include "risk that our lack of extensive experience in manufacturing and marketing products may impact our ability to manufacture and market products on a profitable and large-scale commercial basis" and "our ability to achieve the forecasted gross margin on the sale of our products").

Even if Plaintiff had alleged that margins related to the Company's ability to scale, SK Group had every opportunity to and did conduct detailed due diligence before investing, and the JV was formed months after the restatement. *See Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 491 (S.D.N.Y. 2021) (dismissing for lack of scienter because no facts alleged suggesting that misstatements were necessary to complete transaction). The only "connection" Plaintiff musters is a single statement in the press release announcing the plan to form a JV in the future that "Plug Power has proven its *ability to scale* a hydrogen business in North America." Opp. at 13-14. But that statement is not attributed to SK Group, refers to an ability to scale in the future, and does not say that "scalability" or margins was a reason *why* SK Group decided "to partner with and invest

---

[7] Plaintiff claims that "[t]he proven scalability of Plug Power's operations, however, was based on Defendants' materially overstated margins . . . ." Opp. at 14. Plaintiff, however, did not plead the impact of the restatement on margins, and the analysis of the impact on margins found on page 9 of the Opposition is nowhere in the AC.

in Plug Power." *Id.* at 14. Plaintiff's new theory makes no sense; why would SK Group enter into the JV months after the restatement was completed? Plaintiff offers no answer to this question.

Plaintiff agrees it is important to consider "context[]" when evaluating if scienter has been sufficiently pled. Opp. at 13. The context here underscores that the JV could not have been motivation for Defendants to commit fraud. The timing alone forecloses the JV as a motivation to commit fraud. It is also evident that the accounting errors were not relevant to SK Group's February investment in the Company. Investors were told that SK Group conducted the due diligence it deemed necessary before making that investment, and did not rely solely on the Company's public filings. *See* Ex. BB ("The investor further represents that that it has had an opportunity to ask questions and receive answers from the Company regarding the Company, its financial condition, results of operations and prospects . . . sufficient to enable it to evaluate its investment.").

The JV suggests that the non-fraudulent inference is far more cogent and compelling. It is implausible that Plug Power would jeopardize an important, long-term business relationship by defrauding SK Group, who was purchasing nearly 10% of Plug Power's stock during the class period and joining the company's board of directors. Moreover, if, as Plaintiff claims, Plug Power misled or tricked SK Group into its investment and partnership, one would expect SK Group to withdraw its investment in Plug Power, cease negotiations with Plug Power regarding the JV, and potentially bring legal action against Plug Power. None of this happened, and instead SK Group pursued, negotiated, and ultimately completed the JV *five months* after the restatement. Any connection between the alleged misstatements and the SK Group deal is "dubious at best." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009); *see also In re Agnico-Eagle Mines Ltd. Sec. Litig.*, 2013 WL 144041, at \*12 (S.D.N.Y.

Jan. 14, 2013) (scienter based on a motive to induce a transaction is "narrow[]").[8]

Finally, Plaintiff argues that Defendants personally benefitted from the JV by selling shares after announcing the plan to form the JV. Middleton's only trading predated the announcement, AC ¶¶ 70, 184, and as discussed *infra*, the timing of Marsh's trading was not suspicious.[9]

**B.    Trading Pursuant To 10b5-1 Plans Is Not Sufficient To Allege Scienter.**

Plaintiff agrees that Marsh's and Middleton's trades of Plug Power stock during the class period do not create an inference of scienter unless the sales are "unusual or suspicious." Opp. at 16.[10] There is no dispute that their trades were made pursuant to Rule 10b5-1 plans, which raise an inference that the trades are not unusual or suspicious. Mot. at 18-19. Plaintiff incorrectly claims that such plans are "inappropriate" to consider on a motion to dismiss. The Second Circuit recently confirmed just the opposite. In *Bristol-Myers*, the court affirmed dismissal, holding that plaintiff failed to plead a motive to commit fraud based on insider trading because "the vast majority of sales were conducted pursuant to a 10b5-1 plan or were executed for procedural purposes, and therefore could not be timed suspiciously." *Bristol-Myers*, 2022 WL 727149, at *8-9; *see also* Mot. at 20 (citing cases dismissing for lack of scienter after considering 10b5-1 plans). The cases cited by Plaintiff do not support a different conclusion. *See Freudenberg v. E\*Trade Fin. Corp.*,

---

[8] The cases cited by Plaintiff in support of the argument that there is a "unique connection" between the alleged misstatements and the JV did not hold that the allegations of motive alone could establish scienter. *See, e.g.*, *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 243 (S.D.N.Y. 2012); *ECA*, 553 F.3d at 187; *see also Rothman v. Gregor*, 220 F.3d 81, 92-94 (2d Cir. 2000).

[9] Plaintiff notes that following the announcement of the plan to form the JV, Plug Power's stock price increased and the Company raised more money in its offering. Opp. at 14-15. These benefits to the Company and *all* shareholders are not indicative of scienter. *See ECA*, 553 F.3d at 200-01 (no scienter where shareholders benefitted from alleged scheme); *Agnico-Eagle Mines*, 2013 WL 144041, at *16 (no motive where defendants "protect[ed] shareholder investments"); *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 571 (S.D.N.Y. 2007) (no motive where "shareholders themselves would benefit from a superior transaction").

[10] Plaintiff omits factors that even the case he cites deems relevant. *See In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 256 (S.D.N.Y. 2020) ("Whether the trading activities at issue were unusual or suspicious turns on a number of factors [including] whether sales occurred soon after statements defendants are alleged to have known were misleading; *and [] whether sales were made pursuant to trading plans such as Rule 10b5-1 plans*.").

712 F. Supp. 2d 171, 200 (S.D.N.Y. 2010) (10b5-1 plans may be relevant to analysis of scienter).[11]

Nor does anything in Rule 10b5-1 support that a trading plan is irrelevant to whether a trade by a company executive can support an inference of scienter.[12]

Plaintiff attempts to impose a burden on Marsh and Middleton to "show that the plans are valid," and "establish that [their] plans were entered into in good faith." Opp. at 20. But this gets the law "exactly backwards." *Villare*, 2021 WL 4311749, at *21. In *Villare*, this Court considered the existence of a Rule 10b5-1 plan relevant to whether trades pursuant to that plan raised a strong inference of scienter. *Id.* at *21-22. The plaintiff in that case argued, as Plaintiff does here, that "it is unclear when the 10b5-1 plans were entered into, and therefore that Defendants have failed to establish that the plan was entered into before they acquired insider information during the Class Period." *Id.* at *21. Rejecting this argument, this Court found that the plaintiff "has it exactly backwards: it is [the plaintiff] that bears the burden of pleading allegations to establish that the stock sales are unusual or suspicious," and that plaintiff failed to allege that the stock sales were suspicious or unusual in light of the plans' existence. *Id.* So too, here. Plaintiff has not alleged any facts to suggest that the plans were not entered in good faith.[13] Absent such an allegation, the trading plans create an inference that their trading was not unusual or suspicious. *See* Mot. at 19.[14]

Even without this inference, nothing about the trades is suspicious. Plaintiff argues that the

---

[11] In *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 156 (D. Conn. 2007), the court did not consider a trading plan because it already concluded that stock sales were not unusual in amount or timing and did not evidence scienter. *Azar v. Yelp, Inc.*, 2018 WL 6182756, at *18-19 (N.D. Cal. Nov. 27, 2018), in which the court did not consider a Rule 10b5-1 plan because it did not have the opportunity to review it, is an outlier that has not gained traction in other cases.

[12] The SEC's proposed amendments to "the use of 10b5-1 plans as an affirmative defense" in insider trading allegations likewise are irrelevant. Opp. at 19 n.11. Plaintiff does not claim that Marsh or Middleton are liable for violating insider trading laws, and the proposed amendments do not speak to whether a Rule 10b5-1 plan can be relevant to the inquiry of whether a trade was unusual or suspicious to support an inference of scienter.

[13] Middleton's plan was effective more than two months before the start of the class period. Mot. Ex. Y.

[14] In contrast, *Ganino* does not discuss trading plans at all, and so does not support Plaintiff's argument that "these plans provide no defense." Opp. at 21 (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000)).

volume, proceeds, and timing of Marsh's and Middleton's sales are indicative of scienter. Opp. at 15-18. As to volume and proceeds, while Plaintiff argues that "less dramatic insider selling [than Marsh's and Middleton's sales] has been held to show motive and opportunity," *id.* at 16, he fails to distinguish any of the cases cited in the Opening Brief finding *more significant trading* than Marsh's and Middleton's sales insufficient to plead scienter. *See* Mot. at 20. Even *Weight Watchers*, on which Plaintiff relies, involved more significant trading than here: the sale of "14 million shares through two SPOs for over $1 billion," is exponentially more than the 573,268 shares sold by Marsh for $37 million or 216,667 shares sold by Middleton for $7 million. *See Weight Watchers,* 504 F. Supp. 3d at 256.[15]

Likewise, the timing of Marsh's and Middleton's sales is not suspicious. Plaintiff's own cited cases hold that the relevant inquiry is whether trades made during the class period were "dramatically out of line with prior trading practices," *City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 800 (S.D.N.Y. 2013), and compare trades during and immediately before the class period. *Malin*, 499 F. Supp. 2d at 151. Plaintiff does not dispute that Marsh and Middleton sold significantly more during the four months preceding the class period than they did during the four-month class period. Mot. at 19. Instead, Plaintiff inexplicably attempts to group together the pre-class period trades with the class period trades. Opp. at 16-17. Plaintiff offers no basis for comparing Marsh's and Middleton's sales during these combined time periods against their sales before these time periods. Nor can he, as these time periods are unrelated to the class period, and were selected for the sole reason to manufacture suspicion where none exists. *See Bristol-Meyers*, 2022 WL 727149, at *8 (no scienter where "the sales of shares

---

[15] In *In re Initial Public Offering Securities Litigation*, 241 F. Supp. 2d 281, 366 (S.D.N.Y. 2003), the court held that trading allegations are only sufficient to create an inference of scienter "[s]o long as these trades were unusual"—in other words, the amount of the sale on its own was not determinative.

9

constituted a similar (or lesser) proportion of the individual defendants' trades as compared with the proportion of shares sold by those defendants before the putative class period").[16]

Plaintiff also claims that Marsh's sales in January 2021 were inherently suspicious because they "were made less than 2 weeks" after the plan to form the JV was announced and "only 6 weeks before the first corrective disclosure." Opp. at 17-18.[17] But courts routinely decline to find trades made with precisely this timing inherently suspicious. *See e.g.*, *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 524 (S.D.N.Y. 2020) (sale "less than two weeks after an alleged misstatement . . . insufficient to generate a strong inference of scienter" and trade 1.5 months before corrective disclosure not suspicious); *In re Cyberonics Inc. Sec. Litig.*, 523 F. Supp. 2d 547, 554 (S.D. Tex. 2007) (sale within two weeks of disclosure insufficient to infer scienter); *In re Sina Corp. Sec. Litig.*, 2006 WL 2742048, at *12 (S.D.N.Y. Sept. 26, 2006) (trade "more than a month" before corrective disclosure not suspicious).[18]

Finally, the exercise of stock options after they vested but before their ten-year expiration does not establish scienter. Opp. at 18. Tellingly, Plaintiff does not cite a single case to suggest that the exercise of options not set to expire until a date into the future is suspicious, nor could he, as options are routinely used as a significant portion of executive compensation.[19] Indeed, that is the point of vesting schedules; the options become exercisable once vested. At the same time,

---

[16] Plaintiff cites *Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 85 (2d Cir. 1999), to suggest that sale of shares during a period of "optimism" indicates scienter. Opp. at 18. But in *Stevelman* the insider sold 40% of his holdings, 174 F.3d at 82, while here, Marsh's outright ownership remained the same at the beginning and end of the class period, and when considering unvested holdings, Marsh only sold approximately 20% of his overall holdings during the class period. Mot. at 20.

[17] Plaintiff concedes that Marsh and Middleton did not sell their shares immediately *after* any alleged misstatements, and that Middleton did not sell his shares immediately *before* any alleged corrective disclosures. Opp. at 16-18. Plaintiff also does not allege any sales by Middleton after the JV plan was announced. *See* AC ¶ 185.

[18] Plaintiff argues that "sales near the end of the Class Period further support the inference of fraud." Opp. at 17. Here, the trades occurred two and three months before the accounting errors were discovered by the auditors in late February 2021 and before the end of the class period on March 16, 2021.

[19] The only case that Plaintiff cites for support is *Stevelman*, 174 F.3d at 85, but that case had nothing to do with the timing of a defendant's exercise of stock options not yet set to expire.

Plaintiff does not address any of the cases in the Opening Brief indicating that the exercise of vested options in advance of their expiration alone does not mean they were suspicious. *See* Mot. at 21 & n.16; Opp. at 15-21. Nor does Plaintiff dispute that Marsh and Middleton exercised options before expiration prior to the class period as well. *Id.*

### C.    Plaintiff Fails To Plead That Defendants Knew Or Were Extremely Reckless In Not Knowing That Any Statement Was False When Made.

Plaintiff also fails to plead strong circumstantial evidence of conscious misbehavior or recklessness. *ECA*, 553 F.3d at 198. The Opposition does not address the fundamental deficiency in the AC identified in the Opening Brief: there is not a single allegation of fact, including from any internal document, conversation, or witness that demonstrates that the Individual Defendants knew or were reckless in not knowing the accounting errors before the end of February 2021, when the Company's long-term auditors identified the errors as part of their annual audit.[20] *See* Mot. at 24-25. There is not a single allegation that casts doubt on the fact that the misstatements were not attributable to "an override of controls or misconduct," and involved "complex and technical" accounting principles that required "significant judgments." *See id.* at 24. As recent cases confirm, without such specific factual allegations of knowing the statements were false *when made*, the AC fails to establish any inference of scienter, much less the strong and compelling inference required.[21]

---

[20] Plaintiff attacks a straw man when he claims that "[c]ontrary to Defendants' argument, documents and confidential witnesses are not *required* to plead a strong inference of scienter." *See* Opp. at 24 n.14. Defendants never claimed they are *required*, only that they are *relevant*, and complaints with far more particularized allegations, including multiple confidential witnesses, are routinely dismissed with prejudice and affirmed on appeal. Plaintiff does not contest this proposition or attempt to distinguish the supporting cases. *See* Mot. at 25 & n.18.

[21] *See In re Ideanomics, Inc. Sec. Litig.*, 2022 WL 784812, at *10 (S.D.N.Y. Mar. 15, 2022) (no scienter where plaintiff "has not alleged any specific reports" that alerted defendants that their statements may be inaccurate); *Building Trades Pension Fund of W. Penn. v. Insperity, Inc.*, 2022 WL 784017, at *16 (S.D.N.Y. Mar. 15, 2022) (no scienter where plaintiff "does not point to any contradictory predictions, reports, or piece of information that defendants actually possessed that demonstrated their statements were false"); *In re Renewable Energy Grp. Sec. Litig.*, 2022 WL 179830, at *4 (S.D.N.Y. Jan. 20, 2022) (no scienter where plaintiff did not "reference specific information . . . that would have alerted [defendants] to the calculation errors" that resulted in a change in EBITDA guidance from $20 to $35 million to negative $2 to $12 million).

11

### 1.    Choosing Not To Give EBITDA Guidance For 2021 Does Not Suggest Conscious Misbehavior Or Recklessness.

Plaintiff remains unable to point to a single internal document or conversation suggesting that the complex technical accounting errors were known or recklessly should have been known by Defendants before the end of February 2021, despite the Company's auditors repeatedly issuing clean audit opinions on those very judgments. Instead, the Opposition argues that, during this time of extreme growth, the Company did not provide EBITDA guidance for 2021. Opp. at 22. As a general matter, courts have been reluctant to infer scienter based on not providing guidance that is not required by the securities laws.[22]

Plaintiff argues that Plug Power "regularly provided adjusted EBITDA figures" before the class period, but "omitted EBITDA guidance" during the class period, despite "promis[ing] to share EBITDA guidance during the Company's earnings call for the fourth quarter of FY2020," Opp. at 22-23. But the Company had no obligation to provide any guidance, and never "promised" to provide EBITDA guidance for 2021—rather, unsurprisingly given its rapid growth, Marsh stated the Company "*might* be in a better position" to provide more specificity in January 2021. Mot. at 28, Mot. Ex. E.[23] And the very earnings call that Plaintiff relies upon demonstrates that the Company did provide an EBITDA target for 2024. Mot. Ex. E, at 4 (the Company was "targeting 20% EBITDA in 2024"). Plaintiff also argues that the timing of Plug Power's non-disclosure of EBITDA guidance for 2021 is "suspect" because revealing that information "*could have* derailed two of the most important deals in the history of the Company," the SK Group investment and the

---

[22] *See In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at \*15 (S.D.N.Y. Mar. 30, 2018) (no scienter based on failing to disclose information as it "would effectively create a duty to disclose and a presumption of fraudulent intent that is contradicted by the law of this Circuit"); *Kalnit v. Eichner*, 264 F.3d 131, 144 (2d Cir. 2001) (no scienter based on omission absent "clear duty to disclose").

[23] Plaintiff asserts that "analysts" asked for EBITDA guidance. Opp. at 22. In reality, a *single* analyst inquired about such guidance during two different earnings calls, and that *same* analyst drafted the one report that is repeatedly cited in the AC and the Opposition. *See* Mot. Ex. E; Ex. CC, (1/26/2021 Earnings Call Tr.); Ex. DD (2/25/2021 Earnings Call Tr.). No other analyst asked for 2021 EBITDA guidance, which still creates no duty to provide it.

12

February offering. Opp. at 23. But there is no allegation that either the SK Group investment or the secondary offering was in any way related to EBITDA guidance. Such an allegation would make no sense, because SK Group conducted significant due diligence before ever investing in Plug Power, and the JV was formed months after the restatement was issued. *See supra* at 6.[24]

Plaintiff relies on a single case to argue that not providing EBITDA guidance suggests scienter, but that case is unavailing. The plaintiff in *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000), alleged that defendants received weekly reports containing information that directly contradicted their affirmative statements to investors. That is a far cry from Plaintiff's speculation based on Defendants' choice not to give forward-looking guidance of a non-GAAP financial metric that is not required anywhere by the securities laws, and where no internal document or communication suggests Plug Power knew or was reckless in not knowing that it erred on complex accounting judgments that even its independent auditors had not identified.

Plaintiff claims that Plug Power's reliance on *Magnum Hunter* is "misplaced," and the facts there are "wholly distinguishable." Opp. at 24. But like this case, after a period of dramatic growth, Magnum Hunter announced certain accounting errors due to a weakness in internal controls, which ultimately required that certain of the company's financial metrics be restated. *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 286 (S.D.N.Y. 2014), *aff'd* 616 Fed. App'x 442 (2d Cir. 2015). As Plaintiff does here, the plaintiffs in *Magnum Hunter* argued that they had adequately pled scienter based on the magnitude and impact of the restatement, SOX certifications, and the defendants' compensation and "lucrative stock sales during the Class Period." Pls.' Opp. to MTD, *Magnum Hunter*, 26 F. Supp. 3d 278, 2014 WL 903132, at *20-21, 25, 28 n.12. If anything, the scienter allegations in that case were even more robust than the ones here, and were

---

[24] That Plug Power did not provide EBITDA guidance for 2021 *after* the closing of SK Group's investment and the offering further rebuts the inference that Plug Power was concealing information until those transactions closed.

*still* found to be insufficient. *See* Mot. at 25-26.

### 2.      The Magnitude Of The Restatement Does Not Plead Scienter.

Plaintiff does not argue that the restatement impacted the Company's annual net loss, its cash position, or revealed any previously hidden expense. That concession is lethal to his claim that the magnitude of the restatement suggests scienter, because when inferring scienter based on the "magnitude and impact of the restatement," what matters to courts is "the impact on corporate income." *In re Kandi Techs. Grp., Inc. Sec. Litig.*, 2019 WL 4918649, at *6 (S.D.N.Y. Oct. 4, 2019) (dismissing because magnitude of restatement did not show scienter when plaintiff "did not dispute" that "restatements had no impact on [defendant's] net income"); *see also* Mot. at 29.

Because the restatement had only a modest impact on the Company's annual net losses and only moved certain costs from one part of the income statement to another, Mot. at 10,[25] Plaintiff instead focuses on margins and gross profits. Opp. at 25-27. But none of the cases that Plaintiff cites hold that magnitude of the restatement's impact on either margins or gross profits is relevant to the question of scienter. *See Rothman*, 220 F.3d at 92 (allegations of artificial inflation of revenue); *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *9 (S.D.N.Y. Aug. 11, 2021) (company restated improperly recognized revenue); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2014 WL 7176187, at *7 (S.D.N.Y. Dec. 16, 2014) (same); *Dobina*, 909 F. Supp. at 228 (allegation that company understated tax expenses); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76-77 (2d Cir. 2001) (allegations of artificial inflation of revenue).[26]

---

[25] Plaintiff notes that the "restatement resulted in a $25.8 million loss to the Company's bottom line in the third quarter of FY2020." Opp. at 27. By focusing on that one quarter, Plaintiff rightly concedes that the restatement had little to no impact on Plug Power's net loss in 10 of the 11 fiscal quarters that the company restated in 2018, 2019, and 2020. As disclosed, there was a $21.0 understatement of the provision for loss contracts for that quarter due to Plug Power's not properly estimating the loss accrual related to extended maintenance contracts. Mot. at 10 n.5. Plaintiff has not alleged any facts to cast doubt on this logical and non-culpable explanation.

[26] *Turquoise Hill*, cited at Opp. at 27, underscores Plaintiff's failure to allege scienter here. In that case, the court dismissed for failure to plead scienter, holding that: "A restatement is simply a correction, after the fact, of an accounting or other error in financial results. *The fact of an error, even a large error, does not suggest knowledge or*

As Plaintiff acknowledges, magnitude alone is insufficient to plead scienter. *See* Opp. at 27. The other factors that were sufficient in Plaintiff's cited cases are in stark comparison to the lack of any internal documents or communications alleged here. For example, in *Scholastic*, the court inferred scienter based on the magnitude of the restatement coupled with "detailed allegations as to what defendants knew on a daily, weekly and monthly basis . . . while at the same time making public statements that painted a different picture." *Scholastic*, 252 F.3d at 76. Plaintiff's reliance on a single hindsight analyst report[27] that discussed impact of the restatement on margins does not create an inference that Defendants knew *contemporaneously* that the complex accounting judgments were incorrect or, for example, with robust R&D in the field, that it was obvious that costs related to fuel delivery and R&D were distinct that it was reckless to misclassify those costs. *See In re Glenayre Techs., Inc. Sec. Litig.*, 1998 WL 915907, at *5 (S.D.N.Y. Dec. 30, 1998) (analyst's opinion that trades of the company's stock was suspicious was "unhelpful"). *Dobina*, relied upon by Plaintiff for this point, does not "stress" that "analyst interest in accounting errors [are] indicative that errors were substantial," as Plaintiff suggests. Opp. at 26. Rather, the court observed "[h]ow substantial the understatement was . . . is highlighted by the many analyst conference calls and SEC filings *in which defendants touted their lower tax rates*." *Dobina*, 909 F. Supp. 2d at 250. In other words, it was the fact that the defendants repeatedly discussed and disclosed its lower tax rates, not "analyst interest," that suggested the impact of the tax rate misstatement was meaningful. Regardless, even analyst interest and

---

*intent to misstate when the financial results were originally published, particularly when the error was a matter of judgment and made initially in the audited financial statements* of a subsidiary." 2014 WL 7176187, at *7.

[27] Contrary to Plaintiff's claims, the Court can consider Exhibits U and V because they are not being offered for the truth of their statements, but to show that there existed analyst reports other than the one Barclays report that Plaintiff repeatedly cites, which information was available to the investing public. Opp. at 26 n.16; *see Born*, 521 F. Supp. 3d at 486 n.11 ("district courts can take judicial notice of analyst reports for the fact that they contain information without considering the truth of the matters asserted."); *Colbert v. Rio Tinto PLC,* 824 Fed. App'x. 5, 10 n.5 (2d Cir. 2020) ("it is proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents.") (emphasis in original).

15

magnitude of the error in *Dobina* were not sufficient, with the court holding that "what is noticeably missing from the AC *is any allegation that the Weatherford defendants had any contemporaneous basis to believe that the information they related was incorrect* that would be sufficient to allege the requisite conscious recklessness." *Id.* at 251.

### 3.    The "Core Operations Doctrine" Cannot Save The Deficient Pleading.

Even if the core operations doctrine is still valid today (it is not), it is not an independent basis for scienter, and only applies if the operation at issue "make[s] up nearly all of a company's business or [is] essential to its survival." Opp. at 28 & n.17. Plaintiff nowhere addresses that the restatement concerns *accounting errors* that were "complex and technical and involve[d] significant judgments in applying U.S. GAAP"; did not "impact cash and cash equivalents or the economics of the Company's existing or future commercial arrangements"; and were not due to any "override of controls or misconduct." Mot. Ex. O. Plaintiff's silence is unsurprising, as the core operations doctrine is inapplicable in cases involving complex, technical accounting errors. Mot. at 31 (*citing Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *19 (S.D.N.Y. July 23, 2018) (dismissing for lack of scienter); *Hensley v. IEC Elec. Corp.*, 2014 WL 4473373, at *5 (S.D.N.Y. Sept. 11, 2014) (same)).

Instead, the Opposition argues that the "alleged fraud primarily concerns inflating research and development expenses," which Plaintiff claims is "vital to [Plug Power's] survival." Opp. at 28. Only two of the six items that were restated relate to the classification of certain costs related to R&D, and even if the alleged misstatements related to R&D *as opposed to the accounting for R&D*, R&D does not make up nearly all of Plug Power's business. Mot. at 8-9, 31-32. Plaintiff fails to distinguish cases finding that operations constituting greater percentages of a company's business nonetheless are not "core." *See id.* at 32 (citing *Frankfurt-Trust Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 225 (S.D.N.Y. 2018) (core operations doctrine could

16

not support inference of scienter); *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343-44 (S.D.N.Y. 2011) (same); *Hensley*, 2014 WL 4473373, at \*5 (same)).[28]

Plaintiff's reliance on *Atlas Air* is misplaced. *See* Opp. at 29. The scienter allegations in that case were far more particularized, where the company overstated its earnings by \$363.8 million, turning a reported surplus of \$185 million to a deficit of \$178 million, and touted positive results while knowing that: (1) it was losing customers; (2) its "customer relationship builder" CEO passed away leading to a 20% decline in business; and (3) the September 11, 2001 attacks resulted in an industry-wide decline. *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 480-81, 484 (S.D.N.Y. 2004). *Atlas* held that one cannot "ignore reasonably available data that would have indicated that those statements were materially false or misleading," *id.* at 491, and here, Plaintiff has not identified a single admission, internal record, witnessed discussion, or communication that would have led Marsh or Middleton to recognize that the complex accounting judgments blessed by KPMG were wrong.[29]

### 4.    The SOX Certifications Do Not Sufficiently Plead Scienter.

Plaintiff concedes that SOX certifications "*may*" be probative of scienter only where there are allegations of "glaring accounting irregularities or other red flags, of which the certifying defendant had reason to know." Opp. at 30. The AC alleges neither: there is an absence of red flags; if anything, clean audit opinions were green flags. There are no allegations that Marsh or

---

[28] Plaintiff's reliance on one analyst's commentary—unrelated to whether R&D or its accounting made up nearly all of the Company's business or was essential for survival—does not make the restated accounting judgments "core." *See* Opp. at 28-29. Plaintiff does not cite a single case suggesting that an outside analyst's opinion of what operations in a company are "core" matters. If anything, courts routinely hold that it is not enough to rely on analyst opinions alone to establish scienter. *E.g.*, *In re Molycorp. Inc. Sec. Litig.*, 2015 WL 1097355, at \*12 n.9 (S.D.N.Y. Mar. 12, 2015) (no scienter based on "Plaintiffs' bare allegation regarding an industry analyst's statement that Smith had lost credibility . . . to link Smith's resignation to the alleged fraud."); *Glenayre*, 1998 WL 915907, at \*5 (no scienter based on analyst's "unhelpful" opinion that trades of the company's stock were suspicious).

[29] *Howard* is inapplicable because the AC did not allege that Marsh and Middleton were uninvolved "in the preparation of [the financial] statements," or that greater involvement would have led them to recognize that the technical accounting judgments were wrong. *See* Opp. at 29 (citing *Howard v. Everex Sys., Inc.*, 228 F.3d 1057 (9th Cir. 2000)).

17

Middleton knew or were reckless in not understanding that the judgments made on those highly technical accounting issues were incorrect. Mot. at 32.[30] Nor is there any allegation that underlying accounting principles were not complex, or that costs were so obviously unrelated to R&D that it was recklessness to categorize those costs as such. *Id*. at 24. A post-hoc musing from a single analyst with no insight into the Company's classification of certain costs as R&D cannot create a plausible inference of scienter. *See Glenayre*, 1998 WL 915907, at *5 (no scienter despite analyst drawing such a conclusion); *Molycorp*, 2015 WL 1097355, at *12 n.9 (same).[31]

###### D.   Plaintiff's Asserted Inference Is Not More Cogent Or Compelling Than The Non-Fraudulent Inferences The Court Must Weigh.

The inference that Plaintiff asks this Court to draw is not as "cogent" or "compelling" as the non-fraudulent inference: Plug Power's application of accounting guidance was incorrect because the accounting issues were complex and technical. *See Tellabs*, 551 U.S. at 323. The AC does not allege disagreement with the unambiguous disclosure that there was no misconduct or override of financial controls. No one—not Plug Power, not the auditors it engaged since 2001—identified any errors until *after* fourth quarter earnings were announced when KPMG was finalizing its audit. Plaintiff's entire theory of fraud rests on the desire of Marsh and Middleton to entice the JV, but this makes no sense. Plug Power had no incentive to jeopardize an important, long-term business relationship with its new partner. Quite the opposite. SK Group conducted due diligence before its $1.5 billion investment; SK Group was entitled to and did place a director on

---

[30] *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015), did *not* hold, as Plaintiff claims, the converse—that "[s]igning SOX certifications *is* indicative of scienter where a plaintiff alleges facts showing a concomitant awareness of or recklessness to the misleading nature of the statements." Opp. at 30. In any event, the AC does not include even a single allegation of "concomitant awareness" or reckless disregard of information that would have allowed Marsh or Middleton to know that the Company's complex accounting judgments were incorrect, despite KPMG's issuing clean audit reports on those very same judgments.

[31] Plaintiff also argues that the SOX certifications are indicative of scienter because "the Individual Defendants had reason to know of Plug Power's substantial accounting errors" based on their non-disclosure of EBITDA guidance. Opp. at 30. But the non-disclosure of EBITDA guidance is neither a glaring accounting irregularity nor a red flag.

18

the board with its initial investment; and the JV was still only an opportunity during the class period, not closing until October 2021, months *after* the restatement. And Marsh's and Middleton's trades of stock were not unusual or suspicious, as all sales were pursuant to Rule 10b5-1 trading plans and were consistent with their trading prior to the class period. Ultimately, when Plug Power discovered the errors, it promptly disclosed them to the public. More than one year after this lawsuit was filed, Plaintiff *still* cannot point to a single internal document or witness statement that anyone knew or was reckless to not have known that the accounting judgments were incorrect. *See* Mot. at 33-34. The inference that Defendants "discovered, disclosed, and corrected the accounting errors within a relatively short period of time with no fraudulent intent is simply more compelling." *Woodley v. Wood*, 2022 WL 103563, at *19 (S.D.N.Y. Jan. 11, 2022).

## II.    THE AC FAILS TO PLEAD LOSS CAUSATION.

To plead loss causation, Plaintiff must demonstrate that "the market reacted negatively in response to *disclosure of the alleged fraud*." Opp. at 33. However, Plug Power's drop in stock price in March 2021 followed announcements on March 2 that the Company would not file its annual report in time, and on March 16 that it would restate prior periods. Mot. Ex. C, O. These announcements did not disclose any alleged fraud. They expressly *denied* that possibility, stating that the restatement was not the result of "any issues related to an override of controls or misconduct." Mot. Ex. O, at 2. Plaintiff's cases confirm that he must tie his alleged losses to some alleged fraud or wrongdoing, as opposed to disappointing news.[32] For example, in *Carpenters*, the

---

[32] *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 189 (2d. Cir. 2015) (plaintiffs must allege facts "to support the inference that they would have been spared all or an ascertainable portion of that loss *absent the fraud*"); *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 402 (2d Cir. 2015) ("FGIC must allege that the subject of *the fraudulent statement or omission* was the cause of the actual loss suffered."); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014) ("plaintiffs must plausibly allege a *disclosure of the fraud* by which the available public information regarding the company's financial condition was corrected"); *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig*., 763 F. Supp. 2d 423, 508 (S.D.N.Y. 2011) (loss causation pled where corrective disclosures revealed Bear Stearns' "risk management practices and exposure to

plaintiffs adequately pled loss causation because they alleged a negative market reaction to Barclays' announcement that it "entered into the Settlement Agreements with the DOJ, CFTC, and FSA," related to a 17-month period where the company "submitted inaccurate Dollar LIBORs that under-reported its perception of its borrowing costs and its assessment of where its Dollar LIBOR submission should have been." *Carpenters*, 750 F.3d at 231. By contrast, the alleged corrective disclosures in this case did not disclose any alleged fraud, as opposed to disappointing news, and Plaintiff does not contest that courts routinely dismiss complaints for failing to plead loss causation. *See* Mot. at 35 (*citing In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (affirming dismissal for failure to plead loss causation); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 389 (E.D.N.Y. 2013) (dismissing for failure to plead loss causation)).[33]

## III. THE AC MUST BE DISMISSED WITH PREJUDICE.

Plaintiff has not identified any additional facts that would change the result, and the AC should be dismissed with prejudice. *In re Chembio Diagnostics, Inc. Sec. Litig.*, 2022 WL 541891, at *18 (E.D.N.Y. Feb. 23, 2022) (dismissing with no leave to replead because "[p]laintiffs have not identified how repleading would allow them to remedy th[e] scienter deficiency"); *Hensley*, 2014 WL 4473373, at *6-7 (same).

### CONCLUSION

For the reasons described in the Opening Brief and above, the Court should dismiss the AC in its entirety with prejudice.

---

the subprime mortgage crisis"); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005) (plaintiffs must allege a "causal connection . . . between that loss and the misrepresentation concerning Dura's spray device").

[33] Plaintiff is wrong to suggest that the motion to dismiss "is not the time to test the strength of the allegations of loss causation." *See* Opp. at 33 (citing *FGIC*, 783 F.3d at 404). All *FGIC* held is that the plaintiff "is not required to establish that" the defendant's involvement "was the *exclusive* cause of its losses" at the motion to dismiss stage. *FGIC*, 783 F.3d at 404. That is not at issue here, where Plaintiff has not pled facts to show that his losses were caused by any disclosure of alleged fraud at all.

Dated:  March 21, 2022

Respectfully submitted,

PLUG POWER, INC., ANDREW MARSH, AND
PAUL B. MIDDLETON

By their attorneys,

/s/ Deborah S. Birnbach

Deborah S. Birnbach
Jennifer B. Luz
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel.: 617.570.1000
Fax: 617.523.1231
DBirnbach@goodwinlaw.com
JLuz@goodwinlaw.com

21

**<u>CERTIFICATE OF SERVICE</u>**

I, Deborah S. Birnbach, hereby certify that a copy of the foregoing Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint For Violations of the Federal Securities Laws, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on March 21, 2022.

Dated:  March 21, 2022                                  */s/ Deborah S. Birnbach*
                                                         Deborah S. Birnbach

22