# EXHIBIT BB

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 8-K

### CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): January 6, 2021

## Plug Power Inc.

(Exact name of registrant as specified in its charter)

| **Delaware** | **1-34392** | **22-3672377** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**968 Albany Shaker Road,**
**Latham, New York**                **12110**

(Address of principal executive offices)                (Zip Code)

Registrant's telephone number, including area code: **(518) 782-7700**

**N/A**

(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to 12(b) of the Act:

| **Title of each class** | **Trading Symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Common Stock, par value $0.01 per share | PLUG | The Nasdaq Capital Market |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934(§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

---

**Item 1.01 Entry Into a Material Definitive Agreement.**

***Stock Purchase Agreement***

On January 6, 2021, Plug Power Inc. (the "Company") entered into a Stock Purchase Agreement (the "Purchase Agreement") with Grove Energy Capital LLC ("Grove Energy"), Plutus Capital NY, Inc. and SK E&S Americas, Inc., each of which is a subsidiary of SK Holdings Co., Ltd. ("SK Holdings"), in connection with a strategic partnership. Pursuant to the Purchase Agreement, the Company agreed to sell to Grove Energy 51,428,119 shares (subject to adjustment, the "Shares") of the Company's common stock, par value $0.01 per share (the "Common Stock"), at a purchase price of $29.2893 per share or an aggregate purchase price of approximately $1.5 billion (the "Investment"). Based on 468,047,829 shares of Common Stock issued and outstanding as of January 5, 2021, Grove Energy is expected to own approximately 9.9% of the issued and outstanding Common Stock immediately following the Investment.

The Purchase Agreement contains customary representations, warranties and covenants and conditions to closing of the Investment (the "Closing"), including receipt of all approvals or the termination or expiration of all waiting periods required under applicable antitrust laws. The Purchase Agreement may be terminated by either the Company or Grove Energy if the Closing has not occurred by March 5, 2021, subject to extension to April 2, 2021 in the event antitrust approval has not been obtained.

Simultaneous with the execution of the Purchase Agreement, the Company and SK E&S Co., Ltd. ("SK E&S") entered into a Nonbinding Asia JV Framework Agreement ("JV Agreement") with respect to a potential joint venture in Asia to bring hydrogen solutions to Korea, China and Vietnam (the "Proposed Asia JV"). The JV Agreement, which is non-binding, outlines certain principal terms for the Proposed Asia JV. The Purchase Agreement provides that the parties will negotiate exclusively with one another for up to eighteen months with respect to the Proposed Asia JV with the objective of executing definitive agreements for the Proposed Asia JV.

***Investor Agreement***

In connection with the Investment, the Company, Grove Energy, SK Holdings and SK E&S will enter into an Investor Agreement (the "Investor Agreement") providing for certain rights and restrictions relating to the Investment.

*Board Representation.* The Investor Agreement provides that Grove Energy will be entitled to designate one person (the "SK Designee") to be appointed to the Company's Board of Directors (the "Board"). The SK Designee will be an individual selected by Grove Energy who is reasonably acceptable to the Board and otherwise meets the requirements for serving on the Board. The SK Designee will be appointed to the Board effective as of the Closing for a term expiring at the Company's 2023 annual meeting of stockholders. Grove Energy will have the right to require the Board to nominate a SK Designee for election to the Board by the stockholders of the Company at subsequent annual stockholder meetings until the earliest of (i) the date on which Grove Energy and affiliates beneficially own less than 4.0% of the issued and outstanding Common Stock, (ii) the second anniversary of the Closing in the event that the parties to the JV Agreement have not entered into a definitive joint venture agreement with respect to the Proposed Asia JV (the "Definitive Asia JV Agreement"), and (iii) any expiration or termination of the Definitive Asia JV Agreement (the "Director Period").

---

*Standstill Obligations.* The Investor Agreement provides that Grove Energy, SK Holdings, SK E&S and their respective affiliates ("SK Parties") will be subject to a standstill provision until the later of (i) the expiration of the Director Period, (ii) the second anniversary of the Closing, and (iii) the date on which Grove Energy and affiliates beneficially own less than 5.0% of the issued and outstanding Common Stock (the "Standstill

Period"). During the Standstill Period, the SK Parties will not, among other things and subject to specified exceptions: (a) acquire any securities of the Company (except for purchases of Common Stock in the public market to the extent necessary to reverse any decrease in such parties' percentage ownership of the issued and outstanding Common Stock resulting solely from a net increase in the number of shares of issued and outstanding Common Stock); (b) propose any merger, consolidation, business combination, tender offer or similar transaction involving the Company; (c) solicit proxies or consents to vote any securities of the Company; (d) form, join or participate in any group (as such term is used in the rules of the Securities and Exchange Commission (the "SEC")); or (e) seek to call a meeting of the stockholders of the Company or propose any matter to be voted upon by the stockholders of the Company.

*Transfer Restrictions.* The Investor Agreement also provides that, for a period ending on the second anniversary of the Closing, the SK Parties will be prohibited from transferring any Common Stock. If immediately following the second anniversary of the Closing, either (i) the Director Period remains in effect or (ii) the Definitive Asia JV Agreement has been executed and remains in effect, then, until the third anniversary of the Closing, the SK Parties may transfer a number of shares of Common Stock not exceeding, in the aggregate in any 90-day period, 2.0% of the issued and outstanding shares of Common Stock as of the first date in such 90-day period. If immediately following the second anniversary of the Closing, both (i) the Director Period has ended and (ii) the Definitive Asia JV Agreement has not been executed or otherwise is not in effect, then the SK Parties may transfer any amount of Common Stock. From and after the third anniversary of the Closing, the SK Parties may transfer any amount of Common Stock. The SK Parties will also be generally prohibited from transferring Common Stock to (a) any competitor of the Company (as determined by the Board) or (b) any person that together with its affiliates would, after giving effect to such transfer, beneficially own 5.0% or more of the issued and outstanding Common Stock.

*Voting Obligations.* The Investor Agreement also provides that, during the Standstill Period, Grove Energy will vote all of its shares of Common Stock (i) for all Board-recommended director nominees and (ii) on each other matter brought to a vote of the Company's stockholders, in accordance with the recommendation of the Board on such matter. Under the Investor Agreement, Grove Energy has granted a proxy to the Company to vote all such shares of Common Stock in the event that it does not vote such shares at least ten (10) days prior to the date of any meeting of stockholders.

*Registration Rights.* The Investor Agreement includes customary resale shelf registration rights for Grove Energy that require the Company to register the Common Stock held by Grove Energy for resale.

The foregoing description of the Purchase Agreement, the Investor Agreement and the transactions contemplated thereby does not purport to be complete and is subject to, and is qualified in its entirety by, the full text of the Purchase Agreement (including the form of Investor Agreement attached as an exhibit thereto), which is filed herewith as Exhibit 10.1 and incorporated herein by reference.

The Purchase Agreement has been included to provide investors with information regarding its terms. It is not intended to provide any other factual information about the Company and its subsidiaries and affiliates. The representations and warranties contained in the Purchase Agreement were made only for purposes of the Purchase Agreement (together with the exhibits thereto) and as of specific dates, are solely for the benefit of the parties to the Purchase Agreement, may be subject to limitations agreed upon by the contracting parties, may have been made for the purposes of allocating contractual risk between the parties to the Purchase Agreement instead of establishing these matters as facts, and may be subject to standards of materiality applicable to the contracting parties that differ from those applicable to investors. Investors are not third-party beneficiaries to the representations and warranties contained in the Purchase Agreement and should not rely on the representations and warranties or any descriptions thereof as characterizations of the actual state of facts or condition of the parties thereto or any of their respective subsidiaries or affiliates. Moreover, information concerning the subject matter of representations and warranties may change after the date of the Purchase Agreement, which subsequent information may or may not be fully reflected in the Company's public disclosures.

**Item 3.02 Unregistered Sales of Equity Securities.**

The information contained in Item 1.01 of this Current Report on Form 8-K regarding the Purchase Agreement and the Investment is incorporated herein by reference. The Company will offer and sell the Shares in reliance on the exemption from registration provided by Section 4(a)(2) of the Securities Act of 1933, as amended (the "Securities Act"). The Company will rely on this exemption from registration based in part on representations made by Grove Energy in the Purchase Agreement.

**Item 7.01 Regulation FD Disclosure.**

On January 6, 2021, the Company issued a press release with respect to the strategic partnership and the Investment. A copy of the press release is furnished herewith as Exhibit 99.1.

The information included in this Item 7.01 and Exhibit 99.1 of this Current Report are not deemed to be "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), nor shall this item and Exhibit 99.1 be incorporated by reference into the Company's filings under the Securities Act or the Exchange Act, except as expressly set forth by specific reference in such future filing.

**Forward-Looking Statements**

This Current Report on Form 8-K contains forward-looking statements within the meaning of the federal securities laws. These statements include, but are not limited to, statements regarding a strategic partnership with the SK Parties, including the Investment and the Proposed Asia JV. These forward-looking statements are made as of the date hereof and are based on current expectations, estimates, forecasts and projections as well as the beliefs and assumptions of management. Forward-looking statements are subject to a number of risks and uncertainties, many of which involve factors or circumstances that are beyond the Company's control. The Company's actual results could differ materially from those stated or implied in forward-looking statements due to a number of factors, including, but not limited to, the risks related to the satisfaction of the conditions to the Closing, the successful entry into a definitive joint venture agreement with respect to the Proposed Asia JV in the anticipated timeframe or at all, the risks related to the ability of the joint venture to bring hydrogen solutions to Asia, and the risks related to market risks and uncertainties generally, including the impact of any natural disasters or public health emergencies such as the COVID-19 pandemic. These and other potential risks and uncertainties that could cause actual results to differ from the results predicted are more fully detailed in the Company's filings and reports with the SEC, including the Annual Report on Form 10-K for the year ended December 31, 2019, as amended and supplemented by the Quarterly Reports on Form 10-Q for the quarters ended March 31, 2020, June 30, 2020 and September 30, 2020, as well as other filings and reports that are filed by the Company from time to time with the SEC. The Company disclaims any obligation to update forward-looking statements.

**Item 9.01. Financial Statements and Exhibits.**
(d) Exhibits.

| Exhibit Number | Title |
|---|---|
| 10.1 | Stock Purchase Agreement, dated January 6, 2021, by and among the Company, Grove Energy Capital LLC, Plutus Capital NY, Inc. and |

|  | SK E&S Americas, Inc. |
|---|---|
| 99.1 | Press Release of Plug Power Inc., dated January 6, 2021. |
| 104 | Cover Page Interactive Data File (embedded with the Inline XBRL document). |

5

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**Plug Power Inc.**

Date: January 7, 2021                                                     By: /s/ Paul Middleton

                                                                                      Name: Paul Middleton
                                                                                      Title: Chief Financial Officer

6

**Exhibit 10.1**

**STOCK PURCHASE AGREEMENT**
**By and Among**
**GROVE ENERGY CAPITAL LLC,**
**PLUTUS CAPITAL NY, INC.,**
**SK E&S AMERICAS, INC.,**
**AND**
**PLUG POWER INC.**
**Dated as of January 6, 2021**

---

**TABLE OF CONTENTS**

|  |  |  | **Page** |
|---|---|---|---|
| 1. | Definitions | | 1 |
| | 1.1 | Defined Terms | 1 |
| | 1.2 | Additional Defined Terms | 4 |
| 2. | Purchase and Sale of Common Stock | | 5 |
| | 2.1 | Purchase Price and Share Amount | 5 |
| | 2.2 | Share Amount Adjustment | 5 |
| 3. | Closing Date; Deliveries | | 5 |
| | 3.1 | Closing Date | 5 |
| | 3.2 | Deliveries | 5 |
| 4. | Representations and Warranties of the Company | | 6 |
| | 4.1 | Organization, Good Standing and Qualification | 6 |
| | 4.2 | Capitalization and Voting Rights | 6 |
| | 4.3 | Subsidiaries | 7 |
| | 4.4 | Authorization | 7 |
| | 4.5 | No Defaults | 8 |
| | 4.6 | No Conflicts | 8 |
| | 4.7 | No Governmental Authority or Third Party Consents | 8 |
| | 4.8 | Valid Issuance of Shares | 9 |
| | 4.9 | Litigation | 9 |
| | 4.10 | Licenses and Other Rights; Compliance with Laws | 9 |
| | 4.11 | Company SEC Documents; Financial Statements; Nasdaq Stock Market | 9 |
| | 4.12 | Absence of Certain Changes | 10 |
| | 4.13 | Internal Controls; Disclosure Controls and Procedures | 10 |
| | 4.14 | Offering | 10 |
| | 4.15 | No Integration | 10 |
| | 4.16 | Brokers' or Finders' Fees | 11 |
| | 4.17 | Critical Technologies; TID U.S. Business | 11 |
| 5. | Representations and Warranties of the Investor | | 11 |
| | 5.1 | Organization; Good Standing | 11 |
| | 5.2 | Capitalization and Ownership | 11 |
| | 5.3 | Authorization | 11 |
| | 5.4 | No Conflicts | 12 |
| | 5.5 | No Governmental Authority or Third Party Consents | 12 |
| | 5.6 | Purchase Entirely for Own Account | 12 |
| | 5.7 | Disclosure of Information | 13 |
| | 5.8 | Investment Experience and Accredited Investor Status | 13 |
| | 5.9 | Acquiring Person | 13 |
| | 5.10 | Restricted Securities | 13 |
| | 5.11 | Restrictive Legend | 13 |

i

---

|  |  |  |  |
|---|---|---|---|
| | 5.12 | Financial Assurances | 13 |
| 6. | Investor's Conditions to Closing | | 14 |
| | 6.1 | Representations and Warranties | 14 |
| | 6.2 | Covenants | 14 |
| | 6.3 | Investor Agreement | 14 |
| | 6.4 | Other Deliverables | 14 |
| | 6.5 | No Material Adverse Effect | 14 |
| 7. | Company's Conditions to Closing | | 14 |
| | 7.1 | Representations and Warranties | 14 |
| | 7.2 | Covenants | 14 |
| | 7.3 | Letter Agreement | 14 |
| | 7.4 | Investor Agreement | 15 |
| 8. | Mutual Conditions to Closing | | 15 |
| | 8.1 | HSR Act | 15 |
| | 8.2 | No Prohibition | 15 |
| | 8.3 | Market Listing | 15 |
| 9. | Termination | | 15 |
| | 9.1 | Ability to Terminate | 15 |

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 8-K

### CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): January 6, 2021

# Plug Power Inc.

(Exact name of registrant as specified in its charter)

| **Delaware** | **1-34392** | **22-3672377** |
|---|---|---|
| (State or other jurisdiction | (Commission File | (IRS Employer |
| of incorporation) | Number) | Identification No.) |

**968 Albany Shaker Road,**
**Latham, New York**                                                    **12110**

(Address of principal executive offices)                                      (Zip Code)

Registrant's telephone number, including area code: **(518) 782-7700**

**N/A**

(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.01 per share | PLUG | The Nasdaq Capital Market |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934(§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

---

### Item 1.01 Entry Into a Material Definitive Agreement.

***Stock Purchase Agreement***

On January 6, 2021, Plug Power Inc. (the "Company") entered into a Stock Purchase Agreement (the "Purchase Agreement") with Grove Energy Capital LLC ("Grove Energy"), Plutus Capital NY, Inc. and SK E&S Americas, Inc., each of which is a subsidiary of SK Holdings Co., Ltd. ("SK Holdings"), in connection with a strategic partnership. Pursuant to the Purchase Agreement, the Company agreed to sell to Grove Energy 51,428,119 shares (subject to adjustment, the "Shares") of the Company's common stock, par value $0.01 per share (the "Common Stock"), at a purchase price of $29.2893 per share or an aggregate purchase price of approximately $1.5 billion (the "Investment"). Based on 468,047,829 shares of Common Stock issued and outstanding as of January 5, 2021, Grove Energy is expected to own approximately 9.9% of the issued and outstanding Common Stock immediately following the Investment.

The Purchase Agreement contains customary representations, warranties and covenants and conditions to closing of the Investment (the "Closing"), including receipt of all approvals or the termination or expiration of all waiting periods required under applicable antitrust laws. The Purchase Agreement may be terminated by either the Company or Grove Energy if the Closing has not occurred by March 5, 2021, subject to extension to April 2, 2021 in the event antitrust approval has not been obtained.

Simultaneous with the execution of the Purchase Agreement, the Company and SK E&S Co., Ltd. ("SK E&S") entered into a Nonbinding Asia JV Framework Agreement ("JV Agreement") with respect to a potential joint venture in Asia to bring hydrogen solutions to Korea, China and Vietnam (the "Proposed Asia JV"). The JV Agreement, which is non-binding, outlines certain principal terms for the Proposed Asia JV. The Purchase Agreement provides that the parties will negotiate exclusively with one another for up to eighteen months with respect to the Proposed Asia JV with the objective of executing definitive agreements for the Proposed Asia JV.

***Investor Agreement***

In connection with the Investment, the Company, Grove Energy, SK Holdings and SK E&S will enter into an Investor Agreement (the "Investor Agreement") providing for certain rights and restrictions relating to the Investment.

*Board Representation.* The Investor Agreement provides that Grove Energy will be entitled to designate one person (the "SK Designee") to be appointed to the Company's Board of Directors (the "Board"). The SK Designee will be an individual selected by Grove Energy who is reasonably acceptable to the Board and otherwise meets the requirements for serving on the Board. The SK Designee will be appointed to the Board effective as of the Closing for a term expiring at the Company's 2023 annual meeting of stockholders. Grove Energy will have the right to require the Board to nominate a SK Designee for election to the Board by the stockholders of the Company at subsequent annual stockholder meetings until the earliest of (i) the date on which Grove Energy and affiliates beneficially own less than 4.0% of the issued and outstanding Common Stock, (ii) the second anniversary of the Closing in the event that the parties to the JV Agreement have not entered into a definitive joint venture agreement with respect to the Proposed Asia JV (the "Definitive Asia JV Agreement"), and (iii) any expiration or termination of the Definitive Asia JV Agreement (the "Director Period").

2

*Standstill Obligations.* The Investor Agreement provides that Grove Energy, SK Holdings, SK E&S and their respective affiliates ("SK Parties") will be subject to a standstill provision until the later of (i) the expiration of the Director Period, (ii) the second anniversary of the Closing, and (iii) the date on which Grove Energy and affiliates beneficially own less than 5.0% of the issued and outstanding Common Stock (the "Standstill

Period"). During the Standstill Period, the SK Parties will not, among other things and subject to specified exceptions: (a) acquire any securities of the Company (except for purchases of Common Stock in the public market to the extent necessary to reverse any decrease in such parties' percentage ownership of the issued and outstanding Common Stock resulting solely from a net increase in the number of shares of issued and outstanding Common Stock); (b) propose any merger, consolidation, business combination, tender offer or similar transaction involving the Company; (c) solicit proxies or consents to vote any securities of the Company; (d) form, join or participate in any group (as such term is used in the rules of the Securities and Exchange Commission (the "SEC")); or (e) seek to call a meeting of the stockholders of the Company or propose any matter to be voted upon by the stockholders of the Company.

*Transfer Restrictions.* The Investor Agreement also provides that, for a period ending on the second anniversary of the Closing, the SK Parties will be prohibited from transferring any Common Stock. If immediately following the second anniversary of the Closing, either (i) the Director Period remains in effect or (ii) the Definitive Asia JV Agreement has been executed and remains in effect, then, until the third anniversary of the Closing, the SK Parties may transfer a number of shares of Common Stock not exceeding, in the aggregate in any 90-day period, 2.0% of the issued and outstanding shares of Common Stock as of the first date in such 90-day period. If immediately following the second anniversary of the Closing, both (i) the Director Period has ended and (ii) the Definitive Asia JV Agreement has not been executed or otherwise is not in effect, then the SK Parties may transfer any amount of Common Stock. From and after the third anniversary of the Closing, the SK Parties may transfer any amount of Common Stock. The SK Parties will also be generally prohibited from transferring Common Stock to (a) any competitor of the Company (as determined by the Board) or (b) any person that together with its affiliates would, after giving effect to such transfer, beneficially own 5.0% or more of the issued and outstanding Common Stock.

*Voting Obligations.* The Investor Agreement also provides that, during the Standstill Period, Grove Energy will vote all of its shares of Common Stock (i) for all Board-recommended director nominees and (ii) on each other matter brought to a vote of the Company's stockholders, in accordance with the recommendation of the Board on such matter. Under the Investor Agreement, Grove Energy has granted a proxy to the Company to vote all such shares of Common Stock in the event that it does not vote such shares at least ten (10) days prior to the date of any meeting of stockholders.

*Registration Rights.* The Investor Agreement includes customary resale shelf registration rights for Grove Energy that require the Company to register the Common Stock held by Grove Energy for resale.

The foregoing description of the Purchase Agreement, the Investor Agreement and the transactions contemplated thereby does not purport to be complete and is subject to, and is qualified in its entirety by, the full text of the Purchase Agreement (including the form of Investor Agreement attached as an exhibit thereto), which is filed herewith as Exhibit 10.1 and incorporated herein by reference.

The Purchase Agreement has been included to provide investors with information regarding its terms. It is not intended to provide any other factual information about the Company and its subsidiaries and affiliates. The representations and warranties contained in the Purchase Agreement were made only for purposes of the Purchase Agreement (together with the exhibits thereto) and as of specific dates, are solely for the benefit of the parties to the Purchase Agreement, may be subject to limitations agreed upon by the contracting parties, may have been made for the purposes of allocating contractual risk between the parties to the Purchase Agreement instead of establishing these matters as facts, and may be subject to standards of materiality applicable to the contracting parties that differ from those applicable to investors. Investors are not third-party beneficiaries to the representations and warranties contained in the Purchase Agreement and should not rely on the representations and warranties or any descriptions thereof as characterizations of the actual state of facts or condition of the parties thereto or any of their respective subsidiaries or affiliates. Moreover, information concerning the subject matter of representations and warranties may change after the date of the Purchase Agreement, which subsequent information may or may not be fully reflected in the Company's public disclosures.

3

**Item 3.02 Unregistered Sales of Equity Securities.**

The information contained in Item 1.01 of this Current Report on Form 8-K regarding the Purchase Agreement and the Investment is incorporated herein by reference. The Company will offer and sell the Shares in reliance on the exemption from registration provided by Section 4(a)(2) of the Securities Act of 1933, as amended (the "Securities Act"). The Company will rely on this exemption from registration based in part on representations made by Grove Energy in the Purchase Agreement.

**Item 7.01 Regulation FD Disclosure.**

On January 6, 2021, the Company issued a press release with respect to the strategic partnership and the Investment. A copy of the press release is furnished herewith as Exhibit 99.1.

The information included in this Item 7.01 and Exhibit 99.1 of this Current Report are not deemed to be "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), nor shall this item and Exhibit 99.1 be incorporated by reference into the Company's filings under the Securities Act or the Exchange Act, except as expressly set forth by specific reference in such future filing.

**Forward-Looking Statements**

This Current Report on Form 8-K contains forward-looking statements within the meaning of the federal securities laws. These statements include, but are not limited to, statements regarding a strategic partnership with the SK Parties, including the Investment and the Proposed Asia JV. These forward-looking statements are made as of the date hereof and are based on current expectations, estimates, forecasts and projections as well as the beliefs and assumptions of management. Forward-looking statements are subject to a number of risks and uncertainties, many of which involve factors or circumstances that are beyond the Company's control. The Company's actual results could differ materially from those stated or implied in forward-looking statements due to a number of factors, including, but not limited to, the risks related to the satisfaction of the conditions to the Closing, the successful entry into a definitive joint venture agreement with respect to the Proposed Asia JV in the anticipated timeframe or at all, the risks related to the ability of the joint venture to bring hydrogen solutions to Asia, and the risks related to market risks and uncertainties generally, including the impact of any natural disasters or public health emergencies such as the COVID-19 pandemic. These and other potential risks and uncertainties that could cause actual results to differ from the results predicted are more fully detailed in the Company's filings and reports with the SEC, including the Annual Report on Form 10-K for the year ended December 31, 2019, as amended and supplemented by the Quarterly Reports on Form 10-Q for the quarters ended March 31, 2020, June 30, 2020 and September 30, 2020, as well as other filings and reports that are filed by the Company from time to time with the SEC. The Company disclaims any obligation to update forward-looking statements.

4

**Item 9.01. Financial Statements and Exhibits.**
(d) Exhibits.

| Exhibit Number | Title |
| --- | --- |
| 10.1 | Stock Purchase Agreement, dated January 6, 2021, by and among the Company, Grove Energy Capital LLC, Plutus Capital NY, Inc. and |

<table>
<tr><td></td><td>SK E&S Americas, Inc.</td></tr>
<tr><td>99.1</td><td>Press Release of Plug Power Inc., dated January 6, 2021.</td></tr>
<tr><td>104</td><td>Cover Page Interactive Data File (embedded with the Inline XBRL document).</td></tr>
</table>

5

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

|  | **Plug Power Inc.** |
|---|---|
| Date: January 7, 2021 | By: /s/ Paul Middleton |
|  | Name: Paul Middleton |
|  | Title: Chief Financial Officer |

6

**Exhibit 10.1**

**STOCK PURCHASE AGREEMENT**
**By and Among**
**GROVE ENERGY CAPITAL LLC,**
**PLUTUS CAPITAL NY, INC.,**
**SK E&S AMERICAS, INC.,**
**AND**
**PLUG POWER INC.**
**Dated as of January 6, 2021**

**TABLE OF CONTENTS**

|  |  |  | **Page** |
|---|---|---|---|
| 1. | Definitions | | 1 |
| | 1.1 | Defined Terms | 1 |
| | 1.2 | Additional Defined Terms | 4 |
| 2. | Purchase and Sale of Common Stock | | 5 |
| | 2.1 | Purchase Price and Share Amount | 5 |
| | 2.2 | Share Amount Adjustment | 5 |
| 3. | Closing Date; Deliveries | | 5 |
| | 3.1 | Closing Date | 5 |
| | 3.2 | Deliveries | 5 |
| 4. | Representations and Warranties of the Company | | 6 |
| | 4.1 | Organization, Good Standing and Qualification | 6 |
| | 4.2 | Capitalization and Voting Rights | 6 |
| | 4.3 | Subsidiaries | 7 |
| | 4.4 | Authorization | 7 |
| | 4.5 | No Defaults | 8 |
| | 4.6 | No Conflicts | 8 |
| | 4.7 | No Governmental Authority or Third Party Consents | 8 |
| | 4.8 | Valid Issuance of Shares | 9 |
| | 4.9 | Litigation | 9 |
| | 4.10 | Licenses and Other Rights; Compliance with Laws | 9 |
| | 4.11 | Company SEC Documents; Financial Statements; Nasdaq Stock Market | 9 |
| | 4.12 | Absence of Certain Changes | 10 |
| | 4.13 | Internal Controls; Disclosure Controls and Procedures | 10 |
| | 4.14 | Offering | 10 |
| | 4.15 | No Integration | 10 |
| | 4.16 | Brokers' or Finders' Fees | 11 |
| | 4.17 | Critical Technologies; TID U.S. Business | 11 |
| 5. | Representations and Warranties of the Investor | | 11 |
| | 5.1 | Organization; Good Standing | 11 |
| | 5.2 | Capitalization and Ownership | 11 |
| | 5.3 | Authorization | 11 |
| | 5.4 | No Conflicts | 12 |
| | 5.5 | No Governmental Authority or Third Party Consents | 12 |
| | 5.6 | Purchase Entirely for Own Account | 12 |
| | 5.7 | Disclosure of Information | 13 |
| | 5.8 | Investment Experience and Accredited Investor Status | 13 |
| | 5.9 | Acquiring Person | 13 |
| | 5.10 | Restricted Securities | 13 |
| | 5.11 | Restrictive Legend | 13 |

i

|  |  |  | |
|---|---|---|---|
| | 5.12 | Financial Assurances | 13 |
| 6. | Investor's Conditions to Closing | | 14 |
| | 6.1 | Representations and Warranties | 14 |
| | 6.2 | Covenants | 14 |
| | 6.3 | Investor Agreement | 14 |
| | 6.4 | Other Deliverables | 14 |
| | 6.5 | No Material Adverse Effect | 14 |
| 7. | Company's Conditions to Closing | | 14 |
| | 7.1 | Representations and Warranties | 14 |
| | 7.2 | Covenants | 14 |
| | 7.3 | Letter Agreement | 14 |
| | 7.4 | Investor Agreement | 15 |
| 8. | Mutual Conditions to Closing | | 15 |
| | 8.1 | HSR Act | 15 |
| | 8.2 | No Prohibition | 15 |
| | 8.3 | Market Listing | 15 |
| 9. | Termination | | 15 |
| | 9.1 | Ability to Terminate | 15 |

| | 9.2 | Effect of Termination | 16 |
| 10. | | Additional Covenants and Agreements | 17 |
| | 10.1 | Investor Designee | 17 |
| | 10.2 | Market Listing | 17 |
| | 10.3 | Notification under the HSR Act | 17 |
| | 10.4 | Joint Venture Agreement | 18 |
| | 10.5 | Assistance and Cooperation. | 18 |
| | 10.6 | Effect of Waiver of Condition to Closing | 19 |
| | 10.7 | Interim Operations of the Company | 19 |
| | 10.8 | Guarantee | 19 |
| | 10.9 | Confidentiality | 21 |
| | 10.10 | Securities Law Disclosure; Publicity | 22 |
| 11. | | Miscellaneous | 22 |
| | 11.1 | Governing Law; Submission to Jurisdiction | 22 |
| | 11.2 | Waiver | 22 |
| | 11.3 | Notices | 22 |
| | 11.4 | Entire Agreement | 23 |
| | 11.5 | Amendments | 23 |
| | 11.6 | Headings; Nouns and Pronouns; Section References | 23 |
| | 11.7 | Severability | 23 |
| | 11.8 | Assignment | 23 |
| | 11.9 | Successors and Assigns | 23 |
| | 11.10 | Counterparts | 23 |
| | 11.11 | Third Party Beneficiaries | 23 |

ii

| | 11.12 | No Strict Construction | 24 |
| | 11.13 | Survival of Warranties | 24 |
| | 11.14 | Equitable Relief; Remedies | 24 |
| | 11.15 | Expenses | 24 |

Exhibit A – Form of Cross Receipt
Exhibit B – Form of Investor Agreement
Exhibit C – Notices
Exhibit D – Form of Letter Agreement

iii

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (this "**Agreement**"), dated as of January 6, 2021, by and among Grove Energy Capital LLC (the "**Investor**"), a Delaware limited liability company, with its principal place of business at 55 East 59th St. 11th Fl., New York, NY 10022, Plutus Capital NY, Inc. ("**Plutus**"), a Delaware corporation, with its principal place of business at 55 East 59th St. 11th Fl., New York, NY 10022, SK E&S Americas, Inc. ("**SK E&S Americas**"), a Delaware corporation, with its principal place of business at 1980 Post Oak Blvd. Suite 2000, Houston, TX 77056 (Plutus and SK E&S Americas, together, the "**Guarantors**"), and Plug Power Inc. (the "**Company**"), a Delaware corporation, with its principal place of business at 968 Albany Shaker Road, Latham, NY 12110. Each of the Investor, Guarantor and the Company is referred to in this Agreement as a "**party**" and together as the "**parties**."

WHEREAS, pursuant to the terms and subject to the conditions set forth in this Agreement, the Company desires to issue and sell to the Investor, and the Investor desires to subscribe for and purchase from the Company, certain shares of common stock, par value $0.01 per share, of the Company (the "**Common Stock**"); and

WHEREAS, the Investor is wholly owned by Plutus as of the date hereof and will be, directly or indirectly, wholly owned by Plutus and SK E&S Americas as of the Closing, Plutus is directly wholly owned by SK Holdings Co., Ltd. ("**SK Holdings**"), and SK E&S Americas is directly wholly owned by SK E&S Co., Ltd. ("**SK E&S**"), and the Guarantors desire to, jointly and severally, guarantee the obligations of the Investor under this Agreement.

NOW, THEREFORE, in consideration of the following mutual promises and obligations, and for good and valuable consideration, the adequacy and sufficiency of which are hereby acknowledged, the Investor and the Company agree as follows:

1. Definitions.

1.1 Defined Terms. When used in this Agreement, the following terms shall have the respective meanings specified therefor below:

"**Affiliate**" shall mean, with respect to any Person, another Person that controls, is controlled by or is under common control with such Person. A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise. Without limiting the generality of the foregoing, a Person shall be deemed to control another Person if any of the following conditions is met: (i) in the case of corporate entities, direct or indirect ownership of more than fifty percent (50%) of the stock or shares having the right to vote for the election of directors, and (ii) in the case of non-corporate entities, direct or indirect ownership of more than fifty percent (50%) of the equity interest with the power to direct the management and policies of such non-corporate entities. Notwithstanding anything to the contrary, the Affiliates of the Investor, the Guarantors, SK Holdings and SK E&S shall only mean the Investor, the Guarantors, SK Holdings, SK E&S and any Subsidiaries of SK E&S in which SK E&S owns more than fifty percent (50%) of the equity interest. For the purposes of this Agreement, in no event shall the Investor or any of its Affiliates be deemed Affiliates of the Company or any of its Affiliates, nor shall the Company or any of its Affiliates be deemed Affiliates of the Investor or any of its Affiliates.

1

"**Agreement**" shall have the meaning set forth in the Preamble, including all Exhibits attached hereto.

"**Business Day**" shall mean a day on which commercial banking institutions in New York, New York and Seoul, the Republic of Korea are open for

respect of, any security (as defined in the Securities Act) which is or will be integrated with the Shares sold pursuant to this Agreement in a manner that would require the registration of the Shares under the Securities Act.

---

10

---

4.16 Brokers' or Finders' Fees. No broker, finder, investment banker or other Person is entitled to any brokerage, finder's or other fee or commission from the Company in connection with the transactions contemplated by the Transaction Agreements.

4.17 Critical Technologies; TID U.S. Business. The Company does not produce, design, test, manufacture, fabricate, or develop any "critical technologies" as that term is defined in 31 C.F.R. §800.215, nor is it otherwise a "TID U.S. business" as that term is defined in 31 C.F.R. §800.248.

5. Representations and Warranties of the Investor. The Investor hereby represents and warrants the following to the Company as of the date hereof (except for the representations and warranties that speak as of a specific date, which shall be made as of such date):

5.1 Organization; Good Standing. The Investor is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware. The Investor has or will have all requisite power and authority to enter into the Transaction Agreements, to purchase the Shares and to perform its obligations under and to carry out the other transactions contemplated by the Transaction Agreements.

5.2 Capitalization and Ownership.

(a) The membership interests of the Investor as of the date hereof is owned 100% by Plutus.

(b) The authorized capital stock of SK E&S as of the date hereof consists of: 100,000,000 common stock, of which, as of the date of this Agreement, 46,401,990 common stock are issued and outstanding; and as of the date hereof, 41,761,791 (90%) of the issued and outstanding common stock of SK E&S is owned by SK Holdings.

(c) The Investor is wholly owned by Plutus as of the date hereof and will be, directly or indirectly, wholly owned by Plutus and SK E&S Americas as of the Closing, Plutus is directly wholly owned by SK Holdings and SK E&S Americas is directly wholly owned by SK E&S. SK Holdings, SK E&S and the Guarantors (together with their respective wholly-owned Affiliates) control the Investor and will make all decisions with respect to the Investor's investment in the Company and its ownership of the Shares.

(d) There are no outstanding options, rights or agreements of any kind relating to the issuance, sale or transfer of any capital stock or other equity securities of the Investor, Plutus or SK E&S Americas to any other person.

5.3 Authorization.

All requisite corporate or other action on the part of the Investor, the Guarantors, SK Holdings and SK E&S and their respective members, principals, partners, directors, officers and stockholders required by applicable Law for the authorization, execution and delivery by the Investor, the Guarantors, SK Holdings and SK E&S of the Transaction Agreements to which they are a party and the performance of all of their obligations under the Transaction Agreements to which they are a party, including the subscription for and purchase of the Shares by the Investor, has or will have been taken as of the Closing Date. This Agreement has been duly authorized, executed and delivered by the Investor and the Guarantors and, assuming due authorization, execution and delivery thereof by the other parties hereto, is a valid and legally binding obligation of the Investor and the Guarantors, enforceable against the Investor and the Guarantors in accordance with its terms (except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other Laws of general application relating to or affecting enforcement of creditors' rights and (ii) rules of Law governing specific performance, injunctive relief or other equitable remedies and limitations of public policy). The Letter Agreement has been duly authorized by SK Holdings and SK E&S and the Investor Agreement has been duly authorized by the Investor, SK Holdings and SK E&S, and, assuming due authorization, execution and delivery thereof by the other parties thereto, upon the execution and delivery of the Letter Agreement by SK Holdings and SK E&S and the Investor Agreement by the Investor, SK Holdings and SK E&S, will constitute valid and legally binding obligations of the Investor, SK Holdings and SK E&S, as the case may be, enforceable against the Investor, SK Holdings and SK E&S in accordance with their terms (except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other Laws of general application relating to or affecting enforcement of creditors' rights and (ii) rules of Law governing specific performance, injunctive relief or other equitable remedies and limitations of public policy).

---

11

---

5.4 No Conflicts. The execution, delivery and performance of the Transaction Agreements and compliance with the provisions hereof and thereof by the Investor, the Guarantors, SK Holdings and SK E&S to which they are a party do not and shall not: (a) violate any provision of applicable Law or any ruling, writ, injunction, order, permit, judgment or decree of any Governmental Authority, (b) constitute a breach of, or default under (or an event which, with notice or lapse of time or both, would become a default under) or conflict with, or give rise to any right of termination, cancellation or acceleration of, any agreement, arrangement or instrument, whether written or oral, by which the Investor, the Guarantors, SK Holdings and SK E&S or any of their respective assets, are bound, or (c) violate or conflict with any of the provisions of the organizational documents (including any articles or memoranda of organization or association, charter, bylaws or similar documents) of the Investor, the Guarantors, SK Holdings and SK E&S, except as would not impair or adversely affect the ability of the Investor, the Guarantors, SK Holdings and SK E&S to consummate the Transactions to which they are a party and perform their obligations under the Transaction Agreements to which they are a party.

5.5 No Governmental Authority or Third Party Consents. No consent, approval, authorization or other order of any Governmental Authority or other Third Party is required to be obtained by the Investor in connection with the authorization, execution and delivery of any of the Transaction Agreements or with the subscription for and purchase of the Shares, except as required pursuant to the HSR Act and to obtain an approval from the Bank of Korea.

5.6 Purchase Entirely for Own Account. The Shares shall be acquired for investment for the Investor's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and the Investor has no present intention of selling, granting any participation or otherwise distributing the Shares. The Investor does not have and will not have as of the Closing any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participation to a Person any of the Shares.

---

12

---

5.7 Disclosure of Information. The Investor has had the opportunity to review the Company SEC Documents and has received or has had full access to all the information from the Company and its management that the Investor considers necessary or appropriate for deciding whether to purchase the Shares hereunder. The Investor further represents that it has had an opportunity to ask questions and receive answers from the Company regarding the Company, its financial condition, results of operations and prospects and the terms and conditions of the offering of the Shares sufficient to enable it to evaluate its investment. The Investor can bear the economic risk of (x) an investment in the Shares and (y) a total loss in respect of such investment.

5.8 Investment Experience and Accredited Investor Status. The Investor is an "accredited investor" (as defined in Regulation D under the

Securities Act). The Investor has such knowledge and experience in financial and business matters and in investments of this type that it is capable of evaluating the merits and risks of the investment in the Shares and of making an informed investment decision.

5.9 <u>Acquiring Person</u>. As of the date of this Agreement and immediately prior to the Closing, neither the Investor nor any of its Affiliates, beneficially owns, or will beneficially own (as determined pursuant to Rule 13d-3 under the Exchange Act without regard for the number of days in which a Person has the right to acquire such beneficial ownership and without regard to the Investor's rights under this Agreement), Common Stock or any other securities of the Company.

5.10 <u>Restricted Securities</u>. The Investor acknowledges that the Shares have not been registered under the Securities Act or under any state or foreign securities laws. The Investor understands that the Shares, when issued, shall be "restricted securities" under the federal securities Laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such Laws, the Shares may be resold without registration under the Securities Act only in certain limited circumstances. The Investor represents that it is familiar with Rule 144 of the Securities Act, as presently in effect. The Investor will not offer, transfer, sell, pledge or otherwise dispose of any of the Shares, except in compliance with the registration requirements or exemption provisions of the Securities Act and any other applicable securities Laws.

5.11 <u>Restrictive Legend</u>. The Investor understands that the Shares shall bear the restrictive legend, and be subject to the transfer restrictions, set forth in the Investor Agreement.

5.12 <u>Financial Assurances</u>. The Guarantors shall cause the Investor to have, and the Investor will have, as of the Closing Date, access to cash in an amount sufficient to pay to the Company the Aggregate Purchase Price.

13

6. <u>Investor's Conditions to Closing</u>. The Investor's obligation to purchase the Shares at the Closing is subject to the fulfillment as of such Closing of the following conditions (unless waived in writing by the Investor):

6.1 <u>Representations and Warranties</u>. The representations and warranties made by the Company in Section 4 hereof shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made on and as of such dates, except to the extent such representations and warranties (i) are already qualified by materiality, MAE or words of similar import, in which case such representations and warranties shall be true and correct as of such dates in all respects or (ii) are specifically made as of a particular date, in which case such representations and warranties shall be true and correct as of such date.

6.2 <u>Covenants</u>. All covenants and agreements contained in this Agreement to be performed or complied with by the Company on or prior to the Closing Date shall have been performed or complied with in all material respects.

6.3 <u>Investor Agreement</u>. The Company shall have duly executed and delivered to the Investor, pursuant to Section 3.2(b) of this Agreement, the Investor Agreement, and (subject to execution by the Investor, SK Holdings and SK E&S) such agreement shall be in full force and effect.

6.4 <u>Other Deliverables</u>. The Investor shall have received all items required to be delivered to the Investor pursuant to Section 3.2(b) of this Agreement (other than the Investor Agreement) at or prior to the Closing.

6.5 <u>No Material Adverse Effect</u>. From and after the date of this Agreement until the Closing Date, there shall have occurred no event that has caused or would reasonably be expected to cause a Material Adverse Effect.

7. <u>Company's Conditions to Closing</u>. The Company's obligation to issue and sell the Shares at the Closing is subject to the fulfillment as of such Closing of the following conditions (unless waived in writing by the Company):

7.1 <u>Representations and Warranties</u>. The representations and warranties made by the Investor in Section 5 hereof shall be true and correct as of the date of this Agreement and as of the Closing Date as though made on and as of such dates, except to the extent such representations and warranties are specifically made as of a particular date, in which case such representations and warranties shall be true and correct as of such date.

7.2 <u>Covenants</u>. All covenants and agreements contained in this Agreement to be performed or complied with by the Investor on or prior to the Closing Date shall have been performed or complied with in all material respects.

7.3 <u>Letter Agreement</u>. SK Holdings and SK E&S shall have duly executed and delivered to the Company, pursuant to Section 3.2(a) of this Agreement, the Letter Agreement, and (subject to execution by the Company) such agreement shall be in full force and effect.

14

7.4 <u>Investor Agreement</u>. The Investor, SK Holdings and SK E&S shall have duly executed and delivered to the Company, pursuant to Section 3.2(c) of this Agreement, the Investor Agreement, and (subject to execution by the Company) such agreement shall be in full force and effect.

7.5 <u>Other Deliverables</u>. The Company shall have received all items required to be delivered to the Company pursuant to Section 3.2(c) of this Agreement (other than the Investor Agreement) at or prior to the Closing.

8. <u>Mutual Conditions to Closing</u>. The obligations of the Investor and the Company to consummate the Closing are subject to the fulfillment as of the Closing Date of the following conditions:

8.1 <u>HSR Act</u>

. The filings required under the HSR Act in connection with this Agreement shall have been made and the required waiting period shall have expired or been terminated as of the Closing Date.

8.2 <u>No Prohibition</u>. No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law (whether temporary, preliminary or permanent) that is then in effect and that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the transactions contemplated by the Transaction Agreements.

8.3 <u>Market Listing</u>. The Shares shall have been approved for listing on The Nasdaq Capital Market, subject to official notice of issuance.

9. <u>Termination.</u>

9.1 <u>Ability to Terminate</u>. This Agreement may be terminated at any time prior to the Closing by:

(a) mutual written consent of the Company and the Investor;

(b) either the Company or the Investor, upon written notice to the other no earlier than three (3) Business Days after March 5, 2021 (the "**Termination Date**"), if the Transaction shall not have been consummated by the Termination Date; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this Section 9.1(b) shall not be available to any party whose failure to fulfill any obligation under this Agreement has been the cause of, or resulted in, the failure to consummate the transactions contemplated hereby prior to the Termination Date; and <u>provided further</u>, that if on the Termination Date all of the conditions to Closing shall have been satisfied or waived (other than those conditions that by their nature are to be satisfied at the Closing, which conditions shall be capable of being satisfied at such time), other than the conditions set forth in Section 8.1, then the Termination Date shall automatically be extended until April 2, 2021;

(c) either the Company or the Investor, upon written notice to the other, if any of the mutual conditions to the Closing set forth in Section 8 shall have become incapable of fulfillment by the Termination Date and shall not have been waived in writing by the other party; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this Section 9.1(c) shall not be available to any party whose failure to fulfill any obligation under this Agreement has been the cause of, or resulted in, the failure to consummate the transactions contemplated hereby prior to the Termination Date;

15

(d) the Company, upon written notice to the Investor, so long as the Company is not then in breach of its representations, warranties, covenants or agreements under this Agreement such that any of the conditions set forth in Section 6.1 or 6.2, as applicable, could not be satisfied by the Termination Date, (i) upon a breach of any covenant or agreement on the part of the Investor set forth in this Agreement, or (ii) if any representation or warranty of the Investor shall have been or become untrue, in each case such that any of the conditions set forth in Section 7.1, 7.2 or 7.4, as applicable, could not be satisfied by the Termination Date;

(e) the Investor, upon written notice to the Company, so long as the Investor is not then in breach of its representations, warranties, covenants or agreements under this Agreement such that any of the conditions set forth in Section 7.1 or 7.2, as applicable, could not be satisfied by the Termination Date, upon a breach of any covenant or agreement on the part of the Company set forth in this Agreement, or if any representation or warranty of the Company shall have been or become untrue, in each case such that any of the conditions set forth in Section 6.1, 6.2 , 6.3 or 6.5, as applicable, could not be satisfied by the Termination Date; or

(f) the Company, upon written notice to the Investor, so long as the Company is not then in breach of its representations, warranties, covenants or agreements under this Agreement such that any of the conditions set forth in Section 6.1 or 6.2, as applicable, could not be satisfied by the Termination Date, if SK Holdings and SK E&S have not delivered to the Company the duly executed Letter Agreement, pursuant to Section 3.2(a) of this Agreement by the Letter Agreement Delivery Date.

9.2 Effect of Termination. In the event of the termination of this Agreement pursuant to Section 9.1 hereof, (a) this Agreement (except for this Section 9.2 and Section 11 hereof, and any definitions set forth in this Agreement and used in such sections) shall forthwith become void and have no effect, without any liability on the part of any party hereto or its Affiliates, and (b) all filings, applications and other submissions made pursuant to this Agreement, to the extent practicable, shall be withdrawn from the agency or other Person to which they were made or appropriately amended to reflect the termination of the transactions contemplated hereby; provided, however, that nothing contained in this Section 9.2 shall relieve any party from liability for fraud or any intentional or willful breach of this Agreement.

9.3 Notwithstanding anything to the contrary in this Agreement, to the extent SK Holdings and SK E&S have not delivered to the Company the duly executed Letter Agreement pursuant to Section 3.2(a) of this Agreement by the Letter Agreement Delivery Date, the Company may, in lieu of exercising its termination right under Section 9.1(f) hereof, cause Plutus and SK E&S Americas, respectively, to become parties to the Investor Agreement (replacing SK Holdings and SK E&S, respectively) and to absolutely and unconditionally agree to fully and punctually perform and comply with all covenants, agreements and other obligations of SK Holdings and SK E&S under the Investor Agreement, provided that in such event the provisions of the Investor Agreement and this Agreement shall be revised, in good faith among the parties, to effect such intent, and provided further that the obligations of Plutus and SK E&S Americas (upon being replaced as parties for SK Holdings and SK E&S, respectively) shall be joint and several. For the avoidance of doubt, in the event SK Holdings and SK E&S are unable to obtain requisite approval from the Bank of Korea, neither Plutus nor SK E&S Americas shall be obligated to cause SK Holdings or SK E&S to, and neither SK Holdings nor SK E&S shall be obligated to, enter into the Letter Agreement or the Investor Agreement.

16

10. Additional Covenants and Agreements.

10.1 Investor Designee. Within ten (10) days after requested by the Company, the Investor shall provide the Company with the name, relevant background information and other information relating to the of the proposed Investor Designee (as defined in the Investor Agreement) as the Company may request.

10.2 Market Listing. From the date hereof through the Closing Date, Company shall use all reasonable best efforts to (a) maintain the listing and trading of the Common Stock on The Nasdaq Capital Market and (b) effect the listing of the Shares on The Nasdaq Capital Market, including submitting the LAS to The Nasdaq Stock Market LLC no later than fifteen (15) calendar days prior to the Closing Date. In the event that Nasdaq raises any objection with respect to the ownership threshold referenced in the Director Period (as defined in the Investor Agreement), the Company will increase such ownership threshold to the lowest percentage acceptable to Nasdaq and use its reasonable best efforts to obtain approval from Nasdaq, and the parties shall modify the Investor Agreement accordingly.

10.3 Notification under the HSR Act. The parties shall, as soon as practicable, and, in any event, no later than ten (10) days after the date of this Agreement, file or cause to be filed with the U.S. Federal Trade Commission (the "**FTC**") and the U.S. Department of Justice (the "**DOJ**") the notifications required to be filed under the HSR Act with respect to the transactions contemplated by the Transaction Agreements. The Investor will be responsible for all filing fees associated with any notifications required to be filed under the HSR Act. The parties shall use commercially reasonable efforts to promptly obtain clearance under the HSR Act for the consummation of the transactions contemplated by the Transaction Agreements, including by requesting early termination of the HSR waiting period. The parties each agree not to take any action that will have the effect of delaying, impairing, or impeding, the early termination or expiration of the applicable waiting period under the HSR Act for the transactions contemplated by the Transaction Agreements. The parties commit to instruct their respective counsel to cooperate with each other and use commercially reasonable efforts to facilitate and expedite the expiration or termination of the applicable HSR Act waiting period at the earliest practicable date. Such commercially reasonable efforts and cooperation include, but are not limited to, counsel's undertaking (a) to promptly inform the other party of any written or oral communication received from the DOJ or the FTC; (b) to respond as promptly as reasonably practicable to any request from the DOJ or the FTC for information, documents or other materials in connection with a review of the transactions contemplated by the Transaction Agreements; (c) to provide to the other party, and permit the other party to review and comment in advance of submission, all proposed correspondence, filings, and written communications to the DOJ or the FTC with respect to the transactions contemplated by the Transaction Agreements (other than the notifications required to be filed under the HSR Act); and (d) not to participate in any substantive meeting or discussion with the DOJ or the FTC in respect of an investigation or inquiry concerning the transactions contemplated by the Transaction Agreements unless it consults with the other party in advance and, except as prohibited by applicable law or the DOJ or the FTC, gives the other party the opportunity to attend and participate therein; provided, however, that materials provided pursuant to this Section 10.3 may be redacted (x) to remove references concerning the valuation, (y) as necessary to comply with contractual arrangements, and (z) as necessary to address reasonable attorney-client or other privilege or confidentiality concerns. The parties will consider in good faith the views of one another, in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions, and proposals made or submitted by or on behalf of any party to the DOJ or the FTC, except as may be prohibited by or restricted by law. Notwithstanding anything to the contrary, nothing in this Section 10.3 or elsewhere in this Agreement, shall require the Investor or the Company, or any of their respective Affiliates to (or agree or commit to) sell, divest or otherwise dispose of, convey, license, hold separate, or otherwise restrict or limit freedom of action with respect to, any assets, business, products, rights, licenses, investments, or assets, or interests therein.

17

10.4 <u>Joint Venture Agreement</u>. For a period of eighteen (18) months following the Closing, the parties agree to work together and negotiate in good faith and use commercially reasonable efforts to enter into the Joint Venture Agreement. From the date hereof until the earliest of (a) the date that is twelve (12) months after the Closing Date (which date may be extended for an additional six (6) months upon written notice by any party), (b) the execution by the Company and SK E&S of the Joint Venture Agreement and (c) in the event the Closing does not occur, termination of this Agreement, neither the Company, the Investor or SK E&S nor any of their respective Affiliates may directly or indirectly, (i) solicit, initiate or encourage the submission of, any proposal or indication of interest relating to, (ii) participate in any discussions or negotiations regarding, or furnish to any person any non-public information with respect to, or take any other action to facilitate any inquiries or the making of any proposal that constitutes, or may reasonably be expected to lead to, or (iii) authorize, engage in or enter into any agreement or understanding with respect to, the formation of a joint venture for the Korea, China or Vietnam markets as contemplated in the Nonbinding Asia JV Framework Agreement dated the date hereof, an equity investment in any similar entity with respect to Korea, China or Vietnam, or any similar transaction with respect to Korea, China or Vietnam, except with the other party (or its respective Affiliates) (such equity investment or transaction, a "**Competing Transaction**"). For the avoidance of doubt, any equity investment or transaction for the following businesses shall not be considered a Competing Transaction: (i) natural gas reforming, CCUS (Carbon Capture Utilization and Storage), and liquefaction plant business in Korea and (ii) wholesale business of hydrogen to fuel cell power plants and refueling stations in Korea.

10.5 <u>Assistance and Cooperation</u>.

(a) Prior to the Closing, upon the terms and subject to the conditions set forth in this Agreement, and except as set forth in Section 10.3, each of the parties agrees to use all reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and to assist and cooperate with the other party in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement, including using all reasonable best efforts to: (a) cause the conditions precedent set forth in Sections 6, 7 and 8 to be satisfied (including, in the case of the Company, promptly notifying the Investor of any notice from The Nasdaq Stock Market LLC with respect to the LAS); (b) obtain all necessary actions or non-actions, waivers, consents, approvals, orders and authorizations from Governmental Authorities and make all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any); and (c) obtain all necessary consents, approvals or waivers from Third Parties.

18

(b) The Company and the Investor shall each, upon request by the other, furnish the other with all information concerning itself, its Affiliates, directors, officers and stockholders and such other matters as may be reasonably necessary or advisable in connection with any statement, filing, notice or application made by or on behalf of the Investor, the Company or any of their respective Affiliates to any Third Party and/or any Governmental Authority in connection with the Transaction.

(c) Subject to applicable Laws and as required by any Governmental Authority, the Company and the Investor shall each keep the other apprised of the status of matters relating to consummation of the Transaction, including promptly furnishing the other with copies of notices or other communications received by the Investor or the Company, as the case may be, or any of its Affiliates, from any Third Party and/or any Governmental Authority with respect to the Transaction.

10.6 <u>Effect of Waiver of Condition to Closing</u>. In the event that, as of the Closing, the Investor waives the condition regarding a Material Adverse Effect set forth in Section 6.5 of this Agreement, the Investor shall be deemed to have waived any right of recourse against the Company for, and agreed not to sue the Company in respect of, any and all events or inaccuracies in any representations or warranties of the Company (a) that, as of the Closing, have caused or would reasonably be expected to cause such Material Adverse Effect and (b) of which the Investor had notice in writing from the Company immediately prior to the Closing.

10.7 <u>Interim Operations of the Company</u>.

From the date hereof until the Closing, except (a) as required by applicable Law, (b) as otherwise contemplated by this Agreement or (c) as the Investor may approve in writing, the Company shall not: (i) merge or consolidate the Company with any other Person or restructure, reorganize or completely or partially liquidate the Company or (ii) sell or otherwise dispose of any of the Company's material assets other than in the ordinary course of business.

10.8 <u>Guarantee</u>.

(a) Each of the Guarantors hereby unconditionally and irrevocably guarantees to the Company, on a joint and several basis, the full and punctual performance of and compliance with all covenants, agreements and other obligations of the Investor, now or hereafter existing, under the Transaction Agreements, including the payment of the Aggregate Purchase Price due from the Investor under Section 5.12. Each of the Guarantors acknowledges and agrees that its liability under this Section 10.8(a) is joint and several with the Investor and, upon any breach or default by the Investor, the Company shall not be obligated to first attempt enforcement against the Investor. Each of the Guarantors hereby waives any and all defenses to enforcement of the guaranty set forth in this Section 10.8(a), now existing or hereafter arising, which may be available to such Guarantor, sureties and other secondary parties at law or in equity.

19

(b) Each Guarantor, jointly and severally, represents and warrants to the Company that, as of the date of this Agreement and as of the Closing Date: (1) such Guarantor has the requisite power and authority to execute and deliver the Transaction Agreements and to perform its obligations under the Transaction Agreements, including the obligations set forth in Section 10.8(a); (2) this Agreement has been duly authorized, executed and delivered by such Guarantor and, assuming due authorization, execution and delivery by the other parties hereto, is a valid and binding obligation of the Guarantor, enforceable against the Guarantor in accordance with its terms (except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other Laws of general application relating to or affecting enforcement of creditors' rights and (ii) rules of Law governing specific performance, injunctive relief or other equitable remedies and limitations of public policy); (3) the Investor Agreement has been duly authorized by SK Holdings and SK E&S and, assuming due authorization, execution and delivery thereof by the other parties thereto, upon the execution and delivery of the Investor Agreement by SK Holdings and SK E&S, will constitute a valid and legally binding obligation of SK Holdings and SK E&S, enforceable against SK Holdings and SK E&S in accordance with its terms (except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other Laws of general application relating to or affecting enforcement of creditors' rights and (ii) rules of Law governing specific performance, injunctive relief or other equitable remedies and limitations of public policy); and (4) the execution, delivery and performance of the Transaction Agreements and compliance with the provisions hereof and thereof by the applicable Guarantor, including the Guarantor's performance under Section 10.8(a), do not (x) violate any provision of applicable Law or any ruling, writ, injunction, order, permit, judgment or decree of any Governmental Authority, (y) constitute a breach of, or default under (or an event which, with notice or lapse of time or both, would become a default under) or conflict with, or give rise to any right of termination, cancellation or acceleration of, any agreement, arrangement or instrument, whether written or oral, by which such Guarantor or any of its assets, are bound, or (z) violate or conflict with any of the provisions of such Guarantor's organizational documents (including any articles or memoranda of