UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE PLUG POWER, INC. SECURITIES
LITIGATION

**OPINION & ORDER**

21 Civ. 2004 (ER)

R<small>AMOS</small>, D.J.:

Lead plaintiff Manfred Schumacher brings this federal securities class action against Plug Power Inc. ("Plug Power" or "the Company"), a company that develops fuel cell technology, and two of its officers, Andrew Marsh and Paul B. Middleton. Schumacher seeks remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder. He brings this action on behalf of purchasers of Plug Power's common stock between November 9, 2020 and March 16, 2021 (the "Class Period"). ¶ 4.[1]

Before the Court is Defendants' motion to dismiss Schumacher's First Amended Complaint ("FAC") pursuant to the Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1955, 15 U.S.C. § 78u (the "PSLRA"). Doc. 84.

For the reasons set forth below, Defendants' motion to dismiss is GRANTED.

I.      **BACKGROUND**

The FAC alleges that throughout the Class Period, Defendants issued false and misleading financial information by misclassifying costs related to fuel delivery as research and development expenses. Defendants allegedly made these false statements in order to secure financing from the Company's secondary public offerings, attract a

---

[1] Unless otherwise noted, citations to "¶ _" refer to the First Amended Complaint, Doc. 78.

partnership opportunity for the Company, and so that Marsh and Middleton could sell their shares at an inflated price.

### A.  Factual Background

The following facts are based on the allegations in the FAC, which the Court accepts as true for purposes of the instant motion.  *See, e.g.*, *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

#### i.        *The Parties*

Plug Power is a publicly traded company with its principal executive offices located in Latham, New York.  ¶¶ 2, 24.  The Company's common stock is listed on the NASDAQ exchange.  ¶ 24.

Andrew Marsh is the Company's Chief Executive Officer, President, and a member of its board of directors.  ¶ 25.  Marsh has served as the CEO since April 2008, including throughout the entirety of the Class Period.  *Id.*

Paul B. Middleton is the Company's Chief Financial Officer.  ¶ 26.  Middleton has been the CFO since 2014, including throughout the Class Period.  *Id.*  Marsh and Middleton signed the Company's Form 10-Ks for the fiscal years 2016–2019; Form 10-Q for the third quarter of fiscal year 2020; and letters to the shareholders dated November 9, 2020 and February 25, 2021, which reported Plug Power's financial results for the third and fourth quarters of fiscal year 2020, respectively.  ¶¶ 25–26.

The individual defendants possessed the power and authority to control the Company's SEC filings and public statements.  ¶ 27.  Furthermore, they were provided with the filings and statements prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  *Id.*

#### ii.        *Plug Power's Hydrogen Fuel Cell Business*

Plug Power was formed in 1997.  ¶ 29.  The Company serves as the leading provider of hydrogen fuel cell products and created the first commercially viable market

for hydrogen fuel cell technology. ¶ 30. The Company has become the largest buyer of liquid hydrogen. *Id.*

Plug Power develops and sells hydrogen fuel cell products that replace conventional batteries in equipment and vehicles powered by electricity, like forklifts, for some of the world's largest retail distribution and manufacturing businesses, including Amazon, Walmart, and Home Depot. ¶¶ 5, 31. A large part of Plug Power's revenue derives from delivering hydrogen fuel to the customers of its fuel cells. ¶ 6.

Plug Power's ability to compete in the fuel cell industry relies heavily on its ability to raise capital and consistently bring its products and technology to the market. ¶ 34. The Company is a capital-intensive business, requiring cash infusions to bring its technology to the marketplace. ¶ 32. In light of Plug Power's efforts to expand and diversify, the Company's use of cash accelerated to record highs by fiscal year 2020. ¶ 33.

### iii.    *Plug Power's Cost of Fuel Deliveries*

Plug Power's 2018 and 2019 Form 10-Ks announced that fuel delivery to customers was one of the "primary sources" of revenue. ¶ 40. The Company purchases liquid hydrogen from fuel suppliers then separately sells it to its customers. ¶ 41.

The 2018 Form 10-K stated that the cost of revenue[2] from fuel deliveries to customers increased by $5.7 million from $22 million for the year ended December 31, 2017 to $27.7 million for the year ended December 31, 2018. ¶ 43. This increase was primarily due to the higher volume of liquid hydrogen delivered to customer sites as a result of an increase in the number of hydrogen installations completed under the Company's agreements and higher fuel costs. *Id.* The 2019 Form 10-K stated that the cost of revenue from fuel delivery increased by $8.6 million to $36.4 million for the year ended December 31, 2019 for the same reasons. ¶ 42.

---

[2] Cost of revenue is the total cost of manufacturing and delivering a product or service to consumers.

Increases in the cost of fuel increased the loss accruals required for the Company's extended maintenance contracts,[3] which constituted a cost of revenue that directly reduced Plug Power's operating income. ¶ 45. Thus, the cost of fuel delivered impacted the Company's net revenue as well as its earnings before interest, taxes, depreciation, and amortization ("EBITDA"). ¶¶ 44–45.

### iv. *Plug Power's Financial Results and Goals*

In fiscal years 2018 and 2019, Plug Power generated gross profits of $2.62 million and $27.97 million, respectively. ¶ 47. It was the first time in a decade that the Company posted gross profits in consecutive years. *Id.* For fiscal year 2020, the Company advised that it relied on adjusted EBITDA as a basis for evaluating its performance as well as for forecasting future periods. ¶ 48.

On December 2, 2019, the Company filed an Automatic Shelf Registration Statement, which became effective that day, that would allow it to make multiple offerings of its securities without having to file a new registration statement for each offering. ¶ 55.

On January 30, 2020, during the Company's business update conference call, Marsh stated that "2019 was really a breakout year for Plug Power, EBITDA-positive for the year." ¶ 49. Middleton further reported that the Company had "crossed a milestone in breaking into breakeven to positive EBITDAs" and that the Company was "going to be moving in directionally north in the right way." *Id.* Marsh provided a financial target for 2020 of $20 million in adjusted EBITDA as well as the Company's goals of $1 billion in

---

[3] Each quarter, the Company estimates the cost to provide maintenance services to its customers, and how much revenue it expects to receive from those contracts. Doc. 85 at 18. If the expected costs of providing services are more than the expected revenue, a loss is recorded on the Company's financial statements as a "cost of revenue: provision for loss contracts related to service." *Id.* When the Company restated that certain costs misclassified as a research and development operating expense should instead be categorized as a cost of revenue, the expected cost of providing services under certain contracts increased and became more than the unearned revenue on those contracts in fiscal years 2018 and 2020. *Id.*

gross billings, $200 million in EBITDA, and $170 million in operating income by 2024. *Id.*

On March 5, 2020, in a letter to the shareholders, the Company noted that fiscal year 2019 was the "best year in the Company's history – setting the stage for meaningful growth in 2020 and beyond." ¶ 50.  The Company achieved this "milestone breakthrough year with [its] first positive adjusted EBITDA" of $10.9 million in the Company's history. *Id.*  During the Company's earnings call on the same day, Marsh described fiscal year 2019 as a "record year." *Id.*

On May 5, 2020, in a letter to the shareholders, the Company announced that it had achieved $6.1 million in adjusted EBITDA for the first quarter of fiscal year 2020, a 30% improvement from the first quarter of fiscal year 2019.  ¶ 51.  During the Company's earnings call on that same day, Marsh reiterated the Company's guidance of $300 million in gross bookings and $20 million in EBITDA for the year as well as the Company's goals of $200 million in EBITDA and $170 million in operating income for 2024.  *Id.*

On August 6, 2020, during the Company's earnings call for the second quarter of fiscal year 2020, Marsh stated that the Company "had a record quarter in the middle of the pandemic, achieving over $72 million in gross billings and $1 million in EBITDA." ¶ 52.  Marsh further stated that the Company's "success this year with rapid growth in gross billings and EBITDA [and] a move into green hydrogen . . . provided [it with] a clear path to achieve $1.2 billion in revenue and $250 million in EBITDA in 2024." *Id.*

On November 9, 2020, during the Company's earnings call for the third quarter of fiscal year 2020, Marsh lauded the Company's operational performance and stated that it "achieved 19% EBITDA on an adjusted basis this past quarter, generating $21.2 million of adjusted EBITDA."  ¶ 53.  When asked by an analyst from Barclays regarding adjusted EBITDA guidance for 2021, Marsh responded that "it will definitely be higher" than 2020 and that the Company was "very confident that we'll continue to be accretive and go up."  ¶ 54.

**v.       Defendants' November 9, 2020 Alleged False Statements**

On November 9, 2020, Plug Power reported its financial results for the third quarter of fiscal year 2020 in a letter to shareholders, which was signed by the individual defendants.  ¶ 127.  This letter was posted on the Company's website and attached to a Form 8-K filed on the same day.  *Id.*  The Company made false statements that its proforma adjusted EBITDA margin was 19% and that its proforma adjusted EBITDA was $24 million.  ¶¶ 127–28.

On the same day, the Company filed its Form 10-Q for the third quarter of 2020, which was also signed by the individual defendants.  ¶ 129.  The Form 10-Q falsely stated that the Company's research and development expenses were $11.96 million; provision for loss contracts[4] related to service was $4.31 million; gross profit was negative $1.29 million; and operating income was negative $27.53 million.  ¶¶ 130–32.  The Company further falsely stated that its disclosure controls and procedures were effective.  ¶ 134.

As further set forth below, the Company later restated these financial results.  ¶ 133.

Following the disclosure of the Company's financial results, the Company's stock increased by $1.45, or 7.6%, to close at $20.31.  ¶ 214.

**vi.      Plug Power's November 2020 Offering and Defendants' November 18, 2020 Alleged False Statements**

On November 16, 2020, the Company issued two press releases announcing a secondary public offering of $750,000 of common stock at $22.25 per share.  ¶ 56.  The press releases directed investors to rely on the prospectus supplement related to the offering as well as the Company's previous financial statements incorporated therein and filed with the SEC.  *Id.*

On November 18, 2020, Plug Power filed a prospectus pursuant to Rule 424(b)(2) of the Securities Act of 1933 in connection with the Shelf Registration Statement,

---

[4] The term "loss contracts" refers to the Company's extended maintenance contracts.

offering 38 million shares of common stock at $22.25 per share.  ¶ 57.  The Company also granted the underwriters a 30-day option to purchase up to an additional 5,700,000 shares.  *Id.*  The prospectus included financial data for the fiscal years 2017, 2018, and 2019 as well as unaudited financial data for the nine months ended September 30, 2020. ¶ 58.  Specifically, the prospectus stated that the Company netted a gross profit of negative $28.09 million and incurred $28.69 million in research and development expenses in fiscal year 2017, ¶ 59; netted a gross profit of $2.62 million and incurred $27.71 million in costs related to fuel delivered to customers and $33.91 million in research and development expenses in fiscal year 2018, ¶ 60; and netted a gross profit of $27.97 million and incurred $36.36 million in costs related to fuel delivered to customers and $33.68 million in research and development expenses in fiscal year 2019, ¶ 61.

For the nine months ended September 30, 2020, the prospectus stated that the Company netted a gross profit and operating income of negative $.69 million and negative $79.77 million, respectively, and incurred $4.31 million in costs related to the provision for loss contracts related to service, $32.27 million in costs related to fuel delivered to customers, and $32.13 million in research and development expenses.  ¶ 62. In addition, the prospectus incorporated by reference the Form 10-K for fiscal year 2019 and the Form 10-Qs for the first three quarters of fiscal year 2020.  ¶ 63.  These reports contained the same financial data described above.  *Id.*

The same day, the Company's stock increased by $0.24 to close at $23.33.  ¶ 215.

On November 24, 2020, Plug Power announced that it had completed the offering, which raised $1 billion in capital.  ¶ 64.

### vii.    *Middleton's Stock Sales*

On December 24, 2020, approximately one month after Plug Power completed the secondary offering, Middleton exercised stock options that were not due to expire until 2028 and 2029 and sold 216,667 shares at $35.1299 per share, resulting in net proceeds of approximately $7.6 million.  ¶¶ 66, 68, 185, 187.  This sale was made pursuant to a

Rule 10b5-1 trading plan that was established in September 2020.  ¶¶ 67, 187. Middleton's base salary in 2020 was $387,188.  ¶ 186.

### viii.     *Plug Power's Partnership with SK Group*

On January 6, 2021, Plug Power and SK Group, the largest energy provider in South Korea, announced their plan to provide hydrogen fuel cell systems, among other things, to the Korean and broader Asian markets through a joint venture company to be located in South Korea.  ¶ 70.  A United States subsidiary of SK Group would invest $1.5 billion in Plug Power by acquiring 51.4 million shares of common stock, which would represent 9.9% ownership of Plug Power's issued and outstanding common stock.  ¶ 71. This partnership with SK Group was widely regarded by analysts as a substantial development.  ¶ 72.  Following the Company's announcement, on January 7, 2021, Plug Power's stock price increased by 35% and closed at $47.29.  ¶ 73.  On February 25, 2021, the Company and SK Group announced the completion of their partnership and investment.  ¶ 74.  In the two weeks following the Company's announcements, its stock price increased by nearly 90%.  ¶ 76.

### ix.     *Marsh's Stock Sales*

On January 19, 2021, approximately two weeks after the announcement of the SK Group deal, Marsh sold 573,268 shares pursuant to a Rule 10b5-1 trading plan at prices ranging from $62.6504 to $68.3109 per share, which reduced his holdings in the Company by 43% from 1.322 million shares to 748,680 shares.  ¶¶ 77, 188.  In order to effectuate the sale of 466,668 of his shares, Marsh exercised options that were not due to expire until 2027.  ¶¶ 79, 188.  As a result of his sales, he received proceeds of approximately $37.7 million.  ¶¶ 78, 188.  Marsh's base salary for 2020 was $676,442.  ¶ 190.

### x.     *Plug Power's January 2021 Offering and Defendants' January 28, 2021 Alleged False Statements*

On January 26, 2021, Plug Power announced that it expected a secondary public offering of its common stock for $1.5 billion.  ¶ 82.  The same day, the Company increased the amount of shares initially offered to 28,000,000 shares at a price of $65 per share, with up to an additional 4,200,000 shares for the underwriters.  ¶ 83.  The Company issued two press releases regarding the commencement of the secondary public offering and directing investors to rely on the prospectus related to the offering as well as the Company's SEC filings.  ¶ 84.

On January 28, 2021, Plug Power filed a prospectus pursuant to Rule 424(b)(2), offering 28,000,000 shares at a price of $65 per share, with up to an additional 4,200,000 shares for the underwriters.  ¶ 85.  As with the November filing, this prospectus included the same financial data for the fiscal years 2017, 2018, and 2019 as well as unaudited financial data for the nine months ended September 30, 2020.  ¶¶ 86–91.

The same day, the Company's stock increased by $0.86 to close at $65.28.  ¶ 216.

On February 9, 2021, Plug Power announced the completion of its secondary public offering of 32,200,000 shares at $65 per share, with net proceeds over $2 billion.  ¶ 92.

### xi.     *Defendants' Refusal to Provide Adjusted EBITDA Guidance*

On January 26, 2021, during a business update conference call, the Company omitted a financial target for its adjusted EBITDA for 2021.  ¶ 178.  When an analyst asked about the guidance, Marsh represented that the Company would be happy to share that number at the end of February.  *Id.*

On February 25, 2021, after the Company announced the completion of its secondary public offering, during its earnings call for the fourth quarter of fiscal year 2020, the Company again did not provide information regarding its adjusted EBITDA for 2020 or guidance for 2021.  ¶ 181.  When the same analyst from the January 26, 2021

call asked for the information, Marsh stated, "we're looking at $475 million revenue at margins in the high teens for gross margins, and expense is about 30% higher than the run rate of last year." *Id.*  Middleton did not add to Marsh's answer.  ¶ 182.

### xii.    *Defendants' February 25, 2021 Alleged False Statements*

On February 25, 2021, Plug Power released its financial results for the fourth quarter and full year 2020 in a letter to the shareholders, which was signed by the individual defendants.  ¶ 148.  It was also posted on the Company's website and attached to its Form 8-K filed on the same day.  *Id.*

For the fourth quarter of 2020, the letter falsely stated that the Company's research and development expenses were $18.89 million; the provision for loss contracts related to service was $0.7 million; fuel delivery to customers was $18.46 million; gross profit was negative $422.69 million; and operating income was negative $470.5 million. ¶¶ 149–53.  For the full year 2020, the letter falsely stated the Company's research and development expenses were $51.02 million; the provision for loss contracts related to service was $5.01 million; fuel delivery to customers was $50.73 million; gross profit was negative $423.34 million; and operating income was negative $550.26 million.  *Id.*

The same day, the Company's stock dropped by $6.84 to close at $43.34.  ¶ 217.

### xiii.    *Plug Power's March 2, 2021 and March 16, 2021 Disclosures*

Approximately three weeks after the completion of the secondary public offering, on March 2, 2021, before the market opened, Plug Power filed a Notification of Late Filing with the SEC, stating that it could not timely file its Form 10-K for fiscal year 2020 as the Company was conducting a "review and assessment of the treatment of certain costs with regards to classification between Research and Development versus Costs of Goods Sold, the recoverability of right of use assets associated with certain leases, and certain internal controls over these and other areas."  ¶¶ 95, 155.  The Company stated that "[i]t is possible that one or more of these items may result in charges or adjustments

to current and/or prior period financial statements" and expected "significant changes" from its prior financial reporting for fiscal year 2019 and for the fourth quarter of fiscal year 2020.  *Id.*  That same day, the Company's stock price fell by $3.68, or 7%, to close at $48.78 per share.  ¶ 156.

On March 16, 2021, after the close of trading, the Company issued a press release announcing that it expected to restate its previous financial results for fiscal years 2018 and 2019 as well as the quarterly filings for 2019 and 2020.  ¶¶ 96, 157.  Plug Power further reported that in consultation with KPMG LLP, the Company's independent public accounting firm, the Company's management and Audit Committee determined that these financial statements needed to be restated due to "errors in accounting primarily related to several non-cash items," including "[l]oss accruals for certain service contracts" and "[t]he classification of certain costs, resulting in decrease in research and development expense and a corresponding increase in cost of revenue."  *Id.*  The press release further stated that the Company would not be able to file its 2020 Form 10-K by the March 16, 2021 deadline.  ¶¶ 97, 158.

On the same day, Plug Power filed a Form 8-K, stating that its previously issued financial statements for fiscal years 2018 and 2019 as well as the quarterly reporting for 2019 and 2020 could not be relied upon.  ¶¶ 98, 159.  The Form 8-K further announced that the Company expected to revise the accounting for these statements and disclose in the 2020 Form 10-K a material weakness in its internal controls over financial reporting. *Id.*  The Form 8-K advised that "KPMG's report on the Company's internal control over financial reporting as of December 31, 2019 should no longer be relied upon."  ¶ 159.[5]

The Form 8-K stated that "[t]he changes that will be recorded did not result from . . . any override of controls or misconduct, and KPMG has not informed the Audit Committee of any issues related to an override of controls or misconduct."  *Id.*  The

---

[5] The Form 8-K also stated that "KPMG issued unqualified audit opinions on the Company's financial statements as of and for the years ended December 31, 2018 and December 31, 2019."  Doc. 86-15 at 3.

Company reported that the accounting related to the restatement is "complex and technical and involves significant judgments" in applying the applicable accounting principles.  Doc. 86-15 at 2.

The following day, on March 17, 2021, the Company's stock fell by $3.35, or 7.8%, per share.  ¶¶ 100, 160.  In a report issued on March 18, 2021, analysts from Barclays stated that they were "most crucially" concerned with "the degree to which past margin for fuel cell products are lower (if a lot of [research and development] moves to Cost of Rev.)."  ¶ 102.  The Barclays analysts noted that "management wanted to show higher margins on the core hardware, the fuel cells."  ¶ 103.  They further stated that "[i]f margins are close to 25% today (around ¼ to ½ shift of [research and development]), management's targets could remain, but the execution risk is much greater."  ¶ 104.

On March 31, 2021, it was widely reported that President Biden's infrastructure plan would include subsidies for green energy companies such as Plug Power.  ¶ 161.  This news "buoyed" the price of the Company's stock.  *Id.*

### xiv.    *Plug Power's Restatement*

On May 14, 2021, before the market opened, Plug Power announced that it had completed the restatement of its previously issued financial statements and filed its 2020 Form 10-K, which was signed by the individual defendants.  ¶¶ 105, 121, 162.  The Form 10-K stated that the Company had corrected its misclassification of research and development expenses[6] that should have been classified as costs of revenue for the fiscal years 2016 through 2019 and the first three quarters of fiscal year 2020.  ¶¶ 109–10.  The misclassification included costs of revenue related to fuel delivered to customers.  ¶ 109.  Specifically, the Company misclassified research and development expenses by $8.9

---

[6] The Company advised investors that "[r]esearch and development expense includes:  materials to build development and prototype units, cash and non-cash compensation and benefits for the engineering and related staff, expenses for contract engineers, fees paid to consultants for services provided, materials and supplies consumed, facility related costs such as computer and network services, and other general overhead costs associated with our research and development activities."  ¶ 38.

million for fiscal year 2016, $15.2 million for fiscal year 2017, $21.2 million for fiscal year 2018, $19.5 million for fiscal year 2019, $5.5 million for the first quarter of fiscal year 2020, $4.9 million for the second quarter of 2020, and $5.5 million for the third quarter of 2020.  ¶¶ 110–11.  Thus, for the fiscal years 2016 through 2019 and the first three quarters of fiscal year 2020, Plug Power misclassified research and development expenses by an aggregate $80.7 million or 53.2% of the originally reported figures.  ¶ 111.

Some of these research and development expenses were misclassified as cost of fuel delivered to customers.  ¶ 112.  As part of the restatement, the Company increased the cost of fuel delivered to customers by the following amounts:  $8.3 million for fiscal year 2018, $8.9 million for fiscal year 2019, $2.2 million for the first quarter of fiscal year 2020, $2 million for the second quarter of 2020, and $2.8 million for the third quarter of 2020.  *Id.*

As a result of correcting the misclassification of costs of revenue as research and development expenses, the Company reduced its previously reported gross profits for fiscal years 2016 through 2019 and the first three quarters of fiscal year 2020 as follows:

| Gross Profit (In Millions)[7] | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **Q1 2020** | **Q2 2020** | **Q3 2020** |
| **Originally Stated** | $3.95 | ($28.09) | $2.62 | $27.97 | ($4.47) | $5.08 | ($1.29) |
| **Restated** | ($4.91) | ($43.30) | ($26.00) | $10.65 | ($9.70) | ($0.02) | ($28.58) |

¶¶ 113–14.

The reclassification caused nearly every reporting period to report large gross losses except for fiscal year 2019.  ¶ 115.

---

[7] The figures in parentheses indicate gross losses.

The Form 10-K also described the Company's improper assumptions in connection with loss accruals for certain service contracts, which is a type of cost of revenue. ¶ 116. As further described above, because the Company misclassified research and development costs, it did not consider all relevant historical costs when estimating future service costs in its determination of whether a loss accrual for extended maintenance contracts was necessary. *Id.* When properly considering these costs, additional loss accruals for the extended maintenance contracts were required to be recorded. *Id.* Such corrections resulted in a loss accrual of $5.3 million for the year ended December 31, 2018 and negative $1.6 million benefit for loss accrual for the year ended December 31, 2019. *Id.* Furthermore, the Form 10-K described how most of the $35.5 million loss accrual for the fiscal year 2020 derived from the Company's understatement of the provision for loss contracts related to service during the third quarter by $20.8 million. ¶ 117. This understatement of loss accrual was a result of the Company's misclassification of fuel delivery to customers as a research and development expense instead of as a cost of revenue, and caused the Company's operating income to decrease by $20.8 million. *Id.*

The Form 10-K reported that these "errors were identified after the Company reported its 2020 fourth quarter and year end results on February 25, 2021 during the course of the audit with respect to the Company's financial statements for the year ended December 31, 2020, as well as during preparation of this Annual Report on Form 10-K." Doc. 86-2 at 3.

The Form 10-K stated that Plug Power's management, including the individual defendants, under the oversight of the Company's board of directors, evaluated the Company's internal controls over financial accounting. ¶ 118. The Company concluded that its internal controls were not effective because of certain material weaknesses. *Id.* Specifically, Plug Power determined that it "did not maintain a sufficient complement of trained, knowledgeable resources to execute their responsibilities with respect to internal

control over financial reporting for certain financial statement accounts and disclosures." *Id.* As a result, the Company "did not conduct an effective risk assessment process" and "did not design and implement effective process-level controls activities." *Id.* The Form 10-K further provided that these deficiencies resulted in material misstatements that were identified and corrected in the consolidated financial statements as of and for each of the three years in the period ended December 31, 2020 and other historical periods. ¶ 119.

For fiscal year 2020, the Form 10-K reported that the Company's research and development expenses were $27.85 million, provision for loss contracts related to service was $35.47 million, cost of revenue related to fuel delivered to customers was $61.82 million, gross profit was negative $469.42 million, and operating income was negative $584.20 million. ¶ 120.

The same day, Plug Power's common stock increased by $2.62, or approximately 12%, per share. ¶ 122. On May 16, 2021, analysts from Barclays issued a report, noting that the "biggest concern" was the sizeable shift from research and development expenses to cost of goods sold and that this change "surprised [them], as it's unclear how fuel could've ended up erroneously" in research and development. ¶¶ 123–24. The analysts further reported that the shift in fees "reflect[ed] a level closer to a severe downside case" and raised "fresh concerns." ¶ 125. The report stated that while Barclays had previously "pointed to strong gross margin . . . as indicators of [the Company's research and development] efforts paying off, specifically fuel cells[,] [t]his proved untrue." ¶ 126.

### xv.     *Defendants' Scienter*

At the time of the statements above, Defendants allegedly knew or recklessly disregarded that (1) material amounts of the Company's fuel delivery costs were being reported as research and development expenses and therefore inflated reported gross profits and (2) classifying fuel delivery costs as research and development expenses allowed the Company to understate the loss accrual related to its extended maintenance contracts thereby inflating reported gross profits and EBITDA. ¶¶ 133, 135, 141, 147,

154.  According to the FAC, the individual defendants, because of their positions, made or controlled the Company's public statements, had access to relevant information prior to or shortly after the issuance of the alleged misstatements, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  ¶ 166.

### B.  Procedural Background

Dawn Beverly first filed this putative class action on March 8, 2021.  Doc. 1. Manfred Schumacher moved on May 7, 2021 for appointment as lead plaintiff, approval of Bernstein Liebhard LLP as lead counsel, and consolidation of *Beverly v. Plug Power, Inc., et al*, No. 21 Civ. 2004, and *Tank v. Plug Power, Inc., et al*, No. 21 Civ. 3985.  Doc. 67 at 1–2, 6.  Schumacher also filed a lead plaintiff appointment motion in *Smolicek v. Plug Power, Inc., et al*, No. 21 Civ. 4832, which was first filed in the Central District of California on March 18, 2021, but was transferred to this district on June 1, 2021 and subsequently assigned to the Court.  *Id.* at 2.  On July 22, 2021, the Court granted Schumacher's motions and *sua sponte* consolidated *Smolicek*, No. 21 Civ. 4832, into this action.  *Id.*

On October 6, 2021, Schumacher amended the Complaint.  Doc. 78.  The instant motion to dismiss the FAC was filed on December 6, 2021.  Doc. 84.

## II.    LEGAL STANDARD

### A.  Rule 12(b)(6)

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (citing *Twombly*, 550 U.S. at 556).  However, this

"flexible plausibility standard" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (quotation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Just. v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N. Y 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 368 (2d Cir. 1995)). Indeed, "the purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quotations omitted). Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). In considering a Rule 12(b)(6) motion, a district court may also consider "documents attached to the complaint as exhibits[ ] and documents incorporated by reference in the complaint." *Doe v. N.Y. Univ.*, No. 20 Civ. 1343 (GHW), 2021 WL 1226384, at *10 (S.D.N.Y. Mar. 31, 2021) (quotation mark omitted) (quoting *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010)). "Judicial notice may be taken of documents that are 'integral to the complaint,' such that the complaint 'relies heavily upon [the documents'] terms and effect." *Hesse*, 463 F. Supp. 3d at 462 (quoting *Palin v. N.Y. Times Co.*, 940 F.3d 804, 811 (2d Cir. 2019)). Further, "[c]ourts have taken judicial notice of materials in the public record, such as federal copyright registrations, newspaper articles, and regulatory filings—all for the limited purpose of noting what the documents state, rather than to 'prove the truth of their contents." *Id.* (quoting *Ace Arts, LLC v. Sony/ATV Music Pub., LLC*, 56 F. Supp. 3d 436, 442 (S.D.N.Y. 2014)).

### B.  Rule 9(b)

A complaint alleging securities fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA by stating the circumstances constituting fraud with particularity.  *See, e.g.*, *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320–21 (2007)).  These requirements apply whenever a plaintiff alleges fraudulent conduct, regardless of whether fraudulent intent is an element of a claim.  *Rombach v. Chang*, 355 F.3d 164, 170–71 (2d Cir. 2004) ("By its terms, Rule 9(b) applies to 'all averments of fraud.'" (quoting Fed. R. Civ. P. 9(b))).

Specifically, Rule 9(b) requires that a securities fraud claim based on misstatements must identify:  (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent. *See, e.g.*, *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012) (citing *Rombach*, 355 F.3d at 170).  Conditions of a person's mind—such as malice, intent, or knowledge—may be alleged generally, however.  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (citing Fed. R. Civ. P. 9(b)).  Like Rule 9(b), the PSLRA requires that securities fraud complaints "'specify' each misleading statement," set forth the reasons or factual basis for the plaintiff's belief that the statement is misleading, and "state with particular facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u-4(b)(1), (2)); *see also, e.g.*, *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

These heightened pleading standards, when viewed together with the more general standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal*, make clear that "plaintiffs must provide sufficient particularity in their allegations to support a plausible inference that is more likely than not that a securities law violation has been

committed." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (citing *ECA*, 553 F3d at 196).

## III.   DISCUSSION

Section 10(b) of the Exchange Act prohibits using or employing, "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance," 15 U.S.C. § 78j(b) (1934), while Rule 10b-5 creates liability for a person who makes "any untrue statement of a material fact or . . . omit[s] to state a material fact . . . in connection with the purchase or sale of any security." *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 397 (S.D.N.Y. 2013) (quoting 17 C.F.R. § 240.10b-5 (1951)).  Rule 10b-5, promulgated by the SEC to implement Section 10(b), "more specifically delineates what constitutes a manipulative or deceptive device or contrivance." *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir. 1999).  Under Rule 10b-5, it is unlawful for any person, directly or indirectly, by use of any means specified in Section 10(b):

> (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a private civil claim under Section 10(b) and Rule 10b-5, a plaintiff must plead that:  (1) the defendant made a material misrepresentation or omission, (2) with scienter, *i.e.*, a wrongful state of mind, (3) in connection with the purchase or sale of a security, and (4) that the plaintiff relied on the misrepresentation or omission, thereby (5) causing economic loss.  *Dura*, 544 U.S. at 341–42; *see also Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 153 (2d Cir. 2007).  Defendants contest only the second and fifth elements.

*First*, Defendants argue that the FAC fails to plead an inference of scienter, because (1) motives to raise capital or make the Company appear profitable, (2) routine

trading by Marsh and Middleton, (3) the magnitude of the restatement, (4) the core operations doctrine, even if viable in the Second Circuit, and (5) the individual defendants' Sarbanes-Oxley certifications do not constitute evidence of scienter, nor does the FAC otherwise plead any facts suggesting scienter, much less with particularity. *Second*, Defendants further argue that the action should be dismissed, because it fails to plead loss causation. *Finally*, absent a primary violation of §10(b)(5), Defendants seek the dismissal of the § 20(a) claim.

### A. Scienter

Defendants argue that Schumacher fails to adequately plead scienter. A plaintiff may establish scienter by alleging facts that either (1) show that the defendant had both the "motive and opportunity" to commit the alleged fraud, or (2) constitute "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. The relevant inquiry for the Court "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets the standard." *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 291–92 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015) (citing *Tellabs*, 551 U.S. at 322–23); *see also ECA*, 553 F.3d at 198; *Medis Inv'r Grp. v. Medis Tech., Ltd.*, 586 F. Supp. 2d 136, 141 (S.D.N.Y. 2008) ("In order to determine whether a complaint has adequately pleaded scienter, a court should examine all of the facts alleged collectively or 'holistically' (without parsing individual allegations), and take into account any inference concerning scienter—supporting or opposing—which can be drawn from the complaint."), *aff'd*, 328 F. App'x 754 (2d Cir. 2009) (summary order). "According to the Supreme Court, the critical inquiry is: 'When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?' If so, then scienter has been adequately pleaded. If not, the case may be dismissed." *Medis*, 586 F. Supp. 2d at 141 (citing *Tellabs*, 551 U.S. at 326).

### i.       *Motive and Opportunity*

*First*, Defendants argue that courts in this district routinely reject allegations similar to those in the FAC that Defendants were motivated to falsify financial statements in order to raise investment capital for the Company.  "A complaint has sufficiently alleged 'motive and opportunity to commit fraud' if it pleads facts showing that the defendant 'benefited in some concrete and personal way from the purported fraud.'"  *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 468 (S.D.N.Y. 2013) (quoting *Novak v. Kasaks*, 216 F.3d 300, 307–08 (2d Cir. 2000)).  While "[t]he opportunity to commit fraud is generally assumed where the defendant is a corporation or corporate officer," *id.* (collecting cases), general motives common to most corporate officers do not constitute "motive" for the purpose of establishing scienter.  *ECA*, 553 F.3d at 198.  Therefore, the desire for the corporation to maintain the appearance of profitability, keep stock prices high to increase officer compensation, and sustain the success of an investment does not suffice to establish a motive.  *See Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 213 (S.D.N.Y. 2020); *see also Van Dongen*, 951 F. Supp. 2d at 468 (citing *Novak*, 216 F.3d at 307); *Novak*, 216 F.3d at 307.

The "desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired or to acquire another," and therefore is generally insufficient for scienter.  *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 242 (S.D.N.Y. 2012) (quoting *ECA*, 553 F.3d at 201).  Whether such an interest in acquisition is sufficient to plead scienter is "extremely contextual" and requires an allegation of a "unique connection between the fraud and the acquisition." *Id.* (quoting *ECA*, 553 F.3d at 201 n.6).  Such a unique connection is sufficient when the "misstatements directly relate to the acquisition." *Id.* at 243 (quoting *ECA*, 553 F.3d at 201 n.6).

Here, Schumacher's allegations suggest nothing more than the ordinary motives possessed by virtually all corporate insiders.  Defendants' alleged desire to raise capital

from conducting offerings and entering into favorable transactions, such as the SK Group deal, is not evidence of scienter.  Indeed, courts in this district have generally found allegations regarding the desire to raise capital inadequate to plead scienter.  *See, e.g.*, *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 585 n.8 (S.D.N.Y. 2013) ("the alleged motive to raise capital is a generic one insufficient to support scienter"), *aff'd*, 566 F. App'x 93 (2d Cir. 2014); *Abengoa*, 481 F. Supp. 3d at 212 (holding that purported motive to misclassify debt and artificially inflate cash flows in order to raise capital was insufficient for scienter); *Dobina*, 909 F. Supp. 2d at 242 (finding no scienter where the fraud allegedly inflated the company's stock price and permitted it to fund its aggressive growth strategy).  Nor have courts held allegations regarding the desire to enter into transactions on favorable terms sufficient to establish scienter.  *See, e.g.*, *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 571 (S.D.N.Y. 2007) ("The assertion that [the company] sought to keep its share price elevated so that it could complete transactions on more favorable terms 'does not demonstrate defendants' intent to benefit themselves at the expense of the shareholders because the shareholders themselves would benefit from a superior transaction.'" (quoting *Kalnit*, 264 F.3d at 140–41)).

This remains true even taking into consideration Schumacher's argument, raised for the first time in his opposition papers, that Defendants' alleged misstatements inflated the Company's gross margins and created the appearance that its growth trajectory was positive in order to attract the investment of and partnership with the SK Group.  As evidence of the connection between the alleged misstatements and the SK Group deal, Schumacher points to the Company's and the SK Group's joint announcement on January 6, 2021, which stated that "Plug Power has proven its ability to scale a hydrogen business in North America[.]"  Doc. 88 at 21; *see also* Doc. 86-8 at 6.  According to Schumacher, the SK Group's decision to partner with and invest in Plug Power was based on the Company's false statements regarding its gross margins on fuel delivery and fuel cell

maintenance, which gave the Company the appearance of "scalability."  Doc. 88 at 20–21.

However, assuming *arguendo* that the Company's gross margins are relevant to scalability, which Schumacher arguably fails to plead, he has not sufficiently alleged that Plug Power's gross margins or scalability were the reasons for the SK Group's decision to partner with and invest in the Company.  Schumacher's reliance on a single statement referring to Plug Power's scalability in the joint announcement falls short of establishing a unique connection between the alleged fraud and the SK Group deal.  This bare allegation does not adequately plead that the Company's alleged misstatements directly relate to the partnership with the SK Group.[8]

Moreover, as Defendants note, Plug Power and the SK Group formed a joint venture on October 6, 2021, five months *after* the restatement.  Doc. 94-5 at 3.  That the SK Group formed a joint venture and pursued a long-term business relationship with the Company after the restatement weighs against the argument that Defendants were motivated by the potential partnership to commit the alleged fraud.  In fact, the October 6, 2021 announcement of the joint venture again states:  "Plug Power has proven its ability to scale hydrogen infrastructure quickly[.]"  *Id.*  Thus, Schumacher fails to adequately plead motive on this basis.  *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 491 (S.D.N.Y. 2021) (finding that plaintiffs did not plead any particularized facts to support their motive allegation, such as facts demonstrating the artificial inflation of stock

---

[8] The cases cited by Schumacher do not support his allegation.  *See Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 243–44 (S.D.N.Y. 2012) (finding allegations that an acquisition program was funded by stock issuances insufficient to allege scienter); *Rothman v. Gregor*, 220 F.3d 81, 94 (2d Cir. 2000) (holding that scienter was adequately alleged where, in combination with other scienter allegations, the company and its officers improperly refused to expense royalty advances to artificially inflate its stock price in order to use its stock to make an acquisition); *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 269–70 (2d Cir. 1993) (finding sufficient pleading of motive where the company permitted prior statements to become misleading through a material nondisclosure of the active consideration of a dilutive rights offering in order to lessen dilutive effect of that announcement on stock price); *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 327–28 (S.D.N.Y. 2001) (holding that motive was sufficiently concrete where defendants unlawfully recognized "phony receivables" to maintain artificially high stock price so that the company could use the stock as currency for acquisitions of legitimate receivables).

price resulting from the alleged misstatements was necessary to consummate the acquisition); *In re Agnico-Eagle Mines Ltd. Sec. Litig.*, No. 11 Civ. 7968 (JPO), 2013 WL 144041, at *12 (S.D.N.Y. Jan. 14, 2013) (interpreting the question of whether artificial inflation of stock price in the acquisition context is sufficient for scienter "narrowly"), *aff'd sub nom. Forsta AP-Fonden v. Agnico-Eagle Mines Ltd.*, 533 F. App'x 38 (2d Cir. 2013).

     *Second*, Defendants argue that the individual defendants' stock sales fail to establish scienter.  Motive can be established "when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit."  *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 233 (S.D.N.Y. 2010).  Nevertheless, the mere fact that insider stock sales occurred is not sufficient to establish scienter; instead, a plaintiff must establish that the sales were unusual or suspicious.  *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009).  To determine whether trading is unusual or suspicious, a court examines the following factors:

> (1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider defendants selling; (5) whether sales occurred soon after statements defendants are alleged to have known were misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5-1 plans.

*Villare v. Abiomed, Inc.*, No. 19 Civ. 7319 (ER), 2021 WL 4311749, at *21 (S.D.N.Y. Sept. 21, 2021) (citation omitted).  The plaintiff bears the burden of establishing that the defendants' stock sales are unusual or suspicious.  *Id.* (citation omitted).

     As a threshold matter, the parties disagree as to the individual defendants' net proceeds and percentage of shares sold.  While the FAC alleges that Marsh's sales during the Class Period reduced his holdings by 43%, or 573,268 shares, and "netted" $37.7 million, ¶ 188, Defendants argue that Marsh recovered, after deducting the exercise price of the shares sold, net proceeds of $36.1 million and only sold 20% of his overall holdings during the Class Period.  Doc. 85 at 27 n.13, 14.  Furthermore, while the FAC

alleges that Middleton sold 48% of his holdings, or 216,667 shares, and "netted" $7.6 million from his sales, ¶ 185, Doc. 88 at 23, Defendants assert that he recovered, after deducting the exercise price of shares sold, net proceeds of $7.1 million.  Doc. 85 at 26–27 n.12.  "Plaintiffs must allege not only the insider defendants' selling activity during the relevant period, but also those defendants' net profits as opposed to *gross proceeds*." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011) (emphasis in original). Thus, taking into account the exercise price of the shares sold, Marsh and Middleton gained net proceeds of $36.1 million and $7.1 million, respectively, from sales made during the Class Period.  Docs. 86-24, 86-25.  In any event, whether based on Schumacher's or Defendants' calculations of net proceeds and percentage of shares sold, as Defendants argue, courts have held that more significant trading was not indicative of scienter, specifically where there were no additional indications that the defendants' trades were unusual or suspicious.  *See, e.g.*, *Reilly v. U.S. Physical Therapy, Inc.*, No. 17 Civ. 2347 (NRB), 2018 WL 3559089, at *15 (S.D.N.Y. July 23, 2018) (finding sales of 40% of shares, without more, not suspicious and holding that "courts routinely find that raw sales numbers alone are insufficient to establish scienter"); *In re CRM Holdings, Ltd. Sec. Litig.*, No. 10 Civ. 975 (RPP), 2012 WL 1646888, at *23 (S.D.N.Y. May 10, 2012) (finding sales of 100%, 36%, and 26% of defendants' shares for proceeds in excess of $37.3 million, standing alone, to be inadequate proof of scienter).

In opposition, Schumacher, without distinguishing Defendants' cases, contends that courts in this district have found less significant stock sales to be indicative of scienter.  However, these cases are distinguishable.  For example, in *In re Initial Pub. Offering Sec. Litig.*, while the court held that "[w]here corporate insiders engaged in unusual insider trading activity, *i.e.*, sold hundreds of thousands of dollars worth of inflated stock, the motive prong is plainly satisfied," the court also required that the trades took place "reasonably soon" after the alleged misstatement.  241 F. Supp. 2d 281, 365–66 (S.D.N.Y. 2003) (internal citation and quotation marks omitted).  In *In re Weight*

*Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 256–57 (S.D.N.Y. 2020), where the defendant sold approximately 14 million shares for over $1 billion, thus reducing his ownership from approximately 44% to 22%, the court found that *both* the gross amount and percentage of holdings clearly supported scienter.  Thus, the Court finds that, standing alone, the net proceeds and percentage of holdings sold do not adequately allege motive.

The FAC alleges that (1) Defendants made false statements on November 9 and November 18, 2020 and January 28 and February 25, 2021; (2) Middleton sold shares on December 24, 2020; (3) Marsh sold shares on January 19, 2021; and (4) the alleged corrective disclosures were made on March 2, 2021 and March 16, 2021.  As Defendants argue, that the sales were not made at the beginning or the end of the Class Period is indicative that they were neither unusual nor suspicious.  The sales pre- and post-date the alleged misstatements by at least several weeks.  *See, e.g.*, *In re Iconix Brand Grp., Inc.*, No. 15 Civ. 4860 (PGG), 2017 WL 4898228, at *15 (S.D.N.Y. Oct. 25, 2017) (finding that the timing of stock sales that occurred when "the alleged fraud was only just beginning to ramp up" did not support an inference of motive); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 385 (E.D.N.Y. 2003) (holding that a period of four to six weeks between an allegedly fraudulent statement and defendants' stock sales "tends to negate any inference that defendants 'sought to reap the immediate benefit a falsely positive statement had on the market'" (quoting *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 60 (E.D.N.Y. 1998) (finding no suspicion of fraud where sales took place "well over two weeks after [the] comments were made"), *aff'd sub nom. Fishbaum v. Liz Claiborne, Inc.*, 189 F.3d 460 (2d Cir. 1999))).  Furthermore, the sales took place more than a month prior to the two corrective disclosures.  *See, e.g.*, *In re Sina Corp. Sec. Litig.*, No. 05 Civ. 2154 (NRB), 2006 WL 2742048, at *12 (S.D.N.Y. Sept. 26, 2006) (concluding that the defendants' sales did not give rise to an inference of scienter where, in part, they occurred more than a month before the adverse disclosure).

Without addressing the case law cited by Defendants, Schumacher makes much of the fact that Marsh's sales in January 2021 occurred less than two weeks after the announcement of the SK Group partnership and six weeks before the first alleged corrective disclosure.  However, as Defendants argue and as set forth above, courts have routinely declined to find trading on such a timeline inherently suspicious.[9]  *See, e.g.*, *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 524 (S.D.N.Y. 2020) (finding that defendant's sale less than two weeks after an alleged misstatement and another sale that preceded the alleged corrective disclosure by at least a month and a half were insufficient to create a strong inference of scienter); *Sina*, 2006 WL 2742048, at *12.

As for the individual defendants' prior trading practices, Defendants argue that both Marsh and Middleton traded fewer shares and obtained fewer net proceeds during the four-month Class Period than they did in the four months prior.[10]  During the four months preceding the Class Period, (1) Marsh sold 1.65 million shares and obtained $11.6 million in net proceeds as opposed to the 573,268 shares sold and $36.1 million in net proceeds obtained during the Class Period, ¶ 188, Doc. 85 at 27 n.13, 14, and (2) Middleton sold 1.5 million shares and obtained $18.8 million in net proceeds as opposed to the 216,667 shares sold and $7.1 million in net proceeds obtained during the Class Period, ¶ 185, Doc. 85 at 26–27 n.12.  In opposition, Schumacher contends that during the 12-year period between April 2008 and January 2020, Marsh did not sell any stock,

---

[9] The cases cited by Schumacher do not support a finding of scienter here.  *See City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 800 (S.D.N.Y. 2013) (finding no motive to commit fraud where the defendants sold shares throughout, but not at the end of, the class period); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999) (finding stock sales for aggregate profits of $33 million two months prior to adverse disclosure and in the midst of an investigation into company's accounting irregularities and internal control deficiencies, along with other evidence, sufficient to support a strong inference of scienter).

[10] Defendants calculate the number of shares sold and the amount of net proceeds obtained in the four months preceding the Class Period based on the individual defendants' Form 4 filings with the SEC.  *See* Docs. 86-24, 86-25.  The Court may take judicial notice of the SEC filings in order to determine whether the individual defendants' trading activity during the Class Period was unusual when compared with their prior activity.  *In re Sina Corp. Sec. Litig.*, No. 05 Civ. 2154 (NRB), 2006 WL 2742048, at *11 (S.D.N.Y. Sept. 26, 2006).

until the period between February 2020 and January 2021, when he sold over 5.7 million shares for total proceeds exceeding $76 million.  Doc. 88 at 23.  Similarly, Middleton allegedly never sold any shares until the period between July 6, 2020 and December 24, 2020, when he sold over 1.7 million shares for total proceeds exceeding $29 million.  *Id.* at 24.  Not only does Schumacher fail to cite any case law supporting his approach to analyzing prior trading practices, but he also does not dispute Defendants' calculations of the number of shares sold and the net proceeds obtained from the individual defendants' sales during the four-month period prior to the Class Period.  In fact, as Defendants note, his cases support Defendants' approach of comparing trades before and during the Class Period.  *See, e.g.*, *Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 151 (D. Conn. 2007) (comparing the individual defendants' stock sales in the 22-month period prior to the Class Period and the 23-month Class Period), *aff'd*, 312 F. App'x 400 (2d Cir. 2009).  Accordingly, the individual defendants' sales during the Class Period, when compared with their prior trading history, are not unusual.

Schumacher further argues that the fact that Marsh exercised options with an expiration date of 2027 and Middleton exercised options that were set to expire in 2028 and 2029 is evidence of scienter.  He does not cite any case law supporting this proposition, nor does he distinguish the out-of-circuit cases cited by Defendants standing for the proposition that the exercise of vested options in advance of their expiration, without more, does not indicate that the sales are suspicious.  *See* Doc. 85 at 28 n.16.[11]

Schumacher alleges that Marsh's sale of 573,268 shares on January 19, 2021, ¶188, and Middleton's sale of 216,667 shares on December 24, 2020, ¶¶ 185, 187, were

---

[11] The case that Schumacher cites is distinguishable, as it makes no mention of the exercise of stock options with a future expiration date.  *See Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) (finding scienter adequately pled where president and several other insiders sold large percentages of their stock holdings while president made optimistic statements about the company).

executed pursuant to Rule 10b5-1 trading plans.  Docs. 86-24 at 10–11, 86-25 at 11–12.[12]
It is well-established that trades pursuant to Rule 10b5-1 plans do not raise a strong
inference of scienter.  *Villare*, 2021 WL 4311749, at *21.  "Although this axiom does not
apply where a 10b5-1 plan is entered into or strategically amended to take advantage of
an inflated stock price or insider information," the FAC here "contains no such
allegations" beyond conclusory ones.  *Id.* (quoting *Koplyay v. Cirrus Logic, Inc.*, No. 13
Civ. 790 (CM), 2013 WL 6233908, at *6 (S.D.N.Y. Dec. 2, 2013)).  In fact, Schumacher
concedes that Middleton's Rule 10b5-1 plan was established in September 2020 before
the Class Period.  ¶¶ 67, 187.  He further avers that Defendants failed to establish that
they entered into the plans in good faith, speculating that it is "highly plausible" that the
individual defendants adopted or amended their plans during the Class Period when they
were issuing allegedly false statements.  Doc. 88 at 27.  However, courts have rejected
this exact argument.  *Villare*, 2021 WL 4311749, at *21 (holding that plaintiff failed to
allege that stock sales were suspicious or unusual where plaintiff conceded that it was
unclear when the Rule 10b5-1 plans were entered into).  Thus, Schumacher fails to allege
that the stock sales were suspicious or unusual.  Because Schumacher asserts no other
basis upon which to establish motive, the Court finds that he fails to establish scienter
through the motive-and-opportunity theory.

---

[12] Schumacher argues that the Court should not take into account the Rule 10b5-1 plans, because (1) this is
an affirmative defense that is inappropriate to raise on a motion to dismiss and (2) the individual
defendants' plans are not public.  These arguments, however, are contrary to well-established case law.
First, courts have considered Rule 10b-5 plans when analyzing scienter on a motion to dismiss.  *See, e.g.,*
*Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355–56 (2d Cir. 2022) (finding
that individual defendants' stock trades were not unusual or suspicious where they were conducted
pursuant to Rule 10b5-1 trading plans); *Villare v. Abiomed, Inc.*, No. 19 Civ. 7319 (ER), 2021 WL 4311749,
at *21 (S.D.N.Y. Sept. 21, 2021).  The case cited by Schumacher is inapposite, because unlike here, the
plaintiff in *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200–01 (S.D.N.Y. 2010) alleged that
the trading plans were adopted *during* the Class Period.  Second, Schumacher cites two cases in support of
his contention that the plans are not public and therefore should not be considered, one of which is
inapposite, *see Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 156 (D. Conn. 2007) (not considering trading
plans where the plaintiffs raised questions of fact regarding their genuineness and the proper disposition of
stocks thereunder), *aff'd*, 312 F. App'x 400 (2d Cir. 2009), and one of which is an out-of-circuit case, *see*
*Azar v. Yelp, Inc.*, No. 18 Civ. 400 (EMC), 2018 WL 6182756, at *19 (N.D. Cal. Nov. 27, 2018) (holding
that the court could not conclude that the plan negates any inference of scienter without reviewing it).

###### ii.        *Conscious Misbehavior or Recklessness*

Where, as here, a plaintiff fails to allege a motive to commit fraud, the plaintiff's allegations that indicate a defendant's conscious misbehavior or recklessness "must be correspondingly greater." *Kalnit*, 264 F.3d at 142 (internal quotation marks and citation omitted); *see also Abengoa*, 481 F. Supp. 3d at 213.  In order to establish scienter under the conscious misbehavior or recklessness theory, a plaintiff "must show conduct by defendants that is at least highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 189, 216 (S.D.N.Y. 2004) (internal quotation marks omitted) (quoting *Kalnit*, 264 F.3d at 142); *see also Abengoa*, 481 F. Supp. 3d at 213.  To the extent that plaintiffs assert that defendants had access to contrary facts, the complaint must "specifically identify the reports or statements containing that information." *In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d 645, 659 (S.D.N.Y. 2012) (citation omitted). "Recklessness in the scienter context[, however,] cannot be merely enhanced negligence." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005); *Medis Inv'r Grp.*, 586 F. Supp. 2d at 142 ("To properly allege recklessness, the plaintiff must plead 'a state of mind approximating actual intent, and not merely a heightened form of negligence.'").

The FAC alleges that (1) Defendants' refusal to provide guidance on adjusted EBITDA for 2021 during earnings calls in early 2021, (2) the magnitude of the restatement, (3) the fact that the restatement related to core operations of the Company, and (4) the individual defendants' Sarbanes-Oxley certifications constitute evidence of Defendants' conscious misbehavior or recklessness.  Defendants note that there are no allegations regarding internal documents or communications or confidential witnesses indicating that Defendants had access to contrary information.  Defendants further contend that the only inference to be drawn from these factual allegations is that the

errors in the Company's application of highly technical and complex accounting guidance were identified as part of KPMG's annual audit.  Doc. 85 at 21, 30.[13]

As Defendants note, Schumacher does not proffer any facts that contradict the Company's representation in its 2020 Form 10-K that these "errors were identified *after the Company reported its 2020 fourth quarter and year end results on February 25, 2021* during the course of the audit with respect to the Company's financial statements for the year ended December 31, 2020, as well as during preparation of this Annual Report on Form 10-K."  Doc. 86-2 at 3 (emphasis added).  Nor does he specifically dispute the Company's statement in its March 16, 2021 Form 8-K that "[t]he changes that will be recorded did not result from . . . any override of controls or misconduct, and KPMG has not informed the Audit Committee of any issues related to an override of controls or misconduct."  ¶ 159.  Furthermore, the FAC does not allege any facts disputing the Company's disclosure that the accounting related to the restatement is "complex and technical and involves significant judgments" in applying the applicable accounting principles.[14]  Doc. 86-15 at 2.

*First*, Schumacher points to Defendants' decision not to provide (1) adjusted EBITDA guidance for 2021 during the Company's business update call on January 26, 2021 and (2) adjusted EBITDA for fiscal year 2020 and guidance for fiscal year 2021 on the Company's February 25, 2021 earnings call, when Defendants had consistently provided such guidance prior to the Class Period.  Schumacher argues that this shows Defendants had access to information indicating that Plug Power's margins were inflated and that the Company's financial statements required a restatement that would negatively

---

[13] The parties dispute whether the facts in this action are analogous to *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).  However, the Court need not resolve this dispute to reach its findings.

[14] The FAC relies on an outside analyst's reports regarding the reclassification of research and development costs to assert that there was "no explanation but for fraud or severe recklessness."  ¶¶ 102–04, 171–72.  Furthermore, the FAC alleges that the cost of fuel delivery was a separate line item on the financial statement.  ¶ 124.

impact EBITDA.  Furthermore, Schumacher emphasizes that Defendants revealed Plug Power's false accounting only after the completion of the secondary public offering and the closing of the Company's deal with the SK Group, and therefore concludes that Defendants' non-disclosure of EBITDA guidance for 2021 was suspect.

As Defendants argue, courts generally do not infer scienter based on failure to disclose information where there is no duty to disclose under the securities laws.  *See Kalnit*, 264 F.3d at 144 (finding no scienter based on failure to disclose where there was no "clear duty to disclose"); *In re Rockwell Med., Inc. Sec. Litig.*, No. 16 Civ. 1691 (RJS), 2018 WL 1725553, at *15 (S.D.N.Y. Mar. 30, 2018) ("Such a theory of scienter, which would attribute fraudulent intent to any company that fails to publicly count its chickens before they hatch, would effectively create a duty to disclose and a presumption of fraudulent intent that is contradicted by the law of this Circuit.").  Here, Schumacher does not assert that there was a duty to disclose.  Furthermore, Defendants distinguish the single case cited by Schumacher in support of his argument that the non-disclosure of EBITDA guidance indicates scienter, *Novak*, 216 F.3d 300, noting that unlike Defendants here, the defendants in *Novak* allegedly received weekly reports containing information that directly contradicted their public statements.  Accordingly, the Court agrees with Defendants that this speculation, without more, is insufficient to raise an inference of scienter.

*Second*, the FAC alleges that in light of the magnitude of the restatement's impact on the Company's gross profits and losses, the Company knew or should have known that there were accounting errors.  Courts in this district have rejected fraud-by-hindsight allegations of scienter simply based on the fact that there was a restatement.  *See, e.g.*, *Dobina*, 909 F. Supp. 2d at 251 ("[I]t is clear that the size of the fraud alone does not create an inference of *scienter*[.]" (citation omitted)); *Iconix Brand Grp., Inc.*, 2017 WL

4898228, at *17.  Furthermore, contrary to Schumacher's assertions[15] and as Defendants contend, "[c]ourts within the Second Circuit that have addressed this issue . . . have consistently measured the restatements by the magnitude of their impact on corporate income. . . . Significantly, courts have only found evidence of recklessness when the restatements had some impact on income."  *In re Kandi Techs. Grp., Inc. Sec. Litig.*, No. 17 Civ. 1944 (ER), 2019 WL 4918649, at *6 (S.D.N.Y. Oct. 4, 2019) (collecting cases). Here, Defendants argue that the impact of the Company's restatement on its income was "modest."  Doc. 85 at 36; Doc. 93 at 20 n.25.  Even assuming *arguendo* that the magnitude of the restatement was significant, "[a] restatement is simply a correction, after the fact, of an accounting or other error in financial results," and "[t]he fact of an error, even a large error, does not suggest knowledge or intent to misstate when the financial results were originally published, particularly when the error was a matter of judgment." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 13 Civ. 8846 (LGS), 2014 WL 7176187, at *7 (S.D.N.Y. Dec. 16, 2014).  Thus, the Court finds that the magnitude of the restatement, standing alone, does not raise an inference of scienter.

  *Third*, the FAC alleges that because the alleged misstatements concerned "critical aspects of Plug Power's core operations," Defendants knew or should have known about the accounting errors.  ¶ 168.  The Second Circuit has not expressly determined if the core operations doctrine remains applicable to proving scienter after the enactment of the

---

[15] Schumacher's focus on the impact of the restatement on margins and gross profits as evidence of scienter is not supported by the cases he cites.  *See, e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76–77 (2d Cir. 2001) (finding inflated revenue, in addition to detailed allegations that defendants knew their public statements differed from reality, adequate to plead inference of scienter); *Rothman*, 220 F.3d at 92 (finding a write-off of over 84% of royalty advances, in addition to allegations of poor sales, sufficient to support a strong inference of recklessness); *In re Pareteum Sec. Litig.*, No. 19 Civ. 9767 (AKH), 2021 WL 3540779, at *17 (S.D.N.Y. Aug. 11, 2021) (recognizing that the magnitude of a restatement of revenue, in addition to the timing of terminations and resignations, can be a strong inference of scienter); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 13 Civ. 8846 (LGS), 2014 WL 7176187, at *7 (S.D.N.Y. Dec. 16, 2014) (dismissing action for failure to plead scienter despite allegations that magnitude of the company's restatement of revenue was "substantial"); *Dobina*, 909 F. Supp. 2d at 250–51 (finding failure to allege scienter despite significant restatement of tax expenses and earnings even where defendants touted lower tax rates). Furthermore, the Court agrees with Defendants that Schumacher's reliance on an analyst report discussing the impact of the restatement on margins, without more, does not support an inference of scienter.

PSLRA. *See Frederick v. Mechel OAO*, 475 F. App'x 353, 356 n.5 (2d Cir. 2012)
(summary order).  However, the Second Circuit has suggested that the doctrine can only
provide additional support for an inference of scienter but could not establish scienter on
its own. *See Schwab v. E*TRADE Fin. Corp.*, 258 F. Supp. 3d 418, 434 (S.D.N.Y. 2017)
(citing *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir.
2011) (summary order)); *see also In re Wachovia Wachovia Equity Sec. Litig.*, 753 F.
Supp. 2d 326 (S.D.N.Y. 2011).  While courts within this Circuit have debated the viability
of the doctrine, the majority approach treats it as additional evidence of scienter but not
independently sufficient to show scienter. *Id.*

Defendants argue that, to the extent it remains viable, the doctrine is not
applicable, because accounting judgments or internal controls over financial reporting,
the subject of the alleged misstatements, do not concern the Company's core operations.
Doc. 85 at 37.  The FAC states that the Company's business is focused on providing
hydrogen fuel cells and fuel to its customers.  ¶ 168.  On the other hand, Schumacher
argues that the alleged misstatements concern the Company's fuel delivery costs and
research and development expenses.  Thus, the parties dispute the subject matter of the
alleged misstatements.[16]

Defendants contend that in any event, the FAC fails to plead that the Company's
fuel delivery or research and development constitutes "nearly all of [the Company's]

---

[16] Defendants argue that the alleged misstatements here are similar in nature to those in *Reilly v. U.S. Physical Therapy, Inc.*, No. 17 Civ. 2347 (NRB), 2018 WL 3559089, at *18 (S.D.N.Y. July 23, 2018), in which the court found that the core operations doctrine was inapplicable because the company's core operation did not concern a "disputed technical accounting issue," and *Hensley v. IEC Elecs. Corp.*, No. 13 Civ. 4507 (JMF), 2014 WL 4473373, at *5 (S.D.N.Y. Sept. 11, 2014), in which the court held that "accounting . . . the source of the error that led to the restatement and the alleged false statements by [d]efendants—could not be described as (and, more to the point, is not alleged in the [c]omplaint to be) a 'core operation.'"  In contrast, Schumacher compares this case to *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 491 (S.D.N.Y. 2004), in which the court concluded that the individual defendants who were high-level officers had a "duty to familiarize [themselves] with the facts relevant to the core operations of the company and the financial reporting of those operations."

business" or is "essential to its survival." *Kandi*, 2019 WL 4918649, at \*7.[17]  Defendants further note that Schumacher fails to distinguish cases where operations constituting a greater percentage of a company's business and revenue were not core.  *See, e.g.*, *Hensley v. IEC Elecs. Corp.*, No. 13 Civ. 4507 (JMF), 2014 WL 4473373, at \*5 (S.D.N.Y. Sept. 11, 2014) (finding that the core operations doctrine was not applicable where the operation contributed 15% of total revenue); *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323 (S.D.N.Y. 2011) (holding that the operation was not core where it accounted for 16% of total business).  Nevertheless, Schumacher asserts that research and development expenses were vital to the Company's survival, as evidenced by its 2020 Form 10-K and analyst reports, which purportedly emphasized the importance of research and development to the Company's long-term profitability.

In any event, assuming *arguendo* that the alleged misstatements invoked the core operations doctrine, the Court finds Schumacher's allegations insufficient, on the basis of the core operations doctrine alone, to establish Defendants' scienter.  There are no specific factual allegations linking Defendants to the alleged accounting fraud, nor are there any allegations of Defendants' awareness of specific contradictory facts or information.  *See, e.g.*, *Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 320–21 (S.D.N.Y. 2021); *Kandi*, 2019 WL 4918649, at \*8; *Turquoise Hill Res. Ltd.*, 2014 WL 7176187, at \*8.

*Fourth*, the FAC alleges that Marsh's and Middleton's Sarbanes-Oxley certifications are evidence of their scienter.  ¶¶ 195–98.  In contrast, Defendants argue that, without more, the certifications cannot create an inference of scienter.  "[Sarbanes-Oxley] certifications may be probative of scienter if the complaint alleges 'glaring accounting irregularities or other red flags,' of which the certifying defendant had 'reason to know.'"  *Reilly*, 2018 WL 3559089, at \*19 (quoting *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 304–05 (S.D.N.Y. 2008)).  Thus, a plaintiff "cannot raise an

---

[17] Defendants contend that hydrogen fuel delivery accounted for less than 13% of the Company's net revenue in 2018 and 2019.  Doc. 85 at 39.

inference of fraudulent intent based on the signing of a certification without alleging any facts to show a concomitant awareness of or recklessness to the materially misleading nature of the statements." *Francisco*, 559 F. Supp. 3d at 321 (quoting *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015)).  Courts in this district have generally held that Sarbanes-Oxley certifications, without more, "add nothing substantial to the scienter calculus," as "allowing Sarbanes-Oxley certifications to create an inference of scienter in every case where there was an accounting error . . . by a public traded company would eviscerate the pleading requirements for scienter set forth in the PSLRA." *Reilly*, 2018 WL 3559089, at *19 (quoting *Int'l Ass'n of Heat v. Int'l Bus. Machs. Corp.*, 205 F. Supp. 3d 527, 536 (S.D.N.Y. 2016)).  Accordingly, where, as here, the FAC does not adequately allege that the individual defendants had any knowledge or reason to know of the alleged fraud, it undermines any allegation that they knew that the certifications were false. *Francisco*, 559 F. Supp. 3d at 321; *see also Reilly*, 2018 WL 3559089, at *19 (holding that plaintiffs did not adequately allege that defendants' certifications were probative of scienter where the accounting guidance was complex and the accounting treatment difficult to apply). Accordingly, the Sarbanes-Oxley certifications do not support an inference of scienter as to the individual defendants.

In determining whether Schumacher has adequately established scienter, the Court must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Francisco*, 559 F. Supp. 3d at 321 (emphasis in original) (quoting *Tellabs*, 551 U.S. at 323).  However, Schumacher's allegations, viewed individually and collectively, do not support a strong inference of scienter.  Accordingly, the Court dismisses the claims pursuant to Section 10 and Rule 10b-5.

### B. Loss Causation

Defendants argue that the FAC should be dismissed for the independent reason that it fails to plead loss causation.  Specifically, Defendants contend that the alleged corrective disclosures dated March 2, 2021 and March 16, 2021 did not disclose an alleged fraud, but instead shared disappointing news.  For example, they allege that the March 2, 2021 disclosure announced that the Company would not file its Form 10-K in time, while the March 16, 2021 disclosure stated that the Company would restate financial information for 2018 through 2020, neither of which was a disclosure of fraud or wrongdoing.  In opposition, Schumacher asserts that the FAC clearly alleges that the Company provided false and misleading financial information and later revealed that certain financial information was in fact inaccurate.

Schumacher's failure to adequately plead scienter is dispositive.  Thus, the Court need not reach the issue of loss causation.[18]  *Abengoa*, 481 F. Supp. 3d at 215; *see also In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *22 (S.D.N.Y. Sept. 28, 2012) ("Because the issue of scienter . . . proves fatal to [p]laintiffs' Section 10(b) claims . . . the Court need not reach the [d]efendants' arguments regarding . . . loss causation[.]"), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014); *Hutchinson v. Perez*, No. 12 Civ. 1073 (HB), 2012 WL 5451258, at *8 (S.D.N.Y. Nov. 8, 2012) ("Since the Court must dismiss the Amended Complaint if [p]laintiff fails to adequately plead scienter, I need not reach loss causation or misleading statements and omissions under the PSLRA."), *amended*, No. 12 Civ. 1073 (HB), 2013 WL 93171 (S.D.N.Y. Jan. 8, 2013); *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, No. 09 Civ. 4050 (PKC), 2010 WL 3790810, at *22 (S.D.N.Y. Sept. 28, 2010) ("I need not reach the issue of whether the SAC alleges loss causation because the SAC fails to allege a misstatement or that defendants acted with scienter.").

---

[18] Defendants raise, in a footnote, that the FAC could also be dismissed because it fails to plead an actionable misstatement or omission.  *Id.* at 41 n.23.  The Court need not resolve this issue.

### C.  § 20(a) Claims

Schumacher brings a claim for violation of Section 20(a) against Marsh and Middleton.  Section 20(a) of the Exchange Act imposes liability on individuals who control any person or entity that violates Section 10.  *See* 15 U.S.C. § 78t(a).  "To assert a *prima facie* case under Section 20(a), a plaintiff 'must show a primary violation by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person.'"  *Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 882 (S.D.N.Y. 2011) (quoting *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)), *aff'd sub nom. Frederick*, 475 F. App'x 353.  Because Schumacher has failed to allege a primary violation of the Exchange Act, his claim pursuant to Section 20(a) is also dismissed.  *See Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 369 (S.D.N.Y. 2019), *aff'd sub nom. Cavalier Fundamental Growth Fund v. Skechers U.S.A., Inc.*, 826 F. App'x 111 (2d Cir. 2020); *see also Villare*, 2021 WL 4311749, at *24.

### D.  Leave to Amend

Defendants request that the Court deny the FAC with prejudice.  Rule 15 of the Federal Rules of Civil Procedure instructs courts to "freely give leave" to replead "when justice so requires."  Fed. R. Civ. P. 15(a)(2); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962).  The "usual practice" in this Circuit upon granting a motion to dismiss is to permit amendment of the complaint.  *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 446–47 (S.D.N.Y. 2014) (citing *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990)).  Because it is possible that Schumacher can plead additional facts to remedy some of the deficiencies identified in this opinion without prejudice to Defendants, he is granted leave to amend his complaint.  *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 189–90 (2d Cir. 2015) (finding the "district court exceeded the bounds of its discretion in denying [p]laintiffs

leave to amend their complaint" because an amended complaint "may cure the remaining defects" identified by the court).  Schumacher will not be given unlimited opportunities to amend, however, as he is now on notice of the deficiencies in his pleadings.  *See, e.g.*, *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 351 (S.D.N.Y. 1999) ("[W]here a plaintiff is on notice of deficiencies in an initial pleading and has had the opportunity to cure them by a first amendment, 'dismissal with prejudice is proper when a complaint previously has been amended.'").

## IV.   CONCLUSION

For the reasons discussed above, the motion to dismiss is GRANTED. Accordingly, Defendants' request for oral argument, Doc. 87, is DENIED as moot. Schumacher may file his Second Amended Complaint, if at all, by October 20, 2022.  If he does not, the case will be closed.

The Clerk of Court is respectfully directed to terminate the motions, Docs. 84 and 87.

It is SO ORDERED.

Dated:   September 29, 2022
         New York, New York

_____
         Edgardo Ramos, U.S.D.J.