**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PLUG POWER, INC. SECURITIES LITIGATION | No. 1:21-cv-2004-ER<br><br>JURY TRIAL DEMANDED |

**CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................1

II.     JURISDICTION AND VENUE ............................................................6

III.    THE PARTIES.......................................................................................6

IV.     SUBSTANTIVE ALLEGATIONS ......................................................8

        A.      Plug Power's Hydrogen Fuel Cell Business ............................8

        B.      Plug Power Announces Stock Warrant Deals with Amazon and
                Walmart.....................................................................................9

        C.      Plug's Power's History with the SEC and Efforts to Mislead
                Investors on the True Costs Associated with the Stock Warrant
                Deals .......................................................................................12

        D.      Tracking Research and Development Expenses and Fuel Costs
                Were Critical to Plug Power's Business .................................16

        E.      Plug Power Extols Its Newfound Profitability and Growth.....19

        F.      The Amazon Transaction Agreement Looms as a Debilitating Cost
                for Plug Power ........................................................................22

        G.      Plug Reports its Earnings for the Third Quarter of FY2020......24

        H.      Plug Power Raises $1 Billion from Investors through a Secondary
                Public Offering at a Price of $22 Per Share Based on Overstated
                Financial Statements ..............................................................29

        I.      Plug Power Receives a Private Critical Comment Letter from the
                SEC ..........................................................................................32

        J.      Armed with Knowledge of the SEC's Comment Letter and Plug
                Power's  Planned Vesting of Tens of Millions of Amazon Warrant
                Shares in the Fourth Quarter of FY2020, Defendant Middleton
                Trades on Confidential Non-Public Information ....................33

        K.      Plug Power Vests 20 Million Amazon Warrant Shares...........35

        L.      Plug Power Gains $1.5 Billion from SK Group's Purchase of Plug
                Power's Common Stock ..........................................................39

        M.      Plug Power Responds to the December 16, 2020 SEC Letter ....42

N.   Appraised of the True Cost, Cause, and Ramifications of the
     Amazon Warrant Waiver, Defendant Marsh Sells Nearly Half His
     Holdings While the Stock Price Was Inflated ......................................45

O.   Plug Power Provides Annual Business Update for 2021 and Fails
     to Disclose the True Cost of the Amazon Warrant Waiver ....................47

P.   Plug Power Raises $2 Billion from Investors through a Secondary
     Public Offering at a Price of $65 Per Share Based on False and
     Misleading Statements ...........................................................................48

Q.   Plug Power Issues Prospectus on Potential Resale of its Stock in
     Connection with Walmart Transaction Agreement ...............................51

R.   Plug Power Receives Another Comment Letter from the SEC
     Demanding that the Company Refile its Earnings for the Third
     Quarter of FY2020 .................................................................................52

S.   Leading up to the Release of Earnings for the Fourth Quarter of
     FY2020, Defendants Recklessly Disregard Plug Power's Critical
     Accounting Errors ..................................................................................52

T.   Plug Power Reports Dismal Financial Results for the Fourth
     Quarter of FY2020 and Discloses the Immense Cost of the
     Amazon Warrant Waiver ........................................................................54

U.   Plug Power Reveals that Significant Revisions to Its Prior
     Financials Are Needed ...........................................................................58

V.   In the Wake of Plug Power's False Accounting and Poor Financial
     Results, SK Group Explores Selling its Stake in Plug Power ...............61

W.   Plug Power Restates Its Financial Results Touted to Investors
     during the Class Period and Finally Discloses the True Cost and
     Cause of the Amazon Warrant Waiver ...................................................62

X.   The SEC Continues to Question Plug Power's Accounting
     Practices and Presentation of its Financial Results...............................70

Y.   Plug Power Reveals Further Weaknesses in Its Financial Reporting
     Controls...................................................................................................73

V.   DEFENDANTS' FALSE STATEMENTS AND OMISSIONS OF
     MATERIAL FACTS MADE WITH SCIENTER ...........................................76

A.   The November 9, 2020 False and Misleading Statements......................76

        a.     Misleading Statements Omitting Material Facts Pertaining to the Amazon Transaction Agreement ......................................76

        b.     False and Misleading Statements Pertaining to Plug Power's Accounting Fraud .........................................................78

   B.    The November 18, 2020 False and Misleading Statements.................................80

        a.     Misleading Statements Omitting Material Facts Pertaining to the Amazon Transaction Agreement ......................................80

        b.     False and Misleading Statements Pertaining to the Accounting Fraud................................................................81

   C.    The January 5, 2021 Misleading Statements Omit Material Facts Pertaining to the Amazon Transaction Agreement ................................................82

   D.    The January 26, 2021 False and Misleading Statements Omit Material Facts Pertaining to the Amazon Transaction Agreement .......................84

   E.    The January 28, 2021 False and Misleading Statements .....................................85

        a.     Misleading Statements Omitting Material Facts Pertaining to the Amazon Transaction Agreement ......................................85

        b.     False and Misleading Statements Pertaining to the Accounting Fraud................................................................87

   F.    The February 8, 2021 Misleading Statements Omitting Material Facts Pertaining to the Amazon Transaction Agreement ......................................89

   G.    The February 25, 2021 False Statements of Material Facts...................................90

VI.    THE TRUTH EMERGES ................................................91

VII.   ADDITIONAL ALLEGATIONS OF SCIENTER............................................96

   A.    Plug Power's Fraud Surrounding the Amazon, Transaction Agreement, Amazon Warrant Waiver, and December 16, 2020 SEC Letter..................................................................98

        a.     The Fraud Impacted Plug Power's Core Operations .................................98

        b.     Defendant Middleton's Insider Trading While in Possession of Material Non-Public Information Triggered a Duty to Disclose..........................................................98

       c.     Defendant Marsh's Insider Trading While in Possession of Material Non-Public Material Information Triggered a Duty to Disclose..................................................................100

   B.   Plug Power's Accounting Fraud .........................................................101

       a.     The Fraud Impacted Plug Power's Core Operations ...............................101

       b.     Enticing the Monumental Deal with SK Group Provided Defendants with Motive and Opportunity to Engage in Fraud .....................................................................102

       c.     Defendants' Insider Stock Sales Are Indicative of Scienter ...................104

       d.     At the latest, Defendants Knew or Should Have Been Aware of the Accounting Errors by February 24, 2021.........................106

       e.     Defendants' SOX Certifications Are Indicative of Scienter..................107

VIII.   LOSS CAUSATION/ECONOMIC LOSS ....................................................108

IX.   INAPPLICABILITY OF STATUTORY SAFE HARBOR ...........................................111

X.   PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET.................................112

XI.   CLASS ACTION ALLEGATIONS ....................................................................113

COUNT I  FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER  (AGAINST THE COMPANY AND INDIVIDUAL DEFENDANTS) .......................................................................114

COUNT II  FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT  (AGAINST THE INDIVIDUAL DEFENDANTS)...........................................................................117

XII.   PRAYER FOR RELIEF ....................................................................118

XIII.   JURY TRIAL DEMANDED...............................................................120

1.      Plaintiff Manfred Schumacher ("Lead Plaintiff"), by and through his undersigned counsel, alleges the following upon information and belief, except as to those allegations concerning the Lead Plaintiff certification, which are alleged upon personal knowledge.  Lead Plaintiff's information and belief are based upon, among other things, Lead Counsel's investigation, which includes without limitation, review and analysis of filings with the United States Securities and Exchange Commission ("SEC"), SEC Comment Letters, filings in the Delaware Court of Chancery citing internal Plug Power Inc. ("Plug Power") documents, press releases, news articles, and analyst reports.  Lead Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      INTRODUCTION

2.      Plug Power is a publicly traded company with common stock listed on the NASDAQ and is subject to the requirements of the Securities Exchange Act of 1934 (the "Exchange Act").

3.      Lead Plaintiff seeks to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

4.      This securities fraud class action is on behalf of a class of all persons who purchased Plug Power common stock on the open market of a U.S. stock exchange between November 9, 2020 and March 16, 2021, inclusive (the "Class Period"), and were damaged thereby (the "Class").

5.      Plug Power provides comprehensive hydrogen fuel cell turnkey solutions focused on systems used to power electric motors in the electric mobility and stationary power markets. Plug Power primarily provides fuel cells for forklifts operating in warehouses of some of the world's largest retail-distribution and manufacturing businesses, including Amazon, Walmart, and Home Depot.

6.      Since its inception, Plug Power has been a struggling business.  In an attempt to turn the Company around, Plug Power burdened itself in 2017 with unfavorable customer agreements to book top-line growth and create the appearance of profitability.

7.      This top-line growth propelling the Company's stock price was generated by costly subsidies provided to Amazon and Walmart, in the form of stock warrants issued as sales incentives, at the expense of Plug Power's shareholders.

8.      The Company touted a myriad of misleading non-GAAP[1] metrics designed to obfuscate the significant costs associated with growing the business—tactics which the SEC has repeatedly sought to arrest with Plug Power publicly and privately.

9.      By the beginning of the Class Period, Plug Power's stock price was on the rise. This, in turn, increased the expected value of warrants tied to $400 million of future Amazon revenue.  Additionally, because of an accounting change accepted in 2019, the Company was forced to immediately deduct warrant costs from Amazon revenue and to write off the reasonable value of warrants that were losses.

10.      In the third quarter of the fiscal year ("FY") 2020, it was clear to Defendants that millions of dollars of Amazon warrant charges were decimating its bottom line and would continue to do so for years to come.  In fact, the deal with Amazon was so disastrous and the that in order for Plug Power to break even, the Company needed to generate $1.9 billion in revenue from Amazon to earn sufficient profit margins.

11.      Plug Power was forced to bail out of its deal with Amazon by waiving the vesting conditions for tens of millions of its shares on December 31, 2020 and forgoing hundreds of millions in prospective revenue for the Company (the "Amazon Warrant Waiver").  Despite

---

[1] "GAAP" refers to the Generally Accepted Accounting Principles.

knowing that this failed deal alone would cost the Company almost $400 million in the fourth quarter of FY2020 and devastate its financial results, Defendants did not disclose the truth of this financial calamity until almost two months later on February 25, 2022.

12.    Meanwhile, armed with non-public information on the true cost, cause and ramifications of the Amazon Warrant Waiver and non-public correspondence from the SEC challenging Plug Power's improper and misleading non-GAAP metrics, Individual Defendants sold Plug Power stock for tens of millions of dollars.  Defendant Andrew Marsh capitalized on the Company's inflated stock price by selling 43% of his vested holdings which netted him $36.1 million, when Plug Power's common stock price was at its peak.  Defendant Paul Middleton also profited by netting approximately $7.1 million from insider sales during the Class Period.

13.    The insider trading was so suspicious that it was flagged and highlighted by researchers analyzing insider trading at public companies.  The *Wall Street Journal* on June 29, 2022 highlighted Defendant Marsh's questionable insider trading indicating that corporate insiders were likely using nonpublic information "to game the system."

14.    During the Class Period, the Company also raised over $3.5 billion from investors to support its capital-intensive business (including the largest bought deal in the cleantech sector and the most lucrative capital raise in the Company's history) by using material omissions and relying on its inflated financial results from the fiscal years 2018, 2019, and 2020.

15.    Unbeknownst to investors was the fact that Defendants were also hiding higher fuel delivery costs as research and development expenses.  This misclassification shielded millions of dollars in fuel costs from negatively impacting cost of revenue and profits and made Plug Power's business model appear to be a success.  The misclassification also negatively impacted EBITDA

reported during 2020 because restating the fuel delivery costs increased the loss accruals required for Plug Power's extended maintenance contracts.

16.    It was not until a change in auditors that the Company was forced to address years of accounting manipulations.  The Company nevertheless discarded its auditor's findings and moved forward with releasing its earnings for the fourth quarter and full year FY2020.

17.    The truth was revealed in multiple disclosures.  On February 25, 2021, before the market opening, the Company finally disclosed the true cost of its failed deal with Amazon.  In the fourth quarter of FY2020, the Company reported revenue of **negative $316 million for the quarter and negative $100 million for full year driven by over $437 million in common stock warrant charges stemming from the failed deal with Amazon**.  The Company had never reported negative annual revenue in its history.  On this news, the Company's stock price fell $6.82, or more than 13.5%, to close at $43.34 per share on February 25, 2021.

18.    On March 2, 2021, just weeks after Defendants completed a colossal sale of shares to the largest energy provider in South Korea and conducted the Company's largest ever secondary public offering, and Defendant Marsh executed incredibly lucrative insider trading sales, Plug Power filed a Notification of Late Filing with the SEC.  Plug Power stated that it could not timely file its 2020 Form 10-K because the Company was completing a "review and assessment of the treatment of certain costs with regards to classification between research and development versus costs of goods sold, the recoverability of right of use assets associated with certain leases, and certain internal controls over these and other areas."  The Company also stated that "[i]t is possible that one or more of these items may result in charges or adjustments to current and/or prior period financial statements."

19.     On this news, the Company's stock price fell $3.68, or 7%, to close at $48.78 per share on March 2, 2021, on unusually heavy trading volume, thereby damaging investors.

20.     On March 16, 2021, Plug Power revealed that the Company needed to restate its prior financial results for FY2018 and FY2019 and quarterly filings for 2019 and 2020 (the "Previously Issued Financial Statements").  Plug Power informed investors that the Company's Previously Issued Financial Statements could not be relied upon and that the Company expected to revise the accounting for the statements, including reclassifying certain research and development expenses as costs of revenue—directly reducing the Company's gross profits—and disclosing a material weakness in the Company's internal controls over financial reporting.

21.     As a result of this news, the price of Plug Power's stock fell $3.35 per share to close at $39.33 per share on March 17, 2021, a decline of over 7.8%, thereby causing further damages to investors.

22.     Ultimately, Plug Power admitted that its prior representations about its gross profit and EBITDA were materially false when it restated those metrics from positive profits to gross losses with negative EBITDAs for results touted during the Class Period.

23.     One analyst summed up the fuel delivery restatement as inexcusable and shocking, while noting there was no justification to classify fuel costs as research and development expenses except to intentionally overstate the value of Plug Power's business.

24.     Concerning the failed deal with Amazon, Plug Power detailed after the Class Period that that it had no choice but to waive the vesting conditions for tens of millions of its shares as the deal had become an unsustainable loss contract for the Company.  As a result of the cost of the Amazon Warrant Waiver, Amazon accounted for (332.4)% of the Company's total consolidated revenue for FY2020.

## II.    JURISDICTION AND VENUE

25.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

26.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

27.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this judicial district.

28.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of national securities exchanges.

## III.    THE PARTIES

29.    Lead Plaintiff purchased Plug Power common stock during the Class Period and suffered damages as a result of Defendants' federal securities law violations.

30.    Defendant Plug Power is incorporated under the laws of Delaware with its principal executive offices located in Latham, New York.  At all relevant times, the Plug Power common stock was listed on the NASDAQ exchange in New York, NY under the symbol "PLUG."

31.    Defendant Andrew Marsh ("Marsh") is the Company's CEO, President, and a member of its board of directors.  Defendant Marsh has been CEO of the Company since April of 2008 and was its CEO throughout the entirety of the Class Period.  Defendant Marsh signed the Company's Automatic Shelf Registration Statement filed on December 2, 2019, the Annual Reports on Form 10-K for the fiscal years 2016-2019, Quarterly Report on Form 10-Q for the third

6

quarter of FY2020, and letters to shareholders dated November 9, 2020 and February 25, 2021, which reported Plug Power's financial results for the third and fourth quarter of FY2020, respectively.

32.    Defendant Paul B. Middleton ("Middleton") is the Company's CFO.  Defendant Middleton has been the CFO of the Company since 2014 and was its CFO throughout the entirety of the Class Period.  Defendant Middleton signed the Company's Annual Reports on Form 10-K for the fiscal years 2016-2019, Current Report on Form 8-K filed on January 5, 2021, Quarterly Report on Form 10-Q for the third quarter of FY2020, and letters to shareholders, dated November 9, 2020 and February 25, 2021, which reported Plug Power's financial results for the third and fourth quarter of FY2020, respectively.

33.    Defendants Marsh and Middleton (collectively, the "Individual Defendants"), by virtue of their high-level positions with Plug Power, possessed the power and authority to control the contents of the Company's reports filed with the SEC, and public statements, including Company-issued press releases, letters to shareholders, and presentations to securities analysts, money and portfolio managers, and investors.  The Individual Defendants were provided with copies of the Company's reports and letters to shareholders alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected, including to disclose all material information omitted from those disclosures, as alleged herein.  Because of their positions and access to material, non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and/or misleading.

34.     Defendant Plug Power and the Individual Defendants are collectively referred to as "Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.  Plug Power's Hydrogen Fuel Cell Business

35.     Plug Power was founded in 1997 and provides comprehensive hydrogen fuel cell (HFC) turnkey solutions focused on systems used to power electric motors in the electric mobility and stationary power markets.

36.     Plug Power sells itself as building the hydrogen economy by serving as the leading provider of HFC turnkey solutions amid an ongoing paradigm shift in the power, energy, and transportation industries to address climate change and energy security, while providing efficiency gains and meeting sustainability goals.  Plug Power created the first commercially viable market for HFC technology.  As a result, the Company has deployed over 40,000 fuel cell systems for e-mobility, more than anyone else in the world, and has become the largest buyer of liquid hydrogen, having built and operated a hydrogen highway across North America.

37.     Plug Power's business evolved into developing and selling commercially viable hydrogen and fuel cell product solutions, also known as GenDrive, to replace lead-acid batteries in electric material handling vehicles for some of the world's largest retail-distribution and manufacturing businesses, including Amazon, Walmart, and Home Depot.  This business primarily consists of providing fuel cells for forklifts and ground support equipment operating in the warehouses of large customers with 24/7/365 operations and high equipment usage.

38.     Until the early 2010s, many of Plug Power's GenDrive customers would purchase Plug Power's fuel cells directly or arrange for lease financing through a separate financial partner.  However, in 2014, Plug Power's larger customers, such as Walmart and Volkswagen, appear to have demanded that the Company offer operating leases itself, thereby keeping the equipment off

their respective balance sheets. Without a large enough balance sheet of its own to support this, Plug Power was forced to enter into sale/leaseback agreements with a number of financial institutions, such as M&T Bank and Wells Fargo, to facilitate these customer leases.

39.     In these arrangements, Plug Power essentially sells certain fuel cell systems and hydrogen infrastructure to financial institutions. The financial institutions then lease the equipment back to Plug Power who then leases the equipment under lease agreements to its customers, like Walmart. Soon after Plug Power began to provide operating-type sale/leaseback deals to customers, this type of lease became a dominant source of revenue for the Company.

40.     In 2016, Plug Power revealed that in connection with certain of its operating leases, the Company's partners financing the sale/leaseback agreements required the Company to maintain high cash balances in restricted accounts securing the Company's finance obligations in full. This materially handcuffed Plug Power as it was forced to accept payments from its end user customers over time, while at the same time being restricted from up-front cash payments from the sale/leasebacks. This drain on Plug Power's liquidity and limited access to unrestricted funds drove the Company to seek expensive external financing over the course of 2016.

41.     By February of 2017, Plug Power's stock price had fallen to $.85. Faced with the prospect of being delisted from NASDAQ and deteriorating liquidity, the Company offered aggressive sales incentives, in form of stock warrants, to boost its credibility and revenue without having to commit additional capital towards restricted cash.

### B.  Plug Power Announces Stock Warrant Deals with Amazon and Walmart

42.     On April 4, 2017, Plug Power filed a Form 8-K with the SEC disclosing that the Company and Amazon entered into a transaction agreement (the "Amazon Transaction Agreement"), pursuant to which the Company agreed to issue to Amazon.com NV Investment Holdings LLC, a wholly owned subsidiary of Amazon, warrants to acquire up to 55,286,696 shares

of the Company's common stock (the "Amazon Warrant Shares"), subject to certain vesting events described below. Plug Power and Amazon entered into the Amazon Transaction Agreement in connection with existing commercial agreements between the Company and Amazon with respect to the deployment of the Company's GenKey fuel cell technology at Amazon distribution centers. A copy of the warrant issued to Amazon was attached to the 2017 10-K and was signed by Defendant Marsh.

43.    To entice Amazon to continue to do business with Plug Power without sale/leasebacks, Plug Power gave Amazon warrants for 5.82 million shares just for signing the Amazon Transaction Agreement with no strings attached. The rest of the 50 million or so shares would be provided by Plug Power to Amazon in exchange for purchase orders (primarily fuel cells for warehouse forklifts) in $50 million increments up to $600 million. The agreement was further organized by various tranches of warrants and the revenue level that was needed to unlock each award.

44.    Specifically, the first tranche of 5.82 million Amazon Warrant Shares vested upon the execution of the Amazon Transaction Agreement. The second tranche of 29,098,260 Amazon Warrant Shares would vest in four installments of 7,274,565 shares each time Amazon made an aggregate of $50 million in payments for goods and services to Plug Power, up to payments totaling $200 million in the aggregate. Once Amazon made payments to Plug Power totaling $200 million, the third tranche of 20,368,784 Amazon Warrant Shares would vest in eight installments of 2,546,098 shares each time Amazon made an aggregate of $50 million in payments for goods and services to Plug Power, up to payments totaling $400 million in the aggregate. The exercise price for the first and second tranches of Amazon Warrant Shares was set at $1.1893 per share.

45.    For the third tranche, the exercise price would then be determined once the second tranche vested.  The measurement date would also be determined at that time.  The exercise price of the third tranche of Amazon Warrant Shares would be an amount per share equal to 90% of the 30-day volume weighted average share price ("VWAP") of the common stock as of the final vesting date of the second tranche of Amazon Warrant Shares.  The Amazon Warrant Shares were exercisable through April 4, 2027.

46.    As the strike prices were set so low in the second tranche, Amazon stood to potentially make more money off of the Amazon Warrant Shares than the cost of the products they were purchasing from Plug Power.  In other words, the higher the Plug Power stock price, the more incentive Amazon had to order products.

47.    Following the announcement of the Amazon Transaction Agreement, the price of Plug Power's stock shot up 73%, increasing from $1.30 per share on April 4, 2017 to $2.25 per share on April 5, 2017.

48.    On July 20, 2017, Walmart entered a warrant deal with Plug Power (the "Walmart Transaction Agreement").  Following this announcement, Plug Power's stock price increased $.32 per share to close at $2.44 on July 21, 2017, an increase of over 15%.

49.    While the market reacted positively to the deal announcements, the stark reality was that the financial impact of the stock warrants being provided to Amazon and Walmart loomed as a substantial hindrance to Plug Power's bottom line as the fair value of the stock being provided to each customer had to be recorded as a reduction of revenue in accordance with GAAP.   From an accounting perspective, Plug Power would accrue for the anticipated standard warranty costs at the same time that revenue was recognized for the related product, or when circumstances indicated that warranty costs would be incurred.  In other words, the higher Plug Power's share

price and the more the warrants vest, the larger the resulting warrant charge on the Company's books.

50.     During the fourth quarter of FY2019, Plug Power adopted ASU 2019-08, with retrospective adoption as of January 1, 2019, which required that these share-based payment awards granted to the Company's customers be measured and classified by applying the guidance of ASC Topic 718.  As a result, the amount recorded as a reduction of revenue would be measured based on the grant-date fair value of the warrants.  Previously, this amount was measured based on vesting date fair value with estimates of fair value determined at each financial reporting date for unvested warrant shares considered to be probable of vesting.  Except for the third tranche of the Amazon and Walmart Transaction Agreements, all existing unvested warrants would use a measurement date of January 1, 2019, the adoption date, in accordance with ASU 2019-08.  The fair value of the warrants in the first and second tranche was ultimately determined to be $1.05.

51.     Amazon and Walmart quickly became stalwarts of Plug Power's revenue stream. In 2018 and 2019, Amazon and Walmart were together 67% and 50% of the Company's revenues. These transaction agreements were instrumental in Amazon and Walmart becoming two of the "key pedestal multisite customer[s]" for Plug Power.

### C. Plug's Power's History with the SEC and Efforts to Mislead Investors on the True Costs Associated with the Stock Warrant Deals

52.     Following the closing of Amazon and Walmart Transaction Agreements, Plug Power immediately sought to inflate its financial results by excluding the effect of warrant related costs and circumventing the prohibitions against providing misleading non-GAAP measures.

53.     Throughout 2017 and 2018, Defendants prominently displayed "Gross Revenue" in its quarterly letters to shareholders filed on Form 8-K with the SEC and added the provisions for warrants back to gross profit to create a new "Adjusted Gross Profit" metric.  Defendants

regularly touted these misleading metrics. Accordingly, Plug Power's financial statements drew an extraordinary level of scrutiny from the SEC.

54.     On September 5, 2018, Defendant Middleton received a "comment" letter from the SEC Division of Corporate Finance concerning Plug Power's 2017 annual report filed on Form 10-K (the "2017 Form 10-K"), Form 10-Q for the first quarter of FY2018, and an August 9, 2018 Form 8-K containing the shareholder letter describing the Company's financial results for the second quarter of FY2018. The SEC admonished Plug Power for, among other issues, presenting and discussing its revenue and gross profit on gross basis excluding the effects of the provision for the fair value of warrants issued as sales incentives. The SEC directed Defendant Middleton to Question 100.04 of the Compliance and Disclosure Interpretations on non-GAAP Financial Measures, which dictated that it was not appropriate for Plug Power to present non-GAAP measures that substitute individually tailored revenue recognition and measurement methods for those of GAAP.

55.     In addition, the SEC reprimanded Plug Power for presenting non-GAAP measures with greater prominence than the directly comparable GAAP measure, even at times failing to discuss the comparable GAAP measure at all and presenting forward-looking non-GAAP measures without providing reconciliation of the amounts to the most directly comparable GAAP measure.

56.     In a response letter dated September 19, 2018, Defendant Middleton assured the SEC that Plug Power would correct its misleading presentations of non-GAAP measures to conform to the SEC's comments. Defendant Middleton further promised that the Company would present net revenues, not gross revenues, and properly allocate the provision for the fair value of the warrants among the revenue line items in future filings and earnings releases.

57.    In a supplemental response dated December 27, 2018, Defendant Middleton clarified for the SEC that it planned to present non-GAAP measures in future earnings releases but not in its Form 10-Q or Form 10-K filings.  Defendant Middleton further detailed the non-GAAP measures and operating metrics it planned to present going forward, including "Gross Billings," "adjusted gross profit," and "adjusted EBITDA."  Pertaining to adjusted gross profit, Defendant Middleton explicitly promised that the Company would "no longer make an adjustment for the provision for customer common stock warrants when determining adjusted gross profit."  With respect to adjusted EBITDA, the Company planned to present it as a liquidity measure and defined the non-GAAP measure as "net cash provided by (used by) operating activities, adjusted for changes in working capital, cash-based interest expense, and principal and interest payments related to operating leases."  Concerning Gross Billings, Defendant Middleton stated:

> The Company's objective in presenting Gross Billings is to present an operating metric that conveys commercial growth over time. The Company intends to present Gross Billings based on the invoice value of equipment deployed and services rendered.  Invoice value of equipment will be measured on a relative basis using cash value within contracts with customers and it will be attributed to the period in which equipment is deployed.  To that amount, the Company will add the invoice value for services rendered in the period. These services include fuel provided, extended warranty contracts serviced, power provided under Power Purchase Agreements, etc.

> The Company believes Gross Billings as constructed is an operating metric that is not within the scope of Regulation G as pursuant to Reg G §244.101 operating measures are not non-GAAP financial measures.

58.    The Company's description of Gross Billings did not mention the inclusion of the value of stock warrants.  Despite specifically being made aware by the SEC only three months earlier that individually tailored adjustments to revenue were improper and misleading non-GAAP measures, Gross Billings was designed by Defendants to be precisely that.  By branding it an

"operating metric" and providing a vague description of the metric to the SEC, Plug Power was able to deceive the SEC and investors and make its growth appear greater than it actually was.

59.    Defendants' ploy succeeded, and the SEC initially took no issue with the Company's use of Gross Billings.

60.    Defendants immediately adopted Gross Billings in a March 7, 2019 Form 8-K containing the letter to shareholders describing the Company's financial results for the fourth quarter of FY2018 (the "4Q2018 Letter to Shareholders"). In the 4Q2018 Letter to Shareholders, which provided no description or explanation of Gross Billings for investors, Plug Power flaunted the quarter as a "Breakthrough Fourth Quarter of 2018" and emphasized "Fourth quarter gross billings of $62.1 million versus $32.9 million gross billings in fourth quarter 2017…Positive adjusted EBITDA for fourth quarter 2018, the first in the Company's history." Despite recently asserting to the SEC that it would treat adjusted EBITDA as a liquidity measure, the Company nonetheless stated that it used the metric "as a basis for evaluating the Company's financial performance as well as for forecasting future periods."

61.    On April 24, 2019, Defendant Middleton received another comment letter from the SEC in reference to Plug Power's annual report for FY2018 filed on Form 10-K with the SEC (the "2018 Form 10-K") and the 4Q2018 Letter to Shareholders. In connection with the 4Q2018 Letter to Shareholders, the SEC again admonished Plug Power for giving non-GAAP "adjusted EBITDA" more "prominence" than "the most directly comparable GAAP measure." The SEC further demanded that Plug Power describe adjusted EBITDA as purely a liquidity metric, not a performance measure.

62.    On May 8, 2019, Defendant Middleton responded to the SEC and stated that "GAAP measure[s]" would be presented "with equal or greater prominence" as the "non-GAAP

measures" and that it would further clarify in its earnings that adjusted EBITDA was purely a liquidity measure.

63.    On June 20, 2019, the SEC sent another comment letter to Defendant Middleton with respect to several of Plug Power's financial filings and shareholders letters filed in 2019. Among other issues, the SEC underscored that the Company was improperly excluding the cash flow effects associated with changes in working capital from the adjusted EBITDA measure, which was inconsistent with presenting it as a liquidity measure and potentially misleading investors.

64.    On July 5, 2019, Defendant Middleton responded to the SEC that the Company would "revise our future non-GAAP presentation of adjusted EBITDA accordingly."

65.    Finally, on July 30, 2019, the SEC informed Defendant Middleton that it had completed its reviewed of Plug Power's filings.

66.    On August 6, 2019, Plug Power immediately reneged on its assurances to the SEC and resumed presenting adjusted EBITDA as a performance measure by stating that it used the metric "as a basis for evaluating the Company's financial performance as well as for forecasting future periods."

67.    Despite Plug Power receiving four comment letters from the SEC between September of 2018 and July of 2019, Plug Power failed to disclose these letters in any of its Form 10-K or Form 10-Q filings.  This included Plug Power's 2018 Form 10-K which included a section explicitly dealing with "Unresolved Staff Comment Letters."

### D.  Tracking Research and Development Expenses and Fuel Costs Were Critical to Plug Power's Business

68.    As the fuel cell industry is still in the early state of adoption, Plug Power's ability to compete successfully is heavily dependent on its ability to raise capital, ensure a continual and timely flow of competitive products, services, and technologies to the marketplace.  According to

Plug Power's 2020 annual report filed with the SEC on Form 10-K, the Company must "continue to develop new products and technologies and to enhance existing products in the areas of cost, size, weight, and in supporting service solutions in order to drive further commercialization."

69.     Financial Accounting Standards Board (FASB) No.2 defines Research and Development as follows:

> *Research* is planned search or critical investigation aimed at discovery of new knowledge with the hope that such knowledge will be useful in developing a new product or service (hereinafter "product") or a new process or technique (hereinafter "process") or in bringing about a significant improvement to an existing product or process.

> *Development* is the translation of research findings or other knowledge into a plan or design for a new product or process or for a significant improvement to an existing product or process whether intended for sale or use.  It includes the conceptual formulation, design, and testing of product alternatives, construction of prototypes, and operation of pilot plants.  It does not include routine or periodic alterations to existing products, production lines, manufacturing processes, and other on-going operations even though those alterations may represent improvements and it does not include market research or market testing activities.

70.     Under GAAP, codified by the FASB, whenever a company spends any funds on research and development activities, it records those costs as an expense in the period incurred.

71.     A company's research and development expenses are included in the company's operating expenses and are usually reflected in its income statement.  A company's total operating expenses is used to calculate its operating income by subtracting it from the gross profit.  This is opposed to the direct costs of producing, distributing, or marketing the goods sold by a company (cost of goods sold) or cost of revenue, which directly contributes to a company's gross profit.  A company's gross profit is computed by subtracting a company's total cost of revenue from the company's total revenue.

72.     The Company advised investors that "[r]esearch and development expense includes: materials to build development and prototype units, cash and non-cash compensation and

benefits for the engineering and related staff, expenses for contract engineers, fees paid to consultants for services provided, materials and supplies consumed, facility related costs such as computer and network services, and other general overhead costs associated with our research and development activities."

73.     Defendants knew or recklessly disregarded that research and development expenses do not include the costs of fuel delivered to customers, which are reported separately by Plug Power.

74.     The Company's 2018 and 2019 Annual Reports filed with the SEC on Form 10-K highlighted fuel delivered to customers as one of the "primary sources" of revenue along with the related costs for the Plug Power for which it reported the corresponding cost of revenue and gross (loss) profit.

75.     The Company described the cost of revenue involved for fuel delivered to customers while disclosing the results of operations.  The 2018 Form 10-K and 2019 Form 10-K stated that the "[c]ost of revenue from fuel delivered to customers represents the purchase of hydrogen from suppliers that ultimately is sold to customers.  As part of the GenKey solution, the Company contracts with fuel suppliers to purchase liquid hydrogen and separately sells it to its customers when delivered or dispensed."

76.     According to the 2019 Form 10-K, the "[c]ost of revenue from fuel delivered to customers for the year ended December 31, 2019 increased $8.6 million, or 31.2%, to $36.4 million from $27.7 million for the year ended December 31, 2018.  The increase was due primarily to higher volume of liquid hydrogen delivered to customer sites as a result of an increase in the number of hydrogen installations completed under GenKey agreements and higher fuel costs."

77.     According to the 2018 Form 10-K, the "[c]ost of revenue from fuel delivered to customers for the year ended December 31, 2018 increased $5.7 million, or 25.9%, to $27.7 million from $22.0 million for the year ended December 31, 2017. The increase is due primarily to higher volume of liquid hydrogen delivered to customer sites as a result of an increase in the number of hydrogen installations completed under GenKey agreements and higher fuel costs."

78.     The cost of fuel delivered was a major drag on the Company's net revenue and ability to profit. Defendants tracked and reported the cost of fuel delivered in the Company's financial statements throughout the Class Period.

79.     The cost of fuel also affected Plug Power's loss accruals for extended maintenance contracts, a type of cost of revenue. Increases in cost of fuel negatively impacted EBITDA because that increased the loss accruals required for Plug Power's extended maintenance contracts which directly reduced the Company's operating income.

### E. Plug Power Extols Its Newfound Profitability and Growth

80.     In Plug Power's 24-year history, the Company has not generated an operating profit.

81.     In the fiscal years of 2018 and 2019, Plug Power was able to generate gross profits of $2.62 million and $27.97 million, respectively, in consecutive years for the first time in a decade.

82.     For FY2020, the Company advised investors that EBITDA was an important metric to value the Company and that Plug Power relied on "adjusted EBITDA" as "a basis for evaluating the Company's performance as well as for forecasting future periods."

83.     On January 30, 2020, during a business update conference call, Defendant Marsh lauded that "2019 was really a breakout year for Plug Power, EBITDA-positive for the year." Defendant Middleton underscored this result and stated the Company "has now crossed a milestone in breaking into breakeven to positive EBITDAs and projecting that this year we're going to be moving in directionally north in the right way. That gets investors and the debt

providers excited."  Defendant Marsh added, "in the fourth quarter, we had between $93 million to $95 million in gross billings.  This was our biggest quarter-to-date by over 50%."  Defendant Marsh further provided a financial target for 2020 of "gross billings of over $300 million, a 25% growth over 2019, adjusted EBITDA of $20 million, a $20 million improvement over our 2019 goal" and reiterated the Company's goals of $1 billion in gross billings, $200 million in EBITDA, 20% Adjusted EBITDA margin, and $170 million in operating income by 2024.  In the Form 8-K containing the business update presentation, the Company defined "adjusted EBITDA" as "operating income, as forecasted, plus stock-based compensation, plus depreciation and amortization, plus right-of-use asset depreciation and interest associated with PPA financings."

84.     In a letter to shareholders filed on Form 8-K, dated March 5, 2020, containing Plug Power's financial results for the fourth quarter of FY2019, the Company previewed its year-end results for FY2019 which it described as the "best year in the Company's history – setting the stage for meaningful growth in 2020 and beyond."  The Company achieved this "milestone breakthrough year with [its] first positive adjusted EBITDA" in the Company's history.  Specifically, the Company netted an adjusted EBITDA of $10.9 million.  The Company also stated that "Q4 2019 marked a record quarter in gross billings – the largest in the company's history by over 50%."  In the letter, the Company defined "adjusted EBITDA" as "operating income (loss), plus stock-based compensation, plus depreciation and amortization, plus right-of-use asset depreciation and interest associated with PPA financings, plus restructuring and other non-recurring charges."  During the Company's earnings call that same day, Defendant Marsh underscored that "[t]he fourth quarter in 2019 were record years for gross billings and EBITDA…[f]or 2020, we expect $300 million in gross billings and $20 million in EBITDA."

85.     In a letter to shareholders filed on Form 8-K, dated May 5, 2020, containing Plug Power's financial results for the first quarter of FY2020, the Company noted that it had achieved a negative $6.1 million Adjusted EBITDA, a "30% improvement" from the first quarter of FY2019" and "record gross billings of $43.0M in the first quarter of 2020, which reflects year-over-year growth of 89%."   In the letter, the Company defined "adjusted EBITDA" as "operating income (loss), plus stock-based compensation, plus depreciation and amortization, plus right-of-use asset depreciation and interest associated with PPA financings, plus restructuring and other non-recurring charges."   During the Company's earnings call that same day, Defendant Marsh reiterated the Company's "guidance of $300 million in gross bookings for the year and $20 million in EBITDA" and the Company's 2024 goals of $200 million in EBITDA and $170 million in operating income.

86.     On August 6, 2020, during Plug Power's earnings call for the second quarter of FY2020, Defendant Marsh stated that the Company "had a record quarter in the middle of the pandemic, achieving over $72 million in gross billings and $1 million in EBITDA."   Defendant Marsh added that with the Company's "success this year with rapid growth in gross billings and EBITDA, a move into green hydrogen, that's provided us a clear path to achieve $1.2 billion in revenue and $250 million in EBITDA in 2024."   In the Form 8-K containing the letter, the Company defined "adjusted EBITDA" as "operating income (loss), plus stock-based compensation, plus depreciation and amortization, plus right-of-use asset depreciation and interest associated with PPA financings, plus costs associated with acquisitions, restructuring and other charges."

87.     On November 9, 2020, during Plug Power's earnings call for the third quarter of FY2020, Defendant Marsh commended the Company's "operational performance" and

highlighted that it "achieved 19% EBITDA on an adjusted basis this past quarter, generating $21.2 million of adjusted EBITDA."    In a letter to shareholders filed on Form 8-K, dated November 9, 2020, containing Plug Power's financial results for the third quarter of FY2020, Defendants touted the Company's gross billings of $125.6M as "the highest…in the company's 22-year history."

88.    Plug Power failed to define or explain Gross Billings in any of the Form 8-K filings detailed in ¶¶ 83-87.

### F. The Amazon Transaction Agreement Looms as a Debilitating Cost for Plug Power

89.    During the third quarter of FY2020, Amazon was in the process of completing over $200 million of purchases in the aggregate in connection with the Amazon Transaction Agreement. Per the agreement, this benchmark represented the final vesting of the second tranche, resulting in the cumulative vesting of 34,917,912 Amazon Warrant Shares.  Accordingly, the exercise price of the third tranche of Amazon Warrant Shares would be set at an amount per share equal to 90% of the 30-day VWAP of Plug Power's common stock as of the final vesting date of the second tranche.

90.    Amazon entering the third tranche posed a serious problem for Plug Power as from June 30, 2020 to September 30, 2020, Plug Power's stock price increased by 63% from $8.21 per share to $13.41 per share.  In fact, the stock price closed as high as $17.88 in October of 2020. The substantial increase in Plug Power's common stock price was expected to significantly increase the 30-day VWAP used for determining the exercise price and fair value for the stock provided to Amazon in the third tranche of the Amazon Warrant Shares.  This would, in turn, greatly increase the corresponding warrant costs on Plug Power's books.

91.    According to Plug Power internal documents, cited in previously redacted Delaware Court filings, on October 20, 2020, Plug Power's Board of Directors convened and discussed "budget planning timeline and financing strategy, as well as status of customer warrants.

Mr. Middleton also discussed the status of the Amazon warrants and discussions with KPMG and Deloitte regarding the same." PLUGPOWER_220_00001804. Materials reviewed by the Board during this meeting discussed related accounting implications, including with respect to loss accrual and revenue recognition. *Id*.

92.    On November 2, 2020, in accordance with terms of the Amazon Transaction Agreement, 34,917,912 shares had vested under the Amazon warrant at an exercise price of $1.1893 per share based on Amazon's total cumulative spending with the Company in excess of $200 million. Upon final vesting of the second tranche, the exercise price for the third tranche of Amazon Warrant Shares was determined to be $13.81 per share. Based on, among other things, the exercise price of the third tranche of the Amazon Warrant Shares, the fair value of the 20,368,784 Amazon Warrant Shares in the third tranche was estimated to be $10.60 each, compared to the fair value of second tranche Amazon Warrant Shares of $1.05 each.

93.    According to Plug Power internal documents, cited in previously redacted Delaware Court filings, on November 6, 2020, Plug Power's Board convened again, and Individual Defendants Marsh and Middleton provided the Board with an update related to the status of the Amazon Warrant Shares, including shares vested and unvested, exercise price for vested shares, and the fact that the warrant permitted cashless exercise. PLUGPOWER_220_00001934. Significantly:

> Mr. Marsh advised the Board of the discussions that he had engaged in with respect to the issue related to the accounting treatment of the vested and unvested options. Mr. Marsh further advised that he and Management had engaged in extensive discussions with ATTORNEYCLIENT PRIVILEGED and accountant, KPMG as well as the Company's tax advisor, Deloitte.

*Id*.

94.    At the time of Plug Power's third quarter earnings release on November 9, 2020, Defendant Marsh was in discussions with Amazon to immediately vest the entirety of the third tranche of the Amazon Warrant Shares to avoid Plug Power perpetually incurring debilitating warrant costs to revenue.  At the time, Defendants believed this vesting would occur by the end of the fourth quarter of FY2020.

### G.  Plug Reports its Earnings for the Third Quarter of FY2020

95.    On November 9, 2020, Plug Power reported its financial results for third quarter of FY2020 in a letter to shareholders signed by the Individual Defendants, which was posted on Plug Power's website and attached to a Current Report on Form 8-K filed with the SEC on that same day (the "3Q2020 Letter to Shareholders").  Plug Power reported declines in gross profit, operating losses, and net losses during the three- and nine-month periods ended September 30, 2020. This was driven by greatly rising costs stemming from the Amazon Transaction Agreement.  On this issue, the 3Q2020 Letter to Shareholders included a section titled "Pedestal Customer Warrants Update", which stated:

> As has been previously disclosed, in 2017 Plug Power entered into commercial agreements with two key pedestal multisite customers which provide warrants for each customer to procure shares of Plug Power's common stock at varied negotiated stock prices. The vesting for the warrants occurs commensurate with each customer paying Plug $600 million in cash for fuel cell technology solutions. Based on the agreements, the strike price of the warrants varies and includes portions where the strike price is set at certain milestones. The Company primarily records the non-cash warrant charges commensurate with the associated revenues as recognized. As such, the total non-cash warrant charges recorded in the third quarter 2020 of $22.9 million were substantially higher than previous reporting periods as a result of higher purchases during the quarter. On November 2, 2020, one of the customers met a critical milestone and the strike price was set for their next tranche at $13.81 (based on the contractual formula). This strike price is substantially higher than previous warrants, given the recent growth in Plug's share price. The details of the warrants and vesting activities will be described in more detail in the 3rd quarter 2020 Form 10-Q.

96.     In its Quarterly Report on Form 10-Q for the third quarter of FY2020 signed by the

Individual Defendants (the "3Q2020 Form 10-Q"), Plug Power clarified that the customer at issue

was Amazon and that the fair value of Amazon Warrant Shares in the third tranche would be $10.60

per share compared to $1.05 for shares provided to Amazon in the second tranche:

> During the third quarter of 2020, approximately $23.8 million of recorded revenue
> from Amazon was constrained by the tranche 3 of the Amazon Warrant Shares. An
> additional 7,274,565 Amazon Warrant Shares vested on November 2, 2020,
> representing the final vesting of tranche 2, resulting in cumulative vesting in
> 34,917,912 Warrant Shares since the execution of the Amazon Transaction
> Agreement. In accordance with terms of the Amazon Transaction Agreement as
> described above, upon final vesting of tranche 2, the tranche 3 Amazon Warrant
> Shares exercise price was determined to be $13.81 per share. Based on the exercise
> price of the third tranche of the Amazon Warrant Shares, among other things, the
> fair value of the 20,368,784 tranche 3 Amazon Warrant Shares is estimated to be
> $10.60 each, compared to the fair value of tranche 2 Amazon Warrant Shares of
> $1.05 each.
>
> The Company also recorded a provision for losses of $4.3 million in the third
> quarter of 2020 related to Amazon service contracts, caused primarily by the
> increase in the value of the tranche 3 warrants, driven by recent increases in the
> Company's stock price.

The Company further revealed that the fair value estimate of $10.60 was based on "the

Black-Scholes pricing model, which requires key inputs including volatility and risk-free

interest rate and certain unobservable inputs for which there is little or no market data,

requiring the Company to develop its own assumptions."

97.     With respect to the Amazon Warrant Shares, the amount of provision for common

stock warrants recorded as a reduction of revenue during the three months ended September 30,

2020 was $17.3 million compared to just $1.0 million during the same period in FY2019.

98.     At this time, Defendants knew, but did not disclose, that the Amazon Transaction

Agreement was no longer a tenable arrangement for Plug Power.  Specifically, Plug Power had

forecasted $0.15 of provision for warrants per dollar of revenue vs. the $0.54 per dollar of revenue

that the third tranche of the Amazon Warrant Shares would require in connection with the next $400 million of prospective payments from Amazon to the Company.

99.    Given the massive costs to revenue facing the Company, Defendants knew that they had no choice but waive the vesting conditions for the outstanding Amazon Warrant Shares by the end of the fourth quarter of FY2020.  Defendant further knew that such a waiver would forgo approximately $400 million in prospective revenue and force Plug Power to incur at least $200 million in revenue costs.[2]

100.    Instead of disclosing this information to the market, Defendants sought to mislead investors about the true condition of the Company's financial health.

101.    In the 3Q2020 Letter to Shareholders, Defendants blatantly distorted its financial results in several respects, including: (1) titling the 3Q2020 Letter to Shareholders, "Plug Power Reports a Record Third Quarter in the Company's History"; (2) touting gross billings of $125.6M as "the highest…in the company's 22-year history"; (3) raising 2020 gross billings guidance from $310 to $325M-330M; (4) proclaiming "that the proforma adjusted EBITDA margin in Q3 2020 of 19%...is approaching our target Adjusted EBITDA margin of 20% by 2024"; and (5) reporting "proforma" metrics which explicitly excluded the $18.6 million in costs associated with provision for common stock warrants and $4.3 in costs associated with provision for loss contracts related to service.

102.    Defendants further included the following table detailing a litany of "proforma" metrics:

---

[2] This approximation is based on multiplying the amount of Amazon Warrant Shares in the third tranche by their estimated fair value on November 2, 2020.

| Results (millions except EPS) | Q3 2020 GAAP | Q3 2020 Proforma |
|---|---|---|
| Gross Billings | $125.6 | $125.6 |
| Gross Margin (Loss) | ($1.3) | $21.6 |
| Operating Income (Loss) | ($27.5) | ($4.6) |
| Adjusted EBITDA | N/A | $24.0 |
| EPS | ($0.11) | ($0.04) |

103.    In the table above, Defendants framed Gross Billings as a GAAP measure, even though it knew it was a non-GAAP adjusted revenue metric.  The 3Q2020 Letter to Shareholders also provided no explanation or definition for Gross Billings or reconciliation to its actual GAAP equivalent, net revenue.

104.    Moreover, the Company's proclamation that its 19% margin for the third quarter of FY2020 was "approaching [its] target of Adjusted EBITDA margin of 20% by 2024" was grossly misleading as the each of the figures were based on different calculations.  Specifically, the adjusted EBITDA margin for the third quarter of FY2020 explicitly excluded the costs associated with the common stock warrants and loss contracts related to service.  On the other hand, the adjusted EBITDA margin for 2024 had no such exclusions.  Plug Power's adjusted EBITDA for the third quarter of FY2020 without the exclusions was $1.1 million resulting in a margin of .01% for the quarter.  In truth, Plug Power was very much not on its way to meeting its 2024 guidance.

105.    Both the 3Q2020 Letter to Shareholders and the 3Q2020 Form 10-Q were signed by Individual Defendants Marsh and Middleton.

106.    During Plug Power's earnings call for its third quarter results in FY2020 (the "3Q2020 Earnings Conference Call"), the Individual Defendant further extolled Plug Power's purported progress.  To open the call, Defendant Marsh exclaimed:

> First, I'd like to highlight our operational performance. Company achieved $126 million in gross billing. This represents a 106% increase from the third quarter of 2019. Second, this quarter is really a strong validation of our business model in years to come.

107.    In light of Plug Power's substantial costs to revenue that quarter, analysts were eager to discuss the Amazon Warrant Shares.  However, despite the warrants being a critical issue during recent Board meetings, ongoing discussions with Amazon to waive all outstanding Amazon Warrant Shares, and Plug Power's plan to waive the warrants by the end of the fourth quarter for FY2020, Defendants endeavored to either minimize the Company's dire situation or spin it as a positive development:

> Christopher Curran Souther - B. Riley Securities, Inc.:
>
> First, I wanted to see if you could walk through some of the warrant mechanics. As of the second quarter, about half of the Amazon warrants said vested and a smaller portion of the Walmart one to add. I thought these were typically more paid in installments as those tranches hit. It was just a matter of very large orders during the quarter or exercise of some of those warrants. Could you kind of remind us how the math works on that?
>
> Andrew J. Marsh:
>
> Sure. I'm going to tell you -- I'm going to start off and then going to hand it off to Paul, Chris. So -- but the warrants actually get charged against each order. So I know this may be hard for folks to understand the higher warrant charges, which is a noncash event, ***it's actually a real positive***. So one of our pedestal customers in the third quarter actually exceeded the tranche where the warrant price gets reset. And the warrant price is reset at a rate that's actually 10x higher in cost than the original ones, which is a real good item since those warrant strike prices over $13 versus the original strike price of $1.19.
>
> What it really says with these increased warrant charges is that you've seen increased purchases of our products. And I think on the last item I would highlight, the fact that the stock is doing so well and the fact that those straight

price for the warrants is now 11, 12x higher, it ultimately means less dilution for shareholders. So it's somewhat hard to see maybe in GAAP financials all the time. This less dilution is really, really good and something we negotiated 3 years ago to protect shareholders, and it's really proven now. So Paul, would you like to add to this from an accounting point of view?

(Emphasis added).

      Paul B. Middleton

      Yes. I think you covered it, Andy. There's really 2 factors in terms of the jump in the cost rate from a GAAP basis, which is increased purchases and them moving into the final tranche, which now the price has been set. And because it's 10x, we use the Black-Scholes methodology, which is the proven accounting approach to use. And those are worth -- the cost value is higher. So you just get a book effect, which as Andy said, is noncash, but those are the 2 drivers that drove that increase and that's why you see the delta change in the quarter.

…

      Amit Dayal - H.C. Wainwright & Co, LLC:

      And just sort of when you look at these warrants, right, previously, there seem to be a little bit of an overhang. But do you feel these are now sort of a little bit of an edge, protecting or has protected the business from maybe competitors, et cetera, given that these large pedestal customers were tied to just not really being able to go to anybody else, but you guys?

      Andrew J. Marsh:

      I think the key item is that we need to put forward for our customers every day and focus on providing our customers value. And it's -- that's really -- next to preparing for calls like this, Amit, *I don't spend a lot of time thinking about the warrants*. I think about how to keep on making sure that Plug Power is delivering value for our customers.

(Emphasis added).

### H.  Plug Power Raises $1 Billion from Investors through a Secondary Public Offering at a Price of $22 Per Share Based on Overstated Financial Statements

     108.    On December 2, 2019, Plug Power filed an Automatic Shelf Registration Statement

that would allow the Company to make multiple offerings of its securities at unspecified times in

the future without having to file a new registration statement for each offering (the "Shelf

Registration Statement"). The Shelf Registration Statement became effective on December 2, 2019. The Shelf Registration Statement was signed by the Individual Defendants.

109. On November 16, 2020, the Company issued two press releases announcing an impending secondary public offering ($750,000 of its common stock) and its pricing ($22.25 per share). Both press releases directed investors to rely on the prospectus supplement related to the offering, as well as the Company's previous financial statements incorporated therein and filed with the SEC.

110. On November 18, 2020, Plug Power filed a prospectus supplement to the Shelf Registration Statement, pursuant to Rule 424(b)(2), offering 38 million shares of its common stock at a price to the public of $22.25 per share (the "November Prospectus"). The Company also granted the underwriters a 30-day option to purchase up to an additional 5,700,000 shares.

111. Among other things, the November Prospectus disclosed a summary of selected consolidated financial data. This included financial data for the fiscal years of 2017, 2018 and 2019 as well as unaudited financial data for the nine months ended September 30, 2020.

112. In connection with FY2017, the November Prospectus stated that the Company netted a gross (loss) profit of ($28.09) million and incurred $28.69 million in research and development expenses.

113. In connection with FY2018, the November Prospectus stated that the Company netted a gross profit of $2.62 million and incurred $27.71 million in costs related to fuel delivered to customers and $33.91 million in research and development expenses.

114. In connection with FY2019, the November Prospectus stated that the Company netted a gross profit of $27.97 million and incurred $36.36 million in costs related to fuel delivered to customers and $33.68 million in research and development expenses.

115.    In connection with the nine months ended September 30, 2020, the November Prospectus stated that the Company netted a gross (loss) profit and operating (loss) income of ($.69) million and ($79.77) million, respectively, and incurred $4.31 million in costs related to provision for loss contracts related to service, $32.27 million in costs related to fuel delivered to customers, and $32.13 million in research and development expenses.

116.    The November Prospectus also incorporated by reference the 2019 Form 10-K, which utilized the consolidated statements of operations data for the years ended December 31, 2019, 2018 and 2017 and the balance sheet data as of December 31, 2019 and 2018, and the Quarterly Reports on Form 10-Q for the first three quarters of FY2020.  All of these reports contain the same financial data detailed in the aforementioned summary of selected consolidated financial data.

117.    The November Prospectus also described the risks related to the offering and Plug Power's common stock.  The November Prospectus's risk section did not mention the Amazon Transaction Agreement or the corresponding costs facing the Company in the third tranche of the Amazon Warrant Shares.

118.    The November Prospectus omitted to disclose that Plug Power faced unsustainable costs to revenue which, in light of the exponential increase in provision for warrant costs, would likely cause the Company to shortly vest the third tranche of Amazon Warrant Shares.  These developments would cause the Company to incur substantial costs that would materially affect its financial condition.

119.    On November 24, 2020, Plug Power announced that it had completed the offering which generated approximately $1 billion in capital and marked one of the largest bought equity deal transactions in the broader clean-tech sector and the largest capital raise in the Company's

history.  The Company further noted that "[t]he capital raise uniquely positions Plug Power to execute and accelerate on its green hydrogen strategy as well as other strategic growth initiatives."

### I.  Plug Power Receives a Private Critical Comment Letter from the SEC

120.    On December 16, 2020, the SEC sent a comment letter to Defendant Middleton regarding Plug Power's 2019 Form 10-K and the 3Q2020 Letter to Shareholders that was not posted for the public as a SEC filing (the "December 16, 2020 SEC Letter").  Pertaining to the 3Q2020 Letter to Shareholders, the SEC noted that the letter's upfront section titled "Recap of the Third Quarter Financials" did not discuss any results on a GAAP basis and admonished Plug Power for prominently and repeatedly broadcasting a "record" quarter when, in fact, the Company had "experienced declines in gross profit, operating losses, and net losses during the three and nine month periods ended September 30, 2020."

121.    The SEC also asked Plug Power to provide a detailed explanation on how it measured and recognized the third tranche of the Amazon Warrant Shares and calculated $17.3 million as a reduction in revenue for the third quarter on FY2020 in connection with those shares.

122.    The SEC also raised a litany of issues concerning Plug Power's presentation of non-GAAP and operational metrics in the letter, including several misleading tactics that the Company had previously promised the SEC that it would no longer do:

- We note that you quantify and discuss "gross billings" in the introductory bullets and the immediately following discussion. Considering the importance that you attribute to this metric, please revise future filings to provide your investors with a clear definition of gross billings and how it is calculated, the reasons why the metric is useful to investors, how management uses the metric, and disclosure of any significant estimates or assumptions underlying the metric.

- We note that you have titled several of your non-GAAP measures as "proforma." Based on the information in the filing, it does not appear that this information is proforma financial information based on the guidance in

Article 11 of Regulation S-X. If true, please revise to more clearly identify these measures as non-GAAP, eliminating the use of the term "proforma."

- We note that you present non-GAAP "proforma" Adjusted EBITDA, operating loss, gross profit, and diluted net loss per share measures that exclude provisions for common stock warrants and loss contracts related to service. Considering these provisions are directly related to revenue generating activities with customers, please amend your filing to remove these adjustments across all of your non-GAAP measures. See Question 100.04 of the Compliance and Disclosure Interpretations on Non-GAAP Financial Measures. In this regard, we note that in a response letter dated December 27, 2018, you indicated that you would no longer make an adjustment for the provision for customer common stock warrants when determining adjusted gross profit. Please help us understand why you have reversed, or appear to have reversed, this previously communicated position and presented additional non-GAAP financial measures reflecting this adjustment.

- We refer to your presentation of Adjusted EBITDA and note that you present it as a measure of your performance. In response letters dated December 27, 2018 and May 8, 2019, you indicated that you consider adjusted EBITDA to be a liquidity measure and that cash flows from operations represent the most directly comparable GAAP measure. Further, in a response letter dated July 5, 2019, you indicated that you would revise the calculation of this liquidity measure in future filings to remove an adjustment that had the effect of excluding the cash flow effects associated with changes in working capital from the measure. Please explain to us why your current presentation contradicts your prior correspondence with us.

….

- Please provide us with an understanding of the disclosure controls and procedures in place as they relate to non-GAAP financial measures and specifically address how changes to non-GAAP measures are to be disclosed in accordance with these procedures.

123.    The SEC December 16, 2020 Letter is not publicly available on the SEC's online Edgar system.

**J. Armed with Knowledge of the SEC's Comment Letter and Plug Power's Planned Vesting of Tens of Millions of Amazon Warrant Shares in the Fourth Quarter of FY2020, Defendant Middleton Trades on Confidential Non-Public Information**

124.    On December 24, 2020, eight days after receiving the December 16, 2020 SEC Letter, Defendant Middleton sold 216,667 shares of his personally held Plug Power stock at a price

of $35.1299 per share.  This sale netted Defendant Middleton proceeds of approximately $7.1 million.

125.    Defendant Middleton's sale was made pursuant to a Rule 10b5-1 trading plan that was established just three months earlier on September 2, 2020.  Defendant Middleton entered into the September 2, 2020 plan to take advantage of an inflated stock price and insider information. By September 2, 2020, Defendant Middleton was aware that the Company's stock price had increased 72% between June 30, 2020 and September 1, 2020, climbing from $8.21 to $14.13. Defendant Middleton further knew that the Company was approaching the close of the second tranche of Amazon Warrant Shares and that the substantial increase in Plug Power's common stock price was expected to significantly increase the 30-day VWAP used for determining the exercise price and fair value for the stock provided to Amazon in the third tranche of the Amazon Warrant Shares.  This would, in turn, greatly increase the corresponding warrant costs on Plug Power's books.  Thus, Defendant Middleton knew that Plug Power's revenue and profits would be greatly hindered moving forward by the increasing cost of the warrants that the Company was providing to Amazon in accordance with the Amazon Transaction Agreement.

126.    To effectuate this sale, Defendant Middleton exercised options that were not due to expire until 2028 and 2029.  Defendant Middleton's decision to exercise his options eight to nine years before their expiration further shows that he knew Plug Power's stock price was did not reflect Plug Power's true financial condition.

127.    At the time of this trade, Defendant Middleton was in possession of material non-public information and knew that Plug Power's stock price did not reflect Plug Power's true financial condition.

128.    As later revealed in a January 14, 2021 letter to the SEC, Defendant Middleton knew that Plug Power faced a dire financial future due to debilitating costs associated with the third tranche of the Amazon Warrant Shares and could no longer afford to uphold the agreement. Specifically, Plug Power had forecasted $0.15 of provision for warrants per dollar of revenue vs. the $0.54 per dollar of revenue that the third tranche would require in connection with the next $400 million of prospective payments from Amazon to the Company.  Defendant Middleton also knew that, as a result of this, the Company had been engaged in negotiations with Amazon since the Company's third quarter earnings release for FY2020 and planned to waive the remaining vesting conditions for tens of millions of outstanding Amazon Warrant Shares by the end of the fourth quarter of FY2020.  This waiver would forgo approximately $400 million in prospective revenue and force Plug Power to incur hundreds of millions in revenue costs.

129.    Additionally, Defendant Middleton knew that the non-public December 16, 2020 SEC Letter revealed that Plug Power's 3Q2020 Letter to Shareholders was blatantly deceiving as it misrepresented the Company's dismal financial condition through, among other things, promoting misleading and inappropriate non-GAAP metrics.  Along these lines, Defendant Middleton knew that the Company would not be able to provide "proforma" metrics which excluded the impact of customer warrant charges.  Defendant Middleton also knew that the SEC was scrutinizing Plug Power's use of Gross Billings—the growth metric Plug Power had relied on for years to buoy its stock—which was nothing more than an improper non-GAAP adjusted revenue metric.

### K.  Plug Power Vests 20 Million Amazon Warrant Shares

130.    On January 5, 2021, before the market opening, Plug Power filed a Current Report on Form 8-K with the SEC which was signed by Defendant Middleton (the "Amazon Warrant Waiver Form 8-K"). The Amazon Warrant Waiver Form 8-K revealed that on December 31, 2020,

"the Company waived the remaining vesting conditions under the warrant, which resulted in the vesting of the remaining 20,368,784 unvested shares under the [Amazon] warrant. This vesting is expected to result in a substantial one-time non-cash charge in the quarter ended December 31, 2020, to eliminate the need to recognize future quarterly non-cash charges for this warrant and to simplify the Company's financial reporting going forward."

131. The 20,368,784 shares represented the entirety of the third tranche of the Amazon Warrant Shares. By waiving the vesting conditions associated with the tranche of Amazon Warrant Shares, Plug Power no longer required Amazon to place $400 million in orders; instead, Plug Power simply made the 20 million or so shares available to Amazon at a heavily discounted price. As Defendant Marsh would later admit to the *Wall Street Journal* on March 28, 2021 in an interview concerning the Amazon Warrant Waiver, "[i]t was an extraordinary payday for [Amazon]."

132. The Amazon Warrant Waiver Form 8-K did not disclose the actual amount of the one-time non-cash charge against revenue in connection with the waiver (approximately $400 million as later revealed in the Company's 2020 Form 10-K) or the reasons why the Company was forced to execute the waiver—the Amazon Transaction Agreement had become an untenable loss contract for Plug Power.

133. However, Defendants knew the cost and cause at the time of the Amazon Warrant Waiver but failed to disclose these critical facts.

134. Defendants reported that as of November 2, 2020, the fair value of the Amazon Warrants was $10.57 based on the terms of the Warrant Agreement. As part of the Amazon Warrant Waiver, Defendants were also required to set the fair value of the warrants on December 31, 2020 for year-end accounting. As later revealed in Plug Power's 2020 Form 10-K, the fair

36

value of these warrants was set based on the Black Scholes Option Pricing Model, which is based, in part, upon level 3 unobservable inputs for which there is little or no market data. The Company used following assumptions for the fair value of the Amazon Warrant Shares in connection with the waiver:

| | December 31, 2020 | November 2, 2020 |
|---|---|---|
| Risk-free interest rate | 0.58% | 0.58% |
| Volatility | 75.00% | 75.00% |
| Expected average term | 6.26 | 6.42 |
| Exercise price | $13.81 | $13.81 |
| Stock price | $33.91 | $15.47 |

All of the assumptions pertaining to the risk-free interest rate and volatility were set on November 2, 2020 and then reapplied to the shares recognized as reduction to revenue on December 31, 2020. Therefore, Defendants knew the fair value of the shares vested on December 31, 2020 ($26.95) by January 1, 2021.

135.    Letters filed with the SEC by Plug Power in 2021 show that Defendant Middleton knew Plug Power would have to charge off the remaining $400 million in Amazon revenue tied to the Amazon warrants by the end of 2020. Defendant Middleton also knew, as later revealed in a letter to the SEC on August 20, 2021, that Plug Power's internal forecasts showed Plug Power only expected $124.4 million in probable revenues from Amazon as of December 31, 2020. While probable revenue of $124.4 million meant Plug Power would write off approximately $57 million of Amazon warrant costs at a lower November 2, 2020 value of $10.57 per warrant (as later revealed in the Company's 2020 Form 10-K), Defendant Middleton knew that the charge for the remaining 12.73 million Amazon Warrants Shares was $343 million at the December 31, 2020 fair value of $26.95 per warrant. This equated to a total warrant charge of approximately $400 million in connection with the Amazon Warrant Waiver.

136.    As Defendant Marsh was intimately involved with all critical aspects of the Amazon Transaction Agreement and Amazon Warrant Waiver (Defendant Marsh signed a copy of the warrant issued to Amazon in 2017, attended Board Meetings in October and November of 2020 during which the status of the Amazon Warrant Shares was discussed, advised the Board in November 2020 of discussions he had engaged with legal counsel, accountants, and tax consultants on the accounting treatment of the vested and unvested options, and conducted negotiations with Amazon on waiving the remaining vesting conditions for the Amazon Warrant Shares), accordingly he also knew the total warrant change of approximately $400 million at the time that the Amazon Warrant Waiver Form 8-K was filed.

137.    Individual Defendants also knew that it was improbable that Plug Power would generate enough revenue from Amazon to avoid taking the Amazon Warrant Agreement as a loss contract.  This fact was confirmed by Defendants who admitted in their August 20, 2021 letter to the SEC that sufficient revenues from Amazon to surpass the Warrant charges would need to exceed $1.9 billion in Amazon revenue for the Company's margins tied to the warrants to be positive.

138.    As Individual Defendants knew that the Amazon Warrant Waiver would result in approximately $400 million in costs to revenue in the fourth quarter for FY2020, they were also aware that this would cause the Company to report negative revenue for FY2020 as the Company had only accrued $215.9 million in revenue through the third quarter of that year.

139.    The Amazon Warrant Waiver Form 8-K was signed by Defendant Middleton.

140.    The materially misleading announcement of Amazon Warrant Waiver received no substantive coverage by the media or analysts.

141.    The omitted information misled the market, which was unable to comprehend the meaning and implications of the Amazon Warrant Waiver due to Defendants' material omissions, causing Plug Power common stock to increase by $1.76, or 5.7% to close at $32.55 on January 5, 2021.

142.    Defendants did not explain the details on the waiver until the Company filed its 2020 Form 10-K.

**L.  Plug Power Gains $1.5 Billion from SK Group's Purchase of Plug Power's Common Stock**

143.    On January 6, 2021, after the close of the market, Plug Power and South Korean company SK Group ("SK Group"), the largest energy provider in South Korea, announced their intention to provide hydrogen fuel cell systems, hydrogen fueling stations, and electrolyzers to the Korean and broader Asian markets through a joint venture company to be located in South Korea by 2022.  Plug Power had been courting SK Group over the previous year to expand the use of green energy in Korean and broader Asian markets.

144.    In addition to the joint venture, SK Group agreed to make a $1.5 billion strategic investment in Plug Power (the "SK Stock Purchase Agreement").  Under the terms of the Stock Purchase Agreement, a United States subsidiary of SK Group would make the $1.5 billion investment in Plug Power by acquiring approximately 51.4 million shares of common stock representing an approximate 9.9% ownership of Plug Power's issued and outstanding common stock.  The investment was without restrictions and could be spent as Plug Power saw fit.

145.    Additionally, as part of the SK Stock Purchase Agreement, Plug Power and SK Group agreed to exclusively work together over the next 18 months to finalize the proposed joint venture in Asia.  The companies further proclaimed that they intended to finalize the joint venture by 2022.

146.    When SK Group and Plug Power announced the deal, the companies stressed that Plug Power's ability to scale its business was integral to forming the joint venture because the South Korean government had been seeking a partner to meet the country's ambitious green energy goals for 2040:

> In January 2019, the South Korea government announced the Hydrogen Economy Roadmap through 2040, with ambitious goals, including: over 5MM tons of hydrogen per year, over 6MM fuel cell EVs, 1,200 refilling station and 15 GW of fuel cell power generation, and expects the cumulative economic value of its hydrogen economy to reach [approximately] 40Bn by 2040. *Plug Power has proven its ability to scale a hydrogen business in North America* as a global leader in the hydrogen economy. The opportunity to partner with SK presents an attractive and timely opportunity to establish a foothold in this market with one of South Korea's leading industrial conglomerates.

(Emphasis added).

147.    In an interview with the Korea Herald on January 7, 2021, SK Group further emphasized Plug Power's substantial growth in recent years and its role as the exclusive supplier of hydrogen forklifts to Amazon and Walmart in choosing the Company as its partner.  It was further reported that SK Group's aggressive investment was "expected to support the Korean government's ambitious hydrogen goals."

148.    The South Korean government aimed to produce 6.2 million hydrogen vehicles, and roll out 80,000 hydrogen taxis, 40,000 hydrogen buses and 30,000 hydrogen trucks.  To power those vehicles, the government planned to increase the annual production capacity of hydrogen to 5.2 million metric tons by 2040 from 130,000 tons as of 2018.  SK Group was specifically expected to establish an annual hydrogen production capacity of 280,000 tons by 2025 and operate a complete value chain of hydrogen from production to retail to supply. Accordingly, SK Group was relying on Plug Power's assistance to reach these objectives.

149.    From Plug Power's side of the isle, analysts regarded the SK Group partnership as a very substantial development for the Company.  For example, a January 7, 2021 Barclays report described this as a "landmark" deal for Plug Power and the "**ultimate example of one of the needle-moving headlines investors have been anticipating to drive the stock to new heights**". (Emphasis added).  The Barclays report added that "such a substantial investment from a leading conglomerate helps validate PLUG's leading IP and potential fuel cell market share in the very long term."  Similarly, a January 7 2021 Craig-Hallum report noted that this partnership "cements [Plug Power's] place as a global hydrogen fuel cell leader" and "meaningfully enhances [its] growth outlook and speed of entry into Asia."  A June 6, 2021 Cowen & Co. report described this deal as a "clearly a positive development", maintained Plug Power's "outperform" rating, and raised their share price target to $50 from $35 prior.

150.    Following this announcement, on January 7, 2021, Plug Power's stock price jumped 35% and closed at $47.29. Within 2 weeks, the Company's stock price has increased by 90%.

151.    Later, on February 25, 2021, Plug Power and SK Group announced the closing of SK Group's investment and partnership between the two companies, including forming a joint venture to provide hydrogen as an energy source to the Asian markets.  Ultimately, SK Group acquired 54.97 million shares for an aggregate purchase price of $1.6 billion representing an approximate 9.6% ownership of Plug Power's issued and outstanding common stock

152.    SK Group acquired its stake in Plug Power via Grove Energy Capital, a special purpose company which was organized as a 50:50 joint venture between two units of SK Holdings Co., Ltd. ("SK Holdings"), the SK Group's holding company, and SK E&S Co., Ltd., a natural gas subsidiary.  SK Holdings and SK E&S each contributed $800 million into Grove Energy

Capital which then purchased $1.6 billion worth of Plug Power shares. Upon finalizing the investment, Grove Energy Capital became Plug Power's largest shareholder.

153.    In finalizing the investment, Grove Energy Capital, SK Holdings, and SK E&S (the "SK Entities") were required by Plug Power to agree to various stipulations and limitations on February 24, 2021 (the "SK Investment Agreement"). Notably, the SK Entities were prohibited from disposing their Plug Power shares for at least two years following the closing of the deal unless receiving consent from Plug Power's Board of Directors. Moreover, SK Holdings and SK E&S were required to maintain a majority equity interest and control over Grove Energy Capital. In other words, SK Group was very much locked into its investment of Plug Power.

154.    SK Group paid Plug Power and acquired Plug Power's common stock, one day before the Company revealed its catastrophic financial results for the fourth quarter and full year FY2020 and one week before the Company disclosed on March 2, 2021 that its financial disclosures were materially false and misleading.

### M. Plug Power Responds to the December 16, 2020 SEC Letter

155.    On January 14, 2021, Defendant Middleton responded to the December 16, 2020 SEC Letter in correspondence that was not posted for the public as a SEC filing (the "January 14, 2021 Response to the SEC"). In explaining the mechanics of the third tranche of the Amazon Warrant Shares, Defendant Middleton asserted that Plug Power had entered the tranche during the third quarter as the Company had "collected $200 million in cumulative, aggregate payments from Amazon, resulting in final vesting of the second Amazon warrant tranche [November 2, 2020], and triggering the determination of the exercise price of the third tranche." Defendant Middleton also described the tenuous position that the third tranche had caused Plug Power:

> As a result of appreciation in our stock price in the second half of 2020 and the related impact on the exercise price of the warrants, the value of variable consideration payable to Amazon increased substantially, from $30.6 million

allocable to $200 million in second tranche gross revenues, or $0.15 per $1.00 of gross revenue recorded, to $215.9 million allocable to $400 million in third tranche gross revenues, or $0.54 per $1.00 of gross revenue recorded. In addition to constraining certain revenues subject to the third tranche as discussed further below, we considered the impact of this increase in warrant provisions on our service contracts, which we review quarterly to determine if any are in a loss position. Given the projected increase in the provision for warrants, we determined that a number of Amazon service contracts were in a loss position as of September 30, 2020, and as a result recognized a $4.3 million charge in the third quarter of 2020.

….

Our discussion of revenue for the three months ended September 30, 2020 was intended to illustrate the impact of the increased value of the third tranche warrants on reported revenue. During the three months ended September 30, 2020, the first $28.4 million of Amazon revenues recorded reflected variable consideration for the second tranche warrants of $4.4 million, resulting in reported revenue of $24.0 million. Upon allocation of the entire value of the second tranche of Amazon warrants in conjunction with $200.0 million in cumulative sales, we began to allocate the value of the third tranche of warrants to Amazon sales. The remaining gross Amazon revenues in the three months ended September 30, 2020 of $23.8 million was partially constrained by warrant charges of $12.9 million, resulting in reported revenue of $10.9 million. Total variable consideration related to Amazon revenue for the three months ended September 30, 2020.

156.    Defendant Middleton further attempted to rationalize Company's presentation of non-GAAP "proforma" metrics in the 3Q2020 Letter to Shareholders which excluded provisions for common stock warrants and loss contracts related to service. After claiming that Plug Power had never made such adjustments before and never would again, Defendant Middleton detailed how the Amazon Transaction Agreement had become untenable for the Company and threatened the sustainability of its business:

The warrant adjustments presented in the third quarter earnings release were intended solely to provide transparency on a topic that investors frequently inquire about and for which there were unusual circumstances, including a significant, unexpected change in warrant value and a potential near-term full vesting of the warrants. We believe it was important to illustrate the significant appreciation in the third tranche of Amazon warrants as compared to the second tranche of warrants, as well as the significant impact on revenue recognized in the statement of operations.…From June 30, 2020 to September 30, 2020, Plug's stock price increased by 63% from $8.21 to $13.41. In fact, the stock price closed as high as

$17.88 in October of 2020. The unforeseen increases in Plug's common stock price significantly increased the 30-day VWAP used for determining the exercise price for the third tranche of warrants. On November 2, 2020, the exercise price for the third tranche was set at $13.81, compared to $1.1893 for the first and second tranches. This resulted in the fair value of the third tranche of warrants being $10.60 each, compared to $1.05 each for the first and second tranches which represented a 909.5% increase. As the increase in stock price and resulting increase in the value of the third tranche of warrants was unexpected, the Company had not forecasted the sudden increase in provision for warrants in the third quarter of 2020. ***The Company had forecasted $0.15 of provision for warrants per dollar of revenue vs. the $0.54 per dollar of revenue that the third tranche would require. Given the magnitude and unexpected nature of the change***, Plug believed it was important to exclude the provision for warrants from certain non-GAAP financial metrics for the third quarter in order to provide investors more transparency regarding what occurred. Without this adjustment, Plug believes that investors would have been confused based on their understanding of prior guidance provided by the Company. Understanding the impact of our provision for warrants is one of the most frequent inquiries we receive from investors and analysts and the significant change impacting the third quarter was outside of previous guidance and historical trends.

(Emphasis added).

157.    In light of Plug Power's calamitous situation, Defendant Middleton further revealed to the SEC that "at the time of our third quarter earnings release, Plug [Power] was in discussions with Amazon to immediately vest the third tranche of warrants and **Plug believed that this vesting would occur by the end of the fourth quarter of 2020.** This resulted in the Company waiving the remaining vesting conditions on December 31, 2020 which was "expected to significantly change the future trends for these warrant provisions." (Emphasis added).

158.    Pertaining to its use of Gross Billings, Defendant Middleton promised that Plug Power's future filings would "provide our investors with a clear definition of gross billings and how it is calculated, the reasons why the metric is useful to investors, how management uses the metric, and disclosure of any significant estimates or assumptions underlying the metric." He further included the same definition of Gross Billings that he had provided to the SEC in 2018. Once again, Defendant Middleton omitted that Gross Billings included the value of stock warrants.

159.    With respect to Plug Power's decision to present adjusted EBITDA as a measure of its performance, instead of as a liquidity measure which it had repeatedly promised the SEC that it would in 2018 and 2019, Defendant Middleton informed the SEC that it had unilaterally decided to revert back to presenting the metric as performance measure and had been doing so since the second quarter of 2019—the year that Plug Power finally achieved positive EBITDA results. Defendant Middleton justified this decision as the Company "did not believe that presenting Adjusted EBITDA as a liquidity measure that included the cash flow effects associated with changes in working capital was meaningful to investors."

160.    Defendant Middleton further admitted to the SEC that both he and Defendant Marsh were intimately involved in the sign off of all quarterly earnings releases, including any changes to non-GAAP measures and related disclosures.

161.    The January 14, 2021 Response to the SEC is not publicly available on the SEC's online Edgar system.

**N.    Appraised of the True Cost, Cause, and Ramifications of the Amazon Warrant Waiver, Defendant Marsh Sells Nearly Half His Holdings While the Stock Price Was Inflated**

162.    In the two weeks following the Company's initial announcement of the SK Group deal, the Company's stock price increased by almost 90%.

163.    On January 19, 2021, Defendant Marsh sold 573,268 shares of his personally held Plug Power stock at prices ranging from $62.6504 to $68.3109 per share in a series of seven transactions.

164.    Defendant Marsh's sale was made pursuant to a Rule 10b5-1 trading plan that was established on December 2, 2020. The trading plan was entered into strategically to take advantage of an inflated stock price and insider information as Defendant Marsh knew that Plug Power's Amazon Transaction Agreement was no longer sustainable and the Company could not afford the

costs associated with the third tranche of the Amazon Warrant Shares.  As a result of this, Defendant Marsh had been in discussions with Amazon since the Company's third quarter earnings release for FY2020 on November 9, 2020 and expected Plug Power to waive the remaining vesting conditions for tens of millions of outstanding Amazon Warrant Shares by the end of the fourth quarter of FY2020.

165.    These sales—which reduced Defendant Marsh's vested holdings by 43% from 1.322 million shares to 748,680 shares—netted Defendant Marsh proceeds of approximately $36.1 million.

166.    In order to effectuate the sale of 466,668 shares or 81% of his total shares sold on January 19, 2021, Defendant Marsh exercised options that would not expire until 2027.

167.    Defendant Marsh's decision to exercise his options seven years before their expiration shows that he knew Plug Power's stock price did not reflect the Company's true financial condition.

168.    At the time of this trade, Defendant Marsh was in possession of material non-public information and knew that Plug Power's stock price did not reflect the Company's true financial condition.

169.    Specifically, Specifically, Defendant Marsh had knowledge of the fair value of the vesting Amazon Warrant Shares, the actual cost to revenue that Plug Power would incur in the fourth quarter of FY2020 in connection with the Amazon Warrant Waiver (approximately $400 million), the true reason that Plug Power was forced to effectuate the waiver (the Amazon Transaction Agreement had become unprofitable for the Company), and the severe financial consequences of the waiver such as reporting negative revenue for FY2020 and dragging down earnings.  In fact, in order for Plug Power to have broken even in the Amazon Transaction

46

Agreement, the Company needed to generate $1.9 billion in revenue.

170.    In a June 29, 2022 *Wall Street Journal* article by Tom McGinty and Mark Maremont titled, "CEO Stock Sales Raise Questions About Insider Trading", the *Journal* underscored that "in [Marsh's] biggest-ever payday from selling the Company's shares, Mr. Marsh netted $36 million by selling about 40% of his holdings under an automatic trading plan. The plan, it turned out, had been set up only the month before. And shortly after he sold, a string of negative company announcements sent the fuel-cell maker's shares plunging—down 60% over three months."

### O. Plug Power Provides Annual Business Update for 2021 and Fails to Disclose the True Cost of the Amazon Warrant Waiver

171.    On January 26, 2021, Plug Power held its annual business update conference call (the "2021 Business Update").  The Company once again provided forecasts for the upcoming year, similar to its business update conference call on January 30, 2020.  Specifically, Defendant Marsh stated that "with our strong bookings, we had been able to up our guidance for 2021 [for gross billings] to $475 million."  However, unlike the business update from the previous year, Plug Power omitted a financial target for its adjusted EBITDA for 2021.

172.    During the call, Defendant Marsh was specifically asked by Jeffrey David Osborne, an analyst at Cowen and Company, what the exact charge would be in connection with the Amazon Warrant Waiver.  In response, Defendant Marsh intentionally did not provide the exact figure:

Jeffrey David Osborne - Cowen and Company:

Got it. Okay. Another, just while we're all redoing our model, I just want to follow up on an 8-K that you filed with Amazon several weeks ago. Do you have a preliminary sense on what the charge will be during the fourth quarter call for the accelerated vesting of those warrants?

Andrew J. Marsh:

No. But I think I do have an idea But it hasn't been finalized with the auditors yet. So I have a pretty good idea, but again, I'm going to bake forgiveness in, and we'll be able to provide you additional insight, okay?

Jeffrey David Osborne - Cowen and Company:

You punted on the first one.

Andrew J. Marsh:

I'll probably [aim] for this once, yes?

173.    At this time, Defendant Marsh knew the exact charge in connection with the Amazon Warrant Waiver; yet he omitted to provide it.

**P.    Plug Power Raises $2 Billion from Investors through a Secondary Public Offering at a Price of $65 Per Share Based on False and Misleading Statements**

174.    In the week following Defendant Marsh's insider trading sales, Plug Power itself also sought to profit from its artificially inflated stock price.

175.    On January 26, 2021, while Plug Power's stock was trading at a 52-week high, Plug Power announced that it was commencing a secondary public offering of its common stock for $1.5 billion.

176.    On the same day, the Company increased the amount of shares that it initially planned to offer to 28,000,000 shares of its common stock at a price to the public of $65.00 per share, with up to an additional 4,200,00 shares for the underwriters.

177.    The Company issued two press releasees on January 26, 2021 concerning the commencement of the secondary public offering and its pricing.  Both press releases directed investors to rely on the prospectus supplement related to the offering, as well as the Company's previous financial statements incorporated therein as filed with the SEC.

178.    On January 28, 2021, Plug Power filed a prospectus supplement to the Shelf Registration Statement, pursuant to Rule 424(b)(5), offering 28,000,000 shares of its common stock at a price to the public of $65.00 per share, with up to an additional 4,200,00 shares for the underwriters (the "January Prospectus").

179.    Among other things, the January Prospectus disclosed a summary of selected consolidated financial data containing key metrics for the Company.  This included financial data for the fiscal years of 2017, 2018 and 2019 as well as unaudited financial data for the nine months ended September 30, 2020.

180.    In connection with FY2017, the January Prospectus stated that the Company netted a gross (loss) profit of ($28.09) million and incurred $28.69 million in research and development expenses.

181.    In connection with FY2018, the January Prospectus stated that the Company netted a gross profit of $2.62 million and incurred $27.71 million in costs related to fuel delivered to customers and $33.91 million in research and development expenses.

182.    In connection with FY2019, the January Prospectus stated that the Company netted a gross profit of $27.97 million and incurred $36.36 million in costs related to fuel delivered to customers and $33.68 million in research and development expenses.

183.    In connection with the nine months ended September 30, 2020, the January Prospectus that the Company netted a gross (loss) profit and operating (loss) income of ($.69) million and ($79.77) million, respectively, and incurred $4.31 million in costs related to provision for loss contracts related to service, $32.27 million in costs related to fuel delivered to customers, and $32.13 million in research and development expenses.

184.    The January Prospectus also incorporated by reference the 2019 Form 10-K, which utilized the consolidated statements of operations data for the years ended December 31, 2019, 2018 and 2017 and the balance sheet data as of December 31, 2019 and 2018, and the Quarterly Reports on Form 10-Q for the first three quarters of FY2020.  All of these reports contain the same financial data detailed in the aforementioned summary of selected consolidated financial data.

185.    January Prospectus also described the risks related to the offering and Plug Power's common stock.  In this section, Plug Power disclosed for the first time the existence of the December 16, 2020 SEC Letter.  The Company further revealed that the Company was "in the process of resolving SEC comments relating to our Annual Report on Form 10-K for the fiscal year ended December 31, 2019 regarding certain accounting and financial disclosure matters, which could possibly result in changes to our existing accounting and financial disclosure."

186.    The disclosure did not reveal that the December 16, 2020 SEC Letter also raised a host of critical issues in connection with the 3Q2020 Letter to Shareholders or how the Company responded to those issues.

187.    The January Prospectus's section on risk factors also did not mention the Amazon Warrant Waiver or its implications on the Company's financial condition.

188.    The January Prospectus omitted to disclose the known quantitative impact of the Amazon Warrant Waiver on Plug Power or the waiver's severe consequences on the Company's financial condition for the fourth quarter and full year of FY2020, including that the Company would likely report negative revenue for the fourth quarter and full year of FY2020.

189.    On February 9, 2021, Plug Power announced the completion of its previously announced upsized offering of 32,200,000 shares at $65 per share with net proceeds in excess of $2 billion.  This transaction signified the largest bought deal in the cleantech sector and the third largest follow-on primary block trade with Morgan Stanley as a sole bookrunner in any market sector historically, as well as the most lucrative capital raise in the Company's 24-year history.

190.    The Proceeds announced on February 9, 2021 together with the final closing of SK Group's investment in the Company on February 25, 2021 tripled the Company's total cash balance to over $5 billion.

191.    Analysts underscored the importance of this sizeable cash balance to Plug Power's growth and diversification.  For example, a January 26, 2021 J.P. Morgan report underscored that Plug Power's "…story keeps getting better, PLUG capitalizing on its leadership position in Hydrogen energy and mobility solutions by nailing down customers and partners that expand the TAM [Total Available Market], improve visibility and de-risk execution. The firm is also capitalizing on its soaring market cap to issue shares, building a balance sheet that will permit the company to execute its growth strategy with confidence."

**Q. Plug Power Issues Prospectus on Potential Resale of its Stock in Connection with Walmart Transaction Agreement**

192.    On February 8, 2021, Plug Power filed a prospectus supplement to the Shelf Registration Statement, pursuant to Rule 424(b)(7), which notified the public of the potential resale from time to time of some or all of 7,274,565 shares that were issuable, subject to certain vesting events, upon exercise of a warrant held by Walmart (the "February Prospectus").  The warrant had been issued to Walmart pursuant to the Walmart Transaction Agreement in 2017.  As of February 8, 2021, 7,274,565 shares of Plug Power common stock underlying the warrant had vested and were beneficially owned by Walmart.

193.    The February Prospectus described risk factors related to Plug Power's common stock.  The February Prospectus did not mention the Amazon Warrant Waiver or its implications on the Company's financial condition.

194.    The February Prospectus omitted to disclose the known quantitative impact of the Amazon Warrant Waiver on Plug Power or the waiver's severe consequences on the Company's financial condition for the fourth quarter and full year of FY2020, including that the Company would likely report negative revenue for the fourth quarter and full year of FY2020.

**R. Plug Power Receives Another Comment Letter from the SEC Demanding that the Company Refile its Earnings for the Third Quarter of FY2020**

195.    On February 10, 2021, the SEC sent another comment letter to Defendant Middleton regarding Plug Power's 2019 Form 10-K and 3Q2020 Letter to Shareholders (the "February 10, 2021 SEC Letter").  Among other issues, the SEC requested that Plug Power amend its 3Q2020 Letter to Shareholders by removing the warrant provision adjustments and provision for loss contracts adjustments from all non-GAAP measures.  The SEC further requested that Defendant Middleton address a host of other issues raised in the December 16, 2020 SEC Letter.

196.    The SEC further requested that Plug Power respond to the February 10, 2021 SEC Letter within 10 business days.  Plug Power did not respond to the SEC until June 1, 2020, almost four months later, in which Defendant Middleton refused to amend the 3Q2020 Letter to Shareholders as Plug Power did not want to "unnecessarily confuse the market."  Defendant Middleton further expressed his belief that it was sufficient to merely direct investors to no longer rely on the Company's 3Q2020 Letter to Shareholders.

**S. Leading up to the Release of Earnings for the Fourth Quarter of FY2020, Defendants Recklessly Disregard Plug Power's Critical Accounting Errors**

197.    According to Plug Power internal documents, cited in previously redacted Delaware Court filings, Plug Power's Board of Directors convened between February 23 and 24, 2021 in anticipation of the Company reporting earnings for the fourth quarter of FY2020 and full year.  Defendant Middleton provided the Board with an update on the Company's FY2020 financials and made a presentation on the financial results for the fourth quarter of FY2020, including revenue, gross margin, and operating cash flow updates. PLUGPOWER_220_00001632.  Defendant Middleton also advised the Board that the KPMG year end audit was progressing and that it would be finalized in the next several days with the Form 10-K to be filed on Monday, March 1, 2021.  *Id*.  Defendant Middleton finally noted that the Audit

Committee would be meeting later in the afternoon with KPMG to discuss the 2020 audit and the Form 10-K. *Id*.

198.    Plug Power's Audit Committee convened later that day and reviewed a "Disclosure Committee Overview" which had been created during the meeting of the Disclosure Committee on February 17, 2021, the week prior.  PLUGPOWER_220_00001486.  The purpose of the overview was purportedly "to ensure management has assessed the completeness and accuracy of financial statements and disclosures." *Id*.  "Key matters" identified in the overview included risk factors and significant disclosures and transactions, among other things. *Id*.

199.    The Audit Committee also reviewed the audit results for FY2020, which contained a risk assessment of significant risks of fraud.  These risks included: (i) revenue recognition; and (ii) management override of controls.  PLUGPOWER_220_00001612.

200.    The 2020 audit results also contained the following slide, which noted required the correction of a series of financial misstatements related to, among other things: (i) recognition of

| ID | Description of misstatement | Type of misstatement | Accounts | Debit | (Credit) |
|---|---|---|---|---|---|
| | | | | | A |
| PY AM-5 | **Non GAAP Policy:** Entry to record impact of non-GAAP application of adoption of ASC Topic 842 (previously deferred profit from 2015 sale leasebacks should have been reversed into accumulated deficit and net impact of classification matters). | Factual | Dr. Revenue | 300 | |
| | | | Dr. Deferred revenue (a) | 300 | |
| | | | Cr. Right-of-use asset | | (560) |
| | | | Cr. Depreciation Exp | | (72) |
| | | | Dr. Accumulated deficit | 32 | |
| AM-1 | **Non GAAP Policy:** Entry to reclass debit in deferred revenue to unbilled receivables. | Factual | Dr. Unbilled accounts receivable | 223 | |
| | | | Cr. Deferred revenue (a) | | (223) |
| AM-2 | Unreconciled difference between the AP subledger and trial balance | Factual | Dr. Cost of goods sold | 151 | |
| | | | Cr. Accounts payable | | (151) |
| AM-3 | Unreconciled difference between the advances to suppliers and the trial balance | Factual | Dr. Advances to suppliers | 92 | |
| | | | Cr. Cost of goods sold | | (92) |
| AM-4 | Entry to correct 2020 projected understatement of inventory identified during the physical inventory count. | Projected | Dr. Inventory | 306 | |
| | | | Cr. Cost of goods sold | | (306) |
| AM-5 | Entry to reclass Cost of Fuel included within R&D | Factual | Dr. Cost of fuel delivered to customers | 11,442 | |
| | | | Cr. Research and development expense | | (11,442) |

revenue from sale-leasebacks; (ii) incorrect costs of goods sold metrics; and (iii) misapplication of fuel delivery costs and research and development expenses:

PLUGPOWER_220_00001613.

201.    Despite these issues being raised in Plug Power's Audit Committee meeting between February 23-24, 2020, Defendants nevertheless moved forward with reporting its earnings for the fourth quarter and full year for FY2020 on February 25, 2021.

**T.  Plug Power Reports Dismal Financial Results for the Fourth Quarter of FY2020 and Discloses the Immense Cost of the Amazon Warrant Waiver**

202.    On February 25, 2021, before the market opening, Plug Power released its fourth quarter and full year FY2020 financial results in a letter to shareholders signed by the Individual Defendants, which was posted on Plug Power's website and attached to a Current Report on Form 8-K filed with the SEC on that same day (the "4Q2020 Letter to Shareholders").  Due to "costs of $456 million recorded in the fourth quarter, the majority being non-cash charges related to the accelerated vesting of a customer's remaining warrants," the Company reported **negative $316.3 million** in revenue for the quarter, compared with the analyst consensus forecast of $87.2 million, and **negative $100.5 million** in revenue for the year.  The Company incurred approximately **$412.7 million in charges of provision to common stock warrants** for the quarter, compared with an analyst at Craig-Haullum estimating $8.9 million in warrant provision costs.

203.    Concerning the warrant charges, the Company added, "that the charges associated with this program have now been fully expensed and there will be no future charges for this warrant program, it should simplify the Company's financial reporting going forward."  While the Company did not explicitly name the customer, it was apparent that most, if not all, of the $412.7 million in charges of provision to common stock warrants stemmed from the Amazon Warrant Waiver in light of the filing of the Amazon Warrant Waiver Form 8-K on January 5, 2021.  No

such waiver had been made in connection with the Walmart Transaction Agreement during FY2020 or any other Plug Power customer during the fourth quarter of FY2020.

204.    These charges resulted in Plug Power reporting **an earnings per share ("EPS") loss of $1.12**, while the consensus EPS estimates had ranged from a loss of $.06 to $.08.

205.    Nevertheless, the 4Q2020 Letter to Shareholders endeavored to frame Plug Power's financial results as positive by pointing to "a **record year** in gross billings, with Q4 gross billings of $96.3 million and $337 million for the full year reflecting the Company's strong value proposition in the growing hydrogen industry" and claiming that the Company was "on track to deliver on recently raised 2021 and 2024 financial targets."  (Emphasis added).

206.    That same day, Plug Power hosted its earnings call for the fourth quarter of FY2020. During the call, Defendants provided no meaningful explication on the quarter's warrant costs of $412.7 million.  Defendant Marsh vaguely stated, "[w]e have never been afraid of tough decisions. We accelerated warrants at the end of 2020.  This decision will have the side benefit and making our GAAP financials more in line with how we operate our business.  It caused a large onetime noncash charge but clears the deck for the future and quite a future."

207.    During the earnings call, Jed Dorsheimer, an analyst from Canaccord Genuity, raised the fact that based on the enormous warrant gains for Walmart and particularly Amazon, Plug Power was effectively paying these customers for using its solutions, and questioned the Company's growth prospects as these sales incentives expired:

> Jonathan Edward Dorsheimer - Canaccord Genuity Corp.:
>
> All right. Perfect. So a couple of questions. I guess just one, on the material handling side, and this might be better served for Paul because it kind of gets into warrant structure a little bit. But if I look at 2 of your 4 major customers, I've actually -- in '20 years, I've never seen this. I mean it's actually a fantastic situation where your customers are literally getting paid to take the product based on the kind of the warrants in 2017 because your stock has been so strong.

So with the expiration of Amazon, I'm just wondering how -- and now only Walmart, how does that change the visibility in terms of -- how do you, Paul, kind of think about the bookings when this starts to pivot away? Because I'm assuming here that Walmart would also exercise the expiration here, too.

In response, Individual Defendants danced around the question by pointing to the fact that "most of the warrants have not been exercised" and both customers remain fully committed to Plug Power:

Andrew J. Marsh:

I'm going to take that, Jed, question, and I'm going to hand it off to Paul. So Jed, the warrants on that, most of the warrants have not been exercised Walmart and Amazon, both have significant interest in the success of Plug Power financially. It's -- obviously, the -- I'm sure it wouldn't strike anybody surprisingly. I'm quite pleased with what happened.

They -- they are -- and I'll then I'll hand it off to Paul, but they are committed to -- both companies view that hydrogen is critical for long term – to meet their long-term climate goals and that they have a partner with Plug Power that goes well beyond financials. That has proven that we can deliver the product sets they need, and they continue to help us, both of them, to find new opportunities for fuel cells in green hydrogen. I can tell you 1 of them actually introduced me to 2 of their other investments in the last 3 weeks to help us grow and propel this business beyond just direct business with them.

On that note, Paul, I hand it off to you.

Paul B. Middleton:

Yes. Thanks, Andy. And I guess, the main comment that I would make is that by the fact that these have all -- the expenses for the 1 customer have been all reflected and reported at this point, there won't be additional charges for those in the future. And that should significantly make it easier and more simple in terms of interpretation on the results as we go forward.

And I expect we've been using gross billings as a means by which to communicate the revenue and sales activities without those charges. But I think going forward, that number should be a lot closer to the GAAP revenue number, which will make it easier as well as we move forward.

The analyst further questioned the dynamic of Plug Power's relationship once the stock warrants expired:

Jed Dorsheimer - Canaccord Genuity Corp.:

Got it. And just to be clear, I mean, I'm not challenging their commitment. But if I just look at it, if their strike price is at 13, and to buy products, and your stock is at 50. They are being paid a significant amount of money to actually take your product. So it does change kind of the relationship a bit once that expires. I guess that was really the core of my question. I think you -- and to be clear, Amazon is done and Walmart isn't.

Andrew J. Marsh:

Yes. And to be clear, Jed, and I'm not going to name specific customer name. They still own -- those companies own a lot of warrants that have not been exercised.

Jonathan Edward Dorsheimer - Canaccord Genuity Corp.:

Got it. Amazon as well?

Andrew J. Marsh:

Yes, Amazon as well. Amazon owns lots of warrants that have not been exercised.

208.    As a result of the disappointing financial results in the fourth quarter of FY2020 and the greater than expected costs associated with Amazon Warrant Waiver, the price of Plug Power's stock fell $6.82 per share to close at $43.34 per share on February 25, 2021, a decline of approximately 13.6%, thereby causing damages to investors.

209.    Analysts and news media expressed dismay over the Company's fourth quarter and full year FY2020 financial results.  In a February 26, 2021 article titled, "Plug Power: Shares Crater On Likely Confusion Over Impact Of Warrant Charges," Seeking Alpha reported that "Plug Power's shares experienced a less-than-stellar session…after the company reported fourth quarter and full-year 2020 results which apparently caused some confusion among market participants." This was driven by the "**[o]utsized** impact of warrant charges caused reported Q4 and full-year 2020 revenues to be negative."  (Emphasis added).  Seeking Alpha further noted that "Plug Power pointed to less complexity in its financial reporting going forward due to the elimination of the Amazon warrant charges but this is not entirely correct as approximately 42.2 million Walmart

warrants had not vested at the end of Q3."

210.    Analysts also expressed concern over the meaning of the Amazon charge and its implications for Plug Power's business.  For example, a February 25, 2021 report by Cannaccord Genuity underscored that the "[w]arrant redemption at Amazon create[d] confusion" and "[g]iven the relatively unique warrant structure at Amazon and Wal-Mart to stimulate adoption of PLUG's fuel cell technology, we suspect this to be an area of concern."  A February 25, 2021 J.P. Morgan report raised that the "one-time [expense relating to exercise of Amazon warrants] made 4Q margins difficult to interpret and make near-term forecasting challenging."  Similarly, a February 25, 2021 Simmons Energy report noted that "[g]iven the messy financials it created a cloudy picture as to how gross margins are progressing."

**U.  Plug Power Reveals that Significant Revisions to Its Prior Financials Are Needed**

211.    On March 2, 2021, before the market opened, Plug Power filed a Notification of Late Filing with the SEC stating that it could not timely file its Annual Report on Form 10-K for FY2020 (the "2020 Form 10-K") because the Company was completing a "review and assessment of the treatment of certain costs with regards to classification between Research and Development versus Costs of Goods Sold, the recoverability of right of use assets associated with certain leases, and certain internal controls over these and other areas."  (Emphasis added).  The Company stated that "[i]t is possible that one or more of these items may result in charges or adjustments to current and/or prior period financial statements" and expected "significant changes" from its previous financial reporting for the fourth quarter of FY2020 and full year FY2019.

212.    After the close of trading on March 16, 2021, Plug Power issued a press release announcing that the Company needed to restate its prior financial results for FY2018 and FY2019 and quarterly filings for 2019 and 2020 ("Previously Issued Financial Statements"). Specifically,

the Company stated:

> In consultation with KPMG LLP, the Company's independent registered public accounting firm, management and the Audit Committee of Plug Power's Board of Directors determined that the Company's Prior Period Financial Statements need to be restated due to errors in accounting primarily related to several non-cash items, including:
>
> - The reported book value of right of use assets and related finance obligations;
> - Loss accruals for certain service contracts;
> - The impairment of certain long-lived assets; and
> - The classification of certain costs, resulting in decrease in research and development expense and a corresponding increase in cost of revenue.
>
> ….
>
> As part of the Company's normal process, prior to releasing its 2020 fourth quarter and year end preliminary results and prior to completion of the audit, on February 24, 2021, the Company and the Audit Committee discussed those results with KPMG, and at that time, no material issues were raised. However, after the Company reported its 2020 fourth quarter and year end results, and in the course of finalizing the audit, the Company and KPMG identified the restatement items cited above. The Company has since reevaluated its accounting and determined that it needed to correct the previous accounting for those items.
>
> ….

(Emphasis added).

213.    The press release added that the Company would not be able to file its 2020 Form 10-K by the March 16, 2021 deadline but was endeavoring to finalize the restatement of the Previously Issued Financial Statements and file its 2020 Form 10-K as soon as possible.

214.    The press release did not reveal the series of financial misstatements that had been raised to Plug Power's Audit Committee between February 23-24, 2021 or that these misstatements involved the same accounting errors resulting in the Company's restatement.

215.    On the same day, Plug Power filed with the SEC a Current Report on Form 8-K which stated that the Company's Previously Issued Financial Statements for FY2018, FY2019, and all quarters reported in 2020 could not be relied upon and that the Company expected to revise

the accounting for the Previously Issued Financial Statements and disclose in its 2020 Form 10-K a material weakness in its internal controls over financial reporting.

216.    On March 17, 2021, the next trading day following Plug Power's announcement that the Company needed to restate its certain of its financial results, Plug Power common stock fell $3.35 per share, or approximately 7.8%, on unusually heavy volume.

217.    On March 18, 2021, Plug Power filed a Notice of Delisting with the SEC, informing investors that the Nasdaq had notified the Company that it was subject to delisting if it failed to file its 2020 Form 10-K by May 17, 2021.

218.    Analysts immediately expressed concerns about the Company's need for restatements as far back as 2018.

219.    In a report issued during trading on March 18, 2021, analysts from Barclays reviewed the causes for Plug Power's restatements and the potential significance of each accounting revision.  Specifically, Barclays analysts were "most crucially" concerned with "the degree to which past margin for fuel cell products are lower (if a lot of R&D moves to Cost of Rev.)."

220.    In the same report, Barclays analysts posited that Plug Power's overstated research and development expenses could have been a ploy by Defendants to inflate margins, stating "**[s]imply put, that management wanted to show higher margins on the core hardware, the fuel cells.**  It has been quite impressive that margins stabilized in the mid-30% range (off of gross billings), from the 20-25% range before 2018."  (Emphasis added).

221.    Additionally, Barclays analysts disagreed with Defendants' representation that the Company's revisions to R&D costs would not affect Plug Power's forecasts, stating:

> "[P]rior expectation that fuel cells were already in the mid-30% margin range dramatically mitigated execution risk for the 2024 and overall guidance. We only

needed to assume 35-40% margins, or around a 500bps increase to execute on the needed margin targets for that line, and be on track with the 2024 AEBITDA margin target of 20%. ***If margins are close to 25% today (around ¼ to ½ shift of R&D), management's targets could remain, but the execution risk is much greater***, reflecting a necessary 1,000bps+ uplift for the next three years in GM (based on our calculations) in order to reach margin guidance"

(Emphasis added).

### V. In the Wake of Plug Power's False Accounting and Poor Financial Results, SK Group Explores Selling its Stake in Plug Power

222.    Immediately following Plug Power's reporting of its disappointed earnings for FY2020 on February 25, 2021 and announcement on March 2, 2021 that its financial disclosures were materially false and misleading, SK Group sought to sell a substantial portion of its stake in Plug Power.

223.    On March 9, 2021, it was reported that SK Group was in negotiations with several private equity firms to sell up to a 49% stake in the special purpose company which owned its Plug Power stock, Grove Energy Capital.  Pursuant to the SK Investor Agreement, SK Group was not allowed to sell its Plug Power shares for at least two years and was only permitted to sell a non-controlling interest in Grove Energy Capital to a non-competitor of Plug Power's.  Thus, the most that SK Group could divest itself from Plug Power was by selling 49% of Grove Energy Capital.

224.    However, as SK Group negotiated selling its stake, Plug Power announced on March 16, 2021 that it needed to restate years of its prior financial results.  In the aftermath of this announcement, the price of Plug Power's stock fell by over 40% over the following five weeks.

225.    With Plug Power's stock falling and a restatement looming, SK Group did not sell its stake in Plug Power via Grove Energy Capital.

### W. Plug Power Restates Its Financial Results Touted to Investors during the Class Period and Finally Discloses the True Cost and Cause of the Amazon Warrant Waiver

226. On May 14, 2021, before the market opened, Plug Power announced that the Company had completed the restatement of its Previously Issued Financial Statements and filed its 2020 Form 10-K with the SEC. The key areas addressed were primarily the same as those detailed in the Company's March 16, 2021 press release.

227. Collectively, the adjustments as part of the restatement and finalization of the 2020 Form 10-K decreased EPS by $.10 for 2020.

228. In 2020, EPS was negatively impacted stemming from one-time non-cash charges associated with $35 million in loss accrual provisions and a $6.4 million long-lived asset impairment.

229. According to the 2020 Form 10-K, the restatement of the Previously Issued Financial Statements corrected the following:

(a) $112.7 million overstatement of the right of use assets related to operating lease liabilities at December 31, 2019, due to the Company incorrectly calculating the operating lease liability associated with certain sale/ leaseback transactions;

(b) ($1.6) million understatement of benefit for loss contracts related to service on the Statement of operations for the year ended December 31, 2019, inclusive of the partial release of the 2018 accrual to the cost of services performed on fuel cells and related infrastructure, and a $5.3 million understatement of the provision for loss contracts for the year ended December 31, 2018, due to the Company not properly estimating the loss accrual related to extended maintenance contracts;

(c) *$19.5 million and $21.2 million, overstatement of gross profit (loss) for the years ended December 31, 2019 and 2018, respectively, due to the Company not properly presenting certain costs related to research and development activities and cost of revenues*;

(d) $1.8 million recording of a deemed dividend for certain conversions of the Company's Series e Convertible Preferred Stock settled in common stock during the year ended December 31, 2019;

(e) The Company determined that the amount recorded to accumulated deficit as of January 1, 2018 for a cumulative adjustment of approximately $3.4 million was the correction of an error in prior lease accounting. as a result of the correction of this error, the $3.4 million charge to accumulated deficit is now reflected in the beginning accumulated deficit for the 12 months ended December 31, 2018; and

(f) $5.3 million understatement of bonus expense and related payroll taxes for the three months ended September 30, 2020, due to the Company not properly estimating bonus expense for the nine-month period ended September 30, 2020.

(Emphasis added).

230.    In correcting its misclassification of research and development expenses, this resulted in a corresponding increase in the Company's cost of revenue.  The specific types of cost of revenue that were affected by this correction included sales of fuel cell systems and related infrastructure, services performed on fuel cell systems and related infrastructure, Power Purchase Agreements, and, notably, fuel delivered to customers.

231.    In addition to the fiscal years 2018 and 2019, the Company further revealed in its 2020 Form 10-K that it had improperly presented research and development expenses that should have been classified as costs of revenue for the fiscal years 2016 and 2017 and first three quarters of FY2020.  Specifically, for FY2016, the Company misclassified $8.9 million.  For FY2017, the Company misclassified $15.2 million.  For the first quarter of FY2020, the Company misclassified $5.5 million. For the second quarter of FY2020, the Company misclassified $4.9 million.  For the third quarter of FY2020, the Company misclassified $5.5 million.

232.    In total, for fiscal years 2016-2019 and the first three quarters of FY2020, Plug Power misclassified research and development expenses by an aggregate $80.7 million or 53.2% of the originally reported figures:

| Research and Development Expenses (In Millions) ("Orig." = Originally Reported Amount, "Restated" = Amount Misclassified) | | | | | | | | | |
| FY2020 (Q1-Q3) | | FY2019 | | FY2018 | | FY2017 | | FY2016 | |
| Orig. | Restated | Orig. | Restated | Orig. | Restated | Orig. | Restated | Orig. | Restated |
|---|---|---|---|---|---|---|---|---|---|
| $32.1 | $15.9 | $33.7 | $19.5 | 33.9 | $21.2 | $28.69 | $15.2 | $21.18 | $8.9 |
| | **49.5%** | | **57.9%** | | **62.5%** | | **53%** | | **42%** |

233.     Much of these research and development expenses were reclassified as a very specific type of cost of revenue—cost of fuel delivered to customers.  As part of the restatement, the Company increased the cost of fuel delivered to customers by the following amounts: for FY2018, $8.3 million; for FY2019, $8.9 million; for the first quarter of FY2020, $2.2 million; for the second quarter of FY2020, $2.0 million; and for the third quarter of FY2020, $2.8 million.

234.     In correcting its misclassification of cost of revenue as research and development expenses, Plug Power accordingly reduced its previously reported gross profit for the fiscal years 2016-2019 and the first three quarters of FY2020.

235.     In its 2020 Form 10-K, the Company made the following corrections to its gross (loss) profits:

| Gross (Loss) Profit for FY 2016- 2020Q3 (In Millions) | | | | | | | |
| | 2020 Q3 | 2020 Q2 | 2020 Q1 | 2019 | 2018 | 2017 | 2016 |
|---|---|---|---|---|---|---|---|
| **Originally Stated** | ($1.29) | $5.08 | ($4.47) | $27.97 | $2.62 | ($28.09) | $3.95 |
| **Restated** | ($28.58) | ($.02) | ($9.70) | $10.65 | ($26.00) | ($43.30) | ($4.91) |

236.     This reclassification, along with other adjustments, expunged almost all of the

Company's gross profits since 2016, and caused nearly every reporting period to report large gross losses except for FY2019 where the gross profit reported was cut by over 60%.

237.    Along these lines, the Company's margins for its services performed on fuel cell systems and related infrastructure and fuel delivered to customers were actually two to four times worse than originally reported:

| Plug Power's Gross Margins for Services Performed on Fuel Cell Systems and Related Infrastructure ("Services") and Fuel Delivered to Customers ("Fuel Delivery") | | | | | |
|---|---|---|---|---|---|
| ("Orig." = Originally Reported Amount, "Rest." = Restated Amount) | | | | | |
| | FY2020 (Q1-Q3) | FY2019 | FY2018 | FY2017 | FY2016 |
| Services (Orig.) | -11.3% | -14.2% | -7.7% | -22.2% | -9.9% |
| Services (Rest.) | -40.04% | -37% | -46.8% | -46.8% | -22.6% |
| | | | | | |
| Fuel Delivery (Orig.) | -31.5% | -24.9% | -23.3% | -62.9% | -27% |
| Fuel Delivery (Rest.) | -60.3% | -55.5% | -60.4% | -274.8% | -74.9% |

238.    Separately, the 2020 Form 10-K also elaborated on the Company's improper assumptions in connection with loss accruals for certain service contacts, a type of the Company's cost of revenue.  Specifically, the Company identified the following flaw in its recording of loss accruals:

> The Company recorded a provision for loss accrual during 2020 of $35.5 million, an increase of $35.9 million over the net benefit for loss contracts related to service recorded in 2019 of $394 thousand (as restated). The increase in the provision for loss accrual during 2020 was driven primarily by an increase in estimated projected costs to service units and an increase in the number of service contracts during 2020. The Company determined during 2020, based on historical experience, that

certain cost down initiatives were taking longer to achieve than originally estimated. As a result, the Company increased its estimated projected costs to service fuel cell systems and related infrastructure.

…

The Company did not properly estimate the loss accrual related to its extended maintenance contracts. As a result of the error in classification of research and development costs discussed below, the Company did not consider all relevant historical costs when estimating future service costs when determining whether a loss accrual for extended maintenance contracts was necessary. Additionally, the Company did not consider the service costs related to hydrogen infrastructure, nor the provision for warrants, when estimating the need for a loss accrual on extended maintenance contracts. When properly considering these costs, additional loss accruals for extended maintenance contracts were required to be recorded. When properly considering these costs, additional loss accruals for extended maintenance contracts were required to be recorded. The corrections resulted in a ($1.6) million benefit for loss accrual for the year ended December 31, 2019, inclusive of the partial release of the 2018 loss accrual, and a provision for loss accrual of $5.3 million for the year ended December 31, 2018.

239.    The 2020 Form 10-K further revealed that most of the $35.5 million loss accrual for FY2020 was generated by the Company understating the provision for loss contracts related to service during the third quarter of that year by $20.8 million.[3]  This directly caused the Company's operating income to decrease by $20.8 million.

240.    The 2020 Form 10-K stated that Plug Power's management, including the Individual Defendants, under the oversight of the Company's board of directors, conducted an evaluation of the effectiveness of the Company's internal control over financial accounting.  Based on this evaluation, the Company's management concluded that, as of December 31, 2020, the Company's internal control over financial reporting was not effective because of certain material weaknesses.  Specifically, Company's management identified the following deficiency in internal control over financial reporting as of December 31, 2020:

---

[3] For the nine months ended September 30, 2020, the Company overstated the provision for loss contracts related to service by $21.6 million.

The Company did not maintain a sufficient complement of trained, knowledgeable resources to execute their responsibilities with respect to internal control over financial reporting for certain financial statement accounts and disclosures. As a consequence, the Company did not conduct an effective risk assessment process that was responsive to changes in the Company's operating environment and did not design and implement effective process-level controls activities in the following areas: presentation of operating expenses; accounting for lease-related transactions; identification and evaluation of impairment, loss-contract accrual, certain expense accruals, and deemed dividends; and timely identification of adjustments to physical inventory in interim periods.

241.    The 2020 Form 10-K further provided that "these deficiencies resulted in material misstatements that were identified and corrected in the consolidated financial statements as of and for each of the three years in the period ended December 31, 2020 and other historical periods…."

242.    The 2020 Form 10-K also contained an adverse opinion on the effectiveness of the Company's internal control over financial reporting on the same issues disclosed by the Company. As part of the critical audit matters, KPGM also described a number of critical audit matters that were communicated or required to be communicated to the Board of Director's Audit Committee, including the stand-alone selling price for fuel cells, the evaluation of a waiver of warrant vesting conditions and maintenance cost projection in the accrual for loss contracts.

243.    The 2020 Form 10-K also detailed the Company's financial results for FY2020. The Company stated that the Company's research and development expenses were $27.85 million, provision for loss contracts related to service was $35.47 million, fuel delivered to customers was $61.82 million for this cost of revenue, gross (loss) profit was ($469.42) million, and operating (loss) income was ($584.20) million.

244.    The 2020 Form 10-K also disclosed that the Company was enveloped in recent unresolved staff comments and revealed for the first time that the December 16, 2020 SEC Comment Letter not only pertained to the 2019 Form 10-K but also to the 3Q2020 Letter to Shareholders.

245.    The Company provided no further information concerning the December 16, 2020 SEC Letter.

246.    Finally, the 2020 Form 10-K revealed the true cost and cause of the Amazon Warrant Waiver.  Specifically, the Company recognized a "$399.7 million reduction to revenue associated with 18,085,395 of the third tranche of Amazon Warrant Shares for which reduction of revenue had not been previously recognized as a reduction of revenue."  On the calculation of the $399.7 million figure and why the Company waived the remaining vesting conditions, the Company stated the following:

> The $399.7 million reduction to revenue resulting from the December 31, 2020 waiver was determined based upon a probability assessment of whether the Amazon Warrant Shares would vest under the terms of the original Amazon Warrant. Based upon the Company's projections of probable future cash collections from Amazon (i.e., a Type I share based payment modification), a reduction of revenue of $56.6 million associated with 5,354,905 Amazon Warrant Shares was recognized at their previously measured November 2, 2020 fair value of $10.57 per share. A reduction of revenue of $343.1 associated with the remaining 12,730,490 Amazon Warrant Shares was recognized at their December 31, 2020 fair value of $26.95 each, based upon the Company's assessment that **associated future cash collections from Amazon were not deemed probable** (i.e., a Type III share based payment modification).

> The $399.7 million reduction to revenue was recognized during the year ended December 31, 2020 ***because the Company concluded such amount was not recoverable from the margins expected under probable future revenues attributable to Amazon***, and no exclusivity or other rights were conferred to the Company in connection with the December 31, 2020 waiver. Additionally, for the year ended December 31, 2020, the Company recorded a reduction to the provision for warrants of $12.8 million in connection with the release of the service loss accrual.

> …

> Fair value of the Amazon Warrant at December 31, 2020 and November 2, 2020 was based on the Black Scholes Option Pricing Model, which is based, in part, upon level 3 unobservable inputs for which there is little or no market data, requiring the Company to develop its own assumptions.

> The Company used the following assumptions for its Amazon Warrant:

| | December 31, 2020 | November 2, 2020 |
|---|---|---|
| Risk-free interest rate | 0.58% | 0.58% |
| Volatility | 75.00% | 75.00% |
| Expected average term | 6.26 | 6.42 |
| Exercise price | $13.81 | $13.81 |
| Stock price | $33.91 | $15.47 |

(Emphasis added).

247.    The reduction to revenue charge was calculated by simply multiplying the number of shares being vested by their respective fair value.

248.    As a result of the cost of the Amazon Warrant Waiver, Amazon accounted for (332.4)% of the Company's total consolidated revenue for FY2020.

249.    The 2020 Form 10-K was signed by the Individual Defendants.

250.    On May 16, 2021, Barclays analysts issued a report stating that their concerns regarding R&D expenses and their impact on the Company's gross margin had been realized. Specifically, the report stated:

> [O]ur biggest concern was that sizable R&D shifts to COGS, rendering realized GM much lower and shifting 2024 AEBITDA guidance into more of an aspirational position rather than reliable targets from today's vantage point. This proved true – PLUG's run rate adj. GM is closer to mid-teens vs. mid-20s implied prior.

251.    Barclays analysts were perplexed by the reclassification of fuel costs, a line item specifically broken out in the Company's financial statements, from research and development expenses to cost of goods sold, stating the change "**surprised us, as it's unclear how fuel could've ended up erroneously in R&D."**  (Emphasis added).

252.    Barclays' May 16, 2021 analyst report further stated that the amount of the reclassification of service and fuel costs reclassified from R&D to cost of goods sold "does reflect a level closer to a severe downside case … [and] raises fresh concerns."

253.    The same report noted that Barclays was "[q]uestioning what margins look like

now, near and long term" and that their outlook for Plug Power moving forward is negatively impacted due to the downward revision to gross margin caused by the Company's restatements, highlighting that "[i[n the past we had pointed to strong gross margin across select business segments as indicators of PLUG's R&D efforts paying off, specifically fuel cells. **This proved untrue** and there is now increased execution risk and lesser clarify on the potential for a dramatic margin improvement narrative playing out."  (Emphasis added).

## X.  The SEC Continues to Question Plug Power's Accounting Practices and Presentation of its Financial Results

254.    On June 1, 2021, in response to the December 16, 2020 SEC Comment Letter and the February 10, 2021 SEC Letter, Plug Power attested that the Company no longer planned to present adjusted EBITDA in its earnings release or other public disclosures on a regular basis.

255.    On July 16, 2021, the SEC sent another comment letter to Defendant Middleton which questioned the accounting surrounding the Amazon Warrant Waiver and the meaning behind Plug Power's statement in the 2020 Form 10-K that the $399.7 million reduction to revenue "was not recoverable from the margins expected from future purchases by Amazon under the Amazon Warrant, and no exclusivity or other rights were conferred to the Company in connection with the December 31, 2020 waiver."  Among other issues, the SEC also asked Plug Power for further clarity on what precisely constitutes Gross Billings as the SEC did not understand the definition previously provided by Plug Power.

256.    On August 20, 2021, Defendant Middleton responded to the SEC and described that "the probable future economic benefit amount associated with Amazon [was] not sufficient to recover the cost of the Third Tranche" which caused Plug Power to execute the Amazon Warrant Waiver.  Specifically, Defendant Middleton stated the following:

> The Company estimated probable future payments as of December 31, 2020 from
> Amazon for the purchase of goods and services to be $124.4 million for purposes

of accounting for the modification of a share based payment award, which included the evaluation of the number of warrants that were probable of vesting immediately prior to the waiver (i.e. a probable-to-probable Type I modification) versus the number that were not deemed probable of vesting (i.e. an improbable-to-probable Type III modification)….

…

In addition, for illustrative, the Company evaluated the amount of future purchases that would be necessary to recover the cost of the Third Tranche warrant. Based on the estimated fair value measure of the Third Tranche and the historical gross margins for Amazon revenues, the Company calculated the breakeven amount of anticipated revenue that would be needed to recover the cost of the Third Tranche. See table below:

| | |
|---|---|
| Sales of Fuel Systems | 1,577,000,000 |
| Estimated Margin (25%) | 394,250,000 |
| | |
| Services Revenue | 323,000,000 |
| Estimated Margin (1%) | 3,230,000 |
| | |
| Warrants Fair Value | 399,688,048 |
| Margin (-) Fair Value | - |
| | |
| Total Breakeven Revenue | 1,900,000,000 plus |

The estimated margins represent the middle of the range of the historical Amazon margins for the respective revenue streams. In addition, the sales mix between fuel systems and services (83%/17%) is the average sales mix for 2017-2019 consolidated revenue amounts. Under these assumption*s, the breakeven amount of anticipated revenue necessary to breakeven on the cost of the Third Tranche is in excess of $1.9 billion.* This illustration further supports the notion that the cost of the Third Tranche cannot reasonably be supported as an asset.

(Emphasis added).  Defendant Middleton added that "[t]he waiver of the remaining vesting conditions with Amazon did not contemplate any exclusivity between Amazon and the Company, nor did it require any new purchase orders or purchase commitments."

257.    Defendant Middleton also provided an example of Gross Billings which illustrated the difference between the amounts: (i) invoiced to customer; (ii) recognized as revenue, and (iii)

presented as Gross Billings.  This example demonstrated that Gross Billings was nothing more than recognized revenue inclusive of the value of the provision for common stock warrant.

258.    On October 19, 2021, the SEC sent another comment letter to Defendant Middleton, which asserted that based on the example of Gross Billings provided on August 20, 2021, the SEC believed that Gross Billings was not an operating metric but "a non-GAAP 'adjusted revenue' measure considering it is the amount of revenue recognized in the current year inclusive of the value of warrants."  The SEC further requested that Plug Power amend its 2020 Annual filing to provide "revised management's discussion and analysis disclosures for all restated periods, including the restated quarterly periods" as the Company's restatement did not account for the full extent of misstated information in prior quarterly reports, including revised management's discussion and analysis for all restated quarterly periods.

259.    On November 9, 2021, Plug Power filed its Quarterly Report on Form 10-Q for the third quarter of FY2021 ("3Q2021 Form 10-Q").  In the 3Q2021 Form 10-Q, the Company clarified that the material weaknesses in its internal control over financial reporting identified as of December 31, 2020 also existed in 2018 and 2019 and its disclosure controls and procedures were not effective as of December 31, 2018 and 2019.  It further revealed that the material weakness had not been remediated as of September 30, 2021.

260.    On November 16, 2021, Defendant Middleton responded to the SEC's comment letter dated October 19, 2021.  Pertaining to the SEC's assertion that Gross Billings was nothing more than non-GAAP adjusted revenue, Plug Power stated that it would no longer present Gross Billings on a regular basis.  Defendant Middleton further requested the SEC to reconsider its demand for Plug Power to amend and refile the 2020 Form 10-K.

261.    On December 20, 2021, the SEC sent another comment letter to Defendant

Middleton which insisted that Plug Power further amend its 2020 Form 10-K.

262.    On January 19, 2022, Defendant Middleton responded by conceding that Plug Power would further amend its 2020 Form 10-K.

263.    On March 21, 2022, the SEC informed Defendant Middleton that the SEC had completed its review of Plug Power's filings.

### Y.  Plug Power Reveals Further Weaknesses in Its Financial Reporting Controls

264.    On March 1, 2022, Plug Power filed its 2021 Form 10-K with the SEC (the "2021 Form 10-K").  The Company disclosed that its correspondence with the SEC, starting on December 16, 2020, had continued over the past year and warranted the Company making further amendments to its 2020 Form 10-K.

265.    Plug also informed investors that it identified deficiencies in its internal controls that had been previously reported in the 2020 Form 10-K and continued to exist in 2021.  The Company further revealed that it had identified additional deficiencies.

> Management identified certain deficiencies in internal control over financial reporting that have been previously reported and continued to exist as of December 31, 2021. The Company did not maintain a sufficient complement of trained, knowledgeable resources to execute its responsibilities with respect to internal control over financial reporting. as a consequence, the Company did not conduct an effective risk assessment process that was responsive to changes in the Company's operating environment and did not design and implement effective process-level controls activities for certain financial statement accounts and disclosures as follows:
>
> (a) presentation of operating expenses;
> (b) accrual for loss contracts related to service; and
> (c) identification of adjustments to physical inventory.
>
> As of December 31, 2021, management identified additional deficiencies which are also the result of the Company not maintaining a sufficient complement of trained, knowledgeable resources to execute its responsibilities and conduct an effective risk assessment. Specifically, the process-level controls to ensure proper capitalization of inventory costs were not performed with an appropriate level of precision to detect and prevent a material misstatement. Additionally, management identified ineffective general information technology control activities over an

information technology system that is used in calculating fuel billings due to the ineffective risk assessment in identifying the relevant system. Management did not design and implement general information technology control activities in response to the current year growth in fuel delivered to customers.

The control deficiency related to the accrual for loss contracts related to service resulted in a material misstatement that was corrected prior to the issuance of the 2021 consolidated financial statements included in this Form 10-K. We did not identify any other material misstatements to the consolidated financial statements and there were no changes to previously released financial results as a result of the other control deficiencies; however, the control deficiencies described above created a reasonable possibility that a material misstatement to the consolidated financial statements would not be prevented or detected on a timely basis. As a result, we concluded the deficiencies described above represent material weaknesses in our internal control over financial reporting and our internal control over financial reporting was not effective as of December 31, 2021.

266.    Relatedly, the 2021 Form 10-K also contained an adverse opinion by KPMG dated March 1, 2022 on the effectiveness of the Company's internal control over financial reporting. This report primarily covered the above-described issues disclosed by the Company.  KPMG also detailed critical audit matters that were communicated or required to be communicated to the Board of Director's Audit Committee.   These matters included similar issues that KPMG previously raised in the 2020 Form 10-K, including the stand-alone selling price for fuel cells and maintenance cost projection in the accrual for loss contracts.

267.    The 2021 Form 10-K was signed by the Individual Defendants.

268.    During the earnings call for FY2021, Joseph Spak, an analyst from RBC Capital Markets, asked for an update on the joint venture with SK Group and whether SK's $1.6 billion investment in Plug Power would be used towards the joint venture.  Defendant Marsh clarified that the SK investment was "Plug Power's money to spend as Plug Power pleases" and emphasized that "Korea is the first and main focus" of the joint venture and "[o]ne of the areas that I'm trying to make sure the JV is really focused on because huge opportunity is putting power on the grid in South Korea."

269.    On March 16, 2022, Plug Power filed an amended Form 10-K for FY2020 (the "Amended 2020 Form 10-K") to:

Amend its Management's discussion and analysis of Financial Condition and Results of operations ("MD&A") to also include the quarterly periods ended March 31, 2020 and 2019, June 30, 2020 and 2019 and September 30, 2020 and 2019: and

Amend Part ii, item 9a, "Controls and Procedures" to clarify that the material weakness identified as of December 31, 2020 also existed in 2018 and 2019 and its disclosure controls and procedures were not effective as of December 31, 2018 and 2019.

…

Restates its Consolidated Balance Sheet as of December 31, 2019 and the related Consolidated Statements of operations, Consolidated Statements of Comprehensive loss, Consolidated Statements of Stockholders' equity (deficit), and Consolidated Statements of Cash Flows for the fiscal years ended December 31, 2019 and 2018;

…

Restates its "Selected Financial data" in Part ii, item 6 for fiscal years 2019, 2018, 2017 and 2016; and

Restates its unaudited Quarterly Financial Statements for the first three fiscal quarters in the fiscal year ended December 31, 2020 and each fiscal quarter in the fiscal year ended December 31, 2019.

270.    Two days later, on March 16, 2022, Plug Power dismissed KPMG as the Company's independent registered public accounting firm.  The Company replaced KPMG with Deloitte & Touche LLP—the same firm which had been involved in advising Plug Power on the Amazon Warrant Shares in October of 2020.

271.    In the Form 8-K that Plug Power filed with the SEC on March 21, 2022 in connection with this decision, the Company provided no substantive explanation for the termination of KPMG.  Instead, the Company merely referenced that it previously concluded that its internal control over financial reporting was not effective as of December 31, 2021, 2020, 2019

and 2018 due to certain material weaknesses and detailed the same weaknesses which had been previously disclosed in the 2020 and 2021 Form 10-Ks.

## V. DEFENDANTS' FALSE STATEMENTS AND OMISSIONS OF MATERIAL FACTS MADE WITH SCIENTER

### A. The November 9, 2020 False and Misleading Statements

#### a. Misleading Statements Omitting Material Facts Pertaining to the Amazon Transaction Agreement

272.    On November 9, 2020, Plug Power disseminated its 3Q2020 Letter to Shareholders, which was signed by the Individual Defendants, posted on Plug Power's website, and attached to a Current Report on Form 8-K filed with the SEC on that same day.  Therein, the Company provided, in relevant part, a general update on its pedestal customer warrants and disclosed that the strike price for the next tranche of one customer warrant was substantially higher than previous warrants as a result of "higher purchases during the quarter."  (*See* ¶ 95). This resulted in Plug Power recording greater costs to revenue than previous reporting periods.  Plug Power's simultaneous filing of the 3Q2020 Form 10-Q revealed that the customer at issue was Amazon. (*See* ¶ 96).

273.    During the 3Q2020 Earnings Conference Call that same day, Individual Defendants Middleton and Marsh answered questions concerning the Amazon Warrant Shares, which Defendant Marsh represented were "a real positive."  (*See* ¶ 107).

274.    On November 9, 2020, Plug Power filed its 3Q2020 Form 10-Q with the SEC, which was signed by the Individual Defendants.  Therein, the Company disclosed, in relevant part, that the fair value of Amazon Warrant Shares in the third tranche would be $10.60 per share compared to $1.05 for shares provided to Amazon in the second tranche.  It further revealed that this development was actually driven by recent increases in the Company's stock price.  (*See* ¶¶ 96-97).

275.    In the 3Q2020 Letter to Shareholders, 3Q2020 Earnings Conference Call, and 3Q2020 Form 10-Q, Defendants knowingly or recklessly omitted the following material non-public information concerning the Amazon Warrants which caused the statements to be misleading: (a) Plug Power faced unsustainable costs to revenue associated with third tranche of the Amazon Warrant Shares as the Company had forecasted $0.15 of provision for warrants per dollar of revenue vs. the $0.54 per dollar of revenue that the third tranche would require in connection with the next $400 million of prospective payments from Amazon to the Company (*see* ¶ 98; ¶¶ 155-156); (b) as a result of the exponential increase in provision for warrant costs, Plug Power planned to waive the remaining vesting conditions for tens of millions of outstanding Amazon Warrant Shares by the end of the fourth quarter of FY2020 (*see* ¶ 99; ¶ 157); and (c) Plug Power's execution of the waiver would force the Company to incur hundreds of millions in revenue costs that would have a negative, material impact on the Company's financial condition including profits and earnings (*see* ¶ 99).

276.    Defendant Middleton had a duty to disclose the omitted material information from the 3Q2020 Letter to Shareholders, 3Q2020 Earnings Conference Call, and 3Q2020 Form 10-Q as Defendant Middleton traded on the information on December 24, 2020.  (*See* ¶¶ 350-356).

277.    Pursuant to Item 303 of Regulation S–K, Defendants also had a duty to disclose the omitted material information in the 3Q2020 Form 10-Q in order to "[d]escribe any known trends or uncertainties ... that the registrant reasonably expects will have a material ... unfavorable impact on ... revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).

278.    The omitted information described in ¶ 275 was material as it pertained to a $600 million contract with a pedestal customer that had become untenable and required the Company to take actions which would forgo approximately $400 million in prospective revenue and force

Plug Power to incur hundreds of millions in revenue costs.  As described by Defendant Middleton in the January 14, 2021 Response to the SEC, "[u]nderstanding the impact of our provision for warrants is one of the most frequent inquiries we receive from investors and analysts…."  (*See* ¶ 156).

### b.  False and Misleading Statements Pertaining to Plug Power's Accounting Fraud

279.    In the 3Q2020 Letter to Shareholders, the Company falsely stated: "We … report that the proforma Adjusted EBITDA margin in Q3 2020 of 19%…."

280.    The 3Q2020 Letter to Shareholders falsely stated that the Company had achieved a proforma adjusted EBITDA of $24 million during that quarter.

281.    The 3Q2020 Form 10-Q falsely stated that research and development expenses were $11.96 million.

282.    The 3Q2020 Form 10-Q falsely stated that the Company's provision for loss contracts related to service was $4.31 million for this cost of revenue.

283.    The 3Q2020 Form 10-Q falsely stated that the Company incurred a gross (loss) profit of ($1.29) million and an operating (loss) income of ($27.53) million.

284.    The financial metrics represented in ¶¶ 279-283 were materially false and misleading when made because Defendants knew or recklessly disregarded that (a) material amounts of the Company's fuel delivery costs were being reported as research and development expenses in violation of the Company's accounting policy and thereby inflating reported gross profits and (b) booking fuel delivery costs as research and development expenses allowed the Company to understate the loss accrual related to its extended maintenance contracts thereby inflating reported gross profits and EBITDA.  (*See* ¶¶ 342-345, 362-384; ¶¶ 228-239).  The Company later admitted the financial metrics in ¶¶ 279-283 were materially false when restating

these metrics.  (*See* ¶¶ 228-239).

285.    The 3Q2020 Form 10-Q also falsely claimed that the Company's "disclosure controls and procedures are effective[.]"  In particular, the 3Q2020 Form 10-Q stated, in relevant part:

### Item 4 — Controls and Procedures

(a) Disclosure Controls and Procedures

The chief executive officer and chief financial officer, based on their evaluation of disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) as of the end of the period covered by this Quarterly Report on Form 10-Q, have concluded that ***the Company's disclosure controls and procedures are effective*** for ensuring that information required to be disclosed in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Commission's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed in filed or submitted reports is accumulated and communicated to the Company's management, including its principal executive officer and principal financial officer as appropriate, to allow timely decisions regarding required disclosure.

Emphasis added.

286.    The representations that the Company's disclosure controls and procedures were effective were materially false and misleading when made because Defendants knew or recklessly disregarded that (a) material amounts of the Company's fuel delivery costs were being reported as research and development expenses in violation of the Company's accounting policy and thereby inflating reported gross profits and (b) booking fuel delivery costs as research and development expenses allowed the Company to understate the loss accrual related to its extended maintenance contracts thereby inflating reported gross profits and EBITDA.  (*See* ¶¶ 342-345, 362-384; ¶¶ 228-239).  The Company later admitted its financial reporting was materially false when restating its financial results.  (*See* ¶¶ 228-239).  Defendants also admitted that there were material weaknesses in its internal controls over financial reporting, *inter alia*, specifically that Plug Power "did not

maintain a sufficient complement of trained, knowledgeable resources to execute their responsibilities with respect to internal control over financial reporting for certain financial statement accounts and disclosures" and "[a]s a consequence, the Company did not conduct an effective risk assessment process that was responsive to changes in the Company's operating environment and did not design and implement effective process-level controls activities" in connection with "presentation of operating expenses" and "loss-contract accrual" (¶ 240); and the Company admitted that, as a result of the foregoing, it could not timely file its Form 10-K and needed to restate its Previously Issued Financial Statements, including the quarterly report for the third quarter of FY2020 (*see* ¶¶ 212-213).

### B. The November 18, 2020 False and Misleading Statements

#### a. Misleading Statements Omitting Material Facts Pertaining to the Amazon Transaction Agreement

287.    On November 18, 2020, Plug Power filed the November Prospectus with the SEC. The November Prospectus was filed in connection with the Company's Shelf Registration Statement, which was signed by the Individual Defendants.

288.    In the November Prospectus, Defendants knowingly or recklessly omitted the following material non-public information concerning the Amazon Warrants which caused the statements to be misleading: (a) Plug Power faced unsustainable costs to revenue associated with third tranche of the Amazon Warrant Shares as the Company had forecasted $0.15 of provision for warrants per dollar of revenue vs. the $0.54 per dollar of revenue that the third tranche would require in connection with the next $400 million of prospective payments from Amazon to the Company (*see* ¶ 98; ¶¶ 155-156); (b) as a result of the exponential increase in provision for warrant costs, Plug Power planned to waive the remaining vesting conditions for tens of millions of outstanding Amazon Warrant Shares by the end of the fourth quarter of FY2020 (*see* ¶ 99; ¶ 157);

and (c) Plug Power's execution of the waiver would force the Company to incur hundreds of millions in revenue costs that would have a negative, material impact on the Company's financial condition including profits and earnings (*see* ¶ 99).

289.    Pursuant to Item 303 of Regulation S–K, Defendants had a duty to disclose the omitted material information in the November Prospectus in order to "[d]escribe any known trends or uncertainties ... that the registrant reasonably expects will have a material ... unfavorable impact on ... revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).

290.    The information described in ¶ 288 was material as it pertained to a $600 million contract with a pedestal customer that had become untenable and required the Company to take actions which would forgo approximately $400 million in prospective revenue and force Plug Power to incur hundreds of millions in revenue costs.  As described by Defendant Middleton in the January 14, 2021 Response to the SEC, "[u]nderstanding the impact of our provision for warrants is one of the most frequent inquiries we receive from investors and analysts…."  (*See* ¶ 156).

### b.  False and Misleading Statements Pertaining to the Accounting Fraud

291.    The November Prospectus also provided investors with a summary of selected consolidated financial data as well as incorporated by reference financial data from the 2019 Form 10-K and the Quarterly Reports on Form 10-Q for the first three quarters of FY2020.  This included financial data for the fiscal years of 2017, 2018 and 2019 as well as financial data for the nine months ended September 30, 2020.

292.    The November Prospectus falsely stated, in relevant part, that for FY2017, the Company netted a gross (loss) profit of ($28.09) million and incurred $28.69 million in research and development expenses.

293.    The November Prospectus falsely stated that for FY2018, the Company netted a gross profit of $2.62 million and incurred $27.71 million in costs related to fuel delivered to customers and $33.91 million in research and development expenses.

294.    The November Prospectus falsely stated that for FY2019, the Company netted a gross profit of $27.97 million and incurred $36.36 million in costs related to fuel delivered to customers and $33.68 million in research and development expenses.

295.    The November Prospectus falsely stated that for the nine months ended September 30, 2020, the Company netted a gross (loss) profit and operating (loss) income of ($.69) million and ($79.77) million, respectively, and incurred $4.31 million in costs related to provision for loss contracts related to service, $32.27 million in costs related to fuel delivered to customers, and $32.13 million in research and development expenses.

296.    The financial metrics represented in ¶¶ 291-295 were materially false and misleading when made because Defendants knew or recklessly disregarded that (a) material amounts of the Company's fuel delivery costs were being reported as research and development expenses in violation of the Company's accounting policy and thereby inflating reported gross profits and (b) booking fuel delivery costs as research and development expenses allowed the Company to understate the loss accrual related to its extended maintenance contracts thereby inflating reported gross profits and operating income.  (*See* ¶¶ 342-345, 362-384; ¶¶ 228-239). The Company later admitted the financial metrics in ¶¶ 291-295 were materially false when restating these metrics.  (*See* ¶¶ 228-239).

### C.  The January 5, 2021 Misleading Statements Omit Material Facts Pertaining to the Amazon Transaction Agreement

297.    On January 5, 2021, Plug Power filed the Amazon Warrant Waiver Form 8-K with the SEC which was signed by Defendant Middleton.  Therein, Defendants disclosed that on

December 31, 2020, "Under the terms of the warrant, at the same time the exercise price for the unvested 20,368,784 shares was set at $13.81005 per share. On December 31, 2020, the Company waived the remaining vesting conditions under the warrant, which resulted in the vesting of the remaining 20,368,784 unvested shares under the [Amazon] warrant. This vesting is expected to result in a substantial one-time non-cash charge in the quarter ended December 31, 2020, to eliminate the need to recognize future quarterly non-cash charges for this warrant and to simplify the Company's financial reporting going forward." (*See* ¶ 130).

298.    In the Amazon Warrant Waiver Form 8-K, Defendants knowingly or recklessly failed to disclose the following material non-public information: (a) the actual cost to revenue that Plug Power would incur in the fourth quarter of FY2020 in connection with the Amazon Warrant Waiver was approximately $400 million (*see* ¶¶ 132-138); (b) Plug Power was forced to waive the vesting conditions for tens of millions of Amazon Warrant Shares because the Amazon Transaction Agreement was a loss contract for the Company since it estimated that the probable future payments from Amazon for the purchase of goods and services to be $124.4 million and would need over $1.9 billion of Amazon revenue to recover the cost of the third tranche (*see* ¶¶ 246, 256); and (c) the severe financial consequences of the waiver such as reporting negative revenue for FY2020 and dragging down earnings (*see* ¶¶ 132-138; ¶¶ 202-204).

299.    Defendant Marsh had a duty to disclose this material and non-public information as Defendant Marsh traded on the information on January 19, 2021 but failed to do so. (*See* ¶¶ 357-361).

300.    The Amazon Warrant Waiver Form 8-K was also materially misleading in failing to disclose the true cost, cause, and consequences of the waiver which were known to Defendants. (*See* ¶¶ 132-138). The market could not understand how the waiver impacted forecasted revenue

and EPS for the fourth quarter of FY2020, which analysts kept unchanged following this filing. Heading into Plug Power's fourth quarter earnings on February 25, 2021, the consensus EPS ranged from negative $.06 to negative $.08 and revenue was expected to be $87.2 million for the quarter. (*See* ¶¶ 202, 204). An analyst at Craig-Haullum estimated $8.9 million in warrant provision costs. (*See* ¶ 202). Defendants, however, knew the Amazon Transaction Agreement was a loss contract and that there were over $400 million in warrant costs dragging down EPS. (*See* ¶¶ 132-138).

301.    The information described in ¶ 298 was material as the Amazon Warrant Waiver required Plug Power to incur a cost to revenue so considerable that it resulted in Plug Power reporting negative revenue for FY2020, a failure that had never been endured in the Company's history. (*See* ¶¶ 202-204). This was driven by Amazon accounting for (332.4)% of the Company's total consolidated revenue for FY2020. (*See* ¶ 248). In fact, the Amazon Transaction Agreement had become so unprofitable at the time of the waiver that Plug Power would have needed to generate $1.9 billion in order to break even. (*See* ¶ 256).

### D. The January 26, 2021 False and Misleading Statements Omit Material Facts Pertaining to the Amazon Transaction Agreement

302.    On January 26, 2021, Plug Power held its 2021 Business Update conference call with investors. During the call, Defendant Marsh was specifically asked by an analyst what the exact charge would be in connection with the Amazon Warrant Waiver. In response, Defendant Marsh admitted to having "a pretty good idea" of what the figure was but omitted to provide it. (*See* ¶ 172).

303.    In the statements described in ¶ 302, Defendants knowingly or recklessly failed to disclose the following material non-public information: (a) the actual cost to revenue that Plug Power would incur in the fourth quarter of FY2020 in connection with the Amazon Warrant Waiver

(approximately $400 million) (*see* ¶¶ 132-138); (b) Plug Power was forced to waive the vesting conditions for tens of millions of Amazon Warrant Shares because the Amazon Transaction Agreement was a loss contract for the Company since it estimated that the probable future payments from Amazon for the purchase of goods and services to be $124.4 million and would need over $1.9 billion of Amazon revenue to recover the cost of the third tranche (*see* ¶¶ 246, 256); and (c) the severe financial consequences of the waiver such as reporting negative revenue for FY2020 and dragging down earnings (*see* ¶¶ 132-138; ¶¶ 202-204).

304.    Defendant Marsh had a duty to disclose this material and non-public information during the 2021 Business Update as Defendant Marsh traded on the information on January 19, 2021. (*See* ¶¶ 357-361).

305.    The information described in ¶ 303 was material as the Amazon Warrant Waiver required Plug Power to incur a cost to revenue so considerable that it resulted in Plug Power reporting negative revenue for FY2020, a failure that had never been endured in the Company's history. (*See* ¶¶ 202-204). This was driven by Amazon accounting for (332.4)% of the Company's total consolidated revenue for FY2020. (*See* ¶ 248). In fact, the Amazon Transaction Agreement had become so unprofitable at the time of the waiver that Plug Power would have needed to generate $1.9 billion in order to break even. (*See* ¶ 256).

### E.  The January 28, 2021 False and Misleading Statements

#### a.  Misleading Statements Omitting Material Facts Pertaining to the Amazon Transaction Agreement

306.    On January 28, 2021, Plug Power filed the January Prospectus with the SEC. The January Prospectus was filed in connection with the Company's Shelf Registration Statement, which was signed by the Individual Defendants.

307.    In the January Prospectus, Defendants knowingly or recklessly omitted the following material non-public information: (a) the actual cost to revenue that Plug Power would incur in the fourth quarter of FY2020 in connection with the Amazon Warrant Waiver (approximately $400 million) (*see* ¶¶ 132-138); (b) Plug Power was forced to waive the vesting conditions for tens of millions of Amazon Warrant Shares because the Amazon Transaction Agreement was a loss contract for the Company since it estimated that the probable future payments from Amazon for the purchase of goods and services to be $124.4 million and would need over $1.9 billion of Amazon revenue to recover the cost of the third tranche (*see* ¶¶ 246, 256); and (c) the severe financial consequences of the waiver such as reporting negative revenue for FY2020 and dragging down earnings (*see* ¶¶ 132-138; ¶¶ 202-204).

308.    Pursuant to Item 303 of Regulation S–K, Defendants had a duty to disclose the omitted material information in the January Prospectus in order to "[d]escribe any known trends or uncertainties ... that the registrant reasonably expects will have a material ... unfavorable impact on ... revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii).

309.    The information described in ¶ 307 was material as the Amazon Warrant Waiver required Plug Power to incur a cost to revenue so considerable that it resulted in Plug Power reporting negative revenue for FY2020, a failure that had never been endured in the Company's history. (*See* ¶¶ 202-204). This was driven by Amazon accounting for (332.4)% of the Company's total consolidated revenue for FY2020. (*See* ¶ 248). In fact, the Amazon Transaction Agreement had become so unprofitable at the time of the waiver that Plug Power would have needed to generate $1.9 billion in order to break even. (*See* ¶ 256).

310.    Additionally, in the January Prospectus's risks section, Defendants revealed the existence of the December 16, 2020 SEC Letter. The January Prospectus stated that the SEC raised

a number of accounting issues in connection with the Company's 2019 Form 10-K. Defendants, however, knowingly omitted the material non-public information that the SEC also raised a host of concerns about Plug Power's misrepresentation of its financial condition and application of inappropriate non-GAAP metrics in its 3Q2020 Letter to Shareholders which were unresolved. (*See* ¶¶ 120-123; ¶¶ 185-186).

311.    Defendant Middleton had a duty to disclose this material and non-public information in the **January Prospectus** as Defendant Middleton traded on the information on December 24, 2020.  (*See* ¶¶ 350-356).

312.    The information described in ¶ 310 was material as the existence and status of SEC unresolved comments are important insights to investors valuing public companies.  This is the case here where the SEC comments revealed that Plug Power's 3Q2020 Letter to Shareholders was blatantly deceiving as it misrepresented the Company's dismal financial condition and ultimately resulted in Plug Power ceasing to report adjusted EBITDA and Gross Billings—two metrics that the Company relied upon to prop up its growth for years.

### b.  False and Misleading Statements Pertaining to the Accounting Fraud

313.    In the January Prospectus, the Defendants disclosed, in relevant part, a summary of selected consolidated financial data as well as incorporated by reference financial data from the 2019 Form 10-K and the Quarterly Reports on Form 10-Q for the first three quarters of FY2020. This included financial data for the fiscal years of 2017, 2018 and 2019 as well as unaudited financial data for the nine months ended September 30, 2020.

314.    The January Prospectus **falsely** stated that for FY2017, the Company netted a gross (loss) profit of ($28.09) million and incurred $28.69 million in **research and development** expenses.

315.    The January Prospectus falsely stated that for FY2018, the Company netted a gross profit of $2.62 million and incurred $27.71 million in costs related to fuel delivered to customers and $33.91 million in research and development expenses.

316.    The January Prospectus falsely stated that for FY2019, the Company netted a gross profit of $27.97 million and incurred $36.36 million in costs related to fuel delivered to customers and $33.68 million in research and development expenses.

317.    The January Prospectus falsely stated that for the nine months ended September 30, 2020, the Company netted a gross (loss) profit and operating (loss) income of ($.69) million and ($79.77) million, respectively, and incurred $4.31 million in costs related to provision for loss contracts related to service, $32.27 million in costs related to fuel delivered to customers, and $32.13 million in research and development expenses.

318.    The financial metrics represented in ¶¶ 314-317 were materially false and misleading when made because Defendants knew or recklessly disregarded that (a) material amounts of the Company's fuel delivery costs were being reported as research and development expenses in violation of the Company's accounting policy and thereby inflating reported gross profits and (b) booking fuel delivery costs as research and development expenses allowed the Company to understate the loss accrual related to its extended maintenance contracts thereby inflating reported gross profits and operating income. (*See* ¶¶ 342-345, 362-384; ¶¶ 228-239). The Company later admitted the financial metrics in ¶¶ 314-317 were materially false when restating these metrics.  (*See* ¶¶ 228-239).

**F.  The February 8, 2021 Misleading Statements Omitting Material Facts Pertaining to the Amazon Transaction Agreement**

319.    On February 8, 2021, Plug Power filed the February Prospectus with the SEC.  The February Prospectus was filed in connection with the Company's Shelf Registration Statement, which was signed by the Individual Defendants.

320.    In the February Prospectus, Defendants knowingly or recklessly omitted the following material non-public information: (a) the actual cost to revenue that Plug Power would incur in the fourth quarter of FY2020 in connection with the Amazon Warrant Waiver (approximately $400 million) (*see* ¶¶ 132-138); (b) Plug Power was forced to waive the vesting conditions for tens of millions of Amazon Warrant Shares because the Amazon Transaction Agreement was a loss contract for the Company since it estimated that the probable future payments from Amazon for the purchase of goods and services to be $124.4 million and would need over $1.9 billion of Amazon revenue to recover the cost of the third tranche (*see* ¶¶ 246, 256); and (c) the severe financial consequences of the waiver such as reporting negative revenue for FY2020 and dragging down earnings (*see* ¶¶ 132-138; ¶¶ 202-204).

321.    Pursuant to Item 303 of Regulation S–K, Defendants had a duty to disclose the omitted material information in the February Prospectus in order to "[d]escribe any known trends or uncertainties ... that the registrant reasonably expects will have a material ... unfavorable impact on ... revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).

322.    The information described in ¶ 320 was material as the Amazon Warrant Waiver required Plug Power to incur a cost to revenue so considerable that it resulted in Plug Power reporting negative revenue for FY2020, a failure that had never been endured in the Company's history.  (*See* ¶¶ 202-204).  This was driven by Amazon accounting for (332.4)% of the Company's total consolidated revenue for FY2020.  (*See* ¶ 248).  In fact, the Amazon Transaction Agreement

had become so unprofitable at the time of the waiver that Plug Power would have needed to generate $1.9 billion in order to break even.  (*See* ¶ 256).

### G.  The February 25, 2021 False Statements of Material Facts

323.    On February 25, 2021, Plug Power disseminated its 4Q2020 Letter to Shareholders, which was signed by the Individual Defendants, posted on Plug Power's website, and attached to a Current Report on Form 8-K filed with the SEC on that same day.  Therein, the 4Q2020 Letter to Shareholders falsely stated that the Company's research and development expenses were $18.89 million and $51.02 million for the fourth quarter of FY2020 and the entirety of FY2020, respectively.

324.    The 4Q2020 Letter to Shareholders falsely stated that the Company's provision for loss contracts related to service was $0.7 million and $5.01 million for this cost of revenue for the fourth quarter of FY2020 and the entirety of FY2020, respectively.

325.    The 4Q2020 Letter to Shareholders falsely stated that the Company's fuel delivered to customers was $18.46 million and $50.73 million for this cost of revenue for the fourth quarter of FY2020 and the entirety of FY2020, respectively.

326.    The 4Q2020 Letter to Shareholders falsely stated that the Company incurred a gross (loss) profit of ($422.69) million and ($423.34) million for the fourth quarter of FY2020 and the entirety of FY2020, respectively.

327.    The 4Q2020 Letter to Shareholders falsely stated that the Company incurred an operating (loss) income of ($470.5) million and ($550.26) million for the fourth quarter of FY2020 and the entirety of FY2020, respectively.

328.    The financial metrics represented in ¶¶ 324-327 were materially false and misleading when made because Defendants knew or recklessly disregarded (a) the accounting issues raised in Plug Power's Audit Committee meetings between February 23-24, 2021 yet moved

forward with reporting its earnings, (b) material amounts of the Company's fuel delivery costs were being reported as research and development expenses in violation of the Company's accounting policy and thereby inflating reported gross profits, and (c) booking fuel delivery costs as research and development expenses allowed the Company to understate the loss accrual related to its extended maintenance contracts thereby inflating reported gross profits and operating income. (*See* ¶¶ 342-345, 362-384; ¶ 243). The Company's later filed 2020 Form 10-K also revealed that the financial metrics in ¶¶ 324-327 were materially false when restating these metrics. (*See* ¶ 243). Several of the issues that were presented to the Audit Committee between February 23-24, 2021 later proved to be the very same issues which resulted in the Company delaying the filing of its 2020 Form 10-K and ultimately restating its Previously Issued Financial Statements. (*See* ¶¶ 197-201; ¶¶ 212, 229).

## VI.    THE TRUTH EMERGES

329.    The first disclosure to investors that Defendants issued materially false and misleading statements was on February 25, 2021, before the market opening, when Plug Power reported its earnings for the fourth quarter and full year FY2020 financial results in a letter to shareholders. The 4Q2020 Letter to Shareholders reported that due to "costs of $456 million recorded in the fourth quarter, the majority being non-cash charges related to the accelerated vesting of a customer's remaining warrants", the Company garnered **negative** $316.3 million in revenue for the quarter and **negative** $100.5 million in revenue for the year. The Company sustained approximately **$412.7 million in charges of provision to common stock warrants**. These charges resulted in Plug Power reporting an EPS loss of negative $1.12.

330.    While Plug Power did not explicitly name the customer, it was evident that most, if not all, of the $412.7 million in charges of provision to common stock warrants stemmed from the Amazon Warrant Waiver in light of the filing of the Amazon Warrant Waiver Form 8-K on January

5, 2021 and the Company had disclosed no such waiver in connection with the Walmart Transaction Agreement or any other customer during the fourth quarter of FY2020.

331.    As a result of the 4Q2020 Letter to Shareholders revealing the omitted information concerning the Amazon Warrant Waiver and its disastrous effect on the Company's financial results, the price of Plug Power's stock fell $6.82 per share to close at $43.34 per share on February 25, 2021, a decline of approximately 13.6%, thereby causing damages to investors.

332.    The second disclosure was on March 2, 2021, before the market opened, when Plug Power filed a Notification of Late Filing with the SEC stating that it could not timely file its 2020 Form 10-K because the Company was completing a "review and assessment of the treatment **of certain costs with regards to classification between research and development versus costs of goods sold**, the recoverability of right of use assets associated with certain leases, and certain internal controls over these and other areas." (Emphasis added).  The Company stated that "[i]t is possible that one or more of these items may result in charges or adjustments to current and/or prior period financial statements" and expected "significant changes" from its previous financial reporting for the fourth quarter of FY2020 and full year FY2019.  Specifically, the Company stated:

> For the year ended December 31, 2020, Plug Power Inc. (the "Company") became a large accelerated filer for the first time and, as a result, the Company has a shortened filing deadline of 60 days rather than 75 days to file its Annual Report on Form 10-K for the year ended December 31, 2020 (the "Form 10-K"). The Company requires additional time to complete the procedures relating to its year end reporting process, including the completion of the Company's financial statements and procedures relating to management's assessment of the effectiveness of internal controls, and the Company is therefore unable to file the Form 10-K by March 1, 2021, the prescribed filing due date. ***The Company is working diligently to complete the necessary work, including review and assessment of the treatment of certain costs with regards to classification between Research and Development versus Costs of Goods Sold, the recoverability of right of use assets associated with certain leases, and certain internal controls over these and other areas. It is possible that one or more of these items may result in***

*charges or adjustments to current and/or prior period financial statements.* The Company is still evaluating whether any such charges or adjustments would be required and, if required, whether any such charges or adjustments would be material; but any charges, if required, would be non-cash in nature and any such adjustments or charges would not impact the Company's guidance on forward projections. The Company expects to file the Form 10-K within the extension period provided under Rule 12b-25 under the Securities Exchange Act of 1934, as amended.

…

*The Company expects that the fourth quarter and full year 2020 result of operations to be included in the Form 10-K will reflect significant changes from the fourth quarter and full year 2019.*

(Emphasis added.)

333.    On this news, the Company's stock price fell $3.68, or 7%, to close at $48.78 per share on March 2, 2021, on unusually heavy trading volume.

334.    The final curative disclosure was after the close of trading on March 16, 2021, when Plug Power issued a press release announcing that the Company needed to restate its prior financial results for FY2018 and FY2019 and quarterly filings for 2019 and 2020 ("Previously Issued Financial Statements").  Specifically, the Company stated:

In consultation with KPMG LLP [("KPMG")], the Company's independent registered public accounting firm, management and the Audit Committee of Plug Power's Board of Directors determined that the Company's Prior Period Financial Statements need to be restated due to errors in accounting primarily related to several non-cash items, including:

- The reported book value of right of use assets and related finance obligations;
- *Loss accruals for certain service contracts*;
- The impairment of certain long-lived assets; and
- *The classification of certain costs, resulting in decrease in research and development expense and a corresponding increase in cost of revenue.*

….

(Emphasis added).

335.    The press release added that the Company would not be able to file its 2020 Form

10-K by the March 16, 2021 deadline but was endeavoring to finalize the restatement of the Previously Issued Financial Statements and file its 2020 Form 10-K as soon as possible.

336.    On the same day, Plug Power filed with the SEC a Current Report on Form 8-K which stated that the Company's Previously Issued Financial Statements could not be relied upon and that the Company expected to revise the accounting for the Previously Issued Financial Statements and disclose in its 2020 Form 10-K a material weakness in its internal controls over financial reporting.  Specifically, the Form 8-K stated:

> **Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**
>
> (a) On March 12, 2021, management and the Audit Committee of the Board of Directors (the "Audit Committee") of the Company, in consultation with KPMG LLP ("KPMG"), the Company's independent registered public accounting firm, determined that the Company's previously issued financial statements as of and for the years ended December 31, 2019 and 2018, and as of and for each of the quarterly periods ended March 31, 2020 and 2019, June 30, 2020 and 2019, and September 30, 2020 and 2019 (collectively, the "Prior Period Financial Statements"), should no longer be relied upon due to errors in accounting primarily relating to (i) the reported book value of right of use assets and related finance obligations ("ROU Accounting"), (ii) loss accruals for certain service contracts, (iii) the impairment of certain long-lived assets, and (iv) the classification of certain expenses previously included in research and development costs ((i) through (iv) collectively, the "Restatement Items"). In addition, the fourth quarter and full year 2020 financial results and related discussion included in the Company's shareholder letter furnished on the Form 8-K filed by the Company on February 25, 2021 should no longer be relied upon.
>
> The Company and the Audit Committee have determined that these accounting changes will require a restatement of the Prior Period Financial Statements.
>
> The revised accounting for the Restatement Items will change how the Company accounts for certain transactions and items, but the revised accounting is not expected to impact cash and cash equivalents or the economics of the Company's existing or future commercial arrangements. The Company currently anticipates that the primary impact of the revised accounting on the Prior Period Financial Statements will include:
>
> • Adjustments on the balance sheets to reduce the carrying amount of certain right of use assets and finance obligations associated with leases;

• *An increase in the loss accrual relating to certain service contracts*;

• Recognition of non-cash impairment charges relating to certain long-lived assets, including certain right of use assets and certain fixed assets; and

• *A reclassification of certain costs resulting in a decrease in Operating expenses - Research and development expense and a corresponding increase in Cost of revenue.*

In addition to the above, the Company expects to correct certain less significant items in its previously issued financial statements and other financial data. The Company also expects that its Form 10-K for the year ended December 31, 2020 will disclose a material weakness in its internal controls over financial reporting arising from the Restatement Items. As such, KPMG's report on the Company's internal control over financial reporting as of December 31, 2019 should no longer be relied upon. The changes that will be recorded did not result from a change in published accounting guidance during the relevant time period or any override of controls or misconduct, and KPMG has not informed the Audit Committee of any issues related to an override of controls or misconduct.

….

The Company expects to restate its financial statements as of and for the years ended December 31, 2019 and 2018 and for each of the quarterly periods ended March 31, 2020 and 2019, June 30, 2020 and 2019, September 30, 2020 and 2019, and December 31, 2019, in its Form 10-K for the year ended December 31, 2020. The Company will not be able to file its Form 10-K for the year ended December 31, 2020 by the March 16, 2021 deadline, but it is working diligently to finalize the restated financial statements and to file its Form 10-K as soon as practicable.

(Emphasis added.)

337.    On March 17, 2021, the next trading day following Plug Power's announcement that the Company needed to restate its certain of its financial results, Plug Power common stock fell $3.35 per share, or approximately 7.8%, on unusually heavy volume.

338.    On March 31, 2021, the press widely reported that President Biden's Infrastructure plan would include subsidies for green energy companies such as Plug Power.  This news buoyed the market price of Plug Power common stock throughout the spring of 2021.  For example, an April 19, 2021 Evercore ISI report noted that "[g]reen infrastructure is a key component of the

U.S. infrastructure package (not included in our tallies) and many new cabinet secretaries have expressed commitments to climate. Not only power generated from renewable technologies such as wind and solar, and battery storage will benefit from green stimulus – other areas such as mobility, energy efficiency, and low-carbon concepts including hydrogen and carbon capture will also receive a major boost."

339. On May 14, 2021, before the market opening, Plug Power announced that the Company had completed the restatement of its Previously Issued Financial Statements and filed its 2020 Form 10-K with the SEC. The restatement was consistent with the key areas previously addressed in the Company's March 16th press release and coverage of President Biden's Infrastructure plan otherwise buoyed the stock price.

340. The restatement also revealed the true cost and cause of the Amazon Warrant Waiver. Specifically, the Company recognized a $399.7 million reduction to revenue associated with 18,085,395 of the third tranche of Amazon Warrant Shares. Plug Power further disclosed that it was forced to execute the Amazon Warrant Waiver as "the Company concluded [the $399.7 million] was not recoverable from the margins expected under probable future revenues attributable to Amazon."

341. On August 20, 2021, in a response letter to an SEC comment letter dated July 16, 2021, Defendant Middleton revealed that Defendants knew by December 31, 2020 that in order for Plug Power to have broken even in the Amazon Transaction Agreement, the Company needed to generate $1.9 billion in revenue from Amazon.

## VII.    ADDITIONAL ALLEGATIONS OF SCIENTER

342. As alleged herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company or in their own name during the Class Period were

materially false and misleading.

343.    Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding the December 16, 2020 SEC Letter, the Amazon Warrant Transaction Agreement, the Amazon Warrant Waiver, and Plug Power's accounting for certain of the Company's costs, including but not limited to the misclassification of fuel and service costs as research and development expenses instead of cost of goods sold, underestimating the loss accrual related to extended maintenance contracts, Plug Power's 3Q2020 proforma Adjusted EBITDA results, and Plug Power's profitability, their control over, or receipt or modification of Plug Power's allegedly materially misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

344.    Defendants knew or recklessly disregarded the false and misleading nature of the information that they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge or complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

345.    Defendants, because of their positions within Plug Power, made or controlled the contents of the Company's public statements during the Class Period. The Individual Defendants were provided with or had access to the information alleged herein to be false or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not be disclosed to and were being concealed from the public and that the

positive representations that were being made were materially false and misleading.  As a result, the Individual Defendants are responsible for the accuracy of Plug Power's corporate statements and are therefore responsible and liable for the representations contained therein.

### A. Plug Power's Fraud Surrounding the Amazon, Transaction Agreement, Amazon Warrant Waiver, and December 16, 2020 SEC Letter

#### a. The Fraud Impacted Plug Power's Core Operations

346.    Defendants' false and misleading statements concern critical aspects of Plug Power's core operations.  Plug Power heavily relies on its "pedestal" customers, including Amazon and Walmart to generate revenue.  For example, in 2018 and 2019, Amazon and Walmart were together 67% and 50% of the Company's revenues.

347.    On February 25, 2021, Plug Power reported its earnings for the fourth quarter and full year FY2020 financial results in a letter to shareholders.  The Company reported negative $316.3 million in revenue for the quarter and negative $100.5 million in revenue for the year.  Plug Power had never before reported negative revenue for the duration of a fiscal year in its history.

348.    The Company also reported that it sustained approximately $412.7 million in charges of provision to common stock warrants.  These charges resulted in Plug Power reporting an EPS loss of negative $1.12.

349.    Plug Power later revealed in its 2020 Form 10-K filed on May 14, 2021 that the Amazon Warrant Waiver specifically resulted in almost $400 million in costs to revenue. This was such a catastrophic cost for Plug Power that Amazon alone accounted for (332.4)% of the Company's total consolidated revenue for FY2020.

#### b. Defendant Middleton's Insider Trading While in Possession of Material Non-Public Information Triggered a Duty to Disclose

350.    On December 24, 2020, Defendant Middleton sold 216,667 shares of his personally held Plug Power stock at a price of $35.1299 per share.  This sale netted Defendant Middleton

proceeds of approximately $7.1 million. In order to effectuate this sale, Defendant Middleton exercised options that were not due to expire until 2028 and 2029.

351.    At the time of this trade, Defendant Middleton was in possession of material non-public information and knew that Plug Power's stock price did not reflect its true financial condition.

352.    As revealed in Plug Power's January 14, 2021 Response to the SEC, Defendant Middleton knew by early November of 2020 that Plug Power's Amazon Transaction Agreement was no longer sustainable and the Company could not afford the costs associated with the third tranche of the Amazon Warrant Shares. Specifically, Plug Power had forecasted $0.15 of provision for warrants per dollar of revenue vs. the $0.54 per dollar of revenue that the third tranche would require in connection with the next $400 million of prospective payments from Amazon to the Company. (*See* ¶¶ 155-161).

353.    Defendant Middleton also knew that, as a result of this, Plug Power had been engaged in discussion with Amazon since the Company's third quarter earnings release for FY2020 on November 9, 2020 and planned to waive the remaining vesting conditions for tens of millions of outstanding Amazon Warrant Shares by the end of the fourth quarter of FY2020—a waiver that would forgo approximately $400 million in prospective revenue and force Plug Power to incur hundreds of millions in revenue costs. (*See* ¶¶ 151-162; ¶¶ 132-138).

354.    Additionally, Defendant Middleton knew that the non-public SEC December 16, 2020 Letter revealed that Plug Power's 3Q2020 Letter to Shareholders was blatantly deceiving as it misrepresented the Company's financial condition and promoted misleading and inappropriate non-GAAP metrics. As a result of this letter, Defendant Middleton knew that the Company would no longer be able to tout "proforma" metrics which excluded the impact of customer warrant

charges.  Defendant Middleton also knew that the SEC would likely soon uncover that Gross Billings was nothing more than an improper non-GAAP adjusted revenue metric.  (*See* ¶¶ 120-123).

355.    Ultimately, after a series of follow up letters and responses, the December 16, 2020 SEC Letter resulted in the Company abstaining from providing adjusted EBITDA and Gross Billings—non-GAAP metrics that the Company had relied upon to prop up its purported growth for years.

356.    In light of Defendant Middleton's insider trading, Defendant Middleton breached his duty to disclose this material and non-public information.

### c.  Defendant Marsh's Insider Trading While in Possession of Material Non-Public Material Information Triggered a Duty to Disclose

357.    On January 19, 2021, Defendant Marsh sold 573,268 shares of his personally held Plug Power stock at prices ranging from $62.6504 to $68.3109 per share in a series of seven transactions.  These sales netted Defendant Marsh proceeds of approximately $36.1 million.  In order to effectuate the sale of 466,668 shares or 81% of his total shares sold on January 19, 2021, Defendant Marsh exercised options that would not expire until 2027.

358.    At the time of this trade, Defendant Marsh was in possession of material non-public information and knew that Plug Power's stock price did not reflect Plug Power's true financial condition.

359.    Specifically, Defendant Marsh had knowledge of the fair value of the vesting Amazon Warrant Shares (ranging from $10.57 to $26.95 per warrant), the actual cost to revenue that Plug Power would incur in the fourth quarter of FY2020 in connection with the Amazon Warrant Waiver (approximately $400 million), the true reason that Plug Power was forced to effectuate the waiver (the Amazon Transaction Agreement had become unprofitable for the

Company), and the harsh financial consequences of the waiver (the Company reporting negative revenue for FY2020 and dragging down earnings). In fact, in order for Plug Power to have broken even in the Amazon Transaction Agreement, the Company needed to generate $1.9 billion in revenue from Amazon. (*See* ¶¶ 132-138).

360.    Defendant Marsh had knowledge of this material non-public information by January 5, 2021—the time of the filing of the Amazon Warrant Waiver Form 8-K. Defendant Marsh was heavily involved in all critical aspects pertaining to the Amazon Transaction Agreement. Defendant Marsh signed a copy of the warrant issued to Amazon in 2017 (*see* ¶ 42), attended Board Meetings in October and November of 2020 during which the status of the Amazon Warrant Shares was discussed (*see* ¶¶ 91-94), advised the Board in November 2020 of discussions he had engaged with legal counsel, accountants, and tax consultants on the accounting treatment of the vested and unvested options (*id.*), and conducted negotiations with Amazon on waiving the remaining vesting conditions for the Amazon Warrant Shares (*id.*).

361.    In light of Defendant Marsh's insider trading, Defendant Marsh breached his duty to disclose this material non-public information.

### B. Plug Power's Accounting Fraud

#### a. The Fraud Impacted Plug Power's Core Operations

362.    Defendants' false and misleading statements concern critical aspects of Plug Power's core operations. Plug Power's business is focused on providing hydrogen fuel cells and fuel to its customers.

363.    On March 16, 2021, Plug Power announced that it needed to restate certain of the Company's financial statements due to accounting misclassifications, including the misclassification of cost of goods sold as research and development expenses.

364.    Analysts from Barclays noted the importance of Plug Power's adjustments to

research and development expenses. In a March 18, 2021 report, Barclays surmised that these misclassifications occurred because "management wanted to show higher margins on the **core hardware, the fuel cells.**" (Emphasis added).

365.   The classification of fuel delivery as a research and development expense had no explanation but for fraud or severe recklessness. In other words, the costs that were reclassified from R&D to cost of fuel delivered were so obviously unrelated to R&D that it was reckless to categorize those costs as R&D.

366.   On May 16, 2021, after the announcement of the results of Plug Power's restatement, an analyst from Barclays was perplexed by the adjustments to research and development expenses caused by the misclassification of hydrogen fuel, the bedrock of Plug Power's business, stating "[t]he reclassification of R&D to fuel COGS surprised us, as it's unclear how fuel could've ended up erroneously in R&D."

367.   In the same May 16, 2021 report, Barclays analysts noted that due to the revisions they cannot render positive EBITDA for 2020 or 2021, no matter the add-backs attempted by the Company. Additionally, Barclays noted that they had "pointed to strong gross margins…as indicators of PLUG's R&D efforts paying off, specifically fuel cells" however, "[t]his proved untrue" and put Plug Power's long-term profitability goals at risk.

### b.   Enticing the Monumental Deal with SK Group Provided Defendants with Motive and Opportunity to Engage in Fraud

368.   Defendants were motivated to falsely inflate Plug Power's gross margins to create the appearance that the Company's growth trajectory was positive. This illusion of progressive growth increased Plug Power's stock price and attracted a needed $1.5 billion investment from SK Group. Plug Power's misleading margins increased the stock price, attracted this crucial investment, and allowed Defendants to profit in the weeks following the SK Group deal through

considerable insider sales and a historic secondary offering at inflated prices.

369.    On January 6, 2021, Plug Power and SK Group, the largest energy provider in South Korea, announced their intention to enter a joint venture.  As part of this new partnership, SK Group agreed to make a $1.5 billion strategic investment in Plug Power.  The companies' stressed that Plug Power's proven ability to scale its business was integral to the deal as the South Korean government had been seeking a partner to meet the country's ambitious green energy goals for 2040.

370.    In an interview with the Korea Herald on January 7, 2021, SK Group further emphasized Plug Power's substantial growth in recent years and its role as the exclusive supplier of hydrogen forklifts to Amazon and Walmart in choosing the Company as its partner.  It was further reported that SK Group's aggressive investment was "expected to support the Korean government's ambitious hydrogen goals."

371.    The "proven" scalability and growth of Plug Power's operations, however, was based on Defendants' materially overstated margins published in the Company's financial statements.  Between FY2016 and the third quarter of FY2020, the Company represented that it maintained relatively steady margins for its services performed on fuel cell systems and related infrastructure and fuel delivered to customers.  In reality, Plug Power's margin losses for fuel delivery and fuel cell maintenance were actually two to four times worse than originally reported and at times over 100% negative.  Furthermore, Plug Power was no longer profiting from its business dealings with Amazon for which years of future Amazon revenue would be offset by warrant charges.  In other words, Plug Power was not scaling efficiently and the critical reason for SK Group's decision to partner with and invest in Plug Power was based on the materially false statements.

372.     After Defendants' false statements induced the SK Group deal, Plug Power's stock price jumped 35%.  Within two weeks, Plug Power's stock increased by almost 90%.

373.     On cue, Defendant Marsh then sold the Company's inflated stock by executing unusual trades on January 19, 2021 and selling 43% of his vested holdings to net $36.1 million.  A week later, Plug Power announced that it was commencing a secondary public offering of its common stock.  Ultimately, this secondary offering netted the Company proceeds in excess of $2 billion, representing the largest bought deal in the cleantech sector the most lucrative capital raise in the Company's 24-year history.

### c.    Defendants' Insider Stock Sales Are Indicative of Scienter

374.     Individual Defendants Marsh and Middleton both sold Plug Power stock during the Class Period to take advantage of Plug Power's artificially inflated stock price.

375.     On December 24, 2020, Defendant Middleton sold 216,667 shares of his personal held Plug Power stock for $35.1299 per share.  This sale netted Defendant Middleton proceeds of approximately $7.1 million.

376.     Defendant Middleton's base salary in 2020 was $387,188.  Accordingly, the $7.1 million generated by this sale were material.

377.     Defendant Middleton's sale was suspicious in timing.  Defendant Middleton's December 24, 2020 sale was made pursuant to a 10b5-1 trading plan that was established just three months earlier in September 2020.  The sale was also suspicious because to effectuate the sale, Defendant Middleton exercised options that were not due to expire until 2028 and 2029 – eight to nine years before their expiration.  Defendant Middleton's decision to exercise his options eight to nine years before their expiration further shows that he knew Plug Power's stock price was did not reflect Plug Power's true financial condition.

378.     On January 19, 2021, Defendant Marsh sold 573,268 shares of his personally held

Plug Power stock at prices ranging from $62.6504 to $68.3109 per share in a series of seven transactions. Defendant Marsh's sale was purportedly made pursuant to a Rule 10b5-1 trading plan that was instituted on December 2, 2020. These sales—which reduced Defendant Marsh's vested holdings by 43% from 1.322 million shares to 748,680 shares—netted Defendant Marsh proceeds of approximately $36.1 million. In order to effectuate the sale of 466,668 shares or 81% of his total shares sold on January 19, 2021, Defendant Marsh exercised options that would not expire until 2027. Defendant Marsh's decision to exercise his options seven years before their expiration further shows that he knew Plug Power's stock price did not reflect Plug Power's true financial condition.

379.    Defendant Marsh's actions indicate that he was likely aware that KPMG had identified Plug Power's accounting scheme prior to selling his stock.

380.    Additionally, as Defendant Marsh's salary for 2020 was $676,442, his gain of approximately $9.8 million by selling prior to the announcement of a potential restatement was material.

381.    The timing and quantity of the stock sales by Defendant Marsh were also unusual. Defendant Marsh's sale of 573,268 shares of Plug Power stock occurred at or near the Company's 52-week high stock price and reduced his vested holdings in the Company by 43%.

382.    Similar to Defendant Middleton, Defendant Marsh exercised options that would not expire until 2027 to sell 466,668 shares or 81% of his total shares sold on January 19, 2021. By exercising options approximately six years early, especially after Plug Power's stock had increased more than 1500% in the prior 12 months, Defendant Marsh had reason to believe that Plug Power's stock price was worth more at the time than it would be in the future.

383.    Defendant Marsh's January 19, 2021 sale was also made pursuant to a 10b5-1 plan

that was established on December 2, 2020.

384.    Accordingly, the fact that the Individual Defendants profited substantially from Plug Power's inflated stock price shows that they acted with scienter.

### d. At the latest, Defendants Knew or Should Have Been Aware of the Accounting Errors by February 24, 2021

385.    Between February 23-24, 2021, Plug Power's Board of Directors convened in anticipation of the Company reporting earnings for the fourth quarter of FY2020 and full year. Defendant Middleton provided the Board with an update on the Company's FY2020 financials and made a presentation on the financial results for the fourth quarter of FY2020, including revenue, gross margin, and operating cash flow updates.  Defendant Middleton also advised the Board that the KPMG year end audit was progressing and that it would be finalized in the next several days with the Form 10-K to be filed on Monday, March 1, 2021.  Defendant Middleton finally noted that the Audit Committee would be meeting later in the afternoon with KPMG to discuss the 2020 audit and the Form 10-K.

386.    Plug Power's Audit Committee convened between February 23-24, 2021 and reviewed a "Disclosure Committee Overview" which had been created during the meeting of the Disclosure Committee on February 17, 2021, the week prior.  The purpose of the overview was purportedly "to ensure management has assessed the completeness and accuracy of financial statements and disclosures."  "Key matters" identified in the overview included risk factors and significant disclosures and transactions, among other things.

387.    The Audit Committee also reviewed the audit results for FY2020, which contained a risk assessment of significant risks of fraud.  These risks included: (i) revenue recognition; and (ii) management override of controls.

388.    The 2020 audit results also contained a slide which explicitly noted the required

correction of a series of financial misstatements related to, among other things: (i) recognition of revenue from sale-leasebacks; (ii) incorrect costs of goods sold metrics; and (iii) misapplication of fuel delivery costs and research and development expenses:

389.    Despite these issues being raised in Plug Power's Audit Committee meeting by February 24, 2021, Defendants nevertheless moved forward with reporting its earnings for the fourth quarter and full year for FY2020 the next day.  Several of the issues that had been raised before the filing were the very same issues which resulted in the Company delaying the filing of its 2020 Form 10-K and ultimately restating its Previously Issued Financial Statements.

### e.  Defendants' SOX Certifications Are Indicative of Scienter

390.    Defendants also represented to investors in the 3Q2020 Form 10-Q that Plug Power's financial statements were adequate and that they were complying with their obligations under the Sarbanes-Oxley Act ("SOX").  Defendants made these representations notwithstanding the fact that they knew that Plug Power was not properly accounting for the Company's research and development expenses.

391.    For example, Defendants represented that "the financial statements and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

392.    The fact that the Defendants reviewed Plug Power's financial reports is highly indicative that they reviewed the relevant accounting standards at issue but purposefully ignored them.

393.    Accordingly, Defendants' disclosure that they regularly reviewed Plug Power's financial statements yet needed to restate the Company's financial statements due to accounting misclassifications indicates that Defendants acted with scienter.

## VIII.   LOSS CAUSATION/ECONOMIC LOSS

394.    During the Class Period, as detailed herein, Plug Power's common stock was artificially inflated due to Defendants' false and misleading public statements.  When Defendants' prior misrepresentations were disclosed and became apparent to the market, the price of Plug Power common stock fell as the prior artificial inflation came out.

395.    As a result of their purchases of Plug Power common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

396.    The declines in the price of Plug Power's common stock after the corrective disclosures on February 25, 2021, March 2, 2021, and March 16, 2021 were a direct result of Defendants' misrepresentations and omissions being revealed to the market.

397.    The corrective disclosure on February 25, 2021, revealed before the market opened the material omissions concerning the Amazon Warrant Waiver.

398.    Over the course of that day, the price of Plug Power's stock fell $6.82 per share to close at $43.34 per share on February 25, 2021, a decline of approximately 13.6%.

399.    The corrective disclosure on March 2, 2021, revealed that Plug Power would not be timely filing its 2020 Form 10-K because the Company was completing a "review and assessment of the treatment of certain costs with regards to classification between research and development versus Costs of Goods Sold, the recoverability of right of use assets associated with certain leases, and certain internal controls over these and other areas."  The Company stated that "[i]t is possible that one or more of these items may result in charges or adjustments to current and/or prior period financial statements."

400.    After the adverse March 2, 2021 announcement, the Company's stock price fell $3.68, or 7%, to close at $48.78 per share on March 2, 2021.

401.    After the March 2, 2021 partial disclosure, Plug Power common stock remained artificially inflated because Defendants did not fully reveal the extent of the Company's restatement. Specifically, Plug Power concealed that the upcoming restatement impacted not only the Company's FY2019 and certain of its FY2020 financial statements, but also its FY2018 financial statements. Plug Power also concealed the material negative impact the restatements had on the Company's profitability.

402.    The corrective disclosure on March 16, 2021, revealed that Plug Power's Previously Issued Financial Statements for FY2018 and FY2019 and its quarterly filings for 2019 and 2020 needed to be restated primarily for reclassification of research and development expenses, increasing cost of revenue, and underestimating loss accruals for certain service contracts. The corrective disclosure further divulged that the Company's Previously Issued Financial Statements could not be relied upon and that the Company expected to describe in its 2020 Form 10-K a material weakness in its internal controls over financial reporting.

403.    On March 17, 2021, the next trading day following Plug Power's announcement that the Company needed to restate its financial results, Plug Power common stock fell $3.35 per share, or approximately 7.8%, on unusually heavy volume.

404.    The dramatic decline in the price of Plug Power securities after the corrective disclosures on February 25, 2021, March 2, 2021, and March 16, 2021 were direct results of Defendants' misrepresentations and omissions being revealed to investors and the market.

405.    During the Class Period, the Plug Power common stock traded as high as $75.49 per share, and it traded at $50.16 just prior to the February 25th disclosure. Over the next few months, as the truth continued to emerge, Plug Power's stock price dropped to $21.96 on May 13, 2021, a decline of over 56% since February 25, 2021.

406.    The adverse consequences of the Company's disclosures, including the decline in Plug Power's stock price, and the adverse impact of those circumstances on the Company's business going forward, were entirely foreseeable to Defendants at all relevant times.  Defendants' conduct, as alleged herein, proximately caused foreseeable losses and damages to Lead Plaintiff and members of the Class.

407.    The timing and magnitude of the price decline in Plug Power' stock price negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' statements.  As set forth above, the Company's failure to disclose critical aspects concerning the third tranche of the Amazon Warrant Shares, Amazon Warrant Waiver and maintaining effective controls over its financial reporting and the associated accounting misclassifications were not only material but also triggered foreseeable and grave consequences for the Company.

408.    Thus, the economic loss, *i.e.*, damages suffered by Lead Plaintiff and the other Class members, was a direct, foreseeable, and proximate result of the fraudulent scheme being revealed to investors and to the market.

409.    The market's reaction following Plug Power's false and misleading statements also shows that investors were misled by the Company's misstatements.

410.    On November 9, 2020, following the disclosure of Company's materially misleading 3Q2020 financial results and material omissions, Plug Power common stock increased $1.45, or 7.6% to close at $20.31 on November 7, 2020.

411.    On November 18, 2020, following the filing of Company's November Prospectus containing materially misleading financial information and material omissions, Plug Power

common stock increased $0.24 to close at $23.33 on November 18, 2020.

412.    On January 5, 2021, following the disclosure of the Company's materially misleading Amazon Warrant Waiver Form 8-K, Plug Power common stock increased $1.76, or 5.7% to close at $32.55 on January 5, 2021.

413.    On January 26, 2021, following the conclusion of the materially misleading 2021 Business Update conference call, Plug Power common stock increased $5.54, or 8.2% to close at $73.18 on January 26, 2021.

414.    On January 28, 2021, following the filing of the Company's January Prospectus containing materially misleading financial information and management discussion and analysis, Plug Power common stock increased $0.86 to close at $65.28 on January 28, 2021.

415.    On February 8, 2021, following the filing of the Company's materially misleading February Prospectus and management discussion and analysis, Plug Power common stock increased $.08 to close at $66.18 on February 8, 2021.

416.    On February 25, 2021, following the disclosure of the Company's materially misleading 4Q2020 and FY2020 financial results, Plug Power stock dropped $6.84 to close at $43.34, buoyed from a steeper decline by Defendants' false and misleading statements to the market.

## IX.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

417.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this Complaint.  The statements alleged to be false and misleading all relate to historical facts of existing conditions and were not identified as forward-looking statements.  To the extent any of the false statements alleged herein may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made and were not accompanied by

meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly "forward-looking" statements. Alternatively, to the extent that the statutory safe harbor would otherwise apply to any statement pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the speaker knew the statement was false or the statement was unauthorized or approved by an executive officer of Plug Power who knew that those statements were false.

## X.    PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

418.    Lead Plaintiff is entitled to a presumption of reliance on Defendants' misrepresentations of material facts and omissions pursuant to the fraud-on-the-market doctrine.

419.    At all relevant times, the market for Plug Power's common stock was an efficient market for the following reasons, among others:

(a)    Plug Power met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient market;

(b)    As a regulated issuer, Plug Power filed periodic public reports with the SEC;

(c)    Plug Power regularly communicated with public investors via means of established market communication mechanisms, including through regular dissemination of press releases on the nation's newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(d)    Plug Power was followed by numerous securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. These reports were publicly available and entered the public marketplace; and

(e)      the market for Plug Power securities promptly digested current information

regarding Plug Power from all publicly available sources and reflected such information

in Plug Power's share price.

420.    All purchasers of Plug Power common stock during the Class Period relied on the

same information disseminated by Defendants as reflected in the market price of Plug Power

common stock and suffered similar injury through their purchases at artificially inflated prices.

## XI.    CLASS ACTION ALLEGATIONS

421.    Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3)

of the Federal Rules of Civil Procedure on behalf of all persons and entities that purchased Plug

Power common stock on the open market of a U.S. stock exchange during the Class Period,

November 9, 2020 through March 16, 2021, inclusive, and were damaged thereby.  Excluded from

the Class are (a) Defendants; (b) members of the immediate family of each Individual Defendant;

(c) any person who was an officer or director of the Company, at all relevant times; (d) any firm,

trust, corporation, officer, or other entity in which any Defendant has or had a controlling interest;

(e) any person who participated in the wrongdoing alleged herein; and (f) the legal representatives,

heirs, agents, affiliates, beneficiaries, successors-in-interest, or assigns of any such excluded party.

422.    The members of the Class are so numerous that joinder of all members is

impracticable.  The disposition of their claims in a class action will provide substantial benefits to

the parties and the Court.  Throughout the Class Period, Plug Power's common shares were

actively traded on the NASDAQ.  While the exact number of Class members is unknown to Lead

Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff

believes that there are at least hundreds or thousands of members in the proposed Class.  Thousands

of shares of Plug Power's common stock were traded publicly during the Class Period on the

NASDAQ.  Record owners and other members of the Class may be identified from records

maintained by Plug Power or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

423.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

424.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests that conflict with those of the Class.

425.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include: (1) whether Defendants violated the Exchange Act; (2) whether Defendants issued false or misleading statements; and (3) the extent to which members of the Class have sustained damages.

426.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.

427.    There will be no difficulty in the management of this action as a class action.

## COUNT I

**FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE
10b-5 PROMULGATED THEREUNDER
(AGAINST THE COMPANY AND INDIVIDUAL DEFENDANTS)**

428.    Lead Plaintiff repeats and re-alleges each and every allegation contained above in ¶¶ 1-427 as if fully set forth herein and further alleges as follows:

429.    This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC, on behalf of Lead Plaintiff and members of the Class against the Company and the Individual Defendants.

430.    During the Class Period, the Company and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (b) cause Lead Plaintiff and other members of the Class to purchase Plug Power common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each Individual Defendant, took the actions set forth herein.

431.    The Company and the Individual Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Plug Power's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

432.    The Company and Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Plug Power's financial well-being, operations, and prospects, as specified herein.

433.    During the Class Period, the Company and the Individual Defendants made the

false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

434.    The Company and the Individual Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  The Company and the Individual Defendants engaged in this misconduct to conceal Plug Power's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

435.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Plug Power' common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and the other members of the Class purchased Plug Power securities during the Class Period at artificially high prices and were damaged thereby.

436.    Lead Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Plug Power common stock had been artificially inflated by the Company and the Individual Defendants' fraudulent course of conduct.

437.    As a direct and proximate result of the Company's and the Individual Defendants'

wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

438.    By virtue of the foregoing, the Company and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

<u>**COUNT II**</u>

**FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT**
**(AGAINST THE INDIVIDUAL DEFENDANTS)**

439.    Lead Plaintiff repeats and re-alleges each and every allegation contained above in ¶¶ 1-427 as if fully set forth herein and further alleges as follows:

440.    This Count is asserted pursuant to Section 20(a) of the Exchange Act against the Individual Defendants on behalf of Lead Plaintiff and members of the Class.

441.    As alleged above, Plug Power is liable to Lead Plaintiff and members of the Class based on the materially false and misleading statements and omissions as set forth above, pursuant to Section 10(a) of the Exchange Act.

442.    Throughout the Class Period, the Individual Defendants were controlling persons of Plug Power within the meaning of Section 20(a) of the Exchange Act as alleged herein, and culpable participants in the fraud alleged herein.

443.    By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the Company's accounting and actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading. The Individual Defendants were provided with or had

unlimited access to copies of the Company's financial statements, letters to shareholders, reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

444.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence, the decision-making of Plug Power, including the content of its financial statements and other public statements.

445.    Given their individual and collective responsibilities for managing Plug Power throughout the Class Period, the Individual Defendants were regularly presented to the market as the individuals responsible for the Company's day-to-day business and operations, as well as its strategic direction.

446.    As set forth above, the Individual Defendants acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Lead Plaintiff and other members of the Class who purchased Plug Power common stock during the Class Period.

447.    Each of the Individual Defendants culpably participated in some meaningful sense in the fraud alleged herein.  By reason of the foregoing, and by virtue of their position as controlling persons, the Individual Defendants are liable to Lead Plaintiff and members of the Class for violations of Section 20(a) of the Exchange Act.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

(A)    Determining that this action is a proper class action and certifying Lead Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure;

(B)     Awarding damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the Exchange Act, in an amount to be proven at trial, including prejudgment interest thereon;

(C)     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(D)     Granting such other and further relief as the Court deems just and proper.

## XIII.  JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

DATED: November 21, 2022                Respectfully submitted,

**BERNSTEIN LIEBHARD LLP**

By: */s/ Michael S. Bigin*
_____

Michael S. Bigin
Stanley D. Bernstein
Adam M. Federer
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218
bigin@bernlieb.com
bernstein@bernlieb.com
afederer@bernlieb.com

*Counsel for Lead Plaintiff and Lead Counsel for the Proposed Class*

120

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2022 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List.

*/s/ Michael S. Bigin*
MICHAEL S. BIGIN