**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PLUG POWER, INC. SECURITIES LITIGATION | No. 1:21-cv-2004-ER<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**(LEAVE TO FILE MOTION TO DISMISS AND ADDITIONAL PAGES GRANTED 11/29/2022 AND 1/6/2023)** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE CONSOLIDATED SECOND AMENDED CLASS ACTION**
<u>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**</u>

Deborah S. Birnbach
Jennifer B. Luz
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel.: 617.570.1000
Fax: 617.523.1231
DBirnbach@goodwinlaw.com
JLuz@goodwinlaw.com

*Counsel for Defendants Plug Power Inc.,*
*Andrew Marsh, and Paul B. Middleton*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ................................................................................................................. 4

    A.    Plug Power Is A Rapidly Growing Market Leader In Hydrogen Fuel Cells. ........ 4

    B.    Amazon Became An Anchor Client. .................................................................... 5

    C.    Plug Power Negotiated An Agreement With Amazon To Allow It To Simplify Its Financial Reporting Because The Accounting Treatment Of The Warrant Agreement Was Complicated and Caused Confusion....................... 7

    D.    From 2018 To 2020, Plug Power Received Comment Letters From The Corporate Finance Division Of The SEC. ........................................................... 10

    E.    Plug Power Issued A Restatement Of Complex Accounting Issues In 2021................................................................................................................... 11

ARGUMENT ..................................................................................................................... 14

I.    THE SAC FAILS TO SUPPORT ANY INFERENCE OF SCIENTER, MUCH LESS THE REQUIRED STRONG INFERENCE. ........................................... 15

    A.    The SAC Still Fails To Plead Any Inference Of Scienter With Respect To The Company's Restatement. ...................................................................... 16

    B.    The SAC Does Not Plead Any Facts To Suggest Defendants Had Motive Or Opportunity To Engage In Fraud Related To The Amazon Warrant. ............ 18

    C.    Plaintiff Does Not Allege Particularized Facts That Defendants Knew Or Were Extremely Reckless In Not Disclosing The Waiver Agreement Or Q4 Revenue Charge Earlier. ............................................................................ 24

        1.    The SAC Pleads No Specific Facts That Defendants Knew Or Were Reckless In Not Knowing That A Waiver Agreement Would Be Reached With Amazon And The Amount Of The Q4 Revenue Charge. ....................................................................................... 25

        2.    The Amazon Warrant Was Not Plug Power's Core Operation And Is Not A Basis For Inferring Scienter. .................................................. 28

    D.    Under The Mandatory *Tellabs* Balancing Test, The Non-Fraudulent Inferences Far Outweigh Any Inference Of Scienter. ........................................ 29

II.    THE SAC DOES NOT ALLEGE ANY ACTIONABLE OMISSIONS WITH RESPECT TO THE AMAZON WARRANT................................................................ 31

III.    THE SAC FAILS TO PLEAD LOSS CAUSATION........................................................ 34

IV.    PLAINTIFF'S SECTION 20(A) CLAIM MUST BE DISMISSED. .............................. 35

CONCLUSION.................................................................................................................. 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acito v. IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995)............................................................................ *passim*

*Altimeo Asset Mgmt. v. WuXi PharmaTech Inc.*,
  2020 WL 6063539 (S.D.N.Y. Oct. 14, 2020) ....................................................34

*Arfa v. Mecox Lane Ltd.*,
  2012 WL 697155 (S.D.N.Y. Mar. 5, 2012) ........................................................33

*In re AstraZeneca plc Sec. Litig.*,
  2022 WL 4133258 (S.D.N.Y. Sept. 12, 2022)..............................................19, 34

*Bldg. Trades Pension Fund W. Pa. v. Insperity, Inc.*,
  2022 WL 784017 (S.D.N.Y. Mar. 15, 2022) ................................................19, 35

*In re Bristol-Myers Squibb Sec. Litig.*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004)................................................................25

*Chapman v. Mueller Water Prods., Inc.*,
  466 F. Supp. 3d 382 (S.D.N.Y. 2020)................................................................26

*City of Brockton Ret. Sys. v. Shaw Grp. Inc.*,
  540 F. Supp. 2d 464 (S.D.N.Y. 2008)................................................................30

*City of Westland Police & Fire Ret. Sys. v. Sonic Sols.*,
  2009 WL 942182 (N.D. Cal. Apr. 6, 2009) ........................................................28

*In re Coty Inc. Sec. Litig.*,
  2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ....................................................32

*In re CRM Holdings, Ltd. Sec. Litig.*,
  2012 WL 1646888 (S.D.N.Y. Mar. 29, 2019) ..............................................21, 24

*In re Diebold Nixdorf, Inc. Sec. Litig.*,
  2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ....................................................26

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)..........................................................................................34

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)........................................................................ *passim*

*Emerson v. Mut. Fund Series Tr.*,
    393 F. Supp. 3d 220 (E.D.N.Y. 2019) ...................................................34

*In re Express Scripts Holding Co. Sec. Litig.*,
    2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017) .............................................15, 28, 29

*Francisco v. Abengoa, S.A.*,
    481 F. Supp. 3d 179 (S.D.N.Y. 2020) ................................................ *passim*

*Fries v. N. Oil & Gas, Inc.*,
    285 F. Supp. 3d 706 (S.D.N.Y. 2018) ...............................................15, 29

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352 (E.D.N.Y. 2013) ...................................................34

*In re Gildan Activewear, Inc. Sec. Litig.*,
    636 F. Supp. 2d 261 (S.D.N.Y. 2009) .....................................................21

*Hensley v. IEC Elecs. Corp.*,
    2014 WL 4473373 (S.D.N.Y. Sept. 11, 2014) .....................................29, 35

*In re HEXO Corp. Sec. Litig.*,
    524 F. Supp. 3d 283 (S.D.N.Y. 2021) ...................................................33

*In re IAC/InterActiveCorp. Sec. Litig.*,
    478 F. Supp. 2d 574 (S.D.N.Y. 2007) ...................................................22

*In re Iconix Brand Grp., Inc.*,
    2017 WL 4898228 (S.D.N.Y. Oct. 25, 2017) .........................................28

*In re JP Morgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005) ...................................................26

*Jackson v. Abernathy*,
    960 F.3d 94 (2d Cir. 2020) ..................................................................14

*Johnson v. Sequans Commc'ns S.A.*,
    2013 WL 214297 (S.D.N.Y. Jan. 17, 2013) ......................................29, 33

*In re Kandi Techs. Grp., Inc. Sec. Litig.*,
    2019 WL 4918649 (S.D.N.Y. Oct. 4, 2019) ..........................................5, 29

*Koplyay v. Cirrus Logic, Inc.*,
    2013 WL 6233908 (S.D.N.Y. Dec. 2, 2013) ..........................................23

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005) ..................................................................34

-iii-

*Lipow v. Net1 UEPS Techs., Inc.*,
   131 F. Supp. 3d 144 (S.D.N.Y. 2015).................................................................25, 28, 35

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014)...............................................................................14, 21

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
   26 F. Supp. 3d 278 (S.D.N.Y. 2014)...............................................................................26, 28

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
   616 F. App'x 442 (2d Cir. 2015) .....................................................................................15

*Medis Inv. Grp. v. Medis Techs., Ltd.*,
   586 F. Supp. 2d 136 (S.D.N.Y. 2008)..............................................................................24

*Oklahoma L. Enf't Ret. Sys. v. Papa John's Int'l, Inc.*,
   517 F. Supp. 3d 196 (S.D.N.Y. 2021)...........................................................................32, 35

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)...........................................................................................................32

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010)..............................................................................................34

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*,
   153 F. Supp. 3d 628 (S.D.N.Y. 2015)............................................................................24, 32

*Pennsylvania Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
   939 F. Supp. 2d 445 (S.D.N.Y. 2013).............................................................................18, 26

*Pittman v. Chick-fil-A, Inc.*,
   2022 WL 2967586 (S.D.N.Y. July 27, 2022) ....................................................................16

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of
   Com.*, 694 F. Supp. 2d 287 (S.D.N.Y. 2010) ..................................................................35

*In re Progress Energy, Inc.*,
   371 F. Supp. 2d 548 (S.D.N.Y. 2005)..............................................................................34

*Reilly v. U.S. Phys. Therapy, Inc.*,
   2018 WL 3559089 (S.D.N.Y. July 23, 2018) ............................................................. *passim*

*In re Rockwell Med., Inc. Sec. Litig.*,
   2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) ..................................................................27

*Rubinstein v. Credit Suisse Grp. AG*,
   457 F. Supp. 3d 289 (S.D.N.Y. 2020)..............................................................................33

*Shemian v. Research in Motion Ltd.*,
  2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ........................................................28

*Shipman v. Charles Schwab & Co.*,
  2016 WL 11472831 (E.D.N.Y. Aug. 11, 2016).........................................................6

*Silsby v. Icahn*,
  17 F. Supp. 3d 348 (S.D.N.Y. 2014)......................................................................34

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010)..................................................................................15

*Stratte-McClure v. Morgan Stanley*,
  2013 WL 297954 (S.D.N.Y. Jan. 18, 2013) ...........................................................18

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007).......................................................................................15, 29

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
  2014 WL 7176187 (S.D.N.Y. Dec. 16, 2014) ........................................................27

*Tyler v. Liz Claiborne, Inc.*,
  814 F. Supp. 2d 323 (S.D.N.Y. 2011).....................................................................29

*Villare v. Abiomed, Inc.*,
  2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021)................................................ *passim*

*Vladimir v. Bioenvision Inc.*,
  606 F. Supp. 2d 473 (S.D.N.Y. 2009).....................................................................32

*Wade v. Wellpoint, Inc.*,
  740 F. Supp. 2d 994 (S.D. Ind. 2010) ....................................................................22

*Wyche v. Adv. Drainage Sys., Inc.*,
  2017 WL 971805 (S.D.N.Y. Mar. 10, 2017) ..........................................................28

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
  504 F. Supp. 3d 224 (S.D.N.Y. 2020)....................................................................35

**Statutes**

Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a).............................. *passim*

**Other Authorities**

17 C.F.R. § 229.303(a)(1).......................................................................................33

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 .............................................................. *passim*

Defendants Plug Power Inc. ("Plug Power" or the "Company"), Andrew Marsh, and Paul B. Middleton (Marsh and Middleton together, "Individual Defendants," and with the Company, "Defendants") move pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u (the "PSLRA"), to dismiss the Second Amended Class Action Complaint (the "SAC") with prejudice.

## PRELIMINARY STATEMENT

The Court granted Defendants' motion to dismiss the Amended Class Action Complaint (the "AC"), but granted leave to "plead additional facts to remedy . . . the deficiencies." Dkt. No. 95 ("MTD Opinion") at 38-39. Plaintiff still fails to plead a claim that is plausible on its face. The Court should dismiss again, this time, with prejudice.

Plug Power is a leading provider of clean hydrogen energy, operating on the forefront of the "paradigm shift in the power, energy, and transportation industries to address climate change and energy security, while providing efficiency gains and meeting sustainability goals." SAC ¶ 36. Plug Power experienced tremendous growth in 2020, growing from a $959 million market capitalization at the end of 2019 to a $15.5 billion market capitalization at the end of 2020. Ex. CC (Plug Power Market Capitalization); *see* SAC ¶ 86. During this transformative growth in a newly developing industry, the Company's accounting resources were challenged. *See* SAC ¶ 68. On February 24, 2021, prior to releasing its 2020 fourth quarter results, the Audit Committee and the Company's independent auditor KPMG LLP ("KPMG") discussed the fourth quarter results and no material issues were raised. *Id.* ¶ 211; Ex. Y (3/16/2021 Form 8-K) at 2-3. After those results were released, in the course of finalizing the audit, KPMG identified, for the first time, possible issues with the Company's application of certain complex and technical accounting principles, despite KPMG's prior years of clean audit opinions on the Company's financial statements that included the same applications of the same accounting principles. *See* Ex. Y. Plug Power promptly

disclosed the potential accounting issues, which did not result from any override of controls or misconduct. Ex. W (3/2/2021 Form NT 10-K); *see* SAC ¶ 336. Plug Power later restated its 2018, 2019, and 2020 financial results to correct for these errors in several technical accounting areas. *See* SAC ¶ 229. The restatement did not change the overall financial picture of the Company: revenue remained largely the same and the adjustments were not cash adjustments. *See id*. ¶ 226.

Following these disclosures and a drop in Plug Power's stock price, Plaintiff claims securities fraud, repeating in the SAC the allegation that Marsh (the Company's President, CEO, and a director) and Middleton (the Company's CFO) purposefully misclassified costs related to fuel delivery as R&D, so as to inflate gross profits—despite the fact that the Company has always reported net losses—so that Plug Power could secure additional financing and they could continue selling stock pursuant to routine trading plans. *See* SAC ¶¶ 362-93. But the Court already dismissed these allegations as insufficient, finding that the most plausible inference was exactly what the Company disclosed: the "errors were identified *after the Company reported its 2020 fourth quarter and year end results on February 25, 2021* during the course of the audit with respect to the Company's financial statements for the year ended December 31, 2020." *See* MTD Opinion at 31, 36. Plaintiff alleges a single new document—a KPMG Audit Committee presentation the day before the 2020 fourth quarter earnings were released, but this document actually *undermines* any inference of scienter. *See* SAC ¶¶ 385-89. KPMG reported "[n]o significant findings" related to "significant risks of fraud," consistent with the Company's public disclosures that the auditors found no suggestion of any override of controls. Ex. U (KPMG Presentation) at -1612. This single new allegation is insufficient to meet the exacting pleading requirements for scienter.

Unable to plead facts that would support his original theory of fraud, Plaintiff now offers an entirely new theory of securities fraud based on alleged material omissions related to a contract

between Plug Power and its large customer Amazon, which granted Amazon the right to purchase shares of the Company as Amazon hit $50 million payment milestones on purchases (the "Warrant Agreement"). SAC ¶¶ 346-61. The Warrant Agreement, executed in 2017, proved to be a powerful incentive and cemented Amazon as an anchor client who purchased more than $200 million of Plug Power products in fewer than three years. *See* Ex. B (2021 Form 10-K) at 51. The Warrant Agreement, however, presented yet another complicated accounting issue: the accounting guidance required that the fair value of the warrants, as of the grant date of those warrants, be deducted from the Company's reported revenue. *See* SAC ¶ 50; Ex. K (2019 Form 10-K) at 47. This noncash charge against revenue caused significant confusion with investors and analysts as to the Company's revenue trajectory. SAC ¶ 157; Ex. R (1/14/2021 Ltr. to SEC) at 8. Confident that its established relationship with Amazon would continue, in November 2020, the Company initiated discussions with Amazon to amend the Warrant Agreement to eliminate the remainder of the vesting requirements. SAC ¶ 94. Doing so would allow the Company to report *the entirety* of the fair value of the warrants in one quarter and simplify its accounting moving forward. *Id*. Unable to revise the Warrant Agreement unilaterally, Plug Power signed a "Waiver Agreement" with Amazon on December 31, 2020 and disclosed it to investors two business days later. SAC ¶ 130; Ex. Q (1/5/2021 Form 8-K) at 2. Plaintiff now nonsensically alleges fraud because the Company did not disclose the Waiver Agreement nearly two months *before* the parties ever reached agreement, and because the Company did not disclose the fourth quarter 2020 revenue charge associated with the accelerated vesting (the "Q4 Revenue Charge") sooner than when it reported its fourth quarter financial results, even though it was impossible to perform the complex accounting calculations *before* the agreement was signed and the grant dates were set.

Attempting to plead scienter related to the warrant, the SAC relies on the same routine

trading allegations and core operations theory that the Court has already found insufficient. SAC ¶¶ 346-61. Otherwise, the SAC identifies a single document to suggest that the Individual Defendants knew or were reckless in not knowing that an agreement would be reached with Amazon—a letter the Company sent to the SEC *after* the Waiver Agreement was signed—but it does no such thing. *Id.* ¶¶ 155-57. With the benefit of hindsight, the Company's letter stated that the Company was "in discussions" with Amazon in November 2020 and hoped to reach an agreement by the end of the fourth quarter. *Id.* ¶ 157. Plaintiff's fraud by hindsight theory fails here, as it did in the AC: merely because Plug Power was negotiating with Amazon, and, *after* executing the final agreement, stated that it originally had hoped the arms-length negotiations would conclude by a particular date, does not suggest that the Individual Defendants knew if and when the arms-length negotiations would be successful or on what terms. *E.g.*, MTD Opinion at 32. The SAC's extensive allegations about routine correspondence with the SEC are unrelated to Plaintiff's theory of fraud.

The SAC not only fails to plead scienter related to the Amazon Warrant, it also fails to allege a material omission as to that subject, and does not purport to allege any misstatement at all. Nor could it: the Company disclosed accurate information about the Waiver Agreement and Q4 Revenue Charge in the timeframe required by the securities laws. Finally, the SAC should be dismissed for the independent reason that it does not plead loss causation. Absent a primary violation of § 10(b)(5), the § 20(a) claim should also be dismissed, and the SAC should be dismissed with prejudice because Plaintiff should "not be given unlimited opportunities to amend [given that] he [wa]s on notice of the deficiencies in his pleadings." MTD Opinion at 38-39.

## BACKGROUND

### A.    Plug Power Is A Rapidly Growing Market Leader In Hydrogen Fuel Cells.

Plug Power is a market leader in the "paradigm shift[ing]" clean energy industry and the

-4-

leading provider of comprehensive hydrogen fuel cell turnkey solutions. SAC ¶¶ 5, 36; Ex. B at 7.[1] Plug Power's technology enables customers to operate in a more efficient and environmentally sustainable manner. SAC ¶¶ 36-37; Ex. B at 7-8. Its innovative technology involves combining hydrogen and oxygen to produce electricity used to power forklifts and other vehicles of customers such as Amazon, The Home Depot, BMW, Carrefour, and Walmart. SAC ¶¶ 5, 37; Ex. A (2020 Form 10-K/A) at 10. Plug Power sells these customers fuel cells and can install hydrogen fueling infrastructure onsite, for example, at an Amazon warehouse. SAC ¶ 37; Ex. B at 43. The Company has deployed more fuel cell systems than anyone else in the world, and is the largest purchaser of liquid hydrogen, having built and operated a hydrogen highway across North America. SAC ¶¶ 5, 35-36; *see* Ex. B at 6-7. Plug Power's growth has been fast and exponential. *E.g.*, SAC ¶ 86. This growth is reflected in Plug Power's financials: its net revenue increased by orders of magnitude from $82.8 million in 2016 to $230.0 million in 2019—a more than 275% increase in net revenue over a three-year period. Ex. A at 38. The Company's market capitalization alone increased seventeen fold from 2019 to 2021. Ex. CC.

### B.    Amazon Became An Anchor Client.

Contributing to Plug Power's growth are relationships with its "pedestal" clients, including Amazon. *E.g.*, SAC ¶ 51. The 2017 Warrant Agreement solidified Plug Power's relationship with Amazon, incentivizing Amazon by offering the opportunity to invest in Plug Power as Amazon purchased Plug Power products. *Id.* ¶ 42; Ex. C (4/5/2017 Form 8-K) at 1-2.

The Warrant Agreement allowed Amazon to buy some Plug Power shares immediately and

---

[1] The Court may consider the SAC's allegations, and the exhibits attached to the Declaration of Jennifer B. Luz, which are referenced in the SAC and/or filed with the SEC, or are relevant press releases and conference call transcripts whose authenticity is not in dispute. MTD Opinion at 17; *see also Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 197 (S.D.N.Y. 2020) (court may consider SEC filings); *In re Kandi Techs. Grp., Inc. Sec. Litig.*, 2019 WL 4918649, at *1 n.1 (S.D.N.Y. Oct. 4, 2019) (court may consider "press releases and earnings call transcripts"). All (i) internal alterations, citations, and quotation marks are omitted unless otherwise noted; and (ii) emphasis is added.

then again each time that Amazon made $50 million of payments to Plug Power for the Company's products, up to a maximum of $600 million of payments. SAC ¶¶ 42-44; Ex. C, Ex. 10.1; *see also, e.g.*, Ex. D (2017 Form 10-K), Ex. 10.26. Warrant shares could be purchased at a pre-determined price (the "exercise price"). SAC ¶¶ 42-44; Ex. C, Ex. 10.1. The warrant shares were divided into three tranches, each with separate vesting provisions, exercise prices, and number of shares. SAC ¶¶ 42-44; Ex. C, Ex. 10.1. The first tranche vested at the execution of the Warrant Agreement and had an exercise price of $1.1893 per share. SAC ¶¶ 42-44; Ex. C, Ex. 10.1. The second tranche had the same exercise price and vested upon the first four $50 million payment milestones—*i.e.*, the first $200 million. SAC ¶¶ 42-44; Ex. C, Ex. 10.1. The exercise price of the third tranche would be determined *after* the second tranche fully vested, based on the market price of Plug Power's stock at the time of final vesting of the second tranche. SAC ¶¶ 44-45, 89; Ex. C at 1. When the second tranche of warrant shares fully vested in November 2020, the stock price had increased more than tenfold and the exercise price for the third tranche was determined to be $13.81 per share. SAC ¶ 92.[2] As vesting occurred, Amazon could (and always did) elect to pay the exercise price with shares by "reduc[ing] the number of shares issued upon exercise to reflect net settlement of the exercise price." Ex. O (Q3 2020 Form 10-Q) at 34.

The Warrant Agreement was disclosed in 2017 and was an exhibit to the Company's annual report each year. Ex. C, Ex. 10.1; *see also, e.g.*, Ex. D, Ex. 10.26. Upon announcement of the Warrant Agreement, Plug Power's stock price increased by 73%, from $1.30/share on April 4, 2017 to $2.25/share on April 5, 2017. SAC ¶ 47.[3] Sales to Amazon topped $200 million in revenue in two and a half years. *See* Ex. B at 51. Amazon continues to be "one of the largest" and "key

---

[2] *See* Ex. BB (Plug Power Stock Price Chart). Courts routinely take judicial notice of stock prices at the motion to dismiss stage. *See, e.g.*, *Shipman v. Charles Schwab & Co.*, 2016 WL 11472831, at *6 (E.D.N.Y. Aug. 11, 2016).
[3] Plug Power considered the Warrant Agreement to be so beneficial that it entered into a similar agreement with Walmart in July 2017, which was followed by an increase in Plug Power's stock price by more than 15%. SAC ¶ 48.

pedestal multi-site customers" of Plug Power. SAC ¶¶ 51, 95; Ex. C, Ex. 99.2; *see also, e.g.*, Ex. D at 6 (42.4% of consolidated revenues in 2017 associated with Amazon); Ex. B at 9 (40.8% of consolidated revenues in 2021 associated with Amazon).

### C.    Plug Power Negotiated An Agreement With Amazon To Allow It To Simplify Its Financial Reporting Because The Accounting Treatment Of The Warrant Agreement Was Complicated and Caused Confusion.

The accounting treatment of the warrants caused significant confusion among investors and analysts. SAC ¶ 157; Ex. R at 8 (the "impact of our provision for warrants is one of the most frequent inquiries we receive from investors and analysts"). Any revenue from Amazon had to be offset or constrained by the associated accounting cost of the warrant, even though the warrants were not a cash expense for the Company. *See* SAC ¶¶ 50, 107; Ex. K at 47. The overhang created by this noncash charge against revenue was "measured based on the *grant-date fair value* of the warrants." *See* SAC ¶ 50; Ex. K at 47. Fair value is calculated using the Black-Scholes pricing model as of the grant date—*i.e.*, when all of the material terms, including the exercise price, were set. *See* SAC ¶¶ 96, 134. The model "requires key inputs including volatility and risk-free interest rate and certain unobservable inputs for which there is little or no market data, requiring the Company to develop its own assumptions." *Id.* ¶ 96; Ex. K at 46-47.

The material terms of the third tranche were set on November 2, 2020 when the exercise price was determined. *See* Ex. K at 46. Days later, in its November 9, 2020 third quarter reporting, the Company disclosed that it estimated the grant-date fair value per share for the 20.4 million shares in the third tranche to be $10.60. SAC ¶¶ 92, 96, 99 n.2; Ex. O at 34.[4] As Marsh explained

---

[4] "The Company adopted A[ccounting] S[tandards] U[pdate] 2019-08 as of January 1, 2019. As a result, the amount recorded as a reduction of revenue will be measured based on the grant-date fair value of the warrants. Previously, this amount was measured based on vesting date fair value with estimates of fair value determined at each financial reporting date for unvested warrant shares considered to be probable of vesting. Except for the third tranche, all existing unvested warrants are using a measurement date January 1, 2019, the adoption date, in accordance with the transition requirements of ASU 2019-08." Ex. K at 46.

to investors during the November 2020 earnings call when discussing the third tranche of shares, the "higher warrant charges" for the third tranche were "hard for folks to understand," but were "actually a real positive" because the higher charges demonstrated "increased purchases of our products," even if "difficult to see maybe in GAAP financials all the time." SAC ¶ 107.

At the same time, the Company began internally to consider whether there was a way to simplify its accounting for the warrants to reduce the confusion. SAC ¶¶ 91-94. The Company considered waiving the remaining vesting requirements, which, importantly from the Company's perspective, would allow Plug Power to absorb the entirety of the revenue charge associated with the third tranche in one quarter, rather than continuing to reduce revenue across future quarters as shares continued to vest. *See id.* The Company was unable to waive vesting (or any other term of the Warrant Agreement) absent "the written consent of the Company and the Warrantholder." Ex. C, Ex. 10.1 at B-18. In mid-November, the Company initiated arms-length negotiations with Amazon regarding a potential agreement to accelerate the vesting of the remaining warrant shares. SAC ¶ 94. No agreement to revise the Warrant Agreement was reached until December 31, 2020 (and Plaintiff does not allege otherwise), when the companies signed the Waiver Agreement, which waived the remaining vesting requirements. *Id.* ¶ 130; Ex. Q at 2.

When the Company disclosed the Waiver Agreement on January 5, 2021, within four business days as required under SEC rules, it warned that the impact to fourth quarter revenue would be "substantial." SAC ¶ 130; Ex. Q at 2. Upon announcement, Plug Power's stock price rose by nearly $2 per share, to $32.55 by the closing that day. Within a week, the stock price had risen another $34 per share, to $66.02. Ex. BB. On January 26, 2021, in a call with analysts, Marsh was asked for the Q4 Revenue Charge, and confirmed that the Company had not yet completed the accounting work: "it hasn't been finalized with the auditors yet." Ex. S (1/26/2021 Business

Update Call Tr.) at 12; *see also* SAC ¶ 172.

The Q4 Revenue Charge of approximately $400 million was finalized and disclosed in the fourth quarter earnings release on February 25. SAC ¶¶ 132, 202; *see also* Ex. V (2/25/2021 Form 8-K), Ex. 99.1 at 1. Calculation of the Q4 Revenue Charge was complex: the Waiver Agreement impacted the grant date for some, but not all, of the third tranche shares. Ex. A at 56-57. At the time of the Waiver Agreement, the Company projected that it would continue to receive some payments from Amazon, but not the full amount associated with the third tranche vesting schedule. *Id*. Those shares which the Company deemed likely to vest based on projected Amazon purchases were calculated to have a grant-date fair value of $10.57, just $0.03 different from the estimate provided on November 9. *Id*. For the other 12.7 million shares which the Company deemed *unlikely* to vest under the Warrant Agreement, the Waiver Agreement represented a new grant date because the material terms of those shares had changed. *Id*. For those shares, the Company calculated the grant-date fair value as of December 31, 2020 to be $26.95 per share. *Id*. As Table 1 shows, each of the grant-date fair values were based on the stock price and judgments and assumptions for the unobservable inputs, as of the grant date. SAC ¶¶ 134, 246; Ex. A at F-85.

| Table 1: Plug Power's Assumptions for Calculation | | |
|---|---|---|
| | **December 31, 2020** | **November 2, 2020** |
| Risk-free interest rate | 0.58% | 0.58% |
| Volatility | 75.00% | 75.00% |
| Expected average term | 6.26 | 6.42 |
| Exercise price | $13.81 | $13.81 |
| Stock price[5] | $33.91 | $15.47 |

The Company's grant-date fair value calculation and its assessment of the probability of future Amazon revenue were the subject of significant auditor review. *See* SAC ¶¶ 91-94.[6]

---

[5] The stock price is the closing stock price on the grant dates listed. *See* Ex. BB.
[6] The KPMG February 24, 2021 presentation confirms the complexity of determining the grant-date fair value of the third tranche of shares following the Waiver Agreement: "A high degree of judgment was required to evaluate the number of shares that were considered probable of vesting immediately prior to the modification. Specifically,

**D.**      **From 2018 To 2020, Plug Power Received Comment Letters From The Corporate Finance Division Of The SEC.**

The SAC for the first time includes allegations about regulatory correspondence unrelated to Plaintiff's theory of fraud. From 2018 to 2020, Plug Power and the SEC had a series of correspondence regarding certain aspects of the Company's accounting, a typical process by which the SEC's Corporate Finance Division provides comments around the company's disclosures in efforts to monitor and enhance compliance with disclosure and accounting requirements (the "SEC Comment Letters"). *See* SAC ¶¶ 54-67, 120-23, 155-61, 195-96, 254-63.[7] The SEC Comment Letters focused, in part, on Plug Power's use of non-GAAP measures in its disclosures of the Company's financial results, including gross billings, adjusted gross profit, and adjusted EBITDA. *Id.* ¶¶ 54-67; *see also*, *e.g.*, Ex. E (9/5/2018 Ltr. from SEC) at 1-3 (discussing, among other things, presentation of "non-GAAP gross revenue and non-GAAP gross revenue growth percentage, adjusted gross margin and adjusted loss per share. . . without also discussing the comparable GAAP measures"); Ex. H (4/24/2019 Ltr. from SEC) at 2-3 (discussing, among other things, presentation of "adjusted EBITDA, with greater prominence than the most directly comparable GAAP measure"). The SEC Comment Letters also discussed other topics not at issue in this litigation, including an income tax benefit, losses associated with deployments to Walmart, and a lease amendment with Wells Fargo. Ex. E at 2-3; Ex. H at 2; Ex. I (6/20/2019 Ltr. from SEC) at 1-2.

None of the SEC Comment Letters or response letters related to the timing or accounting for the Waiver Agreement. In fact, the SEC Comment Letters only mentioned the Amazon Warrant twice before the end of the Class Period. In September 2018, the SEC asked Plug Power about

---

judgment was required to evaluate the Company's estimate of probable future purchases of goods and services to be made by the customer under the April 2017 arrangement… [KPMG] compared the amount of projected probable future cash collections from the customer to either: purchase orders received from the customer for fuel cells, hydrogen infrastructure and service, or historical fuel purchases by the customer." Ex. U at -1604.

[7] Plug Power's letters with the SEC Corporate Finance Division dated December 2020 and January 2021 were omitted from the SEC's online EDGAR system likely due to an administrative error by the SEC. *See* SAC ¶¶ 123, 161.

"the classification and accounting for" the Amazon Warrant, as well as differences between the Warrant Agreement and the Company's warrant agreement with Walmart. Ex. E at 2. Plug Power provided a detailed response spanning six pages, and the SEC did not have follow-up questions or comments after receiving the Company's response. *See* Ex. F (9/19/2018 Ltr. to SEC) at 2-7; Ex. H; *see also* Ex. J (7/30/2019 Ltr. from SEC). In December 2020, the SEC asked Plug Power about "how [the Company] applied the transition guidance related to" ASU 2019-08 and 2018-07; "how, if at all, adoption of the ASU's [sic] impacted the timing of when you recognize the provision for the second and third warrant tranches"; and "how you measure and recognize the third Amazon warrant tranche." Ex. P (12/16/2020 Ltr. from SEC) at 1-2. Plug Power again responded, and the SEC again did not have further questions or comments after receiving the Company's response. *See* Ex. R at 2-4; Ex. T (2/10/2021 Ltr. from SEC).[8]

### E.    Plug Power Issued A Restatement Of Complex Accounting Issues In 2021.

Starting in 2001, Plug Power retained independent auditor KPMG to audit its financial statements. Ex. A at F-4. Every year, Plug Power received clean audit opinions from KPMG. *E.g.*, Ex. G (2018 Audit Letter); Ex. L (2019 Audit Letter). As far as Plug Power knew at the time of its earnings call for the fourth quarter of FY2020 on February 25, 2021, it was on track to receive another clean audit opinion for its FY2020 financial statements. *See* Ex. Y at 3; Ex. A at 4. The February 24, 2021 KPMG presentation cited in the SAC confirms Plug Power's expectation: KPMG found "[n]o actual or suspected fraud involving management," noted "[n]o significant findings" when assessing risk of fraud, and found only a handful of routine reconciliations that

---

[8] To the extent that the SAC attempts to fault Plug Power for not disclosing SEC Comment Letters in its public disclosures (SAC ¶ 67), that argument is meritless. Plug Power was only required to disclose in its Forms 10-K written staff comments issued more than 180 days prior to the fiscal year end covered by the annual report, that the Company believes to be material, and that remain unresolved at the time of the filing of the annual report. *See* Ex. Z (Form 10-K General Instructions) at 8. Those conditions were not met for any of these SEC Comment Letters.

had less than 0.2% of an impact on the Company's statement of operations, balance sheet, cash flow, and statement of comprehensive loss. *See* Ex. U at -1607, 1612, 1615-16. After that earnings call, however, in the course of finalizing the audit, KPMG for the first time identified several errors with the Company's previously issued financial statements that eventually necessitated a restatement of the Company's prior financials. Ex. Y at 3; *see* SAC ¶ 334.

On March 2, the Company disclosed that it had uncovered potential issues and would not timely file its annual report. SAC ¶ 211; Ex. W. The identified accounting issues were "complex and technical and involve[d] significant judgments in applying U.S. GAAP," made even more complicated by the "unprecedented, dynamic, and innovative nature of the Company's business and its position in a nascent and rapidly developing industry." Ex. Y at 3; Ex. X (3/16/2021 Form 8-K, with PR), Ex. 99.1; *see* SAC ¶ 336. These complicated accounting issues did not "impact cash and cash equivalents or the economics of the Company's existing or future commercial arrangements." Ex. Y at 2; *see* SAC ¶ 336. Nor did they impact the Company's gross billing targets or business partnerships. Ex. X, Ex. 99.1. The accounting issues were not due to "any override of controls or misconduct." Ex. Y at 2; *see* SAC ¶ 336. And they were all part of the Company's prior financial statements on which KPMG had previously issued clean audit opinions. *See* Ex. G; Ex. L. KPMG's new view on these accounting judgments impacted Plug Power's prior financial statements, and on March 16, 2021, Plug Power and its Audit Committee concluded and disclosed that the Company needed to restate its financials for prior periods. Ex. Y at 2; *see* SAC ¶ 334.

On May 14, 2021, Plug Power filed a Form 10-K restating its financials for 2018, 2019, and the earlier quarters of 2020. Ex. A at 4; *see* SAC ¶ 339. The restatement corrected a number of highly technical non-cash errors. Ex. A at 4; SAC ¶¶ 284, 286, 296, 318, 328.[9]

---

[9] Notably, the SAC does not allege misstatements regarding the majority of the highly technical non-cash errors corrected by the restatement, including: "(a) $112.7 million overstatement of the right of use assets related to operating

One of the restatement items was that, after KPMG raised issues while finalizing its audit following the announcement of 2020 fourth quarter results, the Company determined for the first time that certain costs were not appropriately classified as R&D operating expenses on the Company's financial statements. SAC ¶ 230; Ex. A at 47. Less than half of the reclassified R&D expenses concerned costs associated with hydrogen fuel deliveries, which were restated as "cost of revenue: fuel delivered to customers." Ex. A at F-18-19, F-35-36; *see* SAC ¶¶ 231-33. Because the restatement did not reveal any expense that was previously hidden—rather, certain costs were moved from one line item on the income statement to another—the restatement had little to no impact on Plug Power's net loss in ten of the eleven quarters that the Company restated in 2018, 2019, and 2020. MTD Br. at 17.

The reclassification of certain R&D costs had a waterfall effect on loss accruals, which are potential losses related to Plug Power's extended maintenance contracts. SAC ¶¶ 79, 238. Each quarter, Plug Power estimates the cost to provide maintenance services to its customers, and how much unearned revenue it expects to receive from those contracts. Ex. A at 66; *see* SAC ¶ 238. If the expected cost of providing services is more than the expected revenue, a loss is recorded on the Company's financial statements as a "cost of revenue: provision for loss contracts related to service." Ex. A at 66; SAC ¶ 238. When the Company decided for the first time in 2021 that certain costs previously classified as an R&D "operating expense" should instead be recorded as a "cost of revenue," the expected cost of providing services under certain contracts increased and became more than the unearned revenue on those contracts in FY2018 and FY2020, which increased the

---

lease liabilities. . . (d) $1.8 million recording of a deemed dividend for certain conversions of the Company's Series E Convertible Preferred Stock; (e) . . . a cumulative adjustment of approximately $3.4 million was the correction of an error in prior lease accounting . . . and (f) $5.3 million understatement of bonus expense and related payroll taxes for the three months ended September 30, 2020." SAC ¶ 229; Ex. A at 4.

cost of revenue in those years. SAC ¶¶ 229, 239; Ex. A at 66.[10] Finally, the Company assessed the effectiveness of its internal controls over financial reporting, as it must for a restatement, and identified a "material weakness in internal control over financial reporting": during a period of extraordinary growth, it "did not maintain a sufficient complement of trained, knowledgeable resources to execute their responsibilities with respect to internal control over financial reporting for certain financial statement accounts and disclosures." Ex. A at 4, 27; *see* SAC ¶ 240.

## ARGUMENT

To state a securities fraud claim under Section 10(b) of the Exchange Act and Rule 10b-5, Plaintiff must plead, among other things, (i) a strong inference of scienter; (ii) a material misrepresentation; and (iii) loss causation. *ECA & Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 195 (2d Cir. 2009). The complaint must also meet the heightened pleading requirements of the PSLRA and Federal Rule of Civil Procedure 9(b) by "stating with particularity the circumstances constituting fraud," including "facts that give rise to a strong inference that the defendant acted with the required state of mind." *Id.* at 196. The allegations must "provide sufficient particularity . . . to support a plausible inference that it is more likely than not that a securities law violation has been committed." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014); *see also* MTD Opinion at 18-19.[11] Complaints with far more particularized allegations than the SAC are regularly dismissed with prejudice, and the Second Circuit routinely affirms. *See*, *e.g.*, *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020) (affirming dismissal despite "allegations that three employees knew of problems with" the

---

[10] The cost of revenue actually *decreased* by $394,000 in FY 2019. Ex. A at 67.

[11] Defendants adopt and incorporate by reference all of the arguments for dismissing the complaint made in: (i) the Memorandum of Law in Support of Defendants' Motion to Dismiss the AC (Dkt. No. 85); (ii) the Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss the AC (Dkt. No. 93); and (iii) the Court's Opinion and Order granting dismissal of the AC (Dkt. No. 95).

company's products); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 616 F. App'x 442, 446 (2d Cir. 2015) (no scienter in a restatement case despite allegations from nine confidential witnesses); *see also* Dkt. No. 85 ("MTD Br.") at 12 (collecting cases). The SAC falls short of this exacting pleading standard and should be dismissed for at least three independent reasons: Plaintiff fails to adequately plead (i) scienter; (ii) any material omission regarding the Amazon Warrant; and (iii) loss causation.

## I.    THE SAC FAILS TO SUPPORT ANY INFERENCE OF SCIENTER, MUCH LESS THE REQUIRED STRONG INFERENCE.

To plead scienter, Plaintiff must allege that a defendant acted with "a state of mind demonstrating an intent to deceive, manipulate or defraud." *Fries v. N. Oil & Gas, Inc.*, 285 F. Supp. 3d 706, 720 (S.D.N.Y. 2018) (dismissing for lack of scienter); *In re Express Scripts Holding Co. Sec. Litig.*, 2017 WL 3278930, at *15 (S.D.N.Y. Aug. 1, 2017) (dismissing for lack of scienter). Plaintiff must "allege facts with particularity that would give rise to a strong inference that the defendant acted with the required state of mind." *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (affirming dismissal for lack of scienter). Scienter may be established by alleging facts that show either (1) that the defendants had the "motive and opportunity" to commit the alleged fraud, or (2) "strong circumstantial evidence of conscious misbehavior or recklessness." MTD Opinion at 20; *see also ECA*, 553 F.3d at 198-99; *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995). To prevail, Plaintiff must allege a "strong inference" of scienter—*i.e.*, one that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007); *see also* MTD Opinion at 20. This mandatory balancing inquiry "requires courts to consider not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Fries*, 285. F. Supp. 3d at 720.

Plaintiff still fails to plead the strong inference of scienter required to survive dismissal. *See*

*Pittman v. Chick-fil-A, Inc.*, 2022 WL 2967586, at *8 (S.D.N.Y. July 27, 2022) (dismissing and

denying leave to amend where the "SAC fails to cure the FAC's deficiencies").

    **A.**    **The SAC Still Fails To Plead Any Inference Of Scienter With Respect To The Company's Restatement.**

The SAC does not remedy the lack of scienter allegations that resulted in the full dismissal

of the AC. The SAC abandons a number of scienter allegations previously made in the AC and no

longer alleges scienter based on: (1) a motive to raise capital; (2) the magnitude of the restatement;

or (3) the Company's non-disclosure of adjusted EBITDA guidance. *Cf.* AC ¶¶ 173-83; Dkt. No.

88 ("MTD Opp.") at 22-27. And for good reason: the Court has already held that these

allegations—individually and collectively—are insufficient to establish scienter. *See* MTD

Opinion at 21-22, 31-33. The SAC also repeats—without attempting to strengthen—the remaining

scienter allegations that the Court already found inadequate:

- The SAC alleges that Defendants were motivated to commit fraud in order to raise capital and show "scalability" to induce a joint venture with SK Group, but these are "nothing more than ordinary corporate motives possessed by virtually all corporate insiders," and insufficient to plead scienter. MTD Opinion at 21-24 (collecting cases).[12]

- The SAC alleges stock sales by Marsh and Middleton pursuant to Rule 10b5-1 trading plans were motive to commit fraud, but their trading was found not to be suspicious or unusual. *Id.* at 24-29 (collecting cases).[13]

- The SAC alleges that Marsh and Middleton's Sarbanes-Oxley certifications create an inference of scienter, but the Court held that they do not because Plaintiff "did not adequately allege that Marsh or Middleton had any knowledge or reason to know of

---

[12] *Compare*, SAC ¶¶ 368-73 (SK Group deal), *with* MTD Opp. at 12-15 (same). The Court rejected as implausible the SAC's allegation that Defendants were motivated to show scalability in order to induce a joint venture with SK Group because the joint venture was formed in October 2021, "five months *after* the restatement," and was accompanied by a statement that "Plug Power has proven its ability to scale hydrogen infrastructure quickly." MTD Opinion at 23.

[13] *Compare*, SAC ¶¶ 374-84 (insider sales), *with* AC ¶¶ 184-94 (same). While the SAC pleads new facts concerning the relationship between Marsh's and Middleton's trading and the Amazon Warrant, *i.e.*, that their supposed knowledge that the Waiver Agreement would be reached and the final amount of the Q4 Revenue Charge meant they "knew that Plug Power's stock price did not reflect its true financial condition" (SAC ¶¶ 351, 358), it does not allege these facts as a basis to infer scienter related to the restatement. *See id.* ¶¶ 374-84. Even if it did so plead, it would fail to adequately plead a motive related to the restatement for the same reasons discussed *infra* Section I.B.

the alleged fraud." *Id.* at 35-36 (collecting cases).[14]

- The SAC claims that the purported misstatements were related to the "core operations" of Plug Power, but as in the AC, Plaintiff did not allege that technical and complex accounting judgments—or the cost of specific types of fuel delivery—were Plug Power's "core operations," and even if so, a "core operations" theory alone is insufficient to show scienter in this Circuit. *Id.* at 33-35 (collecting cases).[15]

The SAC does little to address the fundamental failure to plead scienter in the AC. As the

Court previously recognized, the AC failed to plead:

> any facts that contradict the Company's representation in its 2020 Form 10-K that these "errors were identified ***after the Company reported its 2020 fourth quarter and year end results on February 25, 2021*** during the course of the audit with respect to the Company's financial statements for the year ended December 31, 2020, as well as during preparation of this Annual Report on Form 10-K." Nor does he specifically dispute the Company's statement in its March 16, 2021 Form 8-K that "[t]he changes that will be recorded did not result from ... any override of controls or misconduct, and KPMG has not informed the Audit Committee of any issues related to an override of controls or misconduct." Furthermore, the [AC] does not allege any facts disputing the Company's disclosure that the accounting related to the restatement is "complex and technical and involves significant judgments in the applicable accounting principles."

MTD Opinion at 31. Plaintiff tries to solve this deficiency by alleging that Defendants knew or

should have known of the restatement issues by February 24, 2021, because "issues [were] raised

in Plug Power's Audit Committee." *See* SAC ¶¶ 385-89. For support, Plaintiff only points to two

pages of a single Audit Committee presentation by KPMG on that date. *See id.* ¶¶ 199-200, 387-

88. But this presentation *undermines* any inference of scienter and *confirms* the Company's

disclosures regarding when it learned about the audit issues and that the restatement was not due

to an override of controls. The KPMG presentation shows that KPMG considered "significant risks

of fraud," including internal controls, and reported to the Audit Committee that there were "*no*

*significant findings noted*" and that fourth quarter routine reconciliations had less than 0.2% of an

---

[14] *Compare*, SAC ¶¶ 390-93 (Sarbanes-Oxley certifications), *with* AC ¶¶ 195-98 (same).
[15] *Compare*, SAC ¶¶ 362-66 (core operations), *with* AC ¶¶ 168-72 (same).

impact on the Company's statement of operations, balance sheet, cash flow, and statement of comprehensive loss. *See* Ex. U at -1607, -1612, -1615-16.

While the SAC includes a number of allegations regarding SEC Comment Letters and Plug Power's responses in an attempt to cast the Company in a negative light, Plaintiff does not allege that this correspondence is a basis for inferring scienter related to the restatement. *See* SAC ¶¶ 362-93 (scienter allegations concerning restatement). Nor could it, as the SEC Comment Letters primarily dealt with the presentation of non-GAAP metrics including gross billings, adjusted gross profit, and adjusted EBITDA. *E.g.*, *id.* ¶¶ 54-67, 120-23, 155-61, 195-96, 254-63. Moreover, none of the correspondence suggests that Plug Power acted fraudulently or was extremely reckless in how it performed its accounting. Courts routinely decline to infer scienter based on SEC comment letters without more. *See Pennsylvania Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 939 F. Supp. 2d 445, 452 (S.D.N.Y. 2013) (no scienter based on SEC comment letter absent "evidence of corresponding fraudulent intent"); *Stratte-McClure v. Morgan Stanley*, 2013 WL 297954, at *9 (S.D.N.Y. Jan. 18, 2013) (no scienter based on SEC comment letter where letter "did not say that disclosure was required, that [the applicable regulations] necessitated further information, or that Defendants failed to comply with GAAP provisions or SEC regulations"); *see also Reilly v. U.S. Phys. Therapy, Inc.*, 2018 WL 3559089, at *13 (S.D.N.Y. July 23, 2018) (same).

The SAC still does not—and cannot—allege a single document, witness statement, or other specific fact contrary to the Company's disclosures that Defendants learned about the need to restate complex accounting issues only after the Company released its fourth quarter earnings on February 25, 2021, and that the need to restate was unrelated to an override of controls. *See* Ex. Y at 3; Ex. A at 4. Plaintiff's failure to fix his pleading deficiency is dispositive.

**B.    The SAC Does Not Plead Any Facts To Suggest Defendants Had Motive Or Opportunity To Engage In Fraud Related To The Amazon Warrant.**

-18-

Unable to rehabilitate its original restatement-based claim, Plaintiff adds a new theory of securities fraud: that Defendants purposefully hid from investors the Waiver Agreement and the Company's calculation of the resulting Q4 Revenue Charge. According to the SAC, Defendants did not disclose the Waiver Agreement in November 2020 *before* the agreement was signed and the Q4 Revenue Charge *before* the Company reported its Q4 results, just so that the Individual Defendants could continue to sell Company stock pursuant to their trading plans. "To plead a motive to commit fraud, a plaintiff must allege that the individual defendants received a concrete and personal benefit from making their alleged misrepresentations or actionable omissions." *In re AstraZeneca plc Sec. Litig.*, 2022 WL 4133258, at *9 (S.D.N.Y. Sept. 12, 2022); *see also ECA*, 553 F.3d at 198 ("Motives that are common to most corporate officers . . . do not constitute 'motive' for purposes of this inquiry."); *Bldg. Trades Pension Fund W. Pa. v. Insperity, Inc.*, 2022 WL 784017, at *15 (S.D.N.Y. Mar. 15, 2022) ("plaintiff must allege that the defendants benefited in some concrete and personal way from the purported fraud"); *see also* MTD Opinion at 21. Insider "stock sales, standing alone, are insufficient to support a strong inference of fraudulent intent," unless Plaintiff "establish[es] that [the] stock sales were unusual." *Acito*, 47 F.3d at 54; MTD Opinion at 24. Plaintiff has not done so.

Plaintiff relies on the exact same sales by Middleton on December 24, 2020 and Marsh on January 19, 2021 that the Court already held were neither unusual nor suspicious and therefore insufficient to meet Plaintiff's burden to plead scienter. *See* SAC ¶¶ 350-61; MTD Opinion at 21-24; *see also* MTD Br. at 25-28; MTD Reply at 13-17. Plaintiff identifies no new facts related to the net proceeds of the sales, the Individual Defendants' sales during the class period as compared to prior similar trading periods, or the timing of the expiration of the options that were exercised by the Individual Defendants. Plaintiff fails to provide any basis for the Court to reconsider its

-19-

prior conclusion that "standing alone, the net proceeds and percentage of holdings sold" by Marsh and Middleton "do not adequately allege motive." MTD Opinion at 26. There is also no reason for the Court to revisit its holding that Marsh's and Middleton's sales were not unusual given that they traded fewer shares and obtained fewer net proceeds during the Class Period than the immediately prior similar trading period; and that the fact that Marsh and Middleton exercised options not set to expire until many years later is not, without more, indicative of scienter. *Id.* at 28. And the fact that "the sales were not made at the beginning or the end of the Class Period" and "the sales took place more than a month prior to the . . . corrective disclosures" are still indicative that the sales were "neither unusual nor suspicious." *Id.* at 26, 28.

The SAC's new allegations about Middleton's trading do not save Plaintiff's motive allegations. The SAC alleges that Middleton's December 24, 2020 trades—made pursuant to his September 2, 2020 trading plan—are unusual and suspicious because Middleton had material nonpublic knowledge at the time he entered his plan and at the time of the sale under the plan. SAC ¶¶ 125, 352. According to Plaintiff, when adopting his trading plan, Middleton knew Plug Power's stock price was increasing, the second tranche of the warrant was close to fully vesting, the third tranche exercise price would be higher because the stock price was higher, and the revenue charge associated with the third tranche would be higher than the earlier tranches. *Id.* ¶ 125. But all of this so-called "insider information" was public knowledge. In addition to the public stock price, the Company had already disclosed by August 10, 2020: the second tranche almost fully vested by the end of the second quarter of 2020; the exercise price of the third tranche would be based on the stock price at the time that the second tranche fully vested; and the Company's revenue was reduced by the grant-date fair value of the warrant shares. *See* Ex. M (Q2 2020 Form 10-Q) at 35 (by end of Q2 2020, 27,643,347 of 34,917,912 first and second tranche

shares vested); Ex. K at 39, 46. Plaintiff has failed to allege any facts to suggest that Middleton entered his trading plan "strategically so as to capitalize on insider knowledge." *Lululemon*, 14 F. Supp. 3d at 585. And the SAC's allegations that Middleton knew by the time of his trade that the Company intended to waive the Warrant Agreement vesting requirements; that the revenue charge for the third tranche was "debilitating"; and about the December 16 SEC Comment Letter (SAC ¶¶ 128-29), do not suggest that the trade was done to take advantage of nonpublic information. To the contrary, by the date of Middleton's trade, the Waiver Agreement had not been executed and Plug Power could not unilaterally waive vesting (Ex. C, Ex. 10.1 at B-18); the Company already disclosed that the revenue charge related to the third tranche would be much higher (SAC ¶ 107); and the December 16 SEC Comment Letter did not discuss vesting of the outstanding warrant shares or the revenue charge related to the third tranche (Ex. P). The SAC does not overcome the presumption that Middleton's sale pursuant to his trading plan was "prescheduled and not suspicious." *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009); *see Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *21 (S.D.N.Y. Sept. 21, 2021) ("ordinarily, trades pursuant to 10b5-1 plans do not raise a strong inference of scienter.").

Likewise, the new allegations about Marsh's trading fail to suggest a fraudulent motive. The SAC alleges that Marsh's January 19, 2021 sale was "made pursuant to a Rule 10b5-1 trading plan that was established on December 2, 2020." SAC ¶ 164.[16] Entering into a new trading plan during the class period, without more, is not sufficient to support a strong inference of scienter. *In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at *25 (S.D.N.Y. Mar. 29, 2019) (trading

---

[16] Marsh's and Middleton's September 2, 2020 and December 2, 2020 trading plans were not their first trading plans. *See* Ex. DD (Chart of Marsh Trades) (trades preceding the Class Period were made pursuant to a trading plan dated March 17, 2020); Ex. EE (Chart of Middleton Trades) (trades preceding the Class Period were made pursuant to trading plans dated June 11, 2020 and September 2, 2020). Plaintiff has not alleged whether and to what extent there were any differences among Marsh's and Middleton's trading plans.

plans adopted and cancelled during class period not probative of scienter absent allegations that defendants knew of adverse audit reports at the time of plans' adoption or cancellation); *see also Wade v. Wellpoint, Inc.*, 740 F. Supp. 2d 994, 1011 (S.D. Ind. 2010) (dismissing claims where complaint pleaded only adoption of plans during class period, "without more").

Here, Plaintiff's attempt to plead something "more" does no such thing. The SAC alleges that Marsh entered into the December 2, 2020 trading plan because he "knew that [the Warrant Agreement] was no longer sustainable" and "expected Plug Power to waive the remaining vesting conditions for tens of millions of outstanding Amazon Warrant Shares by the end of the fourth quarter of FY2020." SAC ¶ 164. But, at the time of adoption of the plan, Plug Power was only "in discussion" with Amazon. *See id.* ¶¶ 94, 157, 353; Ex. R at 8. Even if Plug Power wanted to eliminate the vesting schedule, it could not do so unilaterally, and had no ability to force a behemoth public company like Amazon to sign a new contract. *See* Ex. C, Ex. 10.1 at B-18. The SAC also alleges that when adopting his plan, Marsh had unspecified information about "the fair value of the vesting Amazon Warrant Shares, the actual cost to revenue that Plug Power would incur." SAC ¶ 169. To the contrary, as of December 2, 2020, the Warrant Agreement was the only valid contract, and the Company had already disclosed the estimated grant-date fair value for the third tranche of warrants under the Warrant Agreement a month earlier on November 9. *Id.* ¶¶ 92, 96, 99 n.2; Ex. O at 34. It was impossible for Marsh or anyone to calculate an updated grant-date fair value for an unknown portion of the third tranche shares based on a potential new agreement that had not yet been negotiated because, among other things, there was no new grant date or price on which to estimate fair value. *See supra* at 7-9. Plaintiff's vague, speculative allegations regarding what Marsh knew and when resemble allegations that courts routinely dismiss. *E.g.*, *In re IAC/InterActiveCorp. Sec. Litig.*, 478 F. Supp. 2d 574, 604-05 (S.D.N.Y. 2007) (dismissing

-22-

when trading plan adopted during class period, but complaint alleged only "vague, generalized allegations" of defendants' knowledge of financial difficulties).[17]

Finally, the SAC alleges that Marsh had material nonpublic information at the time of his trade on January 19 because he must have known the Q4 Revenue Charge at that time and the "true reason" why the Company negotiated the Waiver Agreement. Even if Marsh's knowledge at the time of trading—rather than the time he adopted his trading plan—were relevant (it is not), these allegations also fail. By January 19, the Company had disclosed the Waiver Agreement, that it would result in a "substantial" revenue charge, and the reason why it had entered the agreement: "to eliminate the need to recognize future quarterly non-cash charges for this warrant and to simplify the Company's financial reporting going forward." *See* SAC ¶ 130; Ex. Q at 2. And, as discussed *infra* at 27, there are no factual allegations to contradict Marsh's statement on January 26 that the calculation of the Q4 2020 revenue charge had not yet been completed. To the contrary, the timing of Marsh's sale *two weeks after* the Company announced the Waiver Agreement and *six weeks after* adoption of his trading plan was not unusual. *See Koplyay v. Cirrus Logic, Inc.*, 2013 WL 6233908, at *5 (S.D.N.Y. Dec. 2, 2013) (stock sales made neither "soon after the allegedly misleading statements, nor clustered at [the class period's] end, when insiders theoretically would have rushed to cash out before the fraud was revealed and stock prices plummeted," are not suspicious); *Reilly*, 2018 WL 3559089, at *14 (no scienter where sales "were not calculated to maximize the personal benefit from undisclosed inside information").

---

[17] Plaintiff's reliance upon the *Wall Street Journal* article that covered Marsh's trading is unavailing. The article does not include any facts that suggest that Marsh entered into his trading plan "to take advantage of an inflated stock price or insider information," the relevant question here. *See* Tom McGinty & Mark Maremont, *CEO Stock Sales Raise Questions About Insider Trading*, WALL ST. J., June 29, 2022, at 3-4; MTD Opinion at 29. The SAC also mischaracterizes the article as suggesting that Marsh and other corporate insiders "were likely using nonpublic information to game the system." *See* SAC ¶ 13. The article does not do this: it uses far more speculative language, indicating that unnamed "[a]cademics and the SEC say *some corporate insiders might be using* nonpublic information to game the system," and it does not claim that Marsh falls in this category of individuals.

Plaintiff has not alleged specific facts to suggest that either Middleton or Marsh entered into their trading plans and sold shares pursuant to those trading plans strategically "to take advantage of an inflated stock price or insider information." *Villare*, 2021 WL 4311749, at *21. Moreover, the alleged motive makes no sense. After the Waiver Agreement was announced, the price of the Company's stock *rose* from $30.79 at opening on January 5, 2021 to $32.55 at closing the same day. Ex. BB. This price increase was not temporary—the price of Plug stock continued to increase up to $66.02 at closing a week later, January 12, 2021. *Id.* These facts further tend to refute any inference of scienter. *See CRM Holdings*, 2012 WL 1646888, at *25 (defendants' adoption and cancellation of trading plans during class period not probative of scienter where not conducted at "class period high").

### C.    Plaintiff Does Not Allege Particularized Facts That Defendants Knew Or Were Extremely Reckless In Not Disclosing The Waiver Agreement Or Q4 Revenue Charge Earlier.

Absent motive to commit fraud, the SAC must plead strong circumstantial evidence of conscious misbehavior or recklessness. MTD Opinion at 30; *see ECA*, 553 F.3d at 198-99; *Acito*, 47 F.3d at 52. To do so, Plaintiff must plead specific facts demonstrating conduct "that is at least highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." MTD Opinion at 30; *see Villare*, 2021 WL 4311749, at *22-23 (dismissing for lack of scienter despite confidential witness allegations); *Abengoa*, 481 F. Supp. 3d at 213 (dismissing for lack of scienter despite allegations of abrupt resignation of CEO and criminal charges). Recklessness is not "merely enhanced negligence"; instead, Plaintiff must plead "a state of mind approximating actual intent." MTD Opinion at 30; *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 653, 655 (S.D.N.Y. 2015) (dismissing for lack of scienter due to lack of "particularized allegations supporting [such] an inference"); *Medis*

*Inv. Grp. v. Medis Techs., Ltd.*, 586 F. Supp. 2d 136, 142 (S.D.N.Y. 2008), *aff'd* 328 F. App'x 754 (2d Cir. 2009) (dismissing for lack of scienter where plaintiff "fail[ed] to adduce" "strong and particularized circumstantial evidence" of recklessness). "Where the plaintiff pleads scienter by conscious misbehavior or recklessness rather than motive, the strength of the circumstantial allegations must be correspondingly greater." *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 162 (S.D.N.Y. 2015); *see* MTD Opinion at 30. The SAC does not allege any facts, much less with particularity, to suggest that Defendants knew or were reckless in not knowing that the Company and Amazon would sign the Waiver Agreement on December 31, 2020 or the specific amount of the Q4 Revenue Charge. And the core operations doctrine does not save the SAC, as that theory, standing alone, is insufficient. Moreover, accounting judgments concerning the vesting and accounting of warrant shares issued to a commercial counterparty are not so core to Plug Power's operations as to impute scienter. *Reilly*, 2018 WL 3559089, at *18.

        **1.**        **The SAC Pleads No Specific Facts That Defendants Knew Or Were Reckless In Not Knowing That A Waiver Agreement Would Be Reached With Amazon And The Amount Of The Q4 Revenue Charge.**

The SAC alleges that Defendants knew, or should have known, prior to December 31, 2020, that Plug Power and Amazon would reach agreement to waive the vesting conditions on the outstanding warrant shares and on what terms; and before February 2021, the Q4 Revenue Charge. For support, Plaintiff makes the conclusory assertion that Defendants knew or must have known "by virtue of their receipt of information reflecting the true facts." SAC ¶ 343. But merely saying so is not enough. *Acito*, 47 F.3d at 53 ("[C]onclusory allegations of fraud do not satisfy the pleading requirements of Rule 9(b)."); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 563 (S.D.N.Y. 2004) (conclusory allegations insufficient to establish scienter). Rather, "the complaint must specifically identify the reports or statements containing that information." MTD Opinion at 30; *see also Villare*, 2021 WL 4311749, at *22 (same); *Abengoa*, 481 F. Supp. 3d at 213 (same).

-25-

The SAC points to SEC Comment Letters to suggest that Defendants knew in November 2020 that Amazon would sign the Warrant Agreement on December 31, 2020. The SEC Comment Letters focused on Plug Power's presentation of non-GAAP measures, and in no way suggest fraud related to the Amazon Warrant or otherwise. SAC ¶¶ 54-67.[18] Plaintiff cites Plug Power's response to the SEC dated January 14, 2021, which states that, at the time of its third quarter disclosure (November 9, 2020), the Company was "*in discussions with*" Amazon regarding the vesting of the outstanding warrant shares and that the Company believed all vesting might occur during the fourth quarter. Ex. R at 8; *see* SAC ¶¶ 94, 157, 353. At best, the letter indicates—*with the benefit of hindsight and knowing the Waiver Agreement was signed two weeks earlier than this letter dated December 31*—that the Company anticipated it might be able to successfully complete its arms-length negotiations of a new contract with Amazon before the end of December 2020. But as this Court previously recognized when dismissing the AC, "[c]ourts in this district have rejected fraud-by-hindsight allegations of scienter." MTD Opinion at 32; *see also In re Diebold Nixdorf, Inc. Sec. Litig.*, 2021 WL 1226627, at *12 (S.D.N.Y. Mar. 30, 2021) ("Hindsight, although 20/20, cannot be used to prove securities fraud."); *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 404 (S.D.N.Y. 2020) (no scienter based on "fraud by hindsight" allegations); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005) ("fraud cannot be pled by hindsight"). The SAC does not allege that any agreement with Amazon was reached, or that Defendants knew any agreement with Amazon would be reached, *before* the parties signed the Waiver Agreement on December 31. *See Pennsylvania Pub. Sch. Emps.' Ret. Sys.*, 939 F. Supp. 2d at 452 (no scienter based on SEC comment letter absent "evidence of corresponding fraudulent intent"); *see supra* at

---

[18] The Company's timely disclosure of the waiver and the Q4 Revenue Charge negates an inference of scienter. *See Acito*, 47 F.3d at 53-54 (no scienter despite one-month delay in disclosure of corrective information); *In re Magnum Hunter Res. Corp. Sec. Litig*, 26 F. Supp. 3d 278, 297-98 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015) (no scienter where prompt disclosure after errors identified).

8-9.[19]

Nor does the SAC identify any internal record, witnessed discussion, or communication to contradict Marsh's January 26 statement that the Company had not yet finalized its calculation of the Q4 Revenue Charge. Ex. S at 12; *see also* SAC ¶ 172. The SAC does not allege that the Company had concluded earlier its assessment of probable revenue from Amazon, or how that probability assessment impacted the number of shares that were subject to different measurement dates for the grant-date fair value calculation, or that the calculation could possibly have been completed before the grant date was determined. Nor does it allege that the Company had finalized its assumptions of unobservable inputs required for the Black-Scholes pricing model on the different measurement dates any earlier. The SAC does not allege that the calculation of the revenue charge was anything other than complex, necessitating "extensive discussions" with the Company's advisors and confirmation with auditors before finalization, and it does not claim that those discussions ended before the Q4 Revenue Charge was disclosed. Ex. N (Plug Power Board of Directors Minutes) at -1934; Ex. K at 46-47; *see also* SAC ¶¶ 91-96. In fact, the February 24 KPMG presentation cited by Plaintiff *confirms* exactly this: the Q4 Revenue Charge was a "critical accounting estimate" with "a high degree of judgment," that required significant audit work, including analyzing Amazon purchase orders and historical purchasing practices. Ex. U at -1604. Plaintiff's conclusory fraud-by-hindsight allegations that these complex calculations must have been complete earlier without more are insufficient to show actual knowledge or reckless disregard. *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *13 (S.D.N.Y. Mar. 30,

---

[19] To the extent that Plaintiff is arguing scienter based on the fact that Marsh and Middleton were "necessarily involved" in the preparation of the Company's response to SEC comment letters, such an allegation would "not satisfy the stringent particularity requirement imposed by [FRCP] 9(b) [because] they are conclusory accusations founded on nothing more than defendants' corporate positions and are entitled to no weight." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2014 WL 7176187, at *6 (S.D.N.Y. Dec. 16, 2014).

2018) (no scienter where complaint "fails to reference a single internal [] document or confidential source" and does not "include any dates or time frame in which Defendants were put on notice of contradictory information"); *In re Iconix Brand Grp., Inc.*, 2017 WL 4898228, at *18 (S.D.N.Y. Oct. 25, 2017) (same).[20]

### 2. The Amazon Warrant Was Not Plug Power's Core Operation And Is Not A Basis For Inferring Scienter.

According to Plaintiff, the Amazon Warrant "concern[s] critical aspects of Plug Power's core operations," such that Defendants knew or were reckless in not knowing sooner that Plug Power and Amazon would enter the Waiver Agreement and the Q4 Revenue Charge. SAC ¶ 346. It is unclear if the "core operations" doctrine has survived the passage of the PSLRA. *See* MTD Opinion at 33-34; *Shemian v. Research in Motion Ltd.*, 2013 WL 1285779, at *18 (S.D.N.Y. Mar. 29, 2013) ("[T]his Court has carefully considered the continued viability of the core operations inference in light of the PSLRA's heightened pleading requirement and found it lacking"). To the extent it is still viable, the core operations theory does not independently establish scienter and can be, at most, some evidence of scienter. *See* MTD Opinion at 34; *Lipow*, 131 F. Supp. 3d at 163.

Agreements with commercial counterparties regarding the issuance of company stock and related accounting judgments were not Plug Power's "core operations." *See City of Westland Police & Fire Ret. Sys. v. Sonic Sols.*, 2009 WL 942182, at *8 (N.D. Cal. Apr. 6, 2009) (rejecting argument that stock options program was defendant's core operations). Core operations are matters "critical to the long term viability of the company and events affecting a significant source of income." *Express Scripts*, 2017 WL 3278930, at *18. The operation must "either make up nearly

---

[20] Cases with former employee or confidential witness allegations—absent here—are routinely dismissed. *See Villare*, 2021 WL 4311749, at *7, 22 (no scienter despite seven confidential witnesses); *Wyche v. Adv. Drainage Sys., Inc.*, 2017 WL 971805, at *15 (S.D.N.Y. Mar. 10, 2017) (no scienter despite five former employees); *Magnum Hunter*, 26 F. Supp. 3d at 285, 298-99 (no scienter despite nine confidential witnesses).

all of a company's business or be essential to its survival." *Kandi*, 2019 WL 4918649, at \*7. The Warrant and Waiver Agreements do not concern the provision of hydrogen solutions or fuel cells, but instead relate to the Company's issuance of warrant shares to a commercial counterparty. *See* SAC ¶ 362 (Company's core operation is "providing hydrogen fuel cells and fuel to its customers"). Moreover, the calculation of the Q4 Revenue Charge involves complex accounting judgments. *See id.* ¶¶ 91-96. These are not "core operations" such that it is reasonable to infer that Marsh or Middleton knew or were reckless in not knowing if one of the largest companies in the world would agree to a new contract, when such agreement could be reached, and the accounting impact of such an agreement. *See Reilly*, 2018 WL 3559089, at \*18 (core operations doctrine inapplicable where case "involves a disputed technical accounting issue" that did not "undermine[] the ongoing viability of the Company's core business"); *Hensley v. IEC Elecs. Corp.*, 2014 WL 4473373, at \*5 (S.D.N.Y. Sept. 11, 2014) (core operations doctrine inapplicable because "accounting for 'work-in-process' inventory . . . could not be described as (and, more to the point, is not alleged in the Complaint to be) a core operation.").[21]

### D. Under The Mandatory *Tellabs* Balancing Test, The Non-Fraudulent Inferences Far Outweigh Any Inference Of Scienter.

The SAC lacks any facts that support a cogent and compelling inference of scienter when balanced, as the Court must, against non-fraudulent inferences. *Tellabs*, 551 U.S. at 314; *Kandi*, 2019 WL 4918649, at \*4; *Fries*, 285 F. Supp. 3d at 720. The Court must consider the facts taken as a whole, but here, Plaintiff's argument that "zero plus zero plus zero plus zero plus zero adds

---

[21] The fact that Amazon is a large client is not sufficient to establish that the Waiver Agreement and related accounting judgments were the "core operations" of Plug Power. *See* MTD Opinion at 32; *Express Scripts*, 2017 WL 3278930, at \*16 (not core operations despite "[t]he critical importance of Anthem as the company's largest client"); *Johnson v. Sequans Commc'ns S.A.*, 2013 WL 214297, at \*2, 17 (S.D.N.Y. Jan. 17, 2013) (not core operations despite that statements "regarded [defendant's] only business, its main customer," which "accounted for 66% of [its] total revenue in 2010"); *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 327, 344 (S.D.N.Y. 2011) (not core operations despite that "Macy's was largest customer by volume").

up to something" is incorrect. *City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008). Absent any facts showing that the Individual Defendants knew or should have known the application of the accounting principles leading to a financial restatement were incorrect at the time, the SAC asks the Court to accept an illogical theory, unsupported by citation to any contemporaneous documents or witness statements, under which Defendants purposefully misclassified certain costs using complex, technical accounting provisions (and with no real change to the Company's cash position or net losses), just to pursue the typical corporate activity of raising capital, and to continue routine trading under Rule 10b5-1 plans. Further, without any facts suggesting that an agreement with Amazon was reached any earlier than the Waiver Agreement was signed on December 31, 2020 or that the complex accounting judgments could be or were concluded earlier than the Company's fourth quarter reporting, Plaintiff asks the Court to believe that Plug Power hid the agreement and accounting charge from investors, even while knowing that the agreement would be disclosed within four business days of execution and even though the underlying assumptions to calculate that charge were not available until the Waiver Agreement was finalized, just to continue routine trading under Rule 10b5-1 plans, and despite that the market reacted *positively* to this news and caused the price of Plug Power's stock to soar.

By contrast, the non-culpable explanations are cogent and compelling. As to the Company's restatement, Plug Power's application of accounting guidance was incorrect because it was complex and technical and not due to any misconduct or override of internal controls, and neither Plug Power nor its auditors identified the errors until after fourth quarter earnings were announced when KPMG was finalizing its audit. This non-fraudulent inference is especially strong where, as here, there are no allegations of a single internal document or witness statement that anyone knew or should have known the application of the accounting judgments was incorrect;

the Company's independent auditor had issued clean audit opinions in each previous year; the accounting principles at issue were complex and technical and required significant judgments; the Company timely disclosed the accounting errors upon discovery; and there is no allegation that the accounting errors were the result of any override of controls or misconduct.

As for the warrant, while Plug Power may have hoped to accelerate vesting of the warrant shares in the fourth quarter of 2020 so that it could simplify its financial reporting, Plug Power could not unilaterally amend the terms of Warrant Agreement, it had no ability to force a large commercial counterparty to amend on the Company's preferred timetable, and waiver of vesting was uncertain until the Waiver Agreement was signed on December 31, 2020. The Company promptly disclosed the Waiver Agreement, and set to work performing the complex task of finalizing the projections of probable Amazon revenue so that it could determine the grant dates for the shares in the third tranche, then calculating the two different grant-date fair values, and confirming its significant judgments, calculations, and assumptions with its auditor before disclosing the information to investors. This non-fraudulent inference is especially strong where, as here, there are no allegations of a single internal document or witness statement that agreement was reached or calculations were completed earlier; the Company had robust disclosures regarding the Warrant Agreement, including impact to revenue and calculation of grant-date fair value; the calculation of the grant-date fair value of the shares was complex, required significant judgments and unknowable assumptions, and could only be determined after the grant date; and the Company timely disclosed the waiver and its fourth quarter financial results.

## II.    THE SAC DOES NOT ALLEGE ANY ACTIONABLE OMISSIONS WITH RESPECT TO THE AMAZON WARRANT.

The SAC must also be dismissed because it fails to plead a material omission related to the Amazon Warrant. Plaintiff alleges no misstatement in the disclosure of the Waiver Agreement and

the Q4 Revenue Charge; only that the Company ought to have disclosed this information sooner and should have described the Warrant Agreement as "unsustainable." *See* SAC ¶¶ 272-78, 287-90, 297-312, 319-22. Neither theory has merit. The Company disclosed the Warrant Agreement and the Q4 Revenue Charge on the timeline required by the securities laws, and there is no obligation for the Company to disparage itself and its agreements.

To plead securities fraud based on an omission, Plaintiff must show that Defendants "had a duty to disclose the omitted information," *Oklahoma L. Enf't Ret. Sys. v. Papa John's Int'l, Inc.*, 517 F. Supp. 3d 196, 207 (S.D.N.Y. 2021); *see also Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 & n.3 (2015). A material event, such as the Waiver Agreement, must be disclosed within four business days after the event occurs. Ex. AA (Form 8-K General Instructions) at 2, 22. Plug Power did this via a Form 8-K filed on January 5, 2021. Ex. Q. There was no requirement to disclose the Waiver Agreement before execution. *See Vladimir v. Bioenvision Inc.*, 606 F. Supp. 2d 473, 485 (S.D.N.Y. 2009) ("There is no specific duty to disclose merger negotiations . . . until they become definitive agreements."). Likewise, the Company was required to disclose its annual financial results, including the Q4 Revenue Charge, on a Form 10-K "60 days after the end of the fiscal year covered by the report for large accelerated filers," or March 2, 2021. Ex. Z at 1. Plug Power announced its fourth quarter results, including the Q4 Revenue Charge, on February 25, 2021, within the required timeframe. *See* Ex. A; Ex. V, Ex. 99.1 at 1. Defendants were not obligated to disclose any earlier. *Pehlivanian*, 153 F. Supp. 3d at 651-52 (no duty to disclose information "disclosed at its regularly scheduled quarterly earnings announcement . . . earlier than it did").[22]

---

[22] *See also In re Coty Inc. Sec. Litig.,* 2016 WL 1271065, at *6 (S.D.N.Y. Mar. 29, 2016) ("courts have been reluctant to impose liability based upon a failure to disclose financial data for a fiscal quarter in progress . . . the SEC and the case law recognizes how unworkable and potentially misleading a system of instantaneous disclosure out of the normal reporting periods would be, especially since an immediate release of data would likely be without the benefit

Plaintiff's reliance on Item 303 of Regulation S-K, which requires disclosure of "material trends, events, and uncertainties," does not save his claim. *See* SAC ¶¶ 277, 289, 308, 321. Under Item 303, "'Plaintiff[] must demonstrate actual knowledge of an existing trend, event, or risk to allege violations of Section 303.'" *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 302 (S.D.N.Y. 2021). Plaintiff must allege that a trend, demand, commitment, event or uncertainty was both "known" and "reasonably likely to have material effects on the registrant's financial condition or results of operations." *Rubinstein v. Credit Suisse Grp. AG,* 457 F. Supp. 3d 289, 300 (S.D.N.Y. 2020); *see* 17 C.F.R. § 229.303(a)(1). But the SAC does not plead that any of the allegedly omitted facts were *known*: any modification to the Warrant Agreement before December 31, 2020 was entirely hypothetical; it was impossible for the Company to estimate the Q4 Revenue Charge *before* the Waiver Agreement was reached; and there are no facts (as opposed to conclusory statements) to contradict Marsh's statement on January 26, 2021 that he still *did not know* the Q4 Revenue Charge because the calculations and auditor confirmations were still ongoing. Ex. S at 12; *see also* SAC ¶ 172. To the extent the alleged omission is based on a duty to disclose under Item 303, it must be dismissed. *See Johnson*, 2013 WL 214297, at *12 (defendants' statements must be judged by "by assessing the facts as they existed" at the time).

Finally, to the extent Plaintiff alleges that Plug Power failed to describe the Warrant Agreement as "unsustainable" or state that the Warrant Agreement had "severe financial consequences," such omissions are inactionable. A "company has no duty to disparage its own competitive position in the market where it has provided accurate hard data from which analysts and investors can draw their own conclusions about the company's condition and the value of its

---

of reflection or certainty provided by the traditionally recognized reporting periods"); *Arfa v. Mecox Lane Ltd.,* 2012 WL 697155, at *9 n.1 (S.D.N.Y. Mar. 5, 2012), *aff'd*, 504 F. App'x 14 (2d Cir. 2012) (dismissing claim where no authority "for the proposition that Defendants were obligated to disclose the results of a quarter in progress").

stock." *Silsby v. Icahn*, 17 F. Supp. 3d 348, 362 (S.D.N.Y. 2014); *Emerson v. Mut. Fund Series Tr.*, 393 F. Supp. 3d 220, 252 (E.D.N.Y. 2019) (same); *see also AstraZeneca*, 2022 WL 4133258, at *7 ("no generalized duty to disclose negative facts"). Plug Power disclosed the Waiver Agreement and the Q4 Revenue Charge. *See supra* at 8-9.[23] "Having disclosed that hard data," the accuracy of which Plaintiff does not (and cannot) contest, Plug Power had no duty to denigrate the agreements. *See Silsby*, 17 F. Supp. 3d at 362 ("no duty to use the term 'insolvent' when describing the financial condition of" company); *Emerson*, 393 F. Supp. 3d at 252 (no duty to "include language overtly criticizing the soundness of [company's] investment strategy").

## III. THE SAC FAILS TO PLEAD LOSS CAUSATION.

The SAC also must be dismissed in its entirety for the additional reason that it fails to plead loss causation. Plaintiff must allege that "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005). Plaintiff must allege that the price "fell significantly after the truth [of the fraud] became known." *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Plaintiff bases his loss causation claim on three alleged corrective disclosures dated February 25, 2021, March 2, 2021, and March 16, 2021. *See* SAC ¶¶ 394-404. But these disclosures—at most—merely revealed disappointing news, not any misconduct or fraud. *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (no loss causation where article did not include "any new information . . . regarding Omnicom's alleged fraud"); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 389 (E.D.N.Y. 2013) (no loss causation where earnings releases did not "contain any disclosure of the alleged fraud").

---

[23] "A complaint fails to state a § 10(b) claim when the alleged omission has actually been disclosed." *Altimeo Asset Mgmt. v. WuXi PharmaTech Inc.*, 2020 WL 6063539, at *5 (S.D.N.Y. Oct. 14, 2020); *see also In re Progress Energy, Inc.*, 371 F. Supp. 2d 548, 552 (S.D.N.Y. 2005) (same).

The February 25, 2021 disclosure merely quantified the previously-disclosed "substantial" fourth quarter revenue charge. Ex. V, Ex. 99.1.[24] Likewise, the March 2, 2021 announcement that the Company would not file its annual report on time, while disappointing, did not suggest misconduct or fraud. Rather, it stated that the Company was reviewing its accounting judgments, and confirmed that any adjustments would be "non-cash" and "would not impact the Company's guidance on forward projections." Ex. W at 1. And on March 16, 2021, the Company told investors it would restate its 2018, 2019 and 2020 financial statements. *See* Ex. Y at 2. While disappointing, the disclosure dispelled any notion that Plug Power acted inappropriately, stating that the restatement was not the result of "any issues related to an override of controls or misconduct." *Id*. at 2-3. The SAC fails to plead loss causation.

## IV.    PLAINTIFF'S SECTION 20(a) CLAIM MUST BE DISMISSED.

Because Plaintiff fails to plead a primary securities law violation, Plaintiff's claim under Section 20(a) must also be dismissed. 15 U.S.C. § 78t(a); *Lipow*, 131 F. Supp. 3d at 173 ("Given that a control person liability claim under § 20(a) is predicated on a primary violation of the securities laws, the control person liability claims must be dismissed because Plaintiff has failed to allege a primary violation under § 10(b)."); *Abengoa*, 481 F. Supp. 3d at 215 (same).

### CONCLUSION

For the foregoing reasons, the SAC should be dismissed with prejudice. *See Hensley*, 2014 WL 4473373, at *6-7 (denying motion for leave to amend absent any indication that plaintiffs "could allege any additional facts to establish the requisite intent"); *see also Bldg. Trades Pension Fund*, 2022 WL 784017, at *16 (same); *Papa John's*, 517 F. Supp. 3d at 215 (same).

---

[24] Disagreement with the Waiver Agreement is not fraud. *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 249 (S.D.N.Y. 2020) (dismissing where claim concerned strategy, not "adequacy of disclosures"); *Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 303 (S.D.N.Y. 2010) ("disagreements with Defendants' business judgments . . . are not actionable under Section 10(b)").

-36-

Dated:  January 12, 2023

Respectfully submitted,

PLUG POWER, INC., ANDREW MARSH, AND
PAUL B. MIDDLETON

By their attorneys,

*/s/ Deborah S. Birnbach*

Deborah S. Birnbach
Jennifer B. Luz
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel.: 617.570.1000
Fax: 617.523.1231
DBirnbach@goodwinlaw.com
JLuz@goodwinlaw.com

-37-

## CERTIFICATE OF SERVICE

I, Deborah S. Birnbach, hereby certify that a copy of the foregoing Memorandum of Law in Support of Defendants' Motion to Dismiss the Consolidated Second Amended Class Action Complaint For Violations of the Federal Securities Laws, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on January 12, 2023.

Dated: January 12, 2023                    */s/ Deborah S. Birnbach*____