# Exhibit R

January 14, 2021

Ms. Melissa Raminpour
Mr. Andrew Blume
Office of Manufacturing
Division of Corporation Finance
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C.  20549

**RE:     Plug Power Inc.**
         **Form 10-K for Fiscal Year Ended December 31, 2019**
         **Filed March 10, 2020**
         **Form 8-K filed November 9, 2020**
         **File No. 001-34392**

Dear Ms. Raminpour and Mr. Blume:

This letter is submitted on behalf of Plug Power Inc. (the "Company," "Plug," "we," "us," or "our") in response to the comments of the Staff of the Division of Corporation Finance (the "Staff") of the U.S. Securities and Exchange Commission (the "Commission") as set forth in your letter to the Company dated December 16, 2020. For your convenience, the Staff's comments and the responses thereto are set forth sequentially below.

Form 10-K for the Fiscal Year Ended December 31, 2019

Management's Discussion and Analysis of Financial Condition and Results of Operations
Results of Operations, page 28

1.     **Where you identify intermediate causes of changes in your operating results, also describe the reasons underlying the causes. For example, you indicate that the fiscal 2019 increase in revenue from sales of fuel cell systems and related infrastructure was due in part to an increase in units sold and a "change in product mix and variations in customer programs". Please explain in reasonable detail the reasons for these trends, including why unit sales increased and the specific changes in product mix and customer programs that drove the revenue increase. See SEC Release No. 33-8350.**

Company Response:

In future filings, we will include narrative disclosure describing the reasons underlying the causes of changes in our operating results in the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations." The following is an example of the narrative disclosure that we plan on including in our future filings, using the revenue from sales of fuel cell systems and related infrastructure disclosure from Plug's Form 10-K for the fiscal year ended December 31, 2019 referenced in the Staff's comment letter:

*Revenue – sales of fuel cell systems and related infrastructure.* Revenue from sales of fuel cell systems and related infrastructure represents revenue from sale of our fuel cells, such as GenDrive units and GenSure stationary backup power units, as well as hydrogen fueling infrastructure referred to at the site level as hydrogen installations.

Revenue from sales of fuel cell systems and related infrastructure for the year ended December 31, 2019 increased $42.6 million, or 39.7% from $107.3 million for the year ended December 31, 2018. Included within revenue was provision for commons stock warrants of $2.0 million and $4.9 million for the years ended December 31, 2019 and 2018, respectively. The main drivers for the increase in revenue were the increase in GenDrive units recognized as revenue, change in product mix and variations in customer programs, as well as a decrease in the aforementioned provision for common stock warrants, partially offset by a decrease in revenue from hydrogen fueling infrastructure installations.

There were 6,058 GenDrive units recognized as revenue during the year ended December 31, 2019, compared to 4,426 for the year ended December 31, 2018 as customers continued to increase their use of fuel cells. The increase in GenDrive units resulted from a combination of both new customers and greater penetration with existing customers, many of which have a large number of facilities. The increase in GenDrive revenue was partially offset by a decrease in hydrogen fueling infrastructure installations and lower average selling price per installation. There were 12 sites associated with hydrogen fueling infrastructure revenue during the year ended December 31, 2019, compared to 17 during the year ended December 31, 2018. Further, the sites sold in 2019 were smaller configurations yielding lower total revenue per site.

We continue to enhance our GenDrive units, resulting in lower maintenance costs, higher run times, and greater efficiency. These enhancements have resulted in higher demand for our GenDrive product, as well as higher sales prices. In addition, the Company continues to broaden its customer portfolio. Pricing varies amongst customers depending on application and in general the Company has been able to increase average selling prices for GenDrive units by broadening small to medium size customers, resulting in fewer volume discounts.

Equity Instruments, page F-18

2.    **Please address the following comments related to your accounting for the warrants issued under the Amazon and Walmart Transaction Agreements:**

- **We note that you appear to have adopted both ASU's 2019-08 and 2018-07 as of January 1, 2019. Tell us in sufficient detail how you applied the transition guidance related to these standards. In doing so, specifically clarify why you did not recognize a cumulative effect of the change on retained earnings as of the beginning of the adoption period. See ASC 718-10-65-11(f) and 718-10-65-15(g).**

Company Response:

We respectfully advise the Staff that we adopted both ASU 2019-08 and 2018-07 on January 1, 2019 using the modified retrospective transition approach. In order to determine the impact of the cumulative effect adjustment of adoption, we remeasured the second tranche of warrants at their grant date value. Previously, the warrants were measured by estimating their vesting date value. We calculated the impact of adoption as the change in revenue recorded through January 1, 2019 attributable to the change in value of variable consideration for the second tranche of warrants. Variable consideration payable to Amazon and Walmart attributable to revenues recognized through the date of adoption increased by approximately $10,000. We concluded this amount was insignificant and accordingly we did not record an adjustment to our accumulated deficit as of January 1, 2019. In accordance with 718-10-65-15(f) (2)(iii), no remeasurement of the first tranche of warrants was required upon adoption, because the first tranche of Amazon and Walmart warrants had been settled prior to January 1, 2019. Further, there was no impact associated with the third tranche of warrants, as no revenue recorded through the date of adoption was subject to variable consideration under the third tranche. In addition, the third tranche of warrants was not deemed to have been granted at January 1, 2019, because the exercise price of such warrants had not yet been determined.

- **Clarify for us how, if at all, adoption of the ASU's impacted the timing of when you recognize the provision for the second and third warrant tranches.**

Company Response:

Under ASC 606, the Amazon and Walmart warrants are variable consideration payable to the customer. We record a charge for warrants against revenue as revenue is recognized for sales to Amazon and Walmart. The adoption of ASU 2019-08 and 2018-07 did not impact the timing of when we recognize charges for the Amazon and Walmart warrants. The adoption of the ASU's only impacted the measurement of the warrants included as an element of variable consideration. ASU 2019-08 serves to fix the value of the warrants at their grant date, rather than requiring us to estimate their value at a future vesting date. The third tranche of warrants was not remeasured at January 1, 2019, because the exercise price, a key term, had not yet been determined and accordingly the grant date had not yet occurred.

- **Based on your disclosure on page 34 of the Form 10-Q for the quarterly period ended September 30, 2020, we note that you recognized a significant increase in the Amazon warrant provision during the quarter, including a "provision for losses" of $4.3 million. Explain to us in sufficient detail how you measure and recognize the third Amazon warrant tranche. In doing so, explain how adoption of the aforementioned ASU's and the establishment of the exercise price during 2020 impacted your accounting, particularly as it pertains to the timing and amounts of the related warrant provisions. Also reconcile for us the $17.3 million amount disclosed as a reduction of revenue for the three months ended September 30, 2020 with the $23.8 million amount disclosed as constrained revenue.**

Company Response:

We first began to recognize revenue from Amazon subject to variable consideration determined based on the terms of the third tranche of warrants in the three months ended September 30, 2020. Vesting of the Amazon warrants is based on aggregate cash payments received by Plug from Amazon. Therefore, the grant date for the third Amazon warrant tranche was November 2, 2020, the date at which the final key term of the third tranche, exercise price, was determined. As of November 2, 2020, we had collected $200.0 million in cumulative, aggregate payments from Amazon, resulting in final vesting of the second Amazon warrant tranche, and triggering the determination of the exercise price of the third tranche as described below. The value of warrants in the third Amazon tranche was measured utilizing a Black Scholes Merton model based on the terms of the award at the November 2, 2020 grant date. The exercise price of the third Amazon warrant tranche was determined in accordance with the terms of the warrant as an amount equal to ninety percent (90%) of the 30-day volume weighted average share price of our common stock as of the final vesting date of the second Amazon warrant tranche.

As a result of appreciation in our stock price in the second half of 2020 and the related impact on the exercise price of the warrants, the value of variable consideration payable to Amazon increased substantially, from $30.6 million allocable to $200 million in second tranche gross revenues, or $0.15 per $1.00 of gross revenue recorded, to $215.9 million allocable to $400 million in third tranche gross revenues, or $0.54 per $1.00 of gross revenue recorded. In addition to constraining certain revenues subject to the third tranche as discussed further below, we considered the impact of this increase in warrant provisions on our service contracts, which we review quarterly to determine if any are in a loss position. Given the projected increase in the provision for warrants, we determined that a number of Amazon service contracts were in a loss position as of September 30, 2020, and as a result recognized a $4.3 million charge in the third quarter of 2020.

The adoption of the ASU's did not impact the timing of when we recognize provision for the third Amazon warrant tranche, as the exercise price was not determined and accordingly no grant of the third tranche had occurred at adoption on January 1, 2019. Further, because the terms of the third Amazon warrant tranche were not known until after the adoption of the ASU's, the grant was deemed to be made and initially measured on November 2, 2020.

Our discussion of revenue for the three months ended September 30, 2020 was intended to illustrate the impact of the increased value of the third tranche warrants on reported revenue. During the three months ended September 30, 2020, the first $28.4 million of Amazon revenues recorded reflected variable consideration for the second tranche warrants of $4.4 million, resulting in reported revenue of $24.0 million. Upon allocation of the entire value of the second tranche of Amazon warrants in conjunction with $200.0 million in cumulative sales, we began to allocate the value of the third tranche of warrants to Amazon sales. The remaining gross Amazon revenues in the three months ended September 30, 2020 of $23.8 million was partially constrained by warrant charges of $12.9 million, resulting in reported revenue of $10.9 million. Total variable consideration related to Amazon revenue for the three months ended September 30, 2020 was $17.3 million, comprised of $4.4 million for the second tranche plus $12.9 million for the third tranche.

10. Convertible Senior Notes, page F-27

3.     **We note that you amortize the debt discount and transaction costs associated with the liability component of your $100 Million Convertible Senior Notes over the term of the notes. We note similar treatment for your 3.75% Convertible Senior Notes disclosed on page 27 of your Form 10-Q for the quarterly period ended September 30, 2020. Please tell us how your amortization policy complies with the guidance in ASC 470-20-35-13 requiring amortization of such items over the expected life of a similar liability that does not have an associated equity component.**

Company Response:

Our amortization policy for the $100 Million Convertible Senior Notes and the 3.75% Convertible Senior Notes (collectively, the "Notes") complies with the guidance to amortize the debt discount and transaction costs over the expected life of similar liabilities that do not have an associated equity component. The Notes may only be called by the holders in the event of a fundamental change, as defined, and may only be redeemed by the Company in the event of certain appreciation in the Company's stock price, as defined. We have concluded that these criteria are of remote likelihood to occur and accordingly we amortize the debt discount and transaction costs over the contractual term of the instruments.

15. Employee Benefit Plans, page F-36

4.     **Please tell us how you determined it was appropriate to use the simplified method in determining the expected term of your stock option grants. See SAB Topic 14D.**

Company Response:

In accordance with SAB Topic 14D, we concluded that it was appropriate to use the simplified method in determining the expected term of stock option grants because our historical stock option exercise data is limited, and alternative information, such as exercise data relating to employees of other companies, is not easily obtainable. Due to the lack of historical appreciation in the Company's stock price, the Company had a limited number of stock option exercises through December 31, 2019. As such, the Company concluded that its historical share option exercise experience did not provide a reasonable basis upon which to estimate expected term and instead utilized the simplified method to determine the expected term.

18. Commitments and Contingencies, page F-42

5.     **We note your disclosure on page F-43 that you have "sold future services to be performed associated with certain sale/leaseback transactions and recorded the balance as a finance obligation." Please clarify what this statement means and tell us the specific accounting guidance you are using for these future services.**

Company Response:

The Company's sale/leaseback arrangements generally provide for a combination of fuel cell systems and infrastructure, installation, maintenance, spare parts, fuel delivery and other support services to be provided to customers in connection with Power Purchase agreements. The proceeds received by the Company from financial institutions at closing under sale/leaseback arrangements are allocated to the various performance obligations and include amounts for services to be provided by Plug prospectively over time. The Company has significant continuing involvement in the generation of the cash flows due to the financial institution, in the form of services provided to customers over the related contractual term. As discussed in ASC paragraph 470-10-25-2 (b), in such instances, significant continuing involvement by the lessee presumes that cash proceeds allocated to future service performance obligations should be classified as financing obligations on our consolidated balance sheets, which is appropriate to our circumstances.

Form 8-K filed November 9, 2020

Exhibit 99.1, page 1

6.  **We note that the introductory bullets and the "Recap of the Third Quarter Financials" section do not discuss any results on a GAAP basis. We further note that the recap and headline reference a "record" quarter in several places. Considering you experienced declines in gross profit, operating losses, and net losses during the three and nine month periods ended September 30, 2020, please provide a more balanced presentation that also discussed your trends and results on a GAAP basis.**

Company Response:

We respectfully acknowledge the Staff's comment and will revise our future filings to provide a more balanced presentation of our results that also includes our trends and results on a GAAP basis.

7.  **Please address the following comments related to the non-GAAP measures and operational metrics provided in your filing:**

    - **We note that you quantify and discuss "gross billings" in the introductory bullets and the immediately following discussion. Considering the importance that you attribute to this metric, please revise future filings to provide your investors with a clear definition of gross billings and how it is calculated, the reasons why the metric is useful to investors, how management uses the metric, and disclosure of any significant estimates or assumptions underlying the metric.**

Company Response:

We respectfully acknowledge the Staff's comment and will revise future filings to provide our investors with a clear definition of gross billings and how it is calculated, the reasons why the metric is useful to investors, how management uses the metric, and disclosure of any significant estimates or assumptions underlying the metric. The following is the disclosure we intend to make in future filings which is consistent with our supplemental response dated December 27, 2018 to the Staff's letter dated September 5, 2018:

Gross billings is based on the invoice value of equipment deployed and services rendered. Invoice value of equipment is measured on a relative basis using cash value within contracts with customers and it is attributed to the period in which the equipment is deployed. To that amount, the Company adds the invoice value for services rendered in the period. These services include fuel provided, extended warranty contracts serviced, power provided under Power Purchase agreements, etc. The Company's objective in presenting gross billings is to present to investors an operating metric that conveys commercial growth over time. Management also uses this operating metric as a measurement of commercial growth, as well as establishing performance targets, annual budgets and makes operating decisions based in part on gross billings. The significant estimates and assumptions underlying the metric include the allocation of revenue, excluding the provision for warrants, based on relative stand along selling prices used in our GAAP revenue numbers.

- **We note that you have titled several of your non-GAAP measures as "proforma." Based on the information in the filing, it does not appear that this information is pro forma financial information based on the guidance in Article 11 of Regulation S-X. If true, please revise to more clearly identify these measures as non-GAAP, eliminating the use of the term "proforma."**

Company Response:

We respectfully acknowledge the Staff's comment and will revise future filings to eliminate the use of the term "proforma" and more clearly identify certain measures as non-GAAP, where appropriate.

- **We note that you present non-GAAP "proforma" Adjusted EBITDA, operating loss, gross profit, and diluted net loss per share measures that exclude provisions for common stock warrants and loss contracts related to service. Considering these provisions are directly related to revenue generating activities with customers, please amend your filing to remove these adjustments across all of your non-GAAP measures. See Question 100.04 of the Compliance and Disclosure Interpretations on Non-GAAP Financial Measures. In this regard, we note that in a response letter dated December 27, 2018, you indicated that you would no longer make an adjustment for the provision for customer common stock warrants when determining adjusted gross profit. Please help us understand why you have reversed, or appear to have reversed, this previously communicated position and presented additional non-GAAP financial measures reflecting this adjustment.**

Company Response:

Except for the third quarter 2020 earnings release, the Company has not been adding back the warrant provisions to non-GAAP financial measures nor does it plan to do so going forward.

The warrant adjustments presented in the third quarter earnings release were intended solely to provide transparency on a topic that investors frequently inquire about and for which there were unusual circumstances, including a significant, unexpected change in warrant value and a potential near-term full vesting of the warrants. We believe it was important to illustrate the significant appreciation in the third tranche of Amazon warrants as compared to the second tranche of warrants, as well as the significant impact on revenue recognized in the statement of operations. As discussed above in response to comment 2, certain Amazon revenue recognized in the third quarter of 2020 was required to be constrained by the third trance tranche of the Amazon warrants. The exercise price for the third tranche was set on the day the final installment of the second tranche vested, which was November 2, 2020. The exercise price for the third tranche was determined by taking 90% of the 30-day VWAP of Plug's common stock as of the trading day preceding November 2. Plug's stock price increased significantly during the third quarter and early fourth quarter of 2020, which was not forecasted by the Company. From June 30, 2020 to September 30, 2020, Plug's stock price increased by 63% from $8.21 to $13.41. In fact, the stock price closed as high as $17.88 in October of 2020. The unforeseen increases in Plug's common stock price significantly increased the 30-day VWAP used for determining the exercise price for the third tranche of warrants. On November 2, 2020, the exercise price for the third tranche was set at $13.81, compared to $1.1893 for the first and second tranches. This resulted in the fair value of the third tranche of warrants being $10.60 each, compared to $1.05 each for the first and second tranches which represented a 909.5% increase. As the increase in stock price and resulting increase in the value of the third tranche of warrants was unexpected, the Company had not forecasted the sudden increase in provision for warrants in the third quarter of 2020. The Company had forecasted $0.15 of provision for warrants per dollar of revenue vs. the $0.54 per dollar of revenue that the third tranche would require. Given the magnitude and unexpected nature of the change, Plug believed it was important to exclude the provision for warrants from certain non-GAAP financial metrics for the third quarter in order to provide investors more transparency regarding what occurred. Without this adjustment, Plug believes that investors would have been confused based on their understanding of prior guidance provided by the Company. Understanding the impact of our provision for warrants is one of the most frequent inquiries we receive from investors and analysts and the significant change impacting the third quarter was outside of previous guidance and historical trends.

As important, at the time of our third quarter earnings release, Plug was in discussions with Amazon to immediately vest the third tranche of warrants and Plug believed that this vesting would occur by the end of the fourth quarter of 2020. In fact, on December 31, 2020, the Company waived the remaining vesting conditions under the warrant, which resulted in the vesting of the remaining 20,368,784 unvested shares under the warrant. This vesting is expected to result in a substantial one-time non-cash charge in the quarter ended December 31, 2020. This anticipated event and accounting was expected to significantly change the future trends for these warrant provisions. Because of the potential full vesting of the third tranche in the fourth quarter, the related expected substantial warrant charge, and the anticipated impact on future trends, the Company believed it was important in these unique circumstances to present in the third quarter earnings release the above non-GAAP measures excluding the provision for warrants to provide context. As stated above, the Company does not intend to adjust any non-GAAP measures for the customer warrant provision going forward.

- **We refer to your presentation of Adjusted EBITDA and note that you present it as a measure of your performance. In response letters dated December 27, 2018 and May 8, 2019, you indicated that you consider adjusted EBITDA to be a liquidity measure and that cash flows from operations represent the most directly comparable GAAP measure. Further, in a response letter dated July 5, 2019, you indicated that you would revise the calculation of this liquidity measure in future filings to remove an adjustment that had the effect of excluding the cash flow effects associated with changes in working capital from the measure. Please explain to us why your current presentation contradicts your prior correspondence with us.**

Company Response:

In connection with the comment letter dated September 5, 2018, Plug engaged in discussions with the Staff regarding our presentation of Adjusted EBITDA and the add back of the provision for warrants. At the time, Plug presented Adjusted EBITDA as a performance measure. Based on discussions with the Staff, Plug presented Adjusted EBITDA as a liquidity measure in its earnings release for the quarter ended December 31, 2018, and in doing so excluded the cash flow effects associated with changes in working capital in addition to the exclusion of customer warrant charges. Subsequently, in a letter dated April 24, 2019, the Staff objected to the fact that our Adjusted EBITDA presentation for the first quarter of 2019 excluded the cash flow effects associated with changes in working capital. Plug did not believe that presenting Adjusted EBITDA as a liquidity measure that included the cash flow effects associated with changes in working capital was meaningful to investors. As such, beginning in the second quarter of 2019, the Company reverted back to presenting Adjusted EBITDA including customer warrant charges as a performance measure, as the most closely aligned measure. Adjusted EBITDA is defined as operating income(loss), plus stock-based compensation, plus depreciation and amortization, plus right of use asset depreciation and interest associated with PPA financings, plus costs associated with acquisitions, restructuring and other charges. Management uses Adjusted EBITDA as a basis for evaluating the Company's performance as well as for forecasting future periods. Management also establishes performance targets, annual budgets and makes operating decisions based in part upon Adjusted EBITDA. This particular measure, in addition to providing increased insight into the level of customer warrant charges, is routinely solicited by and discussed with key stakeholders, including investors, analysts, customers, vendors, etc.

- **We note that Adjusted EBITDA includes an adjustment for the "Right-of-use asset depreciation and interest associated with PPA financings" which includes amounts "equal to operating lease expense." Tell us the reasons you adjust for operating lease expense and explain how your treatment complies with Question 100.01 of the Compliance and Disclosure Interpretations on Non-GAAP Financial Measures.**

Company Response:

As previously discussed in our response dated May 8, 2019 to the Staff's letter dated April, 24, 2019, Adjusted EBITDA incudes an adjustment for the right of use asset depreciation and interest associated with PPA project financings. Over the years the Company has utilized a variety of financing arrangements to fund growth and PPA project deployments including straight corporate debt, capital leases, and operating leases. Accounting Standards Codification Topic 842, adopted by Plug effective January 1, 2018, required the Company to record a debt liability and an associated right of use asset for operating leases to provide consistency in balance sheet presentation. As per the standard, on a prospective basis the Company is required to record the associated depreciation for the right of use asset and associated interest expense within the income statement.

For straight corporate debt or capital leases, principal and non-cash interest is excluded from the Company's operating cash flows based on GAAP and the associated cash-based interest is added back to Adjusted EBITDA to exclude existing debt service. Likewise, the depreciation for assets financed via capital leases and straight corporate debt is excluded from the Company's Adjusted EBITDA calculation. As with other existing debt service exclusions, right of use asset depreciation and interest expense reported within cost of goods sold (which equates to principal and interest expense), is added back to the Company's Adjusted EBITDA for purposes of excluding any debt service and depreciation. Hence, the final calculation completely excludes all depreciation, interest expense, and principal debt service from the Adjusted EBITDA metric, which as previously discussed is an operating performance metric extensively used by the Company and its stakeholders. It is particularly relevant in the case of the Company given the substantial level of project financing the Company utilizes.

- **Please provide us with an understanding of the disclosure controls and procedures in place as they relate to non-GAAP financial measures and specifically address how changes to non-GAAP measures are to be disclosed in accordance with these procedures.**

Company Response:

Plug follows internal policies, practices and procedures (including formal Disclosure Controls and Procedures) with respect to all filings with the Commission as well as all other public disclosures. Specifically, with respect to non-GAAP financial measures, Plug does not include such measures in its Quarterly Report on Form 10-Q and Annual Report on Form 10-K filed with the Commission, but does include such measures in its quarterly earnings releases. Such non-GAAP measures and related disclosures are initially prepared by Plug's assistant controller, and then reviewed by and discussed with Plug's controller and CFO. The review performed by the controller and CFO includes agreeing amounts to source documents and recalculating amounts as appropriate.

Once the non-GAAP financial measures are prepared, reviewed, discussed and revised as appropriate, the relevant disclosure is included in a draft of the earnings release. The earnings release is then reviewed by and discussed with Plug's legal department and CEO. At this point, any changes in non-GAAP financial measures and related disclosures are discussed by the CFO with the legal department and CEO. When considering the use and appropriateness of non-GAAP financial measures, and changes in such measures, Plug's management considers, among other things, applicable Commission rules and guidance, including Regulation G, relevant Compliance and Disclosure Interpretations and past comment letters from, and discussions with, the Staff.

Once the legal department and the CEO have completed their reviews of the earnings release the release is provided to Plug's Board of Directors. Plug's CEO and CFO review and discuss the earnings release with the Board of Directors, including any discussion of non-GAAP financial measures and changes in non-GAAP financial measures. Following the Board's review, any final changes are incorporated into the earnings release prior to public distribution and filing with the Commission.

The process followed with respect to the non-GAAP financial measures included in our third quarter 2020 earnings release was consistent with that described above.

- **We note that Adjusted EBITDA includes an adjustment for the "impact of COVID-19." Please tell us and clearly disclose the nature of the COVID-related costs included within this adjustment. In your response, tell us the amount of this adjustment.**

Company Response:

We respectfully advise the Staff that COVID-related costs related to incremental costs associated with air freight of approximately $1.1 million in the time period between March and May of 2020, due to temporary closures of several supplier facilities due to COVID and the need to expedite via air freight to meet customer orders. Based on our inventory turns, those incremental charges turned to cost of goods sold in the quarter ended September 30, 2020.

**************************

If you should have any questions concerning this matter, please contact me at 518-738-0319 or Gerard L. Conway, Jr. at 518-738-0281.

PLUG POWER INC.


By:    /s/ Paul B. Middleton
Name: Paul B. Middleton
Title:  Chief Financial Officer

Cc: Gerard L. Conway, Jr.
     Robert P. Whalen, Jr., Goodwin Procter LLP
     Michael L. Draves, KPMG LLP