**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PLUG POWER, INC. SECURITIES LITIGATION | No. 1:21-cv-2004-ER <br><br> <u>JURY TRIAL DEMANDED</u> |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE**
**CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

Page(s)

I.      INTRODUCTION ...........................................................................................................1

II.     STATEMENT OF FACTS ............................................................................................3

    A.      Company Overview .............................................................................................3

    B.      The Company Enters into Stock Warrant Deals with Amazon and
Walmart ................................................................................................................4

    C.      The Amazon Deal Becomes a Debilitating Cost for Plug Power ...........................4

    D.      Throughout the Class Period Defendants Provided the Market with
False and Misleading Financial Information ...........................................................6

    E.      Plug Power Vests 20 Million Amazon Warrant Shares .........................................6

    F.      Individual Defendants Trade on Material Non-Public Information
to Net Tens of Millions of Dollars ........................................................................6

    G.      Plug Power Gains $1.5 Billion from SK Group's Investment ...............................7

    H.      Defendants Disregard Its External Auditor's Findings ..........................................7

    I.      The Truth About the Amazon Warrant Waiver is Revealed, and
Plug Power Is Forced to Restate Its Financial Statements ....................................7

    J.      Post-Class Period Facts Further Confirm that Plug Power Misled
the Market .............................................................................................................8

III.    THE SAC STATES AN EXCHANGE ACT § 10(B) CLAIM .......................................9

    A.      Legal Standard .....................................................................................................9

    B.      The SAC Alleges a Strong Inference of Scienter ...............................................10

        1.      The SAC Adequately Pleads a Strong Inference of Scienter
with Respect to the Company's Restatement .........................................10

            a.      Enticing a Monumental Deal with SK Group
Provided Defendants with Motive and Opportunity
to Engage in Fraud .......................................................................11

        b.       An Internal Document Shows that Individual
Defendants Knowingly or Recklessly Issued False
Financial Information to Investors During the Class
Period ...................................................................................... 13

   2.     The SAC Adequately Pleads a Strong Inference of Scienter
with the Respect to the Failed Amazon Transaction
Agreement ............................................................................................ 15

        a.       The SAC Pleads Specific Facts Demonstrating that
Defendants Knew or Were Reckless in Not
Knowing That a Waiver Agreement Would Be
Reached with Amazon ................................................................. 15

        b.       The SAC Pleads Specific Facts that Defendants
Knew or Were Reckless in Not Knowing the
Amount of Revenue Charge at the Time of the
Amazon Warrant Waiver ............................................................. 18

               i.       Plug Power's Own Documents Demonstrate
Knowledge of the Costs of the Amazon Warrant
Waiver .......................................................................... 19

               ii.      The Magnitude of the Amazon Warrant Waiver
Compels an Inference of Scienter .................................... 22

               iii.    Defendants Knew the Amazon Warrant Waiver
Was Vital to the Core Operations of Plug Power ............ 22

C.    The SAC Alleges Actionable Omissions with Respect to the
Amazon Warrant Waiver ...................................................................................... 25

   1.     Defendant Marsh's Statements During the 3Q2020
Earnings Conference Call Were Materially Misleading .......................... 25

   2.     The Amazon Warrant Waiver Form 8-K Materially
Mislead Investors about the True Cost and Cause of the
Waiver ................................................................................................... 27

   3.     Item 303 Required Defendants to Disclose Their Plan to
Execute the Amazon Warrant Waiver in November 2020
SEC Filings ........................................................................................... 28

   4.     Item 303 Required Defendants to Disclose of the Costs and
Dire Consequences of the Amazon Warrant Waiver in
January and February 2021 SEC Filings ................................................ 30

5.    Individual Defendants' Insider Trading Triggered a Duty to Disclose............................................................................32

D.    The SAC Adequately Pleads Loss Causation.......................................................34

IV.    THE SAC STATES AN EXCHANGE ACT § 20(A) CLAIM .......................................35

V.    CONCLUSION .................................................................................................................35

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Acito v. IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995) ................................................................................16

*Arfa v. Mecox Lane Ltd.*,
  2012 WL 697155 n.1 (S.D.N.Y. Mar. 5, 2012), *aff'd*,
  504 F. App'x 14 (2d Cir. 2012) .......................................................................32

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..........................................................................................9

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..........................................................................................9

*Caiola v. Citibank, N.A.*,
  295 F.3d 312 (2d Cir. 2002) .............................................................................25

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014) .............................................................................34

*Century Pacific, Inc. v. Hilton Hotels Corp.*,
  528 F. Supp. 2d 206 (S.D.N.Y. 2007)...............................................................15

*Chapman v. Mueller Water Prods., Inc.*,
  466 F. Supp. 3d 382 (S.D.N.Y. 2020)...............................................................18

*Chill v. Gen. Elec. Co.*,
  101 F.3d 263 (2d Cir. 1996) .............................................................................11

*City of Westland Police & Fire Ret. Sys. v. Sonic*,
  Sols., 2009 WL 942182 (N.D. Cal. Apr. 6, 2009) .............................................23

*Constr. Laborers Pension Tr. for S. California v. CBS Corp.*,
  433 F. Supp. 3d 515 (S.D.N.Y. 2020)...............................................................29

*Dobina v. Weatherford Int'l Ltd.*,
  909 F.Supp.2d 228 (S.D.N.Y. 2012)..................................................................24

*Dura Pharms. Inc. v. Broudo*,
  544 U.S. 336 (2005)..........................................................................................34

*ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ......................................................................10, 11

i

*Emerson v. Mut. Fund Series Tr.*,
  393 F. Supp. 3d 220 (E.D.N.Y. 2019)........................................................................29

*Francisco v. Abengoa, S.A.*,
  2021 WL 4136899 (S.D.N.Y. Sept. 10, 2021) ..........................................................23

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011)........................................................................33

*Hensley v. IEC Elecs. Corp.*,
  2014 WL 4473373 (S.D.N.Y. Sept. 11, 2014) ..........................................................24

*In re AstraZeneca plc Sec. Litig.*,
  2022 WL 4133258 (S.D.N.Y. Sept. 12, 2022), *appeal filed by*
  No. 22-2704, (2d Cir. Oct. 18, 2022).........................................................................26

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004)........................................................................24

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011)........................................................................35

*In re Bristol Myers Squibb Co. Sec. Litig.*,
  586 F. Supp. 2d 148 (S.D.N.Y.2008)........................................................................25

*In re Comm'n Statement*, SEC Release No. 8056,
  2002 WL 77153 (Jan. 22, 2002) ................................................................................29

*In re Coty Inc. Sec. Litig.*,
  2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016)............................................................32

*In re Diebold Nixdorf, Inc. Sec. Litig.*,
  2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021)............................................................18

*In re Express Scripts Holding Co. Sec. Litig.*,
  2017 WL 3278930 (S.D.N.Y. 2017)...........................................................................23

*In re JP Morgan Chase Sec. Litig.*,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005)........................................................................18

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014)..........................................................................33

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
  616 F. App'x 442 (2d Cir. 2015) ................................................................................10

*In re Magnum Hunter Res. Corp. Sec. Litig*,
  26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015) ........16

*In re Pareteum Sec. Litig.*,
 2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021)......................................................................22

*In re Rockwell Med., Inc. Sec. Litig.*,
 2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018)...............................................................25, 32

*In re Salix Pharms., Ltd.*,
 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ......................................................................27

*In re Scholastic Corp. Sec. Litig.*,
 252 F.3d 63 (2d Cir. 2001) .............................................................................................18, 22

*In re Scottish Re Grp. Sec. Litig.*,
 524 F. Supp. 2d 370 (S.D.N.Y. 2007)..................................................................................22

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
 2016 WL 1211858 (2d Cir. Mar. 29, 2016)..........................................................................28

*Jackson v. Abernathy*,
 960 F.3d 94 (2d Cir. 2020) ...................................................................................................10

*Johnson v. Sequans Commc'ns S.A.*,
 2013 WL 214297 (S.D.N.Y. Jan. 17, 2013) .........................................................................23

*Kalnit v. Eichler*,
 264 F.3d 131 (2d Cir. 2001) .................................................................................................13

*Lapin v. Goldman Sachs Grp., Inc.*,
 506 F. Supp. 2d 221 (S.D.N.Y. 2006)...................................................................................35

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
 797 F.3d 160 (2d Cir. 2015) .................................................................................................34

*Mgmts. Discussion & Analysis of Fin. Condition & Results of Operations, Exch. Act*
 S.E.C. Release No. 6835, 1989 WL 1092885 (May 18, 1989) .............................................29

*Medis Inv'r Grp. v. Medis Tech., Ltd.*,
 586 F. Supp. 2d 136 (S.D.N.Y. 2008), *aff'd*,
 328 F. App'x 754 (2d Cir. 2009).........................................................................................10

*Novak v. Kasaks*,
 216 F.3d 300 (2d Cir. 2000) ..................................................................................... 11, 14, 18

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*,
 153 F. Supp. 3d 628 (S.D.N.Y. 2015)...................................................................................32

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
 2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) .........................................................................9

*Plumbers and Steamfitters Local 137 Pension Fund v. Am. Express Co.*,
2017 WL 4403314 (S.D.N.Y. Sept. 30, 2017) ........................................................................27

*Reilly v. U.S. Phys. Therapy, Inc.*,
2018 WL 3559089 (S.D.N.Y. July 23, 2018) ........................................................................24

*Rothman v. Gregor*,
220 F.3d 81 (2d Cir. 2000) ...............................................................................................11, 18

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*,
75 F.3d 801 (2d Cir. 1996) ......................................................................................................32

*Silsby v. Icahn*,
17 F. Supp. 3d 348 (S.D.N.Y. 2014), *aff'd sub nom.*
*Lucas v. Icahn*, 616 F. App'x 448 (2d Cir. 2015) ................................................................29

*Stratte-McClure v. Morgan Stanley*,
776 F.3d 94 (2d Cir. 2015) ........................................................................................ 29, 30, 31

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)...................................................................................................................10

*Tyler v. Liz Claiborne, Inc.*,
814 F. Supp. 2d 323 (S.D.N.Y. 2011).....................................................................................23

*Vladimir v. Bioenvision Inc.*,
606 F. Supp. 2d 473 (S.D.N.Y. 2009).....................................................................................30

*Wilson v. Merrill Lynch & Co.*,
671 F.3d 120 (2d Cir. 2011) ......................................................................................................9

**Statutes**

15 U.S.C. § 78u–4(b)(2)..............................................................................................................10

**Regulations**

17 C.F.R. § 229.303(a)(3)(ii).......................................................................................................29

17 C.F.R. § 240.10b5-1(c)...........................................................................................................33

17 C.F.R. § 240.10b5-1(c)(1)(i)(A) ...........................................................................................33

17 C.F.R. § 240.10b5-1(c)(1)(ii)................................................................................................33

Lead Plaintiff Manfred Schumacher submits this memorandum of law in opposition to Defendants' motion to dismiss the Second Amended Class Action Complaint ("SAC").[1]

## I.    INTRODUCTION

The SAC alleges facts showing Defendants acted with scienter when issuing false financial information and when omitting material information concerning the Amazon warrant loss contract that wiped out over $400 million in future revenues. While Defendants' first Rule 12(b)(6) motion was *sub judice*, Lead Plaintiff found that Defendants had improperly sealed materials from the Delaware Court of Chancery's public docket. After Lead Plaintiff petitioned that court for disclosure, Defendants released information showing that during the Class Period, Plug Power's external auditor (KPMG) advised that Plug Power's proposed 4Q2020 financial statements were materially incorrect. Defendants intentionally, or at least recklessly, ignored that advice and reported the false numbers to investors anyway. The previously sealed documents also revealed communications with the SEC indicating Plug Power was obfuscating the financial effects of a pivotal warrant arrangement with Amazon. Indeed, there is additional information concerning the fraud that Defendants refused to unseal and is unavailable to Lead Plaintiff until discovery or a ruling by the Delaware Court of Chancery. However, what is known today is enough to sustain the claims alleged in the SAC.

The SAC alleges that Defendants intentionally, or at least recklessly, hid higher fuel delivery costs as research and development expenses from investors during the Class Period. These misclassifications shielded millions of dollars in fuel costs from negatively impacting reported revenue and profits and made Plug Power's business appear to be growing effectively. This scheme

---

[1] Unless otherwise defined, all capitalized terms have the same definitions as in the SAC, filed on November 21, 2022 (ECF No. 98). "¶__" refers to paragraphs in the SAC. "Mot." or "Motion" refers to Defendants' Brief in Support of the Motion to Dismiss filed on January 12, 2023 (ECF No. 104). "Rule" refers to the Federal Rules of Civil Procedure.

secured a partnership and over $1.5 billion investment from SK Group, the largest energy provider in South Korea, which stated that it invested due to Plug Power's proven growth. While the SK Group deal provides a strong motive for fraud, there is also the direct documentary link whereby KPMG advised Defendants of over $11 million in misclassifications before the last false financial release of the Class Period. Later, those numbers were restated in the final curative disclosure causing investors to suffer material losses.

The SAC also alleges securities fraud in connection with Plug Power's $600 million contract with Amazon, a "key pedestal multisite customer." Defendants knew that this arrangement had become a loss contract as the Company could no longer afford the stock warrants being provided in exchange for Amazon purchase orders. This required the Company to take actions which would forgo approximately $400 million in prospective revenue and incur costs so considerable that it resulted in the reporting of negative revenue for FY2020. However, Defendants repeatedly concealed the truth about this development from investors throughout the Class Period despite issuing misleading statements, being required to do so by Item 303 of SEC Regulation S-K ("Item 303"), and in light of Individual Defendants' lucrative insider selling.

Incredibly, during a Class Period earnings conference call, Defendant Marsh even described Amazon's "higher warrant charges" as "actually a real positive" for Plug Power despite knowing otherwise. It was not until January 5, 2021, after Defendant Middleton had sold millions of Plug Power shares to net over $7 million, that Defendants disclosed the completion of the planned waiver of the outstanding Amazon Warrant Shares' vesting conditions—a mere formality considering the "extraordinary payday" it netted Amazon, as described by Marsh. The Amazon Warrant Waiver's announcement provided sparse details despite Defendants being fully informed on its true cost (approximately $400 million) and cause—the Amazon deal had become an

2

unsustainable loss contract requiring $1.9 billion in revenue for Plug Power to break even. Meanwhile, Defendant Marsh sold 43% of his Plug Power stock to net over $36 million. When Marsh was specifically asked by an analyst about the waiver's actual cost, instead of disclosing the non-public material information that he had just traded on, he merely admitted to having a "pretty good idea" of the cost. In fact, Defendants failed to disclose this critical information until February 25, 2021, which caused Plug Power's stock price to fall by more than 13.5%.

Defendants move to dismiss the SAC by chiefly claiming it fails to allege scienter for Defendants' false statements concerning the restatement and Amazon Transaction Agreement. The Complaint, however, details Defendants' motive and awareness that the financial results were false by citing the SK Group deal and an audit report from KPMG, respectively. Defendants also knew that the Amazon Warrant Waiver would be finalized in the fourth quarter of FY2020, and the cost and cause of the waiver. The facts and circumstances described herein support a strong inference that Defendants knew exactly what the costs were as that understanding was paramount to Plug Power's conclusion that it could no longer afford the deal with Amazon, necessitating the waiver.

Defendants also claim that there was no duty to disclose and that there is no loss causation. Defendants, however, were required to disclose the truth about the failed Amazon deal and subsequent waiver because they put their effects in play by discussing them with investors and in accordance with Item 303. Loss causation is also adequately alleged as the revelations of the fraud caused a negative stock price reaction. Accordingly, Defendants' Motion should be denied in full.

## II.    STATEMENT OF FACTS

### A.    Company Overview

Plug Power was founded in 1997 and provides comprehensive hydrogen fuel cell turnkey solutions, including fuel cell products in electric material handling vehicles used by some of the world's largest retail-distribution and manufacturing businesses. ¶¶35-37. In February of 2017, the

Company was in dire straits. ¶¶38-41. Plug Power was facing the prospect of being delisted from NASDAQ as its stock price had fallen to $.85 and, due to its customers insisting on the Company offering operating leases for its fuel cells itself, was facing a liquidity crisis. *Id*. This resulted in the Company offering aggressive sales incentives, in the form of stock warrants, to boost its credibility and revenue without having to commit additional capital towards restricted cash. ¶41.

**B.      The Company Enters into Stock Warrant Deals with Amazon and Walmart**

On April 4, 2017, Plug Power entered into an agreement with Amazon, pursuant to which the Company issued warrants to acquire up to 55,286,696 shares of the Company's common stock in exchange for purchase orders up to $600 million via the following tranches: 1) a first tranche of 5.82 million shares vested upon the agreement's execution; 2) a second tranche would vest in four installments of 7,274,565 shares each time Amazon made an aggregate of $50 million in payments for goods/services to Plug Power, up to payments totaling $200 million; and 3) a third tranche would vest in eight installments of 2,546,098 shares each time Amazon made an aggregate of $50 million in payments for goods/services to Plug Power, up to payments totaling $400 million. ¶¶42-44. Soon after, Walmart also entered into a warrant deal with Plug Power. ¶48. While the market reacted positively to the deals, the fair value of the stock being provided to Amazon and Walmart had to be recorded as a reduction of revenue in accordance with GAAP. ¶49.

**C.      The Amazon Deal Becomes a Debilitating Cost for Plug Power**

By the third quarter of FY2020, Amazon was in the process of concluding the final vesting of the second tranche of Amazon Warrant Shares. ¶89. This posed a serious problem for Plug Power as from June 30, 2020 to September 30, 2020, the Company's stock price increased by 63% from $8.21 per share to $13.41 per share. ¶90. This substantial increase in the stock price was expected to significantly increase the fair value of the stock provided to Amazon in the third tranche, which would, in turn, greatly increase the corresponding warrant costs on Plug Power's

4

books. *Id*. This financial calamity became a central focus for Plug Power's Board of Directors and Individual Defendants in late October and early November of 2020 as the second tranche fully vested on November 2, 2020 and the fair value of the 20,368,784 shares in the third tranche was estimated to be $10.60 each, compared to only $1.05 per share for the previous tranches. ¶¶91-94.

As a result of this, Defendants knew, but did not disclose, that the Amazon Transaction Agreement was no longer a tenable arrangement for Plug Power. ¶¶98-99, 155-58. Specifically, Plug Power had forecasted $0.15 of provision for warrants per dollar of revenue vs. the $0.54 per dollar of revenue that the third tranche would require in connection with the next $400 million of prospective payments from Amazon. *Id*. Due to these massive costs, Defendants knew that they had no choice but to waive the vesting conditions for the outstanding Amazon Warrant Shares and incur hundreds of millions in revenue costs. *Id*. On November 6, 2020, Individual Defendants recommended the waiver to Plug Power's Board that the Company and received approval to do so. ECF No. 105-19. By November 9, 2020, Defendant Marsh was in discussions with Amazon to immediately vest all outstanding Amazon Warrant Shares and believed that this vesting would occur by the end of the fourth quarter of FY2020. ¶¶94, 157. Yet, in response to an analyst's question during the 3Q2020 Earnings Conference Call that day about the stock warrants that Plug Power provides its customers and the corresponding charges to revenue, Defendant Marsh described the "higher warrant charges" as "**actually a real positive**" and noted that "one of our pedestal customers in the third quarter actually exceeded the tranche where the warrant price gets reset. And the warrant price is reset at a rate that's actually 10x higher in cost than the original ones, *which is a real good item*…" ¶107. (Emphasis added).

**D.    Throughout the Class Period Defendants Provided the Market with False and Misleading Financial Information**

The Class Period begins on November 9, 2020, when Plug Power reported its 3QFY2020 financial results. ¶272. Instead of disclosing the dire status of the Amazon deal, Defendants sought to mislead investors about the agreement's true condition. ¶¶95-107, 272-78. Additionally, the Company's results were materially false and misleading because Defendants knew or recklessly disregarded that, among other things, the Company inflated gross profits by misclassifying fuel delivery costs as research and development expenses. ¶¶279-86. These and related false and misleading statements were repeated to the market throughout the Class Period. ¶¶272-328.

**E.    Plug Power Vests 20 Million Amazon Warrant Shares**

On January 5, 2021, Plug Power revealed in a Form 8-K that it had waived the vesting conditions for the third tranche of Amazon Warrant Shares on December 31, 2020 (the "Vesting Conditions") which was "expected to result in a substantial one-time non-cash charge in the quarter ended December 31, 2020, to eliminate the need to recognize future quarterly non-cash charges for this warrant and to simplify the Company's financial reporting going forward." In other words, Plug Power no longer required Amazon to place $400 million in orders; instead, it simply offered Amazon 20 million of its shares at a heavily discounted price. ¶131. The Form 8-K did not disclose the actual amount of the one-time charge or the reasons why the waiver was executed. ¶¶132, 137.

**F.    Individual Defendants Trade on Material Non-Public Information to Net Tens of Millions of Dollars**

On December 24, 2020, armed with the knowledge of the disastrous effect of the third tranche of Amazon Warrant Shares on Plug Power's financial condition and the Company's plan to waive the Vesting Conditions, Defendant Middleton sold 216,667 shares of Plug Power stock, generating proceeds of approximately $7.1 million. ¶¶124-29. Then, on January 19, 2021, cognizant of the true cost and cause of the Amazon Warrant Waiver, Defendant Marsh sold

573,268 shares, or 43%, of his Plug Power stock, for approximately $36.1 million. ¶¶162-70. On January 26, 2021, Defendant Marsh admitted during Plug Power's 2021 Business Update that he had a "pretty good idea" of the waiver's exact charge but failed to disclose it. ¶172.

### G.    Plug Power Gains $1.5 Billion from SK Group's Investment

On January 6, 2021, Plug Power and SK Group, the largest energy provider in South Korea, announced their intention to enter a joint venture. ¶143. SK Group also agreed to make a $1.5 billion investment in Plug Power. ¶144. SK Group stressed to the news media that Plug Power's growth in recent years was instrumental in choosing the Company as its partner. ¶147. Later, on February 25, 2021, Plug Power and SK Group announced the closing of SK Group's investment in the Company, making SK Group the largest shareholder of Plug Power stock. ¶¶151-52.

### H.    Defendants Disregard Its External Auditor's Findings

Plug Power's Board assembled between February 23 and 24, 2021 in anticipation of earnings for the fourth quarter of FY2020 and full year. ¶197. Later that day, Plug Power's Audit Committee convened and reviewed KPGM's audit results which included a slide noting the correction of a series of financial misstatements related to, among other things: (i) recognition of revenue from sale-leasebacks; (ii) incorrect costs of goods sold metrics; and (iii) misapplication of fuel delivery costs and research and development expenses. ¶200. Notably, the slide described over $11 million in costs of fuel delivered to customers that had been improperly categorized as research and development expenses. *Id.* Defendants nevertheless moved forward with reporting its earnings for the fourth quarter and full year for FY2020 on February 25, 2021. ¶201.

### I.    The Truth About the Amazon Warrant Waiver is Revealed, and Plug Power Is Forced to Restate Its Financial Statements

On February 25, 2021, the Company released its fourth quarter and full year FY2020 financial results and finally disclosed the true cost of its failed deal with Amazon. ¶202. The

Company reported revenue of negative $316 million for the quarter and negative $100 million for full year driven by over $437 million in stock warrant charges. *Id.* The Company had never reported negative annual revenue in its history. ¶17. On this news, the Company's stock price fell $6.82, or more than 13.5%. ¶208.

A week later, the Company admitted that its financial results for the fiscal years 2018 through 2020 were incorrect and may need to be restated. ¶211. On March 2, 2021, before the market opened, Plug Power stated that it could not timely file its 2020 Form 10-K because the Company was completing a "review and assessment of the treatment of certain costs with regards to classification between Research and Development versus Costs of Goods Sold…and certain internal controls over these and other areas." *Id*. The Company further expected "significant changes" from its previous financial reporting for the fourth quarter of FY2020 and full year FY2019. *Id*. On this news, the Company's stock price fell $3.68, or 7%. ¶333.

On March 16, 2021 (the last day of the Class Period), Plug Power confirmed that it needed to restate its prior financial results for FY2018 through FY2020. ¶212. Among other things, Plug Power revealed that the Company needed to reclassify certain research and development expenses as costs of revenue—directly reducing the Company's gross profits. *Id*. On March 17, 2021, the next trading day, Plug Power common stock fell $3.35 per share, or approximately 7.8%. ¶216.

**J.        Post-Class Period Facts Further Confirm that Plug Power Misled the Market**

On May 14, 2021, Plug Power announced that the Company had completed the restatement (the "Restatement") and filed its 2020 Form 10-K. ¶226. In total, for fiscal years 2016-2019, Plug Power misclassified research and development expenses by an aggregate $80.7 million or 53.2% of the originally reported figures. ¶232. This effectively eliminated nearly all gross profits since 2016, caused almost every reporting period to turn from positive to negative, and revealed that Plug Power's reported growth in recent years was fictional. ¶¶234, 236. As Plug Power grew its

8

operations, the Company appeared to maintain steady margins for its services performed on fuel cell systems and related infrastructure and fuel delivered to customers. However, Plug Power's margins in these areas were two to four times worse than originally reported. ¶237.

Concerning the failed Amazon deal, the Form 10-K disclosed the true cost and cause of the Amazon Warrant Waiver. ¶246. Specifically, the Company recognized a "$399.7 million reduction to revenue associated with 18,085,395 of the third tranche of Amazon Warrant Shares for which reduction of revenue had not been previously recognized as a reduction of revenue." *Id.* Plug Power "concluded [that the $399.7 million cost] was not recoverable from the margins expected under probable future revenues attributable to Amazon." *Id*. As a result of the waiver's cost, Amazon accounted for (332.4)% of the Company's total consolidated revenue for FY2020. ¶248.

## III.     THE SAC STATES AN EXCHANGE ACT § 10(b) CLAIM

### A.     Legal Standard

A complaint can defeat a Rule 12(b)(6) motion by alleging sufficient factual matter that states a facially plausible claim to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable[.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[P]lausibility…is not akin to…probability…[but] asks for more than a sheer possibility that…defendant…acted unlawfully." *Id.* at 678. Courts must "accept[ ]…all factual allegations [on a 12(b)(6) motion] and draw [] all inferences in…plaintiff's favor." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011). To plead a §10(b) claim, a plaintiff must show that the defendant made a material misrepresentation or omission, scienter, in connection with the purchase or sale of a security, reliance, economic loss, and loss causation. *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *7 (S.D.N.Y. Apr. 14, 2020). Here, Defendants contest scienter, the viability of their omissions, and loss causation. Their arguments fail.

9

### B. The SAC Alleges a Strong Inference of Scienter

Plaintiffs have more than adequately alleged that Defendants acted with scienter. A plaintiff must allege facts with particularity that would give rise "to a strong inference that the defendant acted with the required state of mind."[2] *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (quoting 15 U.S.C. § 78u–4(b)(2)). This requisite scienter "can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Id*. A court must consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007); *Medis Inv'r Grp. v. Medis Tech., Ltd.*, 586 F. Supp. 2d 136, 141 (S.D.N.Y. 2008) ("In order to determine whether a complaint has adequately pleaded scienter, a court should examine all of the facts alleged collectively or 'holistically' (without parsing individual allegations), and take into account any inference concerning scienter—supporting or opposing—which can be drawn from the complaint."), *aff'd*, 328 F. App'x 754 (2d Cir. 2009). A holistic reading of the SAC supports an inference of scienter at least as strong as any opposing inference.

### 1. The SAC Adequately Pleads a Strong Inference of Scienter with Respect to the Company's Restatement

The SAC adequately pleads a strong inference that Defendants were motivated to inflate Plug Power's margins to create the appearance of positive growth trajectory, which attracted SK

---

[2]The cases raised by Defendants are inapplicable. Mot. at 14-15; *see Jackson v. Abernathy*, 960 F.3d 94, 98-99 (2d Cir. 2020) (unlike the SAC's particularized allegations of Individual Defendants' knowledge, plaintiffs in *Jackson* failed to raise any allegations of knowledge by the "officers or directors who were involved in the dissemination of the fraud" and thus failed to impute low-level employees' scienter to the corporate defendant); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 616 F. App'x 442, 446 (2d Cir. 2015) (unlike plaintiff in *Magnum*, Lead Plaintiff is not reliant on general observations of inadequate internal controls by confidential witnesses to infer scienter).

Group's investment and partnership.[3] However, right as Plug Power was finalizing SK Group's investment, Defendants reviewed an Audit Committee presentation which reported material accounting misstatements in Plug Power's financial results, including over **$11 million** in costs improperly classified as research and development expenses. Nevertheless, the next day, Defendants moved forward with closing the deal with SK Group and releasing false earnings for the fourth quarter and full year for FY2020. Soon after, Defendants revealed that the very same accounting issues that had been raised before the earnings' release were causing the Company to delay the filing of its 2020 Form 10-K and ultimately led it to restate years of its financial statements. Taken together, and drawing all inferences in Lead Plaintiff's favor, these allegations support a strong inference that Defendants knowingly or recklessly issued false financial information to investors during the Class Period.

### a.    Enticing a Monumental Deal with SK Group Provided Defendants with Motive and Opportunity to Engage in Fraud

To plead a strong inference of scienter through "motive and opportunity" to defraud, Lead Plaintiff must allege that Plug Power or its officers "benefitted in some concrete and personal way from the purported fraud." *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000). The desire to complete a corporate transaction can be sufficient to warrant an inference of scienter. *Rothman v. Gregor*, 220 F.3d 81, 92–94 (2d Cir. 2000). "But the inquiry is an extremely contextual one, that demands an allegation of a unique connection between the fraud and the acquisition." *ECA, Loc. 134*, 553 F.3d at 201 n.6.  (Internal citation and quotations omitted).

---

[3] Defendants' opportunity to commit the alleged fraud is not contested. Individual Defendants held the highest positions of authority at Plug Power and admittedly made material, false statements in SEC filings to investors. *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996) (noting that it is "indisputable that key directors and officers have [the] ability to manipulate their company's stock price").

Here, misstating cost of goods sold as research and development dramatically inflated Plug Power's gross margins. ¶¶232-37. These false statements made Plug Power's business appear to be growing effectively and attracted the investment and partnership with SK Group. ¶¶368-69. The direct connection between the false statements and the SK Group deal is evidenced by an SK Group official clarifying for the *Korea Herald* on January 7, 2021, a few days after the initial partnership announcement, that SK Group had chosen to invest in and partner with Plug Power due to the Company's substantial growth in recent years and its exclusive relationship with Amazon and Walmart. ¶¶147, 370. That purported growth of Plug Power's operations, however, was based on Defendants' materially overstated margins published in the Company's financial statements. ¶371. Between FY2016 and the third quarter of FY2020, the Company represented that it maintained relatively steady margins for its services performed on fuel cell systems and related infrastructure and fuel delivered to customers. *Id.* In reality, Plug Power's margin losses were two to four times worse than originally reported and at times over 100% negative. *Id.* In other words, Plug Power was not growing efficiently and the critical reason for SK Group's decision to partner with and invest in Plug Power was based on materially false statements. *Id.*

Defendants' attempt to undercut this unique connection between Plug Power's alleged misconduct and the SK Group deal by pointing to SK Group's eventual decision to form a joint venture with Plug Power in October 2021, five months after the Restatement. Mot. at 16 n. 12. In truth, SK Group was stuck between a rock and a hard place and had no choice but to move forward due to the following: (1) at the onset of the collaboration, SK Group was under tremendous pressure to meet the South Korea government's demanding hydrogen energy goals for 2040, including specific targets by 2025, and was relying on Plug Power to meet these objectives (¶¶146-48); (2) as part of the SK Stock Purchase Agreement, Plug Power and SK Group agreed to

exclusively work together over the following 18 months to finalize the proposed joint venture in Asia and announced that they intended to finalize by 2022 (¶145); (3) upon the closing of SK Group's investment on February 25, 2021, SK Group was prohibited from disposing its shares for at least two years and required to maintain a majority interest in the special purpose company, Grove Energy Capital, that had been used to acquire the stake in Plug Power (¶¶151-53); and (4) upon learning on March 2, 2021 that Plug Power's financial disclosures were materially false, SK Group immediately sought to sell up to a 49% stake in Grove Energy Capital but failed to do so as Plug Power's stock dropped precipitously in the ensuing weeks (¶¶222-25). Any announcement by SK Group that it was not moving forward with the promised joint venture would have severely harmed its substantial investment while also derailing its ability to fulfill government-mandated production quotas. Inflating gross margins was done to entice the SK Group acquisition and SK Group had no choice but to move forward with the joint venture with Plug Power despite later learning of the Company's distortion of its gross margins.

    **b.  An Internal Document Shows that Individual Defendants Knowingly or Recklessly Issued False Financial Information to Investors During the Class Period**

The Defendants' receipt of an Audit Committee presentation, which reported material accounting errors and ultimately resulted in the Company's Restatement, supports a strong inference that Defendants knew or recklessly disregarded that the Company issued material accounting misstatements. A plaintiff pleading the recklessness theory of scienter must allege conduct that is "highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (internal quotations and citation omitted). "Where plaintiffs contend defendants had access to

contrary facts, they must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309.

Here, Defendants were presented with data on February 24, 2021, as part of a KPMG presentation provided to Plug Power's Audit Committee, demonstrating that the Company had made improper classifications between research and development versus costs of goods sold and recognitions of revenue from sale-leasebacks. ¶200. Concerning the former misclassification, KPMG flagged particularly egregious misstatements. Namely, KPMG noted that **over $11 million** in costs of fuel delivered to customers had been incorrectly designated as research and development expenses. *Id.* This striking misstatement represented approximately one third of the research and development expenses that were originally reported for the fiscal years 2018-2019 and the first three quarters of 2020 and was also approximately 100 times greater than the other misstatements identified by KPMG. ¶¶200, 232. Nevertheless, Defendants knowingly or recklessly disregarded these findings and released the false 4Q2020 Letter to Shareholders the next day.[4] ¶201. A week later, Plug Power disclosed that it was in the process of reviewing accounting issues, which unbeknownst to investors had been previously raised to the Audit Committee on February 24, 2021. ¶¶211-21, 226-43. Accordingly, the SAC raises specific information presented to Defendants which made them or should have made them aware of Plug Power's accounting misstatements at the time of its earnings release on February 25, 2021.

Defendants' claim that the Audit Committee presentation undermines any inference of scienter as KPMG did not identify any outright fraud by Defendants is misplaced. Mot. at 17. An admission of fraud is not required. "[F]raudulent intent is rarely susceptible to direct proof and

---

[4] Plug Power was simultaneously in the process of finalizing SK Group's $1.6 billion investment in the Company on February 24, 2021 and announced its closing the morning of February 25, 2021. ¶¶151-54.

14

must ordinarily be established by circumstantial evidence and…inference[s] arising therefrom." *Century Pacific, Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 222 (S.D.N.Y. 2007) (internal quotations and citations omitted). Given the size of the accounting misstatements presented to the Audit Committee, along with the timing of SK Group's investment, an inference of Defendants' knowledge or deliberate recklessness as to the false statements contained in the 4Q2020 Letter to Shareholders is at least as compelling as Defendants' ignorance of its improper accounting.

### 2.    The SAC Adequately Pleads a Strong Inference of Scienter with the Respect to the Failed Amazon Transaction Agreement

Defendants' own documents demonstrate that from the onset of the Class Period, Defendants were well aware that Plug Power could not afford the costs of the third tranche of Amazon Warrant Shares and would imminently waive their Vesting Conditions. Their documents further reveal that when Defendants finally disclosed the Amazon Warrant Waiver on January 5, 2021, they provided sparse details despite being fully informed of the true cost and cause of the waiver. They failed to reveal this information to investors until February 25, 2021.

### a.    The SAC Pleads Specific Facts Demonstrating that Defendants Knew or Were Reckless in Not Knowing That a Waiver Agreement Would Be Reached with Amazon

Lead Plaintiff sufficiently alleges that Defendants knew since early November 2020 that Plug Power would waive the Vesting Conditions and execute the Amazon Warrant Waiver during the fourth quarter of FY2020. On November 2, 2020, the second tranche vested, and the fair value for the third tranche of 20,368,784 Amazon Warrant Shares was estimated to be $10.60 each. ¶92. As Defendant Middleton explained to the SEC in a non-public letter dated January 14, 2021,[5] Defendants realized at that time that the "magnitude" of the third tranche's effect on the Company

---

[5] To the extent Defendants imply that Defendant Middleton was not involved in the preparation of this letter, he was the signatory on the letter and informed the SEC to specifically call him directly with any questions concerning it. *See* Mot. at 27 n. 19; *Cf.* ECF No. 105-23 at 12.

given that the "consideration payable to Amazon increased substantially, from $30.6 million allocable to $200 million in second tranche gross revenues, or $0.15 per $1.00 of gross revenue recorded, to $215.9 million allocable to $400 million in third tranche gross revenues, or $0.54 per $1.00 of gross revenue recorded."[6] ¶¶155-56. On November 6, 2020, Plug Power's Board convened, and Individual Defendants provided an update on the status of the Amazon Warrant Shares, the accounting treatment of the vested and unvested options, and their "extensive discussions" with KPMG and Deloitte regarding the same. ¶93. Upon receiving Board approval, Plug Power engaged in discussions with Amazon "to immediately vest the third tranche of warrants…[and] *believed that this vesting would occur by the end of the fourth quarter of 2020*."[7] ¶157; ECF No. 105-19. (Emphasis added). However, Defendants repeatedly failed to disclose their plan and its implications during the Class Period. ¶¶272-78, 287-90.

Defendants' argument that they engaged in discussions with Amazon in early November 2020 on merely a hope and a prayer of a waiver being finalized (Mot. at 3, 26) is wholly blind to the realities of Plug Power's decision to waive the Vesting Conditions.[8] Given the low exercise price ($13.81 per share) that was set for the third tranche on the one hand, and Plug Power's burgeoning stock price on the other, there was no question that Amazon would sign off on the

---

[6] Defendants' attempt to garner credit for Plug Power's eventual disclosure of the Amazon Warrant Waiver on January 5, 2021 and the corresponding revenue charge on February 25, 2021 is misplaced and does not negate Lead Plaintiff's actionable omissions and misstatements in the intervening time period. *See* Mot. 26 n. 18. Thus, Defendants' supporting case law is inapplicable. *See Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 50 (2d Cir. 1995) (one-month delay of disclosure of corrective information, in and of itself, was not pertinent to the court's finding of no scienter; further, unlike here, plaintiffs-appellants alleged no misstatements during the one-month delay); *In re Magnum Hunter Res. Corp. Sec. Litig*, 26 F. Supp. 3d 278, 297-98 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015) (lack of scienter found where accounting issues were released to market in "dribs and drabs" over several months as they were uncovered; however, here, Defendants provided no such updates on the true cost, cause and ramifications of the Amazon Warrant Waiver despite knowing or recklessly not knowing about them for several weeks).

[7] Defendants incorrectly paraphrase Defendant Middleton's statement to the SEC and attempt to downplay their high expectations of the waiver occurring in the fourth quarter of FY2020 in stating "that the Company believed all vesting *might* occur during the fourth quarter." *See* Mot. at 26.

[8] Defendants do not dispute their knowledge that Plug Power faced unsustainable revenue costs associated with the third tranche of Amazon Warrant Shares or that the waiver would force the Company to incur hundreds of millions in costs that would have a negative, material impact on the Company's financial condition. ¶¶275, 288.

16

proposed waiver in the fourth quarter of FY2020. ¶131. When Defendants informed Amazon of the planned waiver on or around November 9, 2020, the Company's stock price closed at $20.31,[9] representing a potential return on investment of over 47% and an approximate net gain of over $132 million for Amazon.[10] *See* ECF No. 105-4 at 11. When Plug Power filed the November Prospectus on November 18, 2020, the Company's stock closed at $23.22, representing a potential return on investment of over 68% and an approximate net gain of over $191 million. *Id.* When Defendant Middleton sold hundreds of thousands of his Plug Power shares on December 23, 2020, Plug Power's stock price closed at $36.14, representing a potential return on investment of over 161% and an approximate net a gain of over $454 million. In other words, as soon as Plug Power informed Amazon that it was offering tens of millions of its heavily discounted stock without requiring $400 million in purchase orders, Amazon's signoff during the fourth quarter of FY2020 was fait accompli and a mere formality.[11] As Defendant Marsh would admit to the *Wall Street Journal* in an interview, "[the waiver] was an extraordinary payday for [Amazon]." ¶131.

Moreover, when Plug Power announced on January 5, 2021 that it had finalized its planned waiver of the Vesting Conditions during the 4QFY2020, it framed the waiver as a unilateral decision by the Company. The Amazon Warrant Waiver Form 8-K made no mention of Amazon's involvement in the process and simply stated that "[o]n December 31, 2020, the Company waived

---

[9] Plug Power's stock price had firmly settled above Amazon's exercise price for the third tranche ($13.81) as over the previous month, Plug Power's closing stock price ranged from $14.00 to $18.43. ECF No. 105-4 at 11.

[10] The approximated net gain is calculated by multiplying the total outstanding Amazon Warrant Shares in the third tranche (20,368,784) by the closing market price and then subtracting that amount by the sum of those shares multiplied by the exercise price.

[11] Defendants admit that leading up to the waiver, "[a]s vesting occurred, Amazon could (and always did) elect to pay the exercise price." Motion at 6. Later, on February 25, 2021, an analyst from Canaccord Genuity described how beneficial the deal had been for Amazon, "…in 20 years. I've never seen this. I mean it's actually a fantastic situation where your customers are literally getting paid to take the product based on the kind of the warrants in 2017 because your stock has been so strong…if their strike price is at 13, and to buy products, and your stock is at 50. They are being paid a significant amount of money to actually take your product." ¶207.

the remaining vesting conditions under the warrant, which resulted in the vesting of the remaining 20,368,784 unvested shares under the [Amazon] warrant." ¶130.

Finally, contrary to Defendants' assertion, Lead Plaintiff is not attempting to plead "fraud by hindsight." Mot. at 26. Under this defense, "[c]orporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them" at the time false or misleading statements were made. *Novak*, 216 F.3d at 309. Here, the SAC relies on concurrent facts when Defendants first informed Amazon in early November 2020 that they planned on waiving the Vesting Conditions.[12] Defendant Middleton explicitly expressed that Defendants believed at that time that a waiver would occur in the fourth quarter of FY2020.[13] ¶157. Accordingly, the SAC is replete with specific allegations demonstrating that Defendants knew from the onset of its discussions with Amazon in early November 2020 that the waiver would be finalized during the fourth quarter of FY2020 yet failed to disclose such.

**b.    The SAC Pleads Specific Facts that Defendants Knew or Were Reckless in Not Knowing the Amount of Revenue Charge at the Time of the Amazon Warrant Waiver**

Defendants' own documents, the magnitude of the Amazon Warrant Waiver, and the waiver's impact on the Company's core operations, taken as a whole, support an inference that

---

[12] Defendants' application of fraud by hindsight is also not supported by their case citations. Mot. at 26. *See*, *e.g.*, *In re Diebold Nixdorf, Inc. Sec. Litig.*, 2021 WL 1226627, at *12 (S.D.N.Y. Mar. 30, 2021) (fraud by hindsight applied to analysis of material misrepresentations or omissions, not scienter); *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 404 (S.D.N.Y. 2020) (unlike here, plaintiff failed to make any allegations suggesting that defendant was aware of the need to take additional warrant charges earlier than they actually did); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005) (plaintiff adequately pled recklessness and fraud by hindsight merely described as a general limitation with no actual application to the matter before the court).

[13] While Defendant Middleton did not admit this until January 2021, it is of no moment as he is describing his beliefs earlier in the Class Period. *See*, *e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (permitting post-class period data to confirm what a defendant should have known during the class period); *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (same).

18

Defendants knew or should have known the amount of waiver's one-time revenue charge at the time of the waiver's announcement but failed to disclose such for almost two months.

i.      **Plug Power's Own Documents Demonstrate Knowledge of the Costs of the Amazon Warrant Waiver**

The SAC adequately alleges that Defendants knew or should have known the amount of the revenue charge (approximately $400 million) stemming from the Amazon Warrant Waiver at the time that the waiver was disclosed to the public on January 5, 2021. Specifically, the SAC alleges the following facts based upon Plug Power's records and documents:

- Individual Defendants repeatedly consulted Plug Power's independent auditor, KPMG, and tax advisor, Deloitte, on the accounting implications of the unvested Amazon Warrant Shares to inform their meetings with the Board on October 20 and November 6, 2020. ¶¶91, 93. Defendants' focus on the Amazon Transaction Agreement was driven by the "magnitude and unexpected nature" of the estimated costs associated with the third tranche of Amazon Warrant Shares, which Plug Power entered into on November 2, 2020. ¶¶92, 156.

- Defendant Marsh relied upon his discussions with KPMG and Deloitte to inform his and management's recommendation to the Board on November 6, 2020 to waive the Vesting Conditions. *See* ECF No. 105-19. Defendants immediately informed Amazon of the waiver and believed it would happen during the fourth quarter of FY2020. ¶157.

- On January 5, 2021, Defendants announced that the Amazon Warrant Waiver had been finalized on December 31, 2020 but failed to provide its true cost and cause. ¶¶130-32. However, Defendants were able to immediately estimate the fair value of the shares that vested as the waiver relied upon the same model (the Black Scholes Option Pricing Model) that was previously used on November 9, 2020 for the third tranche shares' fair value. ¶¶134, 246.

- On January 26, 2021, Defendant Marsh stated during Plug Power's 2021 Business Update that he had a "pretty good idea" when asked by an analyst what the exact charge would be in connection with the Amazon Warrant Waiver but failed to disclose it. ¶172-73.

- On February 25, 2021, Defendants disseminated the 4Q2020 Letter to Shareholders and revealed the massive revenue costs stemming from Amazon Warrant Waiver, which caused the Company to report negative revenue for FY2020. ¶202.

- On May 14, 2021, the 2020 Form 10-K clarified that the waiver's exact charge was $399.7 million and was executed in FY2020 as "the Company concluded [the $399.7 million cost] was not recoverable from the margins expected under probable future revenues attributable to Amazon." ¶246. To reach this conclusion, Defendants conducted a "probability assessment of

19

whether the Amazon Warrant Shares would vest under the terms of the original Amazon Warrant[,]" including calculating probable future cash collection from Amazon. *Id.*

- On August 20, 2021, Defendants disclosed, in a letter to the SEC, Plug Power's calculations, including the warrants' fair value, to support its conclusion in the fourth quarter of FY2020 that "the probable future economic benefit amount associated with Amazon [was] not sufficient to recover the cost of the Third Tranche"—the admitted driving force behind the waiver. ¶256. The Company provided the table below to demonstrate the breakeven amount of anticipated revenue that was needed to recover the costs of the third tranche of Amazon Warrant Shares (*id.*):

| | |
|---|---|
| Sales of Fuel Systems | 1,577,000,000 |
| Estimated Margin (25%) | 394,250,000 |
| | |
| Services Revenue | 323,000,000 |
| Estimated Margin (1%) | 3,230,000 |
| | |
| Warrants Fair Value | 399,688,048 |
| Margin (-) Fair Value | - |
| | |
| Total Breakeven Revenue | 1,900,000,000 plus |

When these allegations are viewed *in toto*, Defendants' disclosures demonstrate that they knew or were reckless in not knowing the Amazon Warrant Waiver's revenue charge when it was announced on January 5, 2021. Critically, Plug Power's 2020 Form 10-K laid bare the true reason that the Company executed the waiver—in sum and substance, the costs associated with the outstanding Amazon Warrant Shares had eclipsed the expected revenue from Amazon. ¶246. As Defendant Middleton illustrated for the SEC as to how Plug Power reached that conclusion, Plug Power first estimated the outstanding Amazon Warrant Shares' fair value. ¶256. This, in turn, required estimating the probable future economic benefits expected from Amazon and the number of warrants that were probable and improbable of vesting. In other words, the admitted cause behind the waiver was rooted in Defendants' understanding of the associated costs.[14] This comports with Individual Defendants' consultations with Plug Power's auditor and tax advisor on

---

[14] Defendants do not dispute their knowledge that Plug Power was forced to execute the waiver because the Amazon Transaction Agreement was a loss contract for the Company since it estimated that the probable future payments from Amazon for the purchase of goods and services to be $124.4 million and would need over $1.9 billion of Amazon revenue to recover the cost of the third tranche or the severe financial consequences of the waiver such as reporting negative revenue for FY2020 and dragging down earnings. ¶¶298, 303, 307, 320.

the implications of the unvested Amazon Warrant Shares before recommending a waiver to the Board on November 6, 2020. Thus, Defendants' stated rationale for executing the waiver first required an understanding of all the computations comprising the total cost of the waiver.[15]

Defendants' plea of helplessness in being able to calculate the costs associated with bailing out of a deal that would cause the Company to report negative revenue rings hallow.[16] Mot. at 27-28. Given the size and importance of the Amazon Warrant Waiver, the extensive discussions that Individual Defendants had with Plug Power's auditor and tax consultant before recommending the waiver to the Company's Board, the established use of the Black Scholes Option Pricing Model to estimate the fair value of the vesting shares, and the admitted cause of the waiver, it is not plausible to infer that Defendants did not make a fully educated estimate of the corresponding charges at the time the waiver was finalized on December 31, 2020. Defendants maintain that the calculation of the waiver's revenue charge was "complex" and required "significant audit work" in an effort to exonerate themselves during the time between the waiver's announcement on January 5, 2021 and Plug Power's subsequent reporting of its financial results on February 25, 2021, when it revealed the true cost of the waiver. Mot. at 27. However, Defendants raise no case law in support of this argument as awaiting a final audit is not a recognized exception to a duty to disclose. If this were the case, defendants would avoid liability under the guise that they cannot be held responsible for any unaudited information that has been improperly omitted. Plug Power's auditor is not responsible for compiling the Company's financial statements, it is the Company's management's

---

[15] As Defendant Marsh was intimately involved with all critical aspects of the Amazon Transaction Agreement and Amazon Warrant Waiver, he knew the total warrant change of approximately $400 million at the time that the waiver's Form 8-K was filed on January 5, 2021. ¶136. Along these lines, Defendant Marsh admitted on January 26, 2021 that he had a "pretty good idea" of what the waiver's exact charge to revenue was. ¶172.

[16] Defendants again incorrectly apply the fraud by hindsight defense. Mot. at 27-28. In opposite to their case law, the SAC specifically identifies Plug Power records and documents which illustrate Defendants' knowledge of the cost and cause of the Amazon waiver during the Class Period. *See* ¶¶91-93, 130-32, 156-57, 246, 256.

responsibility. KPMG expresses an opinion on the statements based on their audit. *See, e.g.*, p. 133 of Plug Power's Form 2020 10-K.

### ii.    The Magnitude of the Amazon Warrant Waiver Compels an Inference of Scienter

Coupled with Defendants' own admissions, the magnitude of the Amazon Warrant Waiver—in sum, a $400 million charge— demonstrates that Defendants knew the associated costs at the time the waiver was announced on January 5, 2021. "The size of the alleged fraud can be relevant to the scienter inquiry, provided it is presented in tandem with other circumstantial evidence to suggest scienter." *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *17 (S.D.N.Y. Aug. 11, 2021) (internal quotations marks and citation omitted); *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76–77 (2d Cir. 2001) (finding the size of inflated revenue, in addition to allegations that defendants knew their public statements differed from reality, adequate to plead inference of scienter); *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 (S.D.N.Y. 2007) ("a large, $112 million 'surprise' valuation that allegedly wiped out a year's worth of the Company's earnings…provides some circumstantial evidence of scienter."). Here, the Amazon Warrant Waiver devastated Plug Power's income in FY2020 and caused the Company to report negative $316.3 million in revenue for the fourth quarter and negative $100.5 million in revenue for the year or (332.4)% of the total annual revenue—a failure that had never been endured in the Company's history—and an earnings per share loss of $1.12 ("EPS"). ¶¶202-04, 246-48. Thus, the massive ramifications of the Amazon Warrant Waiver support an inference that Defendants knew or were reckless in not knowing the corresponding cost to revenue at the time of the waiver.

### iii.    Defendants Knew the Amazon Warrant Waiver Was Vital to the Core Operations of Plug Power

Defendants' execution of the Amazon Warrant Waiver also concerns critical aspects of Plug Power's core operations. The core operations "doctrine allows courts to draw an inference of

scienter where misrepresentations and omissions allegedly made by defendants were about their core operations." *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 423 (S.D.N.Y. 2020). Core operations constitute matters that "make up nearly all of a company's business or be essential to its survival." *Francisco v. Abengoa*, S.A., 2021 WL 4136899, at *24 (S.D.N.Y. Sept. 10, 2021). Here, the Amazon Warrant Shares were essential to Plug Power's survival and the costs ultimately dwarfed the entirety of its business. In 2017, after years of entering into sale/leaseback agreements with financial institutions to offer customers operating leases for its fuel cells, Plug Power faced a liquidity crisis and the prospect of being delisted from NASDAQ. ¶¶38-41. To save itself, Plug Power offered aggressive sales incentives, in the form of stock warrants, and finalized a deal with Amazon in which Plug Power provided tens of millions of its stock in exchange for purchase orders in $50 million increments up to $600 million. ¶¶41-43. Walmart, in turn, entered also into a warrant deal with Plug Power. ¶48. These warrants were indispensable components of Plug Power's ability to do business and instrumental in Amazon and Walmart becoming two of the Company's "key pedestal multisite customer[s]" and representing 67% and 50% of the Company's revenues in 2018 and 2019.[17] ¶¶51, 346.

Ultimately, the cost of providing the Amazon Warrant Shares proved too expensive for Plug Power and resulted in its execution of the Amazon Warrant Waiver on December 31, 2020.

---

[17] Defendants' claim that the importance and size of Amazon's business with Plug Power is not relevant to the core operations theory is not supported by the cases they cite. Mot. at 29 n. 21; *In re Express Scripts Holding Co. Sec. Litig.*, 2017 WL 3278930, at *16 (S.D.N.Y. 2017) (contract with large customer was "unquestionably within the 'core operations'" but dismissed as plaintiff failed to adequately allege an actionable false or misleading statement or provide other inferences of scienter); *Johnson v. Sequans Commc'ns S.A.*, 2013 WL 214297, at *2, 17 (S.D.N.Y. Jan. 17, 2013) (not core operations as insufficient on its own to establish scienter and found no other basis for scienter); *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 327, 344 (S.D.N.Y. 2011) (not core operations as Macy's only represented 16% of corporate-defendant's business). Here, the SAC has sufficiently alleged other inferences of scienter in addition to the core operations doctrine. Defendants' reliance on *City of Westland Police & Fire Ret. Sys. v. Sonic Sols.*, 2009 WL 942182, at *8 (N.D. Cal. Apr. 6, 2009) is also immaterial as the court rejected an employee stock option program provided, not warrants provided to large customers in exchange for hundreds of millions of dollars in purchases. Mot. at 28.

¶¶130, 246. This lead to approximately $400 million in costs to revenue which accounted for (332.4)% of Plug Power's total consolidated revenue for FY2020. ¶349. Given the Amazon Warrant Shares' vital role[18] and size, they were at the heart of Plug Power's "core operations" such that it is reasonable to infer that Defendants knew or were reckless in not knowing the cost of the waiver by the time it was announced on January 5, 2021.

Defendants' argument that their understanding of the Amazon Warrant Waiver's costs is not a "core operation" is misguided. Mot. at 29. Defendants' estimation of the value of the Amazon Warrant Shares was paramount to determining the viability of the Amazon Transaction Agreement and eventually drove the Company to waive the Vesting Conditions of warrants valued several times greater than the entirety of Plug Power's business in FY2020. ¶¶ 155-57, 246. In *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474 (S.D.N.Y. 2004), an argument similar to Defendants' was explicitly rejected as "each individual defendant who served as a high-level officer had a duty to familiarize himself with the facts relevant to the core operations of the company and the financial reporting of those operations." *Id.* at 490-91. The Individual Defendants cannot avoid liability simply because their fraud involved accounting, particularly as it pertains to one of the most important aspects of Plug Power's business.[19]

---

[18] As stated by Defendant Middleton, "[u]nderstanding the impact of our provision for warrants is one of the most frequent inquiries we receive from investors and analysts." ¶156. The fact that the revenues generated from the Amazon Transaction Agreement and the related warrant costs were "key to measuring [Plug Power's] financial performance and [were] a subject about which investors and analysts often inquired" further reinforces the inference of scienter. *Dobina v. Weatherford Int'l Ltd.*, 909 F.Supp.2d 228, 247 (S.D.N.Y. 2012) (internal citation omitted).

[19] Unlike here, none of the cases raised by Defendants involved a critical aspect of the defendant's business. Mot. at 29; *see Hensley v. IEC Elecs. Corp.*, 2014 WL 4473373, at *5 (S.D.N.Y. Sept. 11, 2014) (accounting for inventory of a company that the corporate-defendant acquired which only constituted 15% of defendant's revenue); *Reilly v. U.S. Phys. Therapy, Inc.*, 2018 WL 3559089, at *2, 14 (S.D.N.Y. July 23, 2018) (accounting for managing therapists non-controlling interests, an attenuated issue to defendants' core business of operating outpatient physical therapy clinics).

### C.      The SAC Alleges Actionable Omissions with Respect to the Amazon Warrant Waiver

In addition to the false statements, the SAC alleges actionable omissions in connection with the Amazon Transaction Agreement and Warrant Waiver. Throughout the Class Period, Defendants were obligated to disclose the truth concerning its collapsed deal with Amazon but failed to do so. "Omissions are actionable…when the speaker has an underlying duty to disclose the omitted information." *In re Rockwell Med.*, *Inc. Sec. Litig.*, 2018 WL 1725553, at *6 (S.D.N.Y. Mar. 30, 2018). "A duty to disclose is triggered when a corporate insider trades on confidential information, a statute or regulation requires disclosure, or the company makes a statement that would otherwise be inaccurate, incomplete, or misleading without the disclosure." *Id.* at *7 Here, the SAC sufficiency alleges that Defendants violated Section 10(b) of the Exchange Act by making misleading statements during the 3Q2020 Earnings Conference Call and in the Amazon Warrant Waiver Form 8-K, by omitting facts required by Item 303, and when omitting facts in light of Individual Defendants' trading on material non-public information.

### 1.      Defendant Marsh's Statements During the 3Q2020 Earnings Conference Call Were Materially Misleading

Defendant Marsh's statements during the 3Q2020 Earnings Conference Call that the recent increase in revenue charges stemming from the Amazon Warrant Shares was a "positive" development for Plug Power materially mislead investors considering Plug Power's inability to maintain the Amazon Transaction Agreement and its plan to waive the Vesting Conditions. ¶¶272-73, 275, 278. While Rule 10b–5 imposes no duty to disclose all nonpublic information, once a party chooses to speak, it has a "duty to be both accurate and complete." *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002). "[A]n entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it...materially misleading." *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 160 (S.D.N.Y.2008). "[W]hether a

statement is misleading is evaluated not only by literal truth, but [also] by context and manner of presentation. *In re AstraZeneca plc Sec. Litig.*, 2022 WL 4133258, at *7 (S.D.N.Y. Sept. 12, 2022) (internal citations and quotations omitted), *appeal filed by* No. 22-2704, (2d Cir. Oct. 18, 2022). Here, Lead Plaintiff alleged a relevant context demonstrating the misleading nature of Defendant Marsh's statements during the 3Q2020 Earnings Conference Call on November 9, 2020.

By the third quarter of FY2020, Plug Power faced a dire situation as the increase in its common stock price was significantly increasing the fair value of Amazon Warrant Shares in the third tranche and the corresponding warrant costs on its books. ¶¶89-90. To understand this development's implications, Individual Defendants repeatedly consulted Plug Power's auditor and tax advisor in October and November 2020 and relayed their findings to the Board of Directors. ¶¶91-93. On November 2, 2020, Amazon entered the third tranche and the fair value of its over 20 million shares were estimated to be 909.5% greater than previous tranches. ¶156. As the Amazon Transaction Agreement had become a loss contract for Plug Power, Defendant Marsh recommended and received approval from the Board on November 6, 2020 to execute a waiver of the Vesting Conditions. ¶¶93, 246; ECF No. 105-19. Yet, in response to an analyst's question during the 3Q2020 Earnings Conference Call on November 9, 2020 about the stock warrants that Plug Power provides its customers and the corresponding charges to revenue, Defendant Marsh described the "higher warrant charges" as "***actually a real positive***" and noted that "one of our pedestal customers in the third quarter actually exceeded the tranche where the warrant price gets reset. And the warrant price is reset at a rate that's actually 10x higher in cost than the original ones, ***which is a real good item***…" ¶107. (Emphasis added). Defendant Marsh made these statements while withholding that, at that very moment, Plug Power could no longer afford the deal and informed Amazon that it planned to waive the Vesting Conditions, which it believed

26

would be finalized during the fourth quarter of FY2020. ¶¶94, 157. When later given the opportunity to rectify his comments, Defendant Marsh doubled down on his deceit and stated that "I don't spend a lot of time thinking about the warrants." *Id*. Instead of disclosing the truth during the 3Q2020 Earnings Call, Defendant Marsh materially mislead investors by conveying a positive impression of a deal that had become a loss contract and was soon to be abandoned.

### 2.   The Amazon Warrant Waiver Form 8-K Materially Mislead Investors about the True Cost and Cause of the Waiver

Defendants' statements in the Amazon Warrant Waiver Form 8-K on the waiver's cost and cause were materially misleading as demonstrated by the broader market's reaction to the announcement and Defendant Marsh's positive statements on the higher warrant charges.[20] On January 5, 2021, Plug Power disclosed that it had waived the Vesting Conditions, which was "expected to result in a substantial one-time non-cash charge in the [fourth quarter of FY2020], to eliminate the need to recognize future quarterly non-cash charges for this warrant and to simplify the Company's financial reporting going forward." ¶130. The Form 8-K did not disclose the amount of the charge or the true reason behind the waiver. ¶¶132, 137. However, analysts' and the market's positive reaction indicated that describing the waiver's cost as "non-cash" and "substantial" was misleading and did not properly inform the market that the Company would incur a cost much greater than its annual revenue. ¶¶300-01. The consensus analyst estimates, which are inherently indicative of the broader market, did not reflect any effect on the Company's financials. Leading up to Plug Power's 4QFY2020 earnings, the consensus EPS ranged from negative $.06 to negative $.08 and revenue was expected to be $87.2 million.[21] ¶300. The fact that

---

[20] Defendants incorrectly assert that the SAC alleges no misstatement in the disclosure of the Amazon Warrant Waiver (or as Defendants denote, the "Waiver Agreement"). *See* Mot. at 31-32; *Cf.* ¶300.

[21] *See In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016) (finding that several analysts' misunderstandings of defendant's statement bolstered allegations that the statement was misleading); *Cf. In Plumbers*

the market was duped by the Form 8-K is buttressed by Plug Power's stock price materially increasing that day by $1.76 or 5.7%. ¶141. The Form 8-K's omission of the waiver's actual cost led the broader market to believe that the Company's fourth quarter earnings would be marginally affected, if at all, when they were really decimated with Plug Power reporting negative $316.3 million in revenue and earnings per share loss of $1.12. ¶¶202, 204.

Additionally, the Form 8K's explanation as to the cause of the waiver was materially misleading in light of Defendant Marsh's assurances on November 9, 2020 that the "higher warrant charges" were "actually a real positive."[22] ¶107. As Defendant Marsh's statements led investors to believe that the "higher warrant charges" were a promising development, investors were misled about why Plug Power would soon after want to eliminate the need to recognize these charges. In order to remedy this false impression, the Form 8-K needed to explain why it needed to eliminate these charges—that the charges were not recoverable from the margins expected under probable future Amazon purchase orders (¶246)—but failed to do so.

### 3.  Item 303 Required Defendants to Disclose Their Plan to Execute the Amazon Warrant Waiver in November 2020 SEC Filings

Defendants failed to comply with Item 303 by failing to disclose in the 3Q2020 Form 10-Q on November 9, 2020 and the November Prospectus on November 18, 2020 that Plug Power planned to waive the Vesting Conditions for tens of millions of Amazon Warrant Shares by the end of the fourth quarter of FY2020, which would force the Company to incur hundreds of millions in revenue costs and materially harm its financial condition.[23] ¶¶275, 277, 288-89. Item 303

---

*and Steamfitters Local 137 Pension Fund v. Am. Express Co.*, 2017 WL 4403314, at *14 (S.D.N.Y. Sept. 30, 2017) (rejecting plaintiff's reliance on analysts' poor predictions as a few analysts were not "indicative of a broader market understanding").

[22] Neither Lead Plaintiff nor Defendants raise any other statements between November 9, 2020 and January 5, 2021 in which Defendant Marsh clarified or corrected his materially misleading statements on the "higher warrant costs."

[23] A violation of Item 303 can sustain a claim under Section 10(b) and Rule 10b-5 where materiality and scienter are also adequately alleged. *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 2016 WL 1211858, at *6-8 (2d Cir. Mar. 29, 2016)

requires disclosure of "known trends or uncertainties that have had or that…the registrant reasonably expects will have a material…unfavorable impact on net sales or revenues or income from continuing operations."[24] 17 C.F.R. § 229.303(a)(3)(ii). The test for a duty to disclose under Item 303 involves a two-part inquiry. Once a trend or uncertainty becomes known to management, it must make two assessments:

> (1) Is the known trend [or uncertainty] likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.

> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend [or uncertainty] on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

*Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 103 (2d Cir. 2015) (citing the 1989 SEC Release). According to the SEC, the "reasonably likely" disclosure threshold "is lower than more likely than not." SEC Release No. 8056, 2002 WL 77153, at *4 (Jan. 22, 2002).

Under the first prong of the Item 303 test, Defendants had a clear a duty disclose its plan to execute a waiver of the Vesting Conditions and its materially harmful effect on Plug Power's revenue on November 9 and 18, 2020.[25] Considering Defendant Middleton's admissions to the

---

(defendants' alleged failure to comply with Item 303 supported claims under the Exchange Act). Here, Defendants do not (and cannot) argue that the Amazon Warrant Waiver was not material and describe it as a "material event." Mot. at 32. Further, as discussed in Sections III(B)(2)(a)-(c), *supra*, the SAC adequately alleges scienter.

[24] "Disclosures required by Item 303 will most often relate to issues in the realm of micro and macroeconomics; for example, a 'reduction in the registrant's product prices; erosion in the registrant's market share…**or the likely non-renewal of a material contract**.'" *Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 433 F. Supp. 3d 515, 541 (S.D.N.Y. 2020) (quoting S.E.C. Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989)) (the "1989 SEC Release") (emphasis added). Here, Plug Power's plan to execute the Amazon Warrant Waiver is akin to the non-renewal of a contract as the waiver equates to Plug Power cancelling the Amazon Transaction Agreement.

[25] Defendants attempt to skirt liability by arguing that their failure to describe the agreement as "unsustainable" is inactionable. Mot. at 33-34. However, their case law only further emphasizes the impropriety of their omissions. *See Silsby v. Icahn*, 17 F. Supp. 3d 348, 362 (S.D.N.Y. 2014) (company supplied investors with financial information from which they could determine whether holding company was solvent, and thus officers had no duty to use the term "insolvent" when describing company's financial condition), *aff'd sub nom. Lucas v. Icahn*, 616 F. App'x 448 (2d Cir. 2015); *Emerson v. Mut. Fund Series Tr.*, 393 F. Supp. 3d 220, 252 (E.D.N.Y. 2019) ("the Fund adequately disclosed its exposure to market movements"). Unlike *Silsby* and *Emerson*, the SAC alleges that Defendants withheld its forecast

SEC on the "magnitude" of the costs of the third tranche of Amazon Warrant Shares and expected timing of the waiver, and the Board's sign off on the waiver following multiple meetings, there is no question it was known by Defendants in early November 2020 that Plug Power planned to execute the waiver in the fourth quarter of FY2020. ¶¶91-93, 156-57. Moreover, given the low exercise price that was set for the third tranche of the Amazon Warrant Shares and Plug Power's flourishing stock price, there was little question that Amazon would sign off on Plug Power's proposed waiver during the fourth quarter of FY2020. *See* Section III(B)(2)(a), *supra*. Thus, Defendants certainly believed that the planned waiver was reasonably likely to occur in the fourth quarter of FY2020. Even if Defendants were unable to determine the likelihood of the waiver occurring, the second prong of the Item 303 dictates disclosure. Defendants also knew the value of the third tranche and that the waiver would forgo approximately $400 million in prospective revenue and force Plug Power to incur hundreds of millions in revenue costs. ¶¶89-94, 98-99. Consequently, the SAC adequately pleads that Defendants had a duty under Item 303 to disclose the known plan to waive the Vesting Conditions by the end of the fourth quarter of FY2020.[26]

> 4. **Item 303 Required Defendants to Disclose of the Costs and Dire Consequences of the Amazon Warrant Waiver in January and February 2021 SEC Filings**

Defendants also failed to comply with Item 303 when they failed to disclose the Amazon Warrant Waiver's quantitative impact and harmful effect on the Company's financial condition in the January Prospectus on January 28, 2021 and the February Prospectus on February 8, 2021. ¶¶307-08. In *Stratte-McClure*, the Second Circuit affirmed that required disclosures under Item

---

of $0.54 of provision for warrants per dollar of revenue the third tranche would require for the next $400 million of prospective payments from Amazon vs. $0.15 of per dollar of revenue for the previous tranches—a fact critical to enabling investors to conceive of the necessity of a waiver. ¶¶275, 288. Defendants also failed to disclose what the actual warrant charges were in connection with revenue that was constrained by the third tranche which they only privately shared with the SEC. ¶155.

[26] Defendants' reliance on *Vladimir v. Bioenvision Inc.*, 606 F. Supp. 2d 473, 485 (S.D.N.Y. 2009) is misplaced as the plaintiff only alleged a specific duty to update merger negotiations, not stemming from Item 303. Mot. at 32.

303 can include "quantitative information" where it is "reasonably available and will provide material information for investors."[27] 776 F.3d at 105. Here, the SAC clearly establishes that the cost of the waiver was "reasonably available" to Defendants.[28] Namely, Defendants: (1) were fully informed of the accounting implications and repeatedly consulted Plug Power's auditor and tax consultant before moving forward with the waiver (¶¶91, 93; ECF No. 105-19); (2) established their model for calculating the fair value of the stock being made available to Amazon (the Black Scholes Option Pricing Model) almost two months before the waiver (¶¶134, 246); (3) admitted that they executed the waiver as the costs associated with the outstanding Amazon Warrant Shares had surpassed the expected revenue from Amazon, which further required an understanding of all the computations comprising the total costs of the waiver (¶246); and (4) Defendant Marsh confirmed that they made such computations when he stated on January 26, 2021 that he had a "pretty good idea" as to what those costs were (¶¶172-73). Moreover, as Individual Defendants knew that the waiver would result in approximately $400 million in costs to revenue in the fourth quarter for FY2020, they understood this would likely cause the Company to report negative revenue for FY2020 as the Company had only accrued $215.9 million in revenue through the third quarter of that year.[29] ¶138. Nevertheless, Defendants repeatedly failed to disclose this information to investors on January 28, 2021 and February 8, 2021. ¶¶306-09, 319-22. Accordingly, the

---

[27] Defendants do not dispute that the costs associated with the Amazon Warrant Waiver were material to Plug Power's investors and would likely cause the Company to report negative revenue for FY2020. ¶¶307-08, 320-21.

[28] Defendants mistakenly assert that "it was impossible for the Company to estimate the Q4 Revenue Charge before the Waiver Agreement was reached" (Mot. at 33) as the SAC alleges that disclosure of this information was required on January 28, 2021 and February 8, 2021, which were several weeks *after* the waiver had been finalized on December 31, 2020. ¶¶306-09, 319-22.

[29] Defendants claim that it was not required to disclose the "severe financial consequences" of the waiver is at odds with the clear requirements of Item 303. Mot. at 33-34. *See*, *e.g.*, *Stratte-McClure*, 776 F.3d 94 at 105 (Morgan Stanley required to disclose that the deteriorating subprime mortgage market was likely to cause trading losses that would affect the company's financial condition, given its large exposure to that market).

Defendants failed to uphold their duty under Item 303 and disclose the expected costs of the Amazon Warrant Waiver and its materially harmful effect on Plug Power's financial condition.[30]

### 5.    Individual Defendants' Insider Trading Triggered a Duty to Disclose

Individual Defendants Marsh and Middleton were in possession of material non-public information concerning Plug Power's failed deal with Amazon (*see* Sections III(B)(2)(a)-(b), *supra*) when they sold hundreds of thousands of Plug Power shares on January 19, 2021 and December 24, 2021, respectively; however, they repeatedly failed to disclose this information throughout the Class Period on November 9, 2020, January 5, 2021, and January 26, 2021.[31] ¶¶276, 299, 304, 350-61; ("A duty to disclose is triggered when a corporate insider trades on confidential information") *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *15 (S.D.N.Y. Mar. 30, 2018); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 814 (2d Cir. 1996). Individual Defendants' duty to disclose this material and non-public information based on insider trading is not contested. *See* Mot. at 31-34. Even if Individual Defendants had mounted a challenge by hiding behind their Rule 10b5-1 trading plans, this defense fails. A Rule 10b5-1 plan is an affirmative defense to insider trading and inappropriate to consider in connection with a duty to disclose material omissions during a motion

---

[30] Defendants' case law does not support their argument that they were not obligated to disclose this information prior to their reporting of fourth quarter earnings on February 25, 2021. Mot. at 32. The SAC is not alleging a duty to update due to a subsequent event (*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 651-52 (S.D.N.Y. 2015)), or misleading historical facts on the Company's performance (*In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *6 (S.D.N.Y. Mar. 29, 2016)), or implying that Defendants should have reported its financial results early (*Arfa v. Mecox Lane Ltd.*, 2012 WL 697155, at *9 n.1 (S.D.N.Y. Mar. 5, 2012), *aff'd*, 504 F. App'x 14 (2d Cir. 2012)). Rather, the SAC is alleging that Defendants had a duty under Item 303 to disclose the known and reasonably available costs of a failed deal with a "key pedestal multisite customer[s]" and the reasonably likely damage this foil would wreck on Plug Power's financial condition. ¶¶51, 306-09, 319-22.

[31] Despite Defendants' claims otherwise, Defendant Marsh's admission on January 26, 2021, in conjunction with the SAC's other well plead allegations, demonstrates he knew Plug Power's estimates on the costs associated with the Amazon Warrant Waiver. Mot. at 33. As Defendant Marsh traded on this material and nonpublic information only a week earlier on January 19, 2021, he had a duty to disclose this information when he was specifically asked about it during the 2021 Business Update but failed to do so. ¶¶302-05. It is of no moment that he preferred to not share the information until it had been audited during the Company's next earnings. As discussed in Section III(B)(2)(b), *supra*, awaiting a final audit is not a recognized exception to a duty to disclose.

to dismiss. *See* 17 C.F.R. § 240.10b5-1(c) (a valid plan is an affirmative defense only); *Glaser v. The9*, Ltd., 772 F. Supp. 2d 573, 593 n.14 (S.D.N.Y. 2011) (courts cannot look to evidence of a plan on a motion to dismiss when plead as an affirmative defense to a claim of insider trading).

Even if the Court considers Individual Defendants' Rule 10b5-1 plans on the issue of whether there was a duty to disclose, Individual Defendant Marsh's plan offers no defense because it was adopted during the Class Period, after he became aware of material nonpublic information, and was suspiciously strategic "so as to capitalize on insider knowledge."[32] *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 585 (S.D.N.Y. 2014); 17 C.F.R. § 240.10b5-1(c)(1)(i)(A); (c)(1)(ii). When Defendant Marsh adopted his Rule 10b5-1 plan on December 2, 2020, he had already informed Amazon that Plug Power planned to waive the Vesting Conditions. ¶164. As illustrated in Section III(B)(2)(a), *supra*, it was a near certainty that the waiver would be shortly finalized considering the windfall awaiting Amazon. Moreover, Defendant Marsh understood that the waiver would force Plug Power to incur hundreds of millions in revenue costs. ¶99. Accordingly, the insider sales created a duty to disclose the material omissions before the market learned of the staggering cost of the Amazon Warrant Waiver on February 25, 2021.[33]

---

[32] The SEC issued a final rule on December 14, 2022 amending Rule 105b-1 (which recently took effect) to deter improper insider trading by, among other things, implementing a "cool-off period" following plan adoption or amendment of 90 days during which the insider cannot trade. The SEC based the new cooling-off period, in part, on an academic study prepared by *The Wall Street Journal*— "CEO Stock Sales Raise Questions About Insider Trading," June 29, 2022—which featured Defendant Marsh's trading and plan as the prime example of potentially improper trading by an insider. *See* Jonathan D. Uslaner and Caitlin C. Bozman, *The SEC's run at revamping Rule 10b5-1 to deter insider trading*, Reuters, https://www.reuters.com/legal/legalindustry/secs-run-revamping-rule-10b5-1-deter-insider-trading-2023-01-26/; ¶170.

[33] In response to the SAC's allegation of Defendant Marsh's knowledge of "the fair value of the vesting Amazon Warrant Shares [and] the actual cost to revenue that Plug Power would incur" (¶ 169), the Defendants incorrectly state that it was impossible for Defendant Marsh to calculate this information on December 2, 2020, as the waiver had yet to be finalized. Mot. at 22. As clarified in the previous paragraph of the SAC, this was non-public information that Defendant Marsh possessed **at the time of his stock sales on January 19, 2021, not at the time of his plan implementation on December 2, 2020**. *See* ¶168. These sales occurred after the Amazon Warrant Waiver had been finalized on December 31, 2020, not before.

D.      **The SAC Adequately Pleads Loss Causation**

As the Second Circuit has noted, "[t]he vast majority of courts in this district have required that loss causation only meet the notice requirements of Rule 8." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 183 (2d Cir. 2015). All that is required at the pleading stage is to "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms. Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Alleging that the market reacted negatively in response to disclosure of the alleged fraud is sufficient. *See Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014).

The SAC sufficiently alleges that Defendants' misrepresentations and omissions related to the Company's failed deal with Amazon, as well as the false financial statements caused economic losses. ¶¶329-36, 397, 394-417. Lead Plaintiff alleges that Plug Power's stock was artificially inflated during the Class Period as a result of Defendants' false statements and omissions. ¶394. On February 25, 2021, Plug Power disclosed the true cost of the Amazon Warrant Waiver and its disastrous effect on its financial results. ¶¶329-31. This revelation caused the Company's stock price to fall by $6.82, or 13.6%. ¶¶331, 398.

Then, on March 2, 2021, Plug Power partially revealed the alleged accounting fraud by informing the market that its 2020 Form 10-K would not be timely filed because it was completing an "assessment of the treatment of certain costs with regards to classification between Research and Development versus Costs of Goods Sold…and certain internal controls over these and other areas" which may result in "significant changes" to its prior period financial statements. ¶332. That same day, in response to this announcement, the Company's stock fell $3.68, or 7%. ¶¶333, 400. Finally, on March 16, 2021, Plug Power confirmed that its Previously Issued Financial Statements would need to be restated due to the issues raised on March 2, 2021. ¶402. On March 17, 2021,

34

the Company's common stock fell $3.35, or approximately 7.8%. ¶403. These declines were a direct result of Defendants' false and misleading statements being revealed to the market. ¶404.

Defendants argue that the corrective disclosures only revealed "disappointing news." Mot. at 34. This ignores the SAC allegations and the negative stock price impact when the material misstatements and omissions became known to the market. ¶¶272-337. When "information is revealed to the market that establishes the falsity of a defendant's prior representations, a plaintiff has pleaded enough to show loss causation in this Circuit." *See In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 520-21 (S.D.N.Y. 2011).

## IV.    THE SAC STATES AN EXCHANGE ACT § 20(a) CLAIM

As the SAC states a §10(b) claim, the §20(a) claim should be sustained. *Lapin v. Goldman Sachs Grp.*, Inc., 506 F. Supp. 2d 221, 244 (S.D.N.Y. 2006) ("Because those primary liability claims have been found by the Court sufficient to survive Defendants' Motion to Dismiss, the section 20(a) claims have the requisite primary violation foundation."). *Cf.* Mot. at 35.

## V.    CONCLUSION

For all these reasons, Defendants' Motion should be denied in its entirety.

DATED: March 3, 2023                           Respectfully submitted,

                                               **BERNSTEIN LIEBHARD LLP**

                                               By: */s/ Michael S. Bigin*
                                                   Stanley D. Bernstein
                                                   Michael S. Bigin
                                                   Adam M. Federer
                                                   10 East 40th Street
                                                   New York, NY  10016
                                                   Telephone: (212) 779-1414
                                                   Facsimile: (212) 779-3218
                                                   bernstein@bernlieb.com
                                                   bigin@bernlieb.com
                                                   afederer@bernlieb.com
                                                   *Counsel for Lead Plaintiff and Lead Counsel for the Proposed Class*

35

**CERTIFICATE OF SERVICE**

I hereby certify that on March 3, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List.

*/s/ Michael S. Bigin*
MICHAEL S. BIGIN