UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE PLUG POWER, INC. SECURITIES
LITIGATION

**OPINION & ORDER**

21-cv-2004 (ER)

R̲AMOS, D.J.:

Lead plaintiff Manfred Schumacher brings this federal securities class action against Plug Power Inc. ("Plug Power" or "the Company"), a company that develops fuel cell technology, and two of its officers, Andrew Marsh and Paul B. Middleton. Schumacher seeks remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder. He brings this action on behalf of purchasers of Plug Power's common stock between November 9, 2020 and March 16, 2021 (the "Class Period").[1]  Doc. 98 ¶ 4.[2]

Before the Court is Defendants' motion to dismiss Schumacher's Second Amended Complaint ("SAC") with prejudice pursuant to the Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1955, 15 U.S.C. § 78u (the "PSLRA").  Doc. 103.

For the reasons set forth below, Defendants' motion to dismiss is GRANTED.

I.     **BACKGROUND**

The facts underlying this case are more fully set out in the Court's Opinion and Order in *In re Plug Power, Inc. Sec. Litig.*, No. 21 Civ. 2004 (ER), 2022 WL 4631892

---

[1] The Class Period begins on November 9, 2020, when the Company reported its third quarter financial results for fiscal year 2020 and ends on March 16, 2021, when the Company announced that it needed to restate some of the Company's financial statements due to accounting misclassifications.  ¶¶ 272, 363.

[2] Unless otherwise noted, citations to "¶ _" refer to the Second Amended Complaint, Doc. 98.

(S.D.N.Y. Sept. 29, 2022) ("*In re Plug Power I*"), familiarity with which is assumed.  For present purposes, the Court provides an abbreviated summary.  The SAC alleges that throughout the Class Period, Defendants issued false and misleading financial information by misclassifying costs related to fuel delivery as research and development expenses.  Defendants allegedly made these false statements in order to secure financing from the Company's secondary public offerings, attract a partnership opportunity for the Company, and so that Marsh and Middleton could sell their shares at an inflated price.  Additionally, Defendants allegedly issued false and misleading financial information regarding a transaction with Amazon.

### A.  Factual Background

The following facts are based on the allegations in the SAC, which the Court accepts as true for purposes of the instant motion.  *See, e.g.*, *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

*1.  The Parties*

Andrew Marsh is the Company's Chief Executive Officer, President, and a member of its board of directors.  ¶ 31.  Marsh has served as the CEO since April 2008, including throughout the entirety of the Class Period.  *Id.*  Paul B. Middleton is the Company's Chief Financial Officer.  ¶ 32.  Middleton has been the CFO since 2014, including throughout the Class Period.  *Id.*  Middleton signed the Company's Form 10-Ks for the fiscal years ("FY") 2016–2019; Form 10-Q for the third quarter ("Q3") of FY2020; and letters to the shareholders dated November 9, 2020 and February 25, 2021, which reported Plug Power's financial results for the Q3 and Q4 of FY2020, respectively. ¶ 32.

The individual defendants had authority to issue the Company's SEC filings and public statements.  ¶ 33.  Furthermore, they were provided with the filings and statements

prior to, or shortly after, their issuance and had the ability to prevent their issuance or cause them to be corrected.  *Id.*

2.   *Plug Power's Hydrogen Fuel Cell Business*

Plug Power develops and sells hydrogen fuel cell products that replace conventional batteries in equipment and vehicles powered by electricity, like forklifts, for some of the world's largest retail distribution and manufacturing businesses, including Amazon, Walmart, and Home Depot.  ¶¶ 5, 37.  In 2018 Amazon and Walmart were, together, 67% of the Company's revenue; and in 2019 were 50% of the Company's revenue.  ¶ 51.  In 2020 Amazon alone accounted for 332.4% of the Company's total consolidated revenue, due to its costs to revenue.[3]  ¶ 349.  The Company has become the largest buyer of liquid hydrogen.  ¶ 36.

Until the early 2010s, many of Plug Power's customers would purchase the Company's fuel cells directly or arrange for lease financing through a separate financial partner.  ¶ 38.  However, in 2014, Plug Power's larger customers, such as Walmart and Volkswagen, appear to have demanded that the Company offer operating leases itself, thereby allowing the customers to keep the equipment off of their respective balance sheets.  *Id.*  Without a large enough balance sheet of its own to support this, Plug Power was forced to enter into sale/leaseback agreements with a number of financial institutions, such as M&T Bank and Wells Fargo, to facilitate these customer leases.  *Id.*  In these arrangements, Plug Power essentially sold certain fuel cell systems and hydrogen

---

[3] In fiscal year 2020, the Amazon Warrant Waiver, which is discussed in more detail below, caused the Company to report negative $316.3 million in revenue for the fourth quarter and negative $100.5 million in revenue for the year, or 332.4%, of the total consolidated annual revenue.  ¶ 248; *see also* Doc. 106 at 30.

infrastructure to financial institutions, who then leased the equipment back to Plug Power, who then leased the equipment under lease agreements to its customers. ¶ 39.

Plug Power's ability to compete in the fuel cell industry relies heavily on its ability to raise capital and consistently bring its products and technology to the market. ¶ 68. Soon after Plug Power began to provide operating-type sale/leaseback deals to customers, this type of lease became a dominant source of revenue for the Company. ¶ 39. The Company's partners financing the sale/leaseback agreements required the Company to maintain high cash balances in restricted accounts securing the Company's finance obligations in full. ¶ 40. Because the Company is a capital-intensive business, a lack of liquidity drove the Company to seek external financing over the course of 2016. ¶¶ 14, 40.

3.  *New Allegations*
    a.  *Amazon Warrant Waiver*

On April 4, 2017, the Company disclosed to the SEC that it entered into a transaction agreement with Amazon (the "Amazon Transaction Agreement," or the "Agreement"). ¶ 42. Pursuant to this Agreement, the Company agreed to issue Amazon warrants to acquire up to 55,286,696 shares of the Company's common stock (the "Amazon Warrant Shares"). *Id.*; *see also* Doc. 105-5 at 3 (April 4, 2017 Form 8-K).

The first tranche of 5.82 million Amazon Warrant Shares vested upon the execution of the Amazon Transaction Agreement. ¶ 44. The second tranche of 29,098,260 Amazon Warrant Shares was set to vest in four installments of 7,274,565 shares each time Amazon made an aggregate of $50 million in payments for goods and services to Plug Power, up to payments totaling $200 million in the aggregate. *Id.* The exercise price for the first and second tranches of Amazon Warrant Shares was set at

$1.1893 per share.  *Id.*  For the third tranche, the exercise price was to be determined once the second tranche vested.  ¶ 45.  The measurement date was also to be determined at that time.  *Id.*  Once Amazon made payments to Plug Power totaling $200 million, the third tranche of 20,368,784 Amazon Warrant Shares would vest in eight installments of 2,546,098 shares each time Amazon made an aggregate of $50 million in payments for goods and services to Plug Power, up to payments totaling $400 million in the aggregate. ¶ 44.  Under the Agreement, the Warrant may be waived only with the written consent of the Company and the Warrant holder, Amazon.  Doc. 105-5 at 71.

According to Plug Power internal documents, on October 20, 2020, Plug Power's Board of Directors convened and discussed the status of customer warrants, including "the status of the Amazon warrants and discussions with KPMG[4] and Deloitte[5] regarding the same."  ¶ 91.  On November 2, 2020, Amazon entered the third tranche and the fair value of its over 20 million shares were estimated to be 909.5% greater than previous tranches.  ¶ 156.  The exercise price for the third tranche was set at $13.81, compared to $1.1893 for the first and second tranches.  *Id.*  Middleton stated that the increase in stock price and resulting increase in the value of the third tranche of warrants was unexpected. *Id.*

According to a Plug Power conference call held on November 6, 2020, Marsh and Middleton provided the Board with an update related to the status of the Amazon Warrant Shares, including shares vested and unvested, exercise price for vested shares, and the fact that the Warrant permitted cashless exercise.  ¶ 93.  Marsh advised the Board that

---

[4] KPMG is the Company's independent registered public accounting firm.

[5] Deloitte is the Company's tax advisor.

"due to the rapid pace of business expansion with Amazon and the rate of vesting of outstanding warrants to date" he recommended the Company "accelerate the remaining tranches of outstanding but unvested warrants."  Doc. 105-19 at 2 (November 6, 2020 Board of Directors Conference Call).  He also advised the Board that "he and Management had engaged in extensive discussions with [] [their] accountant, KPMG, as well as the Company's tax advisor, Deloitte."  *Id.*  The Board approved the resolution and directed the Company to execute the Warrant Waiver whereby "the Company [would] waiv[e] all remaining Vesting Events under the Warrant to Purchase Common Stock issued by the Company to Amazon on April 4, 2017 with respect to 55,286,696 shares of the … Warrant, resulting in the vesting of an additional 20,368,784 shares of the Company's Common Stock under the Warrant."  *Id.* at 3.

At the time of Plug Power's Q3 earnings release on November 9, 2020, Marsh was in discussions with Amazon to immediately vest the entirety of the third tranche of the Amazon Warrant Shares "to avoid Plug Power perpetually incurring debilitating warrant costs to revenue."  ¶ 94.  The SAC alleges that at the time, Defendants knew, but did not disclose, that the Amazon Transaction Agreement was no longer a tenable arrangement for Plug Power.  ¶ 98.  Due to the massive costs, Schumacher alleges that Defendants "knew that they had no choice but to waive the vesting conditions" for the outstanding Amazon Warrant Shares and incur hundreds of millions in revenue costs by the end of the Q4 of FY2020.  ¶ 99.

Ultimately, on December 31, 2020, the Company waived the remaining vesting conditions (the "Warrant Waiver"), as reported on the Company's January 5, 2021 Form 8-K.  ¶¶ 130, 297; *see also* Doc. 105-22 (January 5, 2021 Form 8-K).  By waiving the

vesting conditions associated with the tranche of Amazon Warrant Shares, Plug Power no longer required Amazon to place $400 million in orders; instead, Plug Power simply made the 20 million or so shares available to Amazon at a heavily discounted price.

¶ 131.   Thus, the revenue charge (the "Revenue Charge") was approximately $400 million.  This was finalized and disclosed in the Q4 earnings release on the February 25, 2021 Form 8-K.  Doc. 105-27 at 3 (February 25, 2021 Form 8-K) ("As previously announced, reported revenue and results were negatively impacted by certain costs of $456 million recorded in the fourth quarter, the majority being non-cash charges related to the accelerated vesting of a customer's remaining warrants.").  Marsh would later say in a March 28, 2021 *Wall Street Journal* article, that this represented "an extraordinary payday" for Amazon.[6]

On May 14, 2021, the 2020 Form 10-K clarified that the waiver's exact charge was $399.7 million and was executed in FY2020 as "the Company concluded [the $399.7 million cost] was not recoverable from the margins expected under probable future revenues attributable to Amazon."  ¶ 246; *see also* Doc. 105-1 at 10 (May 14, 2021 Form 10-K).  To arrive at this figure, Defendants conducted a "probability assessment of whether the [Amazon Warrant Shares] would have vested under the terms of the original Amazon Warrant[,]" *id.*, and projected that it would continue to receive some payments from Amazon, but not the full amount associated with the third tranche vesting schedule. *Id.*  The shares the Company deemed likely to vest based on projected Amazon purchases

---

[6] James Mackintosh, *The Story of Amazon's Fuel-Cell Supplier Explains this Crazy Market*, Wall St. J., (March 28, 2021), https://www.wsj.com/articles/the-story-of-amazons-fuel-cell-supplier-explains-this-crazy-market-11616936401?ns=prod/accounts-wsj

had a calculated grant-date fair value of $10.57; the 12.7 million shares the Company

deemed to be unlikely to be vested had a grant-date fair value of $26.95.  *Id.*

The fair value of these warrants was set based on the Black Scholes pricing

model, which is partly based on "level 3 unobservable inputs for which there is little or

no market data."  *Id.* at 20.  The Company used the following assumptions to calculate

the fair value of the Amazon Warrant Shares:

| | December 31, 2020 | November 2, 2020 |
|---|---|---|
| Risk-free interest rate | 0.58% | 0.58% |
| Volatility | 75.00% | 75.00% |
| Expected average term | 6.26 | 6.42 |
| Exercise price | $13.81 | $13.81 |
| Stock price | $33.91 | $15.47 |

*Id.*

### b.  *The SEC Comment Letters*

Plug Power received several comment letters from the SEC Division of Corporate

Finance between September of 2018 and July of 2019.  ¶¶ 54–66.  The letters primarily

discussed the presentation of non-GAAP[7] metrics, with one of those letters addressing

the Amazon Transaction Agreement.  On September 5, 2018, Middleton received a

comment letter regarding Plug Power's 2017 Form 10-K, FY2018's Q1 Form 10-Q, and

an August 9, 2018 Form 8-K containing the shareholder letter describing the Company's

financial results for FY2018's Q2.  ¶ 54; *see also* Doc. 105-9.  Among other things, the

letter noted that the Company issued warrants in the Amazon Transaction Agreement and

asked "how [the Company] determined the classification and accounting for the

warrants."  *Id.* at 3.  In a 4-page response letter dated September 19, 2018, Middleton

---

[7] "GAAP" refers to the Generally Accepted Accounting Principles.

detailed the terms of the warrants, the vesting schedule, and how the classifications were determined.  Doc. 105-11 at 4–8.

On December 16, 2020, the SEC sent a private comment letter to Middleton regarding Plug Power's 2019 Form 10-K and the Q32020 Letter to Shareholders (the "December 16, 2020 SEC Letter").  ¶ 120.  The letter asked "how [the Company] applied the transition guidance related to" Accounting Standards Update[8] ("ASU") 2019-08 and 2018-07; "how, if at all, adoption of the ASU[s] impacted the timing of when [the Company] recognize[d] the provision for the second and third warrant tranches"; and "how [the Company] measure[d] and recognize[d] the third Amazon warrant tranche." Doc. 105-21 at 3.  Middleton responded on January 14, 2021, explaining that the Company "was in discussions with Amazon to immediately vest the third tranche of warrants and [] believed that this vesting would occur by the end of the fourth quarter of 2020."  Doc. 105-23 at 9.  The SEC did not respond with further questions or comments. Neither of these two letters are publicly available on the SEC's online Edgar system. ¶¶ 123, 161.

On July 16, 2021, the SEC sent another comment letter to Middleton which questioned the accounting surrounding the Amazon Warrant Waiver and the meaning behind Plug Power's statement in the 2020 Form 10-K that the $399.7 million reduction to revenue "was not recoverable from the margins expected from future purchases by

---

[8] The Company adopted the Accounting Standards Update 2019-08 ("ASU") as of January 1, 2019.  As a result, the amount recorded as a reduction of revenue was measured based on the grant-date fair value of the warrants.  Previously, this amount was measured based on vesting date fair value with estimates of fair value determined at each financial reporting date for unvested warrant shares considered to be probable of vesting.  Except for the third tranche, all existing unvested warrants were using measurement date January 1, 2019, the adoption date, in accordance with the transition requirements of ASU 2019-08.  Doc. 105-15 at 4 (December 31, 2019 Form 10-K).

Amazon under the Amazon Warrant, and no exclusivity or other rights were conferred to the Company in connection with the December 31, 2020 waiver." ¶ 255. Middleton responded on August 20, 2021, and described that "the probable future economic benefit amount associated with Amazon [was] not sufficient to recover the cost of the Third Tranche." ¶ 256. He also stated that the Company estimated the probable future payments as of December 31, 2020 from Amazon to be $124.4 million for purposes of accounting for the modification of a share-based payment award, which included the evaluation of the number of warrants that were probable of vesting immediately prior to the Waiver versus the number that were not deemed probable of vesting. *Id.* Based on the estimated fair value measure of the third tranche and the historical gross margins for Amazon revenues, the Company calculated the breakeven amount of anticipated revenue that would be needed to recover the cost of the third tranche. *Id.* The Company included this table in its response:

| | |
|---|---:|
| Sales of Fuel Systems | 1,577,000,000 |
| Estimated Margin (25%) | 394,250,000 |
| | |
| Services Revenue | 323,000,000 |
| Estimated Margin (1%) | 3,230,000 |
| | |
| Warrants Fair Value | 399,688,048 |
| Margin (-) Fair Value | - |
| | |
| Total Breakeven Revenue | 1,900,000,000 plus |

*Id.* Thus, the amount of anticipated revenue necessary to breakeven on the cost of the third tranche was in excess of $1.9 billion. *Id.*

c.   *Plug Power's Partnership with SK Group*

On January 6, 2021, Plug Power and SK Group, the largest energy provider in South Korea, announced their intention to enter a joint venture.  ¶ 143.  In addition to the joint venture, SK Group agreed to make a $1.5 billion strategic investment in Plug Power (the "SK Stock Purchase Agreement").  ¶ 144.  Under the terms of the SK Stock Purchase Agreement, a United States subsidiary of SK Group would make the $1.5 billion investment in Plug Power by acquiring approximately 51.4 million shares of common stock representing an approximate 9.9% ownership of Plug Power's issued and outstanding common stock.  *Id.*  Additionally, as part of the SK Stock Purchase Agreement, Plug Power and SK Group agreed to work together exclusively over the next 18 months to finalize the proposed joint venture in Asia.  ¶ 145.  The companies further proclaimed that they intended to finalize the joint venture by 2022.  *Id.*

The SK Group stressed that Plug Power's proven ability to scale its business was integral to the deal, as the South Korean government had been seeking a partner to meet the country's ambitious green energy goals for 2040.  ¶ 146.  In an interview with the *Korea Herald* on January 7, 2021, the SK Group further emphasized Plug Power's substantial growth in recent years and its role as the exclusive supplier of hydrogen forklifts to Amazon and Walmart in choosing the Company as its partner.  ¶ 147.

On January 7, 2021, following the Company's announcement, Plug Power's stock price increased by 35% and closed at $47.29.  ¶ 150.  Within 2 weeks, the Company's stock price increased by 90%.  *Id.*  On February 25, 2021, the Company and SK Group announced the closing of their partnership and investment.  ¶ 151.  Ultimately, the SK Group acquired 54.97 million shares for an aggregate purchase price of $1.6 billion representing an approximate 9.6% ownership of Plug Power's issued and outstanding

common stock.  *Id.*  SK Group acquired its stake in Plug Power via Grove Energy Capital.[9]  ¶ 152.  Upon finalizing the investment, Grove Energy Capital became Plug Power's largest shareholder.  *Id.*

In finalizing the investment, Grove Energy Capital, SK Holdings, and SK E&S (the "SK Entities") were required by Plug Power to agree to various stipulations and limitations on February 24, 2021 (the "SK Investment Agreement").  ¶ 153.  One of the stipulations prohibited the SK Entities from disposing their Plug Power shares for at least two years following the closing of the deal unless they received consent from Plug Power's Board of Directors.  *Id.*  Moreover, SK Holdings and SK E&S were required to maintain a majority equity interest and control over Grove Energy Capital.  *Id.*  The SK Group paid Plug Power and acquired the Company's common stock one week before the Company's March 2, 2021 disclosure that it expected "significant changes" from its previous financial reporting for Q4 of FY2020 and full year FY2019.  ¶¶ 154, 211.  The Company's stock price fell $3.68, or 7%, to close at $48.78 per share on March 2, 2021.  ¶ 333.

On March 9, 2021, it was reported that SK Group was in negotiations with several private equity firms to sell up to a 49% stake in Grove Energy Capital.  ¶ 223.  Pursuant to the SK Investor Agreement, SK Group was not allowed to sell its Plug Power shares for at least two years and was only permitted to sell a non-controlling interest in Grove Energy Capital to a non-competitor of Plug Power.  *Id.*  Thus, the most that SK Group could divest itself from Plug Power was by selling 49% of Grove Energy Capital.  *Id.*

---

[9] Grove Energy Capital is a special purpose company which was organized as a 50:50 joint venture between two units of SK Holdings Co., Ltd. ("SK Holdings"), the SK Group's holding company, and SK E&S Co., Ltd., a natural gas subsidiary.  ¶ 152.

### d. *The Audit Committee Presentation*

Between February 23–24, 2021, the Company's Board of Directors convened in anticipation of the Company reporting earnings for Q4 of FY2020 and full year.  ¶ 385. Middleton provided the Board with an update on the Company's FY2020 financials and made a presentation on the financial results for Q4 of FY2020, including revenue, gross margin, and operating cash flow updates.  *Id.*  Middleton also advised the Board that the KPMG year end audit was progressing and that it would be finalized in the next several days with the Form 10-K to be filed on March 1, 2021.  *Id.*

Middleton also noted that the Audit Committee would be meeting later in the afternoon with KPMG to discuss the 2020 audit and the Form 10-K.  *Id.*  The audit contained a risk assessment of significant risks of fraud, including revenue recognition and management override of controls.  ¶ 387.  The audit also included a slide that explicitly noted that corrections would be required for a series of financial misstatements related to recognition of revenue from sale-leasebacks; incorrect costs of goods sold metrics; and misapplication of fuel delivery costs and research and development expenses.  ¶¶ 388, 200; *see also* Doc. 105-26 at 14 (KPMG Presentation).  The slide shows that over $11 million in costs of fuel delivered to customers had been incorrectly designated as research and development expenses, but that the total uncorrected misstatements of financial statement amount was -0.1% for the quarter and .4% for the year, and had zero impact on its balance sheet and cash flow.  *Id.* at 14–15.  Another slide in the presentation indicated that KPMG had "no significant findings" regarding the revenue recognition and management override of controls.  *Id.* at 11.  KPMG told the Audit Committee that there were "[n]o matters to report," that it found "[n]o actual or suspected fraud involving management, employees with significant roles in internal

control, or where fraud results in a material misstatement," and that KPMG had "[n]o significant findings" from its assessment of "significant risks of fraud."  *Id.* at 5–6, 11.

   4.   *Defendants' November 9, 2020 Alleged False Statements*

  On November 9, 2020, Plug Power reported its financial results for Q3 of FY2020 in a letter to shareholders and touted the Company's gross billings of $125.6 million as "the highest … in the company's 22-year history."  ¶ 87.  During the Company's earnings call for Q3 of FY2020 on the same day, Marsh lauded the Company's operational performance and stated that it "achieved 19% EBITDA[10] on an adjusted basis this past quarter, generating $21.2 million of adjusted EBITDA."  *Id.*  This was allegedly misleading as each of the figures were based on different calculations.  ¶ 104.  Specifically, the adjusted EBITDA margin for Q3 of FY2020 explicitly excluded the costs associated with the common stock warrants and loss contracts[11] related to service.  *Id.*  On the same call, Marsh answered questions concerning the Amazon Warrant Shares and represented that the higher warrant charges were "a real positive."  ¶¶ 107, 273.

  On the same day, the Company filed its Form 10-Q for Q3 of 2020, which was also signed by the individual defendants.  ¶¶ 274, 105.  The Form 10-Q allegedly falsely stated that the Company's research and development expenses were $11.96 million; provision for loss contracts related to service was $4.31 million; gross profit was negative $1.29 million; and operating income was negative $27.53 million.  ¶¶ 281–283.  The Company further allegedly falsely stated that its disclosure controls and procedures were effective.  ¶ 285.  Pursuant to Item 303 of Regulation S–K ("Item 303"), Defendants had

---

[10] The acronym EBITDA refers to earnings before interest, taxes, depreciation, and amortization.

[11] The term "loss contracts" refers to the Company's extended maintenance contracts.

a duty to disclose material information in the 3Q2020 Form 10-Q in order to "[d]escribe

any known trends or uncertainties ... that the registrant reasonably expects will have a

material ... unfavorable impact on ... revenues or income from continuing operations." ¶

277; *see also* 17 C.F.R. § 229.303(a)(3)(ii).

Following the disclosure of the Company's financial results, the Company's stock

increased by $1.45, or 7.6%, to close at $20.31 on November 9, 2020.  Doc. 105-4 at 11

(Plug Power Nasdaq Share Pricing).  As further set forth below, the Company later

restated these financial results.

5. *Plug Power's November 2020 Offering and the November 18, 2020 Alleged False Statements*

On November 16, 2020, the Company issued two press releases announcing a

secondary public offering of $750,000 of common stock at $22.25 per share.  ¶ 109.  The

press releases directed investors to rely on the prospectus supplement related to the

offering as well as the Company's previous financial statements incorporated therein and

filed with the SEC.  *Id.*

On November 18, 2020, Plug Power filed a prospectus pursuant to Rule 424(b)(2)

of the Securities Act of 1933 in connection with the Shelf Registration Statement,

offering 38 million shares of common stock at $22.25 per share.  ¶ 110.  The Company

also granted the underwriters a 30-day option to purchase up to an additional 5,700,000

shares.  *Id.*  The prospectus included financial data for the fiscal years 2017, 2018, and

2019, as well as unaudited financial data for the nine months ended September 30, 2020.

¶ 111.  Specifically, the prospectus stated that the Company netted a gross profit of

negative $28.09 million and incurred $28.69 million in research and development

expenses in FY2017, ¶ 112; netted a gross profit of $2.62 million and incurred $27.71

million in costs related to fuel delivered to customers and $33.91 million in research and

development expenses in FY2018, ¶ 113; and netted a gross profit of $27.97 million and

incurred $36.36 million in costs related to fuel delivered to customers and $33.68 million in research and development expenses in FY2019.  ¶ 114.

For the nine months ended September 30, 2020, the prospectus stated that the Company netted a gross profit of negative $.69 million, an operating income of negative $79.77 million, and incurred $4.31 million in costs related to the provision for loss contracts related to service, $32.27 million in costs related to fuel delivered to customers, and $32.13 million in research and development expenses.  ¶ 115.  In addition, the prospectus incorporated by reference Form 10-K for FY2019 and Form 10-Qs for the first three quarters of FY2020.  ¶ 116.  These reports contained the same financial data described above.  *Id.*  Pursuant to Item 303, Defendants had a duty to "[d]escribe any known trends or uncertainties ... that the registrant reasonably expects will have a material ... unfavorable impact on ... revenues or income from continuing operations."  ¶ 289; *see also* 17 C.F.R. § 229.303(a)(3)(ii).

On the same day, November 18, 2020, the Company's stock increased by $0.24 to close at $23.33.  ¶ 411.  On November 24, 2020, Plug Power announced that it had completed the offering, which raised $1 billion in capital.  ¶ 119.

6.  *Middleton's Stock Sales*

On December 24, 2020, eight days after receiving the December 16, 2020 SEC Comment Letter, Middleton exercised stock options that were not due to expire until 2028 and 2029 and sold 216,667 shares at $35.1299 per share, resulting in net proceeds of approximately $7.1 million.  ¶¶ 124, 126.  This sale was made pursuant to a Rule 10b5-1 trading plan that was established in September 2020.  ¶ 125.  Middleton's base salary in 2020 was $387,188.  ¶ 376.

7.  *Marsh's Stock Sales*

On January 19, 2021, approximately two weeks after the announcement of the SK Group deal, Marsh sold 573,268 of his personally held shares pursuant to a Rule 10b5-1 trading plan at prices ranging from $62.6504 to $68.3109 per share, which reduced his

holdings in the Company by 43% from 1.322 million shares to 748,680 shares.  ¶ 378.  In order to effectuate the sale of 466,668 of those shares, Marsh exercised options that were not due to expire until 2027.  *Id.*  As a result of his sales, he received proceeds of approximately $3.61 million.  *Id.*  Marsh's base salary for 2020 was $676,442.  ¶ 380.

8.  *January 5, 2021 Alleged Omissions Regarding the Amazon Transaction Agreement and the Amazon Warrant Waiver*

On January 5, 2021, Plug Power filed the Amazon Warrant Waiver Form 8-K with the SEC, revealing that on December 31, 2020, it had waived the vesting conditions for the third tranche of Amazon Warrant Shares.  ¶ 297.  According to the Form 8-K, this vesting was "expected to result in a substantial one-time non-cash charge in the quarter ended December 31, 2020, to eliminate the need to recognize future quarterly non-cash charges for this warrant and to simplify the Company's financial reporting going forward."  *Id.*  The Form 8-K stated that "[o]n December 31, 2020 the Company waived the remaining vesting conditions under the warrant, which resulted in the vesting of the remaining 20,368,784 unvested shares under the warrant."  Doc. 105-22.  The Form 8-K did not disclose the actual amount of the one-time non-cash charge against revenue in connection with the waiver (approximately $400 million), or the reasons why the Company executed the waiver—namely, that the Amazon Transaction Agreement had become a loss contract for Plug Power.  ¶ 132.

Thus, Defendants omitted the following non-public information:  (1) the actual cost to revenue that Plug Power would incur in Q4 of FY2020 in connection with the Warrant Waiver, approximately $400 million (the "Revenue Charge"); (2) that Plug Power was "forced" to waive the vesting conditions for the Amazon Warrant Shares because the Amazon Transaction Agreement was a loss contract for the Company; and

(3) the known financial consequences of the Waiver such as reporting negative revenue for FY2020 and dragging down earnings.  ¶ 307.

9.  *Plug Power's January 2021 Offering and the January 28, 2021 Alleged False Statements*

On January 26, 2021, during its annual business update conference call, the Company once again provided forecasts for the upcoming year, with Marsh stating that "with our strong bookings, we had been able to up our guidance for 2021 [for gross billings] to $475 million."  ¶ 171.  The Company omitted a financial target for its adjusted EBITDA for 2021.  *Id.*  During the call, Marsh was specifically asked by Jeffrey David Osborne, an analyst at Cowen and Company, what the exact revenue charge would be in connection with the Amazon Warrant Waiver ("Do you have a preliminary sense on what the charge will be during the fourth quarter call for the accelerated vesting of those warrants?").  The SAC alleges that at the time, Marsh knew the exact charge in connection with the Amazon Warrant Waiver, but did not provide it.  ¶ 172.  Instead, he responded "No.  But I think I do have an idea [b]ut it hasn't been finalized with the auditors yet.  So I have a pretty good idea…."  *Id.*; *see also* Doc. 105-24 at 14 (January 26, 2021 Earnings Call Transcripts).

Also on January 26, 2021, while Plug Power's stock was trading at a 52-week high, the Company announced that it expected a secondary public offering of its common stock for $1.5 billion.  ¶ 175.  The same day, the Company increased the amount of shares initially offered to 28,000,000 shares at a price of $65 per share, with up to an additional 4,200,000 shares for the underwriters.  ¶ 176.  The Company issued two press releases regarding the commencement of the secondary public offering and directed

investors to rely on the prospectus related to the offering as well as the Company's SEC filings.  ¶ 177.

On January 28, 2021, Plug Power filed a prospectus pursuant to Rule 424(b)(5), offering the 28,000,000 shares at $65 per share, with up to an additional 4,200,000 shares for the underwriters.  ¶ 178.  As with the November filing, this prospectus included the same financial data for the fiscal years 2017, 2018, and 2019 as well as unaudited financial data for the nine months ended September 30, 2020.  ¶ 179.  And as was the case with the November prospectus, Defendants had a duty to "[d]escribe any known trends or uncertainties ... that the registrant reasonably expects will have a material ... unfavorable impact on ... revenues or income from continuing operations" pursuant to Item 303.  ¶ 308; *see also* 17 C.F.R. § 229.303(a)(3)(ii).

The same day, the Company's stock increased by $0.86 to close at $65.28.  ¶ 414.  On February 9, 2021, Plug Power announced the completion of its secondary public offering of 32,200,000 shares at $65 per share, with net proceeds over $2 billion.  ¶ 189.

*10. Defendants' February 25, 2021 Alleged False Statements*

On February 25, 2021, Plug Power released its financial results for Q4 and full year 2020 in a letter to the shareholders, which was signed by the individual Defendants.  ¶ 323.  It was also posted on the Company's website and attached to its Form 8-K filed on the same day.  *Id.*  The letter falsely stated that in Q4 of 2020, the Company's research and development expenses were $18.89 million; the provision for loss contracts related to service was $0.7 million; fuel delivery to customers was $18.46 million; gross profit was negative $422.69 million; and operating income was negative $470.5 million.  ¶¶ 323–27.  For the full year 2020, the letter falsely stated the Company's research and development

expenses were $51.02 million; the provision for loss contracts related to service was $5.01 million; fuel delivery to customers was $50.73 million; gross profit was negative $423.34 million; and operating income was negative $550.26 million. *Id.*

The Company had never reported negative annual revenue in its history. ¶ 17. That same day, the Company's stock price fell $6.82, or approximately 13.6%, to close at $43.34 per share on February 25, 2021. ¶¶ 17, 398.

*11. Plug Power's March 2, 2021 and March 16, 2021 Disclosures*

Approximately three weeks after the completion of the secondary public offering, on March 2, 2021, before the market opened, Plug Power filed a Notification of Late Filing with the SEC, stating that it could not timely file its Form 10-K for FY2020 as the Company was conducting a "review and assessment of the treatment of certain costs with regards to classification between Research and Development versus Costs of Goods Sold, the recoverability of right of use assets associated with certain leases, and certain internal controls over these and other areas." ¶ 211. The Company stated that "[i]t is possible that one or more of these items may result in charges or adjustments to current and/or prior period financial statements" and expected "significant changes" from its prior financial reporting for FY2019 and for Q4 of FY2020. *Id.* That same day, the Company's stock price fell by $3.68, or 7%, to close at $48.78 per share. ¶ 333.

On March 16, 2021, after the close of trading, the Company issued a press release announcing that it expected to restate its previous financial results for FY2018 and FY2019 as well as the quarterly filings for 2019 and 2020. ¶ 212; *see also* Doc. 105-30 (March 16, 2021 Form 8-K). Plug Power further reported that in consultation with KPMG, the Company's management and Audit Committee determined that these financial statements needed to be restated due to "errors in accounting primarily related to several non-cash items," including "[l]oss accruals for certain service contracts" and "[t]he classification of certain costs, resulting in decrease in research and development

expense and a corresponding increase in cost of revenue." *Id.* The press release further stated that the Company would not be able to file its 2020 Form 10-K by the March 16, 2021 deadline. ¶ 213.

On the same day, Plug Power filed a Form 8-K, stating that "on February 24, 2021, the Company and the Audit Committee discussed such results with KPMG, and, at that time, no material issues were raised" but that in finalizing the audit, the Company concluded that its previously issued financial statements for FY2018 and FY2019 as well as the quarterly reporting for 2019 and 2020 could not be relied upon. ¶ 215; Doc. 105-30 at 3. The Form 8-K further announced that the Company expected to revise the accounting for these statements and disclose in the 2020 Form 10-K a material weakness in its internal controls over financial reporting. ¶ 215. The Form 8-K advised that "KPMG's report on the Company's internal control over financial reporting as of December 31, 2019 should no longer be relied upon." ¶ 336.[12]

The Form 8-K stated that "[t]he changes that will be recorded did not result from … any override of controls or misconduct, and KPMG has not informed the Audit Committee of any issues related to an override of controls or misconduct." *Id.* The Company reported that the accounting related to the restatement is "complex and technical and involves significant judgments" in applying the applicable accounting principles. Doc. 105-30 at 2.

The following day, on March 17, 2021, the Company's stock fell by $3.35, or 7.8%, per share. ¶ 337. On March 18, 2021, Plug Power filed a Notice of Delisting with the SEC, informing investors that the Nasdaq had notified the Company that it was subject to delisting if it failed to file its 2020 Form 10-K by May 17, 2021. ¶ 217.

*13. Plug Power's Restatement*

---

[12] The Form 8-K also stated that "KPMG issued unqualified audit opinions on the Company's financial statements as of and for the years ended December 31, 2018 and December 31, 2019." Doc. 105-30 at 3.

On May 14, 2021, before the market opened, Plug Power announced that it had completed the restatement (the "Restatement") of its previously issued financial statements and filed its 2020 Form 10-K, which was signed by the individual Defendants. ¶¶ 339, 249.  The Form 10-K stated that the Company had corrected its misclassification of research and development expenses[13] that should have been classified as costs of revenue for the fiscal years 2016 through 2019 and the first three quarters of FY2020. ¶ 231.  The misclassification included costs of revenue related to fuel delivered to customers.  ¶ 233.  Specifically, the Company misclassified $8.9 million for FY2016, $15.2 million for FY2017, $21.2 million for FY2018, and $19.5 million for FY2019. ¶¶ 231, 229.  For Q1 of FY2020, the Company misclassified $5.5 million, $4.9 million for Q2, and $5.5 million for Q3.  ¶ 231.

Thus, for fiscal years 2016 through 2019 and the first three quarters of FY2020, Plug Power misclassified research and development expenses by an aggregate $80.7 million or 53.2% of the originally reported figures.  ¶ 232.  As part of the Restatement, the Company increased the cost of fuel delivered to customers by the following amounts: $8.3 million for FY2018, $8.9 million for FY2019, $2.2 million for Q1 of FY2020, $2 million for Q2 of 2020, and $2.8 million for Q3 of 2020.  ¶ 233.

As a result of correcting the misclassification of costs of revenue as research and development expenses, the Company reduced its previously reported gross profits for fiscal years 2016 through 2019 and the first three quarters of FY2020 as follows:

---

[13] The Company advised investors that "[r]esearch and development expense includes:  materials to build development and prototype units, cash and non-cash compensation and benefits for the engineering and related staff, expenses for contract engineers, fees paid to consultants for services provided, materials and supplies consumed, facility related costs such as computer and network services, and other general overhead costs associated with our research and development activities."  ¶ 72.

| Gross Profit (In Millions)[14] | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **Q1 2020** | **Q2 2020** | **Q3 2020** |
| **Originally Stated** | $3.95 | ($28.09) | $2.62 | $27.97 | ($4.47) | $5.08 | ($1.29) |
| **Restated** | ($4.91) | ($43.30) | ($26.00) | $10.65 | ($9.70) | ($0.02) | ($28.58) |

¶ 235.  The reclassification caused nearly every reporting period to report large gross losses except for FY2019.  ¶ 236.

The Form 10-K also described the Company's improper assumptions in connection with loss accruals for certain service contracts, which is a type of cost of revenue.  ¶ 238.  As further described above, because the Company misclassified research and development costs, it did not consider all relevant historical costs when estimating future service costs in its determination of whether a loss accrual for extended maintenance contracts was necessary.  *Id.*  When properly considering these costs, additional loss accruals for the extended maintenance contracts were required to be recorded.  *Id.*  Such corrections resulted in a loss accrual of $5.3 million for the year ended December 31, 2018 and negative $1.6 million loss accrual for the year ended December 31, 2019.  *Id.*  Furthermore, the Form 10-K described how most of the $35.5 million loss accrual for the FY2020 derived from the Company's understatement of the provision for loss contracts related to service during Q3 by $20.8 million.  ¶ 239.  This understatement of loss accrual was a result of the Company's misclassification of fuel delivery to customers as a research and development expense instead of as a cost of revenue, and caused the Company's operating income to decrease by $20.8 million.  *Id.*

The Form 10-K reported that these "errors were identified after the Company reported its 2020 fourth quarter and year end results on February 25, 2021 during the

---

[14] The figures in parentheses indicate gross losses.

course of the audit with respect to the Company's financial statements for the year ended December 31, 2020, as well as during preparation of this Annual Report on Form 10-K." Doc. 105-1 at 4.

The Form 10-K stated that Plug Power's management, including the individual Defendants, under the oversight of the Company's Board of Directors, evaluated the Company's internal controls over financial accounting.  ¶ 240.  The Company concluded that its internal controls were not effective because of certain material weaknesses.  *Id.* Specifically, Plug Power determined that it "did not maintain a sufficient complement of trained, knowledgeable resources to execute their responsibilities with respect to internal control over financial reporting for certain financial statement accounts and disclosures." Doc. 105-1 at 6.  As a result, the Company "did not conduct an effective risk assessment process" and "did not design and implement effective process-level controls activities." *Id.*  The Form 10-K further provided that these deficiencies resulted in material misstatements that were identified and corrected in the consolidated financial statements as of and for each of the three years in the period ended December 31, 2020 and other historical periods.  ¶ 241.

For FY2020, the Form 10-K reported that the Company's research and development expenses were $27.85 million, provision for loss contracts related to service was $35.47 million, cost of revenue related to fuel delivered to customers was $61.82 million, gross profit was negative $469.42 million, and operating income was negative $584.20 million.  ¶ 243; Doc. 105-1 at 7.

*12. Scienter Allegations*

The SAC re-alleges six inferences of scienter argued in the FAC:  (1) Defendants were motivated to falsely inflate Plug Power's gross margins to create the appearance that the Company's growth trajectory was positive; (2) stock sales by Marsh and Middleton pursuant to Rule 10b5-1 trading plans were motives to commit fraud; (3)

Marsh and Middleton's Sarbanes-Oxley certifications create an inference of scienter; (4) the misstatements were related to the "core operations" of Plug Power; (5) material amounts of the Company's fuel delivery costs were being reported as research and development expenses in violation of the Company's accounting policy and thereby inflating reported gross profits; and (6) booking fuel delivery costs as research and development expenses allowed the Company to understate the loss accrual related to its extended maintenance contracts thereby inflating reported gross profits and EBITDA. ¶¶ 368–384, 390–93, 362–66.

The SAC makes four new scienter allegations, claiming that at the time of the statements above, Defendants allegedly knew or recklessly disregarded: (1) that Plug Power planned to waive the remaining vesting conditions for the Amazon Warrant Shares by the end of Q4 of FY2020; (2) the actual cost to revenue that Plug Power would incur in Q4 of FY2020 in connection with the Amazon Warrant Waiver was approximately $400 million; (3) knowledge Defendants had, but ignored, from SEC Comment Letters; and (4) the accounting issues raised in Plug Power's February 23–24, 2021 Audit Committee meetings. ¶¶ 272–78, 385–89.

According to the SAC, Marsh and Middleton, because of their positions, made or controlled the Company's public statements, had access to relevant information prior to or shortly after the issuance of the alleged misstatements, and had the ability and opportunity to prevent their issuance or cause them to be corrected. ¶ 345. Further, in light of Marsh and Middleton's insider trading, they breached their duty to disclose material and non-public information, and both profited substantially from the Company's inflated stock prices. ¶¶ 356, 361, 384.

### B.  Procedural Background

Dawn Beverly first filed this putative class action on March 8, 2021.  Doc. 1.
Manfred Schumacher moved on May 7, 2021 for appointment as lead plaintiff, approval
of Bernstein Liebhard LLP as lead counsel, and consolidation of *Beverly v. Plug Power,
Inc., et al*, No. 21 Civ. 2004, and *Tank v. Plug Power, Inc., et al*, No. 21 Civ. 3985.  Doc.
15.  Schumacher also filed a lead plaintiff appointment motion in *Smolicek v. Plug Power,
Inc., et al*, No. 21 Civ. 4832, which was first filed in the Central District of California on
March 18, 2021, but was transferred to this district on June 1, 2021 and subsequently
assigned to this Court.  On July 22, 2021, the Court granted Schumacher's motions and
*sua sponte* consolidated *Smolicek*, No. 21 Civ. 4832, into this action.  Doc. 67 at 1–2, 6.

On October 6, 2021, Schumacher amended the Complaint.  Doc. 78.  Defendants
moved to dismiss the FAC on December 6, 2021.  Doc. 84.  The Court granted
Defendants' motion and granted leave to Schumacher to plead additional facts to remedy
the deficiencies.  Doc. 95.  Schumacher filed the SAC on November 21, 2022.  Doc. 98.
The instant motion to dismiss the SAC was filed on January 12, 2023.  Doc. 103.  For the
reasons stated below, the motion to dismiss is GRANTED.

## II.  LEGAL STANDARD

### A.  Rule 12(b)(6)

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must
contain sufficient factual matter, accepted as true, to 'state a claim to relief that is
plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl.
Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the
plaintiff pleads factual content that allows the court to draw the reasonable inference that
the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at
556).  The plaintiff must allege sufficient facts to show "more than a sheer possibility that
a defendant has acted unlawfully."  *Id.* (citing *Twombly*, 550 U.S. at 556).  However, this
"flexible plausibility standard" is not a heightened pleading standard, *In re Elevator*

*Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (quotation omitted), and "a complaint

. . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*,

550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately

prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs

for Just. v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N. Y 2012) (quoting *Villager Pond, Inc.

v. Town of Darien*, 56 F.3d 375, 368 (2d Cir. 1995)).  Indeed, "the purpose of Federal

Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal

sufficiency of the plaintiff's statement of a claim for relief without resolving a contest

regarding its substantive merits" or "weigh[ing] the evidence that might be offered to

support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quotations omitted).

Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all

factual allegations in the complaint as true and draws all reasonable inferences in the

plaintiff's favor.  *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).  In considering a Rule

12(b)(6) motion, a district court may also consider "documents attached to the complaint

as exhibits[ ] and documents incorporated by reference in the complaint." *Doe v. N.Y.

Univ.*, No. 20 Civ. 1343 (GHW), 2021 WL 1226384, at *10 (S.D.N.Y. Mar. 31, 2021)

(quotation mark omitted) (quoting *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d

Cir. 2010)).  "Judicial notice may be taken of documents that are 'integral to the

complaint,' such that the complaint 'relies heavily upon [the documents'] terms and

effect." *Hesse*, 463 F. Supp. 3d at 462 (quoting *Palin v. N.Y. Times Co.*, 940 F.3d 804,

811 (2d Cir. 2019)).  Further, "[c]ourts have taken judicial notice of materials in the

public record, such as federal copyright registrations, newspaper articles, and regulatory

filings—all for the limited purpose of noting what the documents state, rather than to

'prove the truth of their contents.'" *Id.* (quoting *Ace Arts, LLC v. Sony/ATV Music Pub.,

LLC*, 56 F. Supp. 3d 436, 442 (S.D.N.Y. 2014)).

### B.  Rule 9(b)

A complaint alleging securities fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA by stating the circumstances constituting fraud with particularity.  *See, e.g.*, *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320–21 (2007)).  These requirements apply whenever a plaintiff alleges fraudulent conduct, regardless of whether fraudulent intent is an element of a claim.  *Rombach v. Chang*, 355 F.3d 164, 170–71 (2d Cir. 2004) ("By its terms, Rule 9(b) applies to 'all averments of fraud.'" (quoting Fed. R. Civ. P. 9(b))).

Specifically, Rule 9(b) requires that a securities fraud claim based on misstatements must identify:  (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent.  *See, e.g.*, *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012) (citing *Rombach*, 355 F.3d at 170).  Conditions of a person's mind—such as malice, intent, or knowledge—may be alleged generally, however.  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (citing Fed. R. Civ. P. 9(b)).  Like Rule 9(b), the PSLRA requires that securities fraud complaints "'specify' each misleading statement," set forth the reasons or factual basis for the plaintiff's belief that the statement is misleading, and "state with particular facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u-4(b)(1), (2)); *see also, e.g.*, *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

These heightened pleading standards, when viewed together with the more general standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal*, make clear that "plaintiffs must provide sufficient particularity in their allegations to support a plausible inference that is more likely than not that a securities law violation has been

committed." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (citing *ECA*, 553 F.3d at 196).

## III.   DISCUSSION

Section 10(b) of the Exchange Act prohibits using or employing, "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance," 15 U.S.C. § 78j(b) (1934), while Rule 10b-5 creates liability for a person who makes "any untrue statement of a material fact or . . . omit[s] to state a material fact . . . in connection with the purchase or sale of any security." *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 397 (S.D.N.Y. 2013) (quoting 17 C.F.R. § 240.10b-5 (1951)).  Rule 10b-5, promulgated by the SEC to implement Section 10(b), "more specifically delineates what constitutes a manipulative or deceptive device or contrivance." *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir. 1999).  Under Rule 10b-5, it is unlawful for any person, directly or indirectly, by use of any means specified in Section 10(b):

> (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a private civil claim under Section 10(b) and Rule 10b-5, a plaintiff must plead that:  (1) the defendant made a material misrepresentation or omission, (2) with scienter, *i.e.*, a wrongful state of mind, (3) in connection with the purchase or sale of a security, and (4) that the plaintiff relied on the misrepresentation or omission, thereby (5)

causing economic loss.  *Dura*, 544 U.S. at 341–42; *see also Lattanzio v. Deloitte &
Touche LLP*, 476 F.3d 147, 153 (2d Cir. 2007).

The SAC re-alleges scienter based on (1) Defendants' motivation to raise capital
and show scalability to entice a venture with SK Group; (2) stock sales by Marsh and
Middleton pursuant to Rule 10b5-1; (3) Marsh and Middleton's Sarbanes-Oxley
certifications; and (4) the alleged misstatements' relation to Plug Power's "core
operations."  ¶¶ 368–384, 390–93, 362–66.  The SAC also newly alleges, among others,
(1) omissions in connection with the Amazon Transaction Agreement and Warrant
Waiver; (2) omissions of knowledge that the actual Revenue Charge in connection with
the Amazon Warrant Waiver was approximately $400 million (3) knowledge Defendants
had, but ignored, from SEC Comment Letters; and (4) knowledge Defendants had from
an Audit Committee Presentation ("KMPG Presentation").  ¶¶ 298, 320, 275, 385.
Lastly, the SAC alleges that there were economic losses caused by Power Plug's false
statements and omissions.

First, as to the realleged claims, Defendants argue that the SAC still fails to plead
an inference of scienter regarding the Company's Restatement, because (1) motives to
make the Company appear profitable, (2) routine trading by Marsh and Middleton, (3) the
core operations doctrine, and (4) the individual defendants' Sarbanes-Oxley certifications
do not constitute evidence of scienter, nor does the SAC otherwise plead any new facts
suggesting scienter. [15]  As to the new allegations, Defendants argue that (1) the SAC does

---

[15] Schumacher seemingly abandons the following arguments:  that Marsh's and Middleton's stock sales
pursuant to Rule 10b5-1 trading plans and their Sarbanes-Oxley certifications amount to an inference of
scienter, and that the "core operations" theory support scienter as to the restatement.  *See* Doc. 106 at 10–
15.  "A court 'may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a
defendant's arguments that the claim should be dismissed.'"  *Williams v. Mirabal*, No. 11 Civ. 336 (JMF),
2013 WL 174187, at *2 (S.D.N.Y. Jan. 16, 2013) (quoting *Lipton v. Cnty. of Orange, N.Y.*, 315 F. Supp. 2d
434, 446 (S.D.N.Y. 2004)).

not plead any facts that suggest Defendants had motive or opportunity to engage in fraud related to the Amazon Warrant Shares; (2) the SAC does not plead any facts to suggest that Defendants knew the Q4 Revenue Charge of $400 million prior to December 31, 2020; (3) the SEC Comment Letters do not suggest that the Company acted fraudulently or was reckless in how it performed its accounting; (4) the KPMG Presentation made no significant findings that indicated fraud.

Second, Defendants argue that the SAC fails to allege a material omission or misstatement as to the Amazon Warrant. Third, Defendants further argue that the action should be dismissed, because it fails to plead loss causation. Fourth, Defendants argue that the § 20(a) claim should be dismissed because there is no primary violation of §10(b)(5). Thus, Defendants argue that the SAC should be dismissed with prejudice.

## A. Scienter

Defendants argue that Schumacher fails to adequately plead scienter. A plaintiff may establish scienter by alleging facts that either (1) show that the defendant had both the "motive and opportunity" to commit the alleged fraud, or (2) constitute "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. The relevant inquiry for the Court "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 291–92 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015) (citing *Tellabs*, 551 U.S. at 322–23); *Medis Inv'r Grp. v. Medis Tech., Ltd.*, 586 F. Supp. 2d 136, 141 (S.D.N.Y. 2008) ("In order to determine whether a complaint has adequately pleaded scienter, a court should examine all of the facts alleged collectively or 'holistically' (without parsing individual allegations), and take into account any inference concerning scienter—supporting or opposing—which can be

drawn from the complaint."), *aff'd*, 328 F. App'x 754 (2d Cir. 2009) (summary order).

"According to the Supreme Court, the critical inquiry is:  'When the allegations are

accepted as true and taken collectively, would a reasonable person deem the inference of

scienter at least as strong as any opposing inference?'  If so, then scienter has been

adequately pleaded.  If not, the case may be dismissed."  *Medis*, 586 F. Supp. 2d at 141

(citing *Tellabs*, 551 U.S. at 326).

### 1.  *Motive and Opportunity*[16]

Defendants argue that the SAC fails to allege scienter as to the Restatement.  The

SAC argues that Defendants were motivated to commit fraud in order to entice a deal

with SK Group.  ¶ 368.  The SAC points to three new documents as evidence of this:  a

statement by SK officials in the *Korean Herald*, the KPMG Presentation,[17] and the SEC

Comment Letters.  Nevertheless, the SAC fails to sufficiently allege that Plug Power's

gross margins or scalability were the reasons for the SK Group's decision to partner with

and invest in the Company.

The Defendants' opportunity to commit the alleged fraud is not contested.

Individual Defendants held the highest positions of authority at Plug Power.  *Chill v. Gen.

Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996) (noting that it is "indisputable that key

directors and officers have [the] ability to manipulate their company's stock price").

Regarding motive, whether such an interest in acquisition is sufficient to plead

scienter is "extremely contextual" and requires an allegation of a "unique connection

---

[16] In their motion to dismiss, Defendants argue that the SAC does not plead facts that suggests they had motive or opportunity to engage in fraud related to the Amazon Warrant Waiver.  However, in his briefing Schumacher does not argue that these allegations demonstrate motive, but rather that Defendants demonstrated "conscious misbehavior or recklessness" in not knowing that a Waiver Agreement would be reached with Amazon.  Doc. 106 at 23.  Accordingly, the allegations regarding the Amazon Warrant Waiver and the Waiver Agreement are discussed under the subsequent section, "Conscious Misbehavior or Recklessness."

[17] The Audit Committee presentation is discussed in further detail under the subsequent section, "Conscious Misbehavior or Recklessness."

between the fraud and the acquisition." *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 242 (S.D.N.Y. 2012) (quoting *ECA*, 553 F.3d at 201 n.6). Such a unique connection is sufficient when the "misstatements directly relate to the acquisition." *Id.* at 243.

In the FAC, Schumacher relied on a single statement referring to the Company's scalability in the joint announcement. *In re Plug Power I* at *12. In *Plug I*, the Court held that "Schumacher's allegations suggest nothing more than the ordinary motives possessed by virtually all corporate insiders" and that "Defendants' alleged desire to raise capital from conducting offerings and entering into favorable transactions, such as the SK Group deal, is not evidence of scienter." *Id.* The SAC now relies on a statement made by an SK Group official in the *Korea Herald* on January 7, 2021—a few days after the initial partnership announcement— in which the official comments that the SK Group's choice to invest in and partner with Plug Power was due to the Company's substantial growth in recent years and its exclusive relationship with Amazon and Walmart.[18] ¶¶ 147, 370. The SAC argues that "the critical reason for SK Group's decision to partner with and invest in Plug Power was based on materially false statements" in other words, the recent growth the official referred to was based on Defendants' overstated margins published in the Company's financial statements. ¶ 371; *see also* Doc. 106 at 20.

The SAC's reliance on this statement fares no better than the FAC's allegations. Again, reliance on a single statement referring to Plug Power's growth falls short of establishing a unique connection between the alleged fraud (inflated margins) and the SK Group deal. The statement in the *Korea Herald* confirms that the SK Group entered into the joint venture for "two reasons—growth potential and price competitiveness."[19] Nowhere in the statement is there a connection between the SK Group's decision to enter

---

[18] Kim Byung-wook, *SK Kicks Off 2021 With $1.5b Investment Into US Hydrogen Company Plug Power*, The Korea Herald (Jan. 7, 2021), https://www.koreaherald.com/common/newsprint.php?ud=20210107000834.

[19] *Supra*, n.18.

the joint venture and the Company's margins. Therefore, there is no allegation that the Company inflated margins to attract the SK Group and that this was done for any personal gain "at the expense of [Company] shareholders because the shareholders themselves would benefit from a superior transaction." *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 571 (S.D.N.Y. 2007).

Likewise, it remains the case that Plug Power and SK Group formed a joint venture on October 6, 2021, five months after the Restatement was issued. This timeline weighs against the argument that Defendants were motivated by the potential partnership to commit the alleged fraud. The SAC attempts to circumvent this conclusion with its new allegation that the SK Group "had no choice but to move forward with the joint venture." Doc. 106 at 21. First, Schumacher argues that the SK Group "was under tremendous pressure to meet the South Korea government's hydrogen energy goals" and that "any announcement by SK Group that it was not moving forward with the promised joint venture would have … derail[ed] its ability to fulfill government-mandated production quotas." Doc. 106 at 20–21. However, the SAC fails to allege: what the relationship between the SK Group and the South Korean government is; what role the South Korean government played in the joint venture; what the government quota is; and how exactly the SK Group "felt pressure" from the South Korean government. Moreover, even if the SK Group felt pressure from the South Korean government, that would not support *Defendants'* state of mind in assessing scienter.

The SAC also speculates that the "SK Group was very much locked into its investment of Plug Power" because SK Holdings and SK E&S were required to maintain a majority equity interest and control over Grove Energy Capital. ¶ 153. The fact remains that any agreement the SK Group entered into with the Company in October 2021 was *after* the Restatement, when the Company's margins for FY2020 were revealed.

The SAC newly alleges facts concerning the SEC Comment Letters the Company received, but does not argue in its briefing that scienter can be inferred from them. Rather, the SAC seems to imply that Defendants had material non-public information from the Comment Letters, and that they failed to disclose that information.  ¶¶ 312, 67. To the extent that the SAC is alleging that Defendants had a duty to disclose the content of the SEC Comment Letters, Defendants are only instructed to disclose written staff comments issued more than 180 days prior to the fiscal year covered by the annual report that remain unresolved and that they believe are material.  Doc. 105-31 at 9 (Form 10-K Instructions).  All of the Comment Letters were resolved.  Nevertheless, the Comment Letters primarily discussed the presentation of non-GAAP metrics, with only two of the letters discussing the Amazon Warrant Waiver at all.  Defendants responded and the SEC did not suggest that the Company acted fraudulently or ask any further questions on the subject.  As Defendants argue, courts routinely decline to infer scienter based on SEC comment letters without more.  *See Pennsylvania Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 939 F. Supp. 2d 445, 452 (S.D.N.Y. 2013) (no scienter based on SEC comment letter absent "evidence of corresponding fraudulent intent").

Thus, the SAC has failed to adequately plead motive on the basis of enticing the SK Group to enter into an agreement with the Company.  Because Schumacher asserts no other basis upon which to establish motive, the Court finds that he fails to establish scienter through the motive-and-opportunity theory.

*2. Conscious Misbehavior or Recklessness*

Where, as here, a plaintiff fails to allege a motive to commit fraud, the plaintiff's allegations that indicate a defendant's conscious misbehavior or recklessness "must be correspondingly greater."  *Kalnit*, 264 F.3d at 142 (internal quotation marks and citation omitted); *see also Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 213 (S.D.N.Y. 2020).

The SAC alleges that Defendants demonstrated conscious misbehavior or recklessness with regard to the Amazon Transaction Agreement and the Restatement.  In

order to establish scienter under the conscious misbehavior or recklessness theory, a plaintiff "must show conduct by defendants that is at least highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 216 (S.D.N.Y. 2004) (internal quotation marks omitted) (quoting *Kalnit*, 264 F.3d at 142); *see also Abengoa*, 481 F. Supp. 3d at 213.

### a. The Amazon Transaction Agreement

First, Defendants argue that the SAC fails to plead Marsh and Middleton's scienter with respect to the Amazon Transaction Agreement because they did not know and were not reckless in not knowing: (1) that the Amazon Warrant Waiver would be finalized before it was signed on December 31, 2020 or (2) the amount of the Q4 Revenue Charge before February 25, 2021. Additionally, they contend that neither the magnitude of the Amazon Warrant Waiver nor the "core operations" theory are sufficient to save the deficient pleading.

### i. Defendants' Knowledge of the Warrant Waiver

Plug Power waived the vesting conditions for the Amazon Warrant Shares on December 31, 2020 (the "Warrant Waiver"). The Company disclosed the Amazon Warrant Waiver on January 5, 2021 in a Form 8-K. Doc. 105-22. The SAC alleges that since early November 2020, Defendants knew that Plug Power would waive the vesting conditions and execute the Amazon Warrant Waiver. "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak v. Kasacks*, 216 F.3d 300, 309 (2d Cir. 2000).

However, the SAC does not "identify any reports or statements containing" information that demonstrates that there was an agreement with Amazon, or that Defendants knew a Warrant Waiver would be signed, before December 31, 2020.

The SAC first points to Defendants' January 14, 2021 response to an SEC Comment Letter. The SAC alleges that "Plug Power had been engaged in discussions with Amazon since the Company's third quarter earnings release for FY2020 on November 9, 2020 and planned to waive the remaining vesting conditions." ¶ 353. However, in the response letter Defendants state "at the time of our third quarter earnings release, Plug was *in discussions* with Amazon to immediately vest the third tranche of warrants and Plug believed that this vesting would occur by the end of the fourth quarter of 2020." Doc. 105-23 at 9 (emphasis added). The letter can be better understood as implying that the Company anticipated that it might be able to successfully execute the new contract with Amazon before the end of December 2020. In other words, in November the Company was still discussing the possibility of entering into the Warrant Waiver, but had not yet come to an agreement to do so, and *believed* all vesting *might* occur during Q4.

Schumacher argues that when Plug Power announced on January 5, 2021 that it had finalized its planned waiver of the vesting conditions during Q4 of FY2020, it framed the waiver as a unilateral decision by the Company because it made no mention of Amazon's involvement when it stated that "[o]n December 31, 2020, the Company waived the remaining vesting conditions under the warrant, which resulted in the vesting of the remaining 20,368,784 unvested shares under the warrant" on the Amazon Warrant Waiver Form 8-K. Doc. 105-22 at 3. The wording or phrasing of the disclosure does not negate the terms of the Amazon Warrant which states that the "Warrant may be waived only with the written consent of the Company *and the Warrant holder*." Doc. 105-5 at 71 (April 4, 2017 Form 8-K) (emphasis added).

Next the SAC, utilizes the meeting notes from the Company's Board conference call held on November 6, 2020, to allege that Defendants were aware of the Warrant Waiver in early November 2020. During the conference call Marsh and Middleton provided the Board with updates regarding the Amazon Warrant Shares. Doc. 105-19.

Marsh advised the Board that "due to the rapid pace of business expansion with Amazon and the rate of vesting of outstanding warrants to date" he recommended the Company "accelerate the remaining tranches of outstanding but unvested warrants." *Id.* at 2.  The notes reflect that the Board approved and directed the Company to execute the Waiver whereby the Company would waive all remaining Vesting Events under the Warrant. *Id.* at 3.  This, too, fails to sufficiently allege that Defendants had information indicating that they were aware of the Warrant Waiver prior to December 31, 2020.  Rather, the notes reveal that the Board approved the Company's decision to begin negotiations with Amazon to execute the Warrant Waiver.  These negotiations were subject to the Agreement's conditions—namely, that Amazon give its written consent.

Lastly, the SAC's argument that "there was no question that Amazon would sign off on the proposed waiver" is of no moment.  Doc. 106 at 24.  Schumacher argues that because Amazon stood to receive "an extraordinary payday," its signoff during Q4 "was fait accompli and a mere formality." *Id.* at 25; ¶ 131.[20]  It is irrelevant that the Waiver was economically beneficial to Amazon.  Far from "fait accomplice and a mere formality," Amazon was required to provide its written consent in order to amend the Warrant Agreement.  Further, it cannot be said that the Company had the ability for force a company as large as Amazon to amend the Warrant Agreement, let alone do so on Plug Power's contemplated timeline.[21]

Indeed, as Defendants argue, the SAC relies on a fraud-by-hindsight theory.  While Schumacher argues that "Defendants knew from the onset of its discussions with Amazon in early November 2020 that the Waiver would be finalized during Q4 of FY2020,"  the SAC has failed to allege facts that support this conclusion.  Doc. 106 at 26.

---

[20] *Supra* at n.6.

[21] Defendants cite to the Fortune Global 500 list, which in 2022 listed Amazon as the second largest company in the world by total revenue.  Currently Amazon is listed as the fourth largest company in the world. *Global 500*, FORTUNE, (2023), https://www.fortune.com/ranking/global500/ (last visited Aug. 23, 2023)/

Rather, Defendants' response to the SEC Comment Letter and the Form 8-K were statements of belief, not of certainty. Defendants "are only responsible for revealing those material facts reasonably available to them" at the time false or misleading statements were made. *Novak,* 216 F.3d at 309. That Amazon would agree to amend the warrant and when it would agree were not "facts reasonably available" to Defendants.

  ii.  *Defendants' Knowledge of the Revenue Charge*

   The Revenue Charge of approximately $400 million was finalized and disclosed in the Q4 earnings release on February 25, 2021 Form 8-K. *See* Doc. 105-27 at 3 (February 25, 2021 Form 8-K) ("As previously announced, reported revenue and results were negatively impacted by certain costs of $456 million recorded in the fourth quarter, the majority being non-cash charges related to the accelerated vesting of a customer's remaining warrants."). Defendants argue that the Q4 Revenue Charge was complex and was not finalized at the time of the Warrant Waiver, December 31, 2020. Schumacher argues that four of the Defendants' documents, the magnitude of the Warrant Waiver, and the Waiver's impact on the Company's core operations, taken as a whole, support an inference that Defendants knew or should have known the amount of the waiver's one-time Revenue Charge at the time of the Waiver's announcement on December 31, 2020. Doc. 106 at 26–27. The four documents Schumacher argues contain contradicting information, *i.e.* that the Company knew or should have known the Revenue Charge before it disclosed the exact amount of the Revenue Charge are:  (1) the meeting notes from the Company's Board conference call held on November 6, 2020 (Doc. 105-19); (2) the Warrant Waiver announcement made on January 5, 2021 (Doc. 105-22); (3) the minutes from a conference call held on January 26, 2021 (Doc. 105-24); and (4) the KPMG Presentation made on February 23–24, 2021 (Doc. 105-26).

First, the SAC alleges that Defendants repeatedly consulted Plug Power's independent auditor, KPMG, and tax advisor, Deloitte, on the accounting implications of the unvested Amazon Warrant Shares as evidenced by the minutes of discussions during the Company's Board of Directors meeting on November 6, 2020. ¶ 93; Doc. 105-19 at 2 (discussing "the status of [the] Amazon warrant[s] and Marsh stating "he and Management had engaged in extensive discussions with [] [their] accountant, KPMG as well as the Company's tax advisor, Deloitte.").

Next, in its Warrant Waiver announcement made on January 5, 2021, the Company stated that the Waiver was "expected to result in a substantial one-time non-cash charge." ¶ 297; *see also* Doc. 105-22 at 3. Further, during a conference call on January 26, 2021, Marsh stated that he had "a pretty good idea" of the Revenue Charge but that "it ha[d]n't been finalized with the auditors yet." ¶ 172; *see also* Doc. 105-24 at 13. These three documents certainly suggest that the Company had an approximate estimate of the Revenue Charge, and knew that it would be "substantial," but not that the Company *knew* exactly what the amount of the Revenue Charge was.

The fourth document, the KPMG Presentation, is the only document that indicates that Defendants knew what the Q4 Revenue Charge would be. And it was only on February 24, 2021, one day before the Company disclosed the Revenue Charge in the Form 8-K, that the $399 million charge was disclosed to the Audit Committee. *See* Doc. 105-26 at 3 (KPMG presentation noting a $399.7 million reduction to revenue). Thus, none of the evidence Schumacher points to demonstrates that Defendants *knew* the Revenue Charge before they disclosed it. Moreover, Defendants repeatedly said that the Revenue Charge would be "significant." *Novak,* 216 F.3d at 309 ("[A]s long as the

public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects."). The Court finds that the SAC does not identify a report or document that contradicts Marsh's statement that the Revenue Charge had not yet been finalized by the auditors.

Nevertheless, Schumacher argues that "Defendants were able to immediately estimate the fair value of the shares that vested" using the Black Scholes pricing model because they previously used that pricing model to estimate the fair value of the Amazon Warrant in November and December of 2020. ¶ 246; Doc. 106 at 27. Schumacher argues that it is not plausible to infer that Defendants did not make a fully educated estimate of the corresponding charges at the time the Waiver was finalized on December 31, 2020, and that viewed *in toto*, Defendants' disclosures demonstrate that they knew or were reckless in not knowing the Revenue Charge when it was announced on January 5, 2021. Doc. 106 at 28–29.

The Court agrees with Defendants that the Q4 Revenue Charge calculation included more complicated inputs, even if it was using the same pricing model. For example, the Company had to determine how many shares were likely to vest and how many were unlikely to vest as of the date of the Waiver Agreement, and determine the grant date fair value for each category of shares. The KPMG Presentation confirms this complexity, noting that:

> A high degree of judgment was required to evaluate the number of shares that were considered probable of vesting immediately prior to the modification. Specifically, judgment was required to evaluate the Company's estimate of probable future purchases of goods and services to be made by the customer under the April 2017 arrangement… [KPMG] compared the amount of projected probable future cash collections from the

> customer to either:  purchase orders received from the customer for fuel cells, hydrogen infrastructure and service, or historical fuel purchases by the customer.

Doc. 105-26 at 3.  Nevertheless, Schumacher argues that Defendants raise no case law in support of this argument "as awaiting a final audit is not a recognized exception to a duty to disclose."  Doc. 106 at 29.  However, the Company's disclosure requirement was to disclose its annual financial results, including the Q4 Revenue Charge, on a Form 10-K "60 days after the end of the fiscal year covered by the report for large accelerated filers," in this case, on March 2, 2021.  Doc. 105-31 at 2 (Form 10-K Instructions).  Defendants met this duty when, before the audit was finished, they disclosed the Q4 Revenue Charge on February 25, 2021.  Doc. 105-27 at 3.  Schumacher has not alleged sufficient facts that Defendants knew what the exact Q4 Revenue Charge was before February 25, 2021 and Defendants were simply not obligated to disclose this figure any earlier.  Absent a "clear duty to disclose, plaintiff's scienter allegations do not provide strong evidence of conscious misbehavior or recklessness."  *Kalnit*, 264 F.3d at 144.  The Company's timely disclosure of the Warrant Waiver and the Q4 Revenue Charge negates an inference of scienter.  *See Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53–54 (2d Cir. 1995) (no scienter despite one-month delay in disclosure of corrective information); *In re Magnum Hunter Res. Corp. Sec. Litig*, 26 F. Supp. 3d 278, 297–98 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015) (no scienter where prompt disclosure after errors identified).

### iii.  *The Magnitude of the Amazon Warrant Waiver*

Next, Schumacher argues that the Company should have known the Revenue Charge due to its magnitude—$400 million.  "The size of the alleged fraud can be relevant to the scienter inquiry, provided it is presented in tandem with other

circumstantial evidence to suggest scienter." *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *17 (S.D.N.Y. Aug. 11, 2021) (internal quotations marks and citation omitted).  The SAC does not present other evidence that suggests scienter.

In *In re Pareteum,* in addition to the size of the restatement, individual defendants were advised by the company's auditors that the company's internal controls were inadequate and ineffective. *Id.* at *16.  Likewise, in the other two cases cited by Schumacher—*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001) and *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370 (S.D.N.Y. 2007)—the complaints alleged other detailed facts that supported an inference of scienter.  The complaint in *In re Scholastic Corp.* contained "detailed allegations as to what defendants knew on a daily, weekly and monthly basis about the retail trade of Goosebumps books, while at the same time making public statements that painted a different picture." *In re Scholastic Corp. Sec. Litig.* at 76.  In *In re Scottish Re* the court found that the large surprise valuation occurring in the same quarter as the transaction's closing supported an inference that the two events were causally related.  This finding, however, was coupled with multiple statements, for example from a conference call and a Form 10-Q, that supported that inference. *In re Scottish Re Grp. Sec. Litig.* at 389.  In the instant case, the SAC does not allege any documents or communications that suggest scienter, and "magnitude . . . alone does not create an inference of scienter." *In re Iconix Brand Grp., Inc.*, 2017 WL 4898228, at *17 (S.D.N.Y Oct. 25, 2017).  Thus, the Court finds that the magnitude of the Revenue Charge, standing alone, does not raise an inference of scienter.

*iv.  Core Operations Doctrine*

The SAC also alleges that the Amazon Warrant Shares "concern critical aspects of Plug Power's core operations," and, accordingly, Defendants knew or were reckless in not knowing sooner that Plug Power and Amazon would enter the Warrant Waiver and the Q4 Revenue Charge.  ¶ 346.  "[T]his doctrine allows courts to draw an inference of scienter where misrepresentations and omissions allegedly made by defendants were about their core operations."  *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 423 (S.D.N.Y. 2020).  Core operations are "critical to the long term viability of the company and events affecting a significant source of income."  *In re Express Scripts Holding Co. Sec. Litig.*, 2017 WL 3278930, at *18 (S.D.N.Y. Aug. 1, 2017).  The operation must constitute matters that "make up nearly all of a company's business or be essential to its survival."  *Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 320 (S.D.N.Y. 2021).

The Second Circuit has not expressly determined if the core operations doctrine remains applicable to proving scienter after the enactment of the PSLRA.  *See Frederick v. Mechel OAO*, 475 F. App'x 353, 356 n.5 (2d Cir. 2012) (summary order).  However, the Second Circuit has suggested that the doctrine can only provide *additional* support for an inference of scienter but could not establish scienter on its own.  *See Schwab v. E*TRADE Fin. Corp.*, 258 F. Supp. 3d 418, 434 (S.D.N.Y. 2017) (citing *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011) (summary order)) (emphasis added).

Defendants argue that the doctrine is not applicable, because the issuance of warrant shares to a commercial counterparty and accounting judgments, do not concern the Company's core operations, which is "providing hydrogen fuel cells and fuel to its customers."  ¶ 362; Doc. 104 at 35.  Schumacher argues that the Amazon Warrant Shares were essential to Plug Power's survival, because together with Walmart, the shares

represented 67% and 50% of the Company's revenue in 2018 and 2019.  ¶ 51.  Further,

the Amazon Warrant Shares resulted in 332.4% of the Company's total consolidated

revenue for FY2020.  ¶ 349.  Accordingly, Schumacher argues, because of the Warrant

Shares' vital and central role, they were at the core of the Company's operations.

The Court finds that the Warrant Waiver and the Revenue Charge are not "core

operations" such that it is reasonable to infer that Defendants knew or were reckless in

not knowing the cost of the Warrant Waiver by the time it was announced on January 5,

2021.  Here, the SAC has not alleged that the affected operations truly constituted nearly

all of the company's business.  *See e.g.*, *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323,

343 (S.D.NY. 2011) (to be core, an operation must "constitute nearly all of a company's

business"; operations were core where "revelation caused company to declare

bankruptcy," and where "fraud concerned company's only product"); *Reilly v. U.S. Phys.*

*Therapy*, 2018 WL 3559089, at *18 (S.D.N.Y. July 23, 2018) (finding core operations

where company "would have been insolvent but for the fraudulent accounting practices").

But even if the Amazon Warrant Shares constituted core operations, this doctrine

can only provide "additional support for an inference of scienter but could not establish

scienter on its own."  *Schwab*, 258 F. Supp. 3d 418 at 434.  For the reasons discussed

above, none of Schumacher's other allegations support an inference of scienter, and thus

the core operations doctrine cannot provide supplemental support.

### b.  The Restatement

Secondly, Defendants argue that the SAC still fails to plead scienter with respect

to the Company's Restatement.  Doc. 104 at 22.  In support of the scienter argument,

Schumacher argues that Defendants knew or recklessly disregarded the Restatement

issues the Company was made aware of in the February KPMG Presentation.  Doc. 106 at 22.

The SAC alleges that one slide from the KPMG Presentation noted that a series of corrections of financial misstatements were necessary.  Doc. 105-26 at 14.  However, in the presentation, KPMG told the Audit Committee that there were "[n]o matters to report," that it found "[n]o actual or suspected fraud involving management, employees with significant roles in internal control, or where fraud results in a material misstatement," and that KPMG had "[n]o significant findings" from its assessment of "significant risks of fraud."  *Id.* at 5–6, 11.  Additionally, the presentation noted that Q4 routine reconciliations had less than 0.2% of an impact on the Company's statement of operations, balance sheet, cash flow, and statement of comprehensive loss.  *Id.* 14–15. Schumacher argues that because the presentation noted that over $11 million in costs of fuel delivered to customers had been incorrectly designated as research and development expenses, there is a strong inference that Defendants knowingly or recklessly issued false financial information.  Doc. 105-26 at 14.

 Nevertheless, as the Court noted, "courts have only found evidence of recklessness where [there is] some impact on income."  *In re Plug Power* I at *17 (quoting *In re Kandi Techs. Grp., Inc. Sec. Litig.*, No. 17 Civ. 1944 (ER), 2019 WL 4918649, at *6 (S.D.N.Y. Oct. 4, 2019)).  The SAC fails to allege that the presentation indicated that there were accounting errors material enough to require a correction.  Thus, the negligible impact on income described in the presentation raises no inference of scienter.  *See Hensley v. IEC Elec. Corp.*, 2014 WL 4473373, at *6 (S.D.N.Y. Sept. 11, 2014) (no scienter where "accounting error, however substantial . . . was highly technical [and] did not affect the company as a whole").

In determining whether Schumacher has adequately established scienter, the Court must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in

isolation, meets that standard." *Francisco*, 559 F. Supp. 3d at 321 (emphasis in original) (quoting *Tellabs*, 551 U.S. at 323).  However, Schumacher's allegations, viewed individually and collectively, do not support a strong inference of scienter.  Accordingly, the Court dismisses the claims pursuant to Section 10 and Rule 10b-5.

### B.  Material Omission or Misstatement and Loss Causation

Defendants argue that the SAC must be dismissed for failure to plead a material omission related to the Amazon Warrant.  The SAC alleges that Defendants made misleading statements during the November 6, 2020 Board of Directors Conference Call and in the Warrant Waiver Form 8-K, by omitting facts required by Item 303, and when omitting facts in light of Defendants' trading on material non-public information. Defendants in turn argue that the Company complied with all regulatory requirements when it disclosed the Warrant Waiver within four business days of its execution and that there was no duty to disclose because the SAC pleads no facts to indicate that Defendants *knew* that Amazon would execute the waiver, or the exact amount of the Q4 Revenue Charge, before they were disclosed.

Defendants also argue that the SAC should be dismissed because it fails to plead loss causation.  Specifically, Defendants contend that the alleged corrective disclosures dated February 25, 2021, March 2, 2021 and March 16, 2021 did not disclose fraud, but instead shared disappointing news.  ¶¶ 394–404.  For example, the February 25, 2021 disclosure announced the exact cost of the Amazon Warrant Waiver Q4 Revenue Charge. The March 2, 2021 disclosure announced that the Company would not file its Form 10-K in time, and the March 16, 2021 disclosure stated that the Company would restate financial information for 2018 through 2020, none of which was a disclosure of fraud or wrongdoing.  In opposition, Schumacher asserts that the SAC clearly alleges the negative

stock price impact when the material misstatements and omissions were revealed in these disclosures.  ¶¶ 272–337.

However, Schumacher's failure to adequately plead scienter is dispositive.  Thus, the Court need not reach the issue of a misstatement or omission, or loss causation. *Abengoa*, 481 F. Supp. 3d at 215; *see also In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *22 (S.D.N.Y. Sept. 28, 2012) ("Because the issue of scienter . . . proves fatal to [p]laintiffs' Section 10(b) claims . . . the Court need not reach the [d]efendants' arguments regarding . . . loss causation[.]"), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014); *Hutchinson v. Perez*, No. 12 Civ. 1073 (HB), 2012 WL 5451258, at *8 (S.D.N.Y. Nov. 8, 2012) ("Since the Court must dismiss the Amended Complaint if [p]laintiff fails to adequately plead scienter, I need not reach loss causation or misleading statements and omissions under the PSLRA."), *amended*, No. 12 Civ. 1073 (HB), 2013 WL 93171 (S.D.N.Y. Jan. 8, 2013); *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, No. 09 Civ. 4050 (PKC), 2010 WL 3790810, at *22 (S.D.N.Y. Sept. 28, 2010) ("I need not reach the issue of whether the SAC alleges loss causation because the SAC fails to allege a misstatement or that defendants acted with scienter.").

### C.  § 20(a) Claims

Schumacher also brings a claim for violation of Section 20(a) against Marsh and Middleton.  Section 20(a) of the Exchange Act imposes liability on individuals who control any person or entity that violates Section 10.  *See* 15 U.S.C. § 78t(a).  "To assert a *prima facie* case under Section 20(a), a plaintiff 'must show a primary violation by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was in some meaningful sense a culpable participant in the

fraud perpetrated by the controlled person.'" *Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 882 (S.D.N.Y. 2011) (quoting *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)), *aff'd sub nom. Frederick*, 475 F. App'x 353.  Because Schumacher has failed to allege a primary violation of the Exchange Act, his claim pursuant to Section 20(a) is also dismissed.  *See Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 368 (S.D.N.Y. 2019), *aff'd sub nom. Cavalier Fundamental Growth Fund v. Skechers U.S.A., Inc.*, 826 F. App'x 111 (2d Cir. 2020); *see also Villare v. Abiomed, Inc.*, No. 19 Civ. 7319 (ER), 2021 WL 4311749, at *24 (S.D.N.Y. Sept. 21, 2021).

### D.  Leave to Amend

Defendants request that the Court deny the SAC with prejudice.  Rule 15 of the Federal Rules of Civil Procedure instructs courts to "freely give leave" to replead "when justice so requires."  Fed. R. Civ. P. 15(a)(2); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962).  Schumacher was on notice of the deficiencies in his pleadings with the Court's September 19 Opinion and Order.  *See, e.g., Dietrich v. Bauer*, 76 F. Supp. 2d 312, 351 (S.D.N.Y. 1999) ("[W]here a plaintiff is on notice of deficiencies in an initial pleading and has had the opportunity to cure them by a first amendment, 'dismissal with prejudice is proper when a complaint previously has been amended.'").  This action was filed in March 8, 2021 and the allegations were first amended on October 6, 2021.  In considering prejudice to the Defendants, "the Court also notes that allowing [Schumacher] to amend his complaint a third time would further delay the disposition of a case that has been pending for over two years."  *McKethan v. New York State Dep't of Corr. Servs.*, No. 10 Civ. 3826 (PAE), 2012 WL 2333415, at *2 (S.D.N.Y. June 19, 2012).  Accordingly, the SAC is denied with prejudice.

### IV.    CONCLUSION

For the reasons discussed above, the motion to dismiss is GRANTED.

The Clerk of Court is respectfully directed to terminate the motion, Doc. 103, and close the case.

It is SO ORDERED.

Dated:   August 29, 2023
         New York, New York

_____
        Edgardo Ramos, U.S.D.J.